CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air



**FILED**
DISTRICT COURT OF GUAM

JAN 1 8 2008

JEANNE G. QUINATA
Clerk of Court

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON,<br><br>        Plaintiff,<br><br>vs.<br><br>HYANNIS AIR SERVICE, INC.<br>dba CAPE AIR,<br><br>        Defendant. | CIVIL CASE NO. CIV06-00027<br><br>**MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ELYZE J. MCDONALD; DECLARATION OF LINDA MARKHAM; EXHIBITS A - U; DECLARATION OF SERVICE** |

        Defendant Hyannis Air Service, Inc. dba Cape Air hereby moves the Court for summary judgment pursuant to Fed. R. Civ. P. 56. This motion is supported by the accompanying Memorandum of Points and Authorities, Declarations of Elyze J. McDonald and Linda Markham, Exhibits A through U, and the records and files for this action.

        DATED: Hagåtña, Guam, January 18, 2008.

CARLSMITH BALL LLP


_____
ELYZE J. MCDONALD
Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 2

II. GENERAL FACTS ............................................................................................ 4

    A.     CAPE AIR, AND NICHOLSON'S HISTORY WITH CAPE AIR ....................... 4

    B.     GROUND TRAINING AND SIMULATOR TRAINING ...................................... 4

    C.     FLYING EXPERIENCE ........................................................................... 6

    D.     NICHOLSON'S RETRAINING .................................................................. 8

    E.     NICHOLSON'S DISCIPLINE .................................................................. 10

        1.     SPECIFIC PROBLEMS WITH NICHOLSON'S CRM SKILLS ........... 10

        2.     THE PANEL'S DECISION ................................................................. 11

        3.     PLAINTIFF'S FAILURE TO RECOGNIZE A PROBLEM IS
            PART OF THE PROBLEM ................................................................... 13

III. STANDARD FOR SUMMARY JUDGMENT .................................................... 15

IV. NICHOLSON DOES NOT HAVE A PRIMA FACIE CASE FOR GENDER
DISCRIMINATION ............................................................................................. 16

    A.     NICHOLSON WAS NOT QUALIFIED FOR HER POSITION ........................ 17

    B.     THERE ARE NO OTHER PILOTS SIMILARLY SITUATED TO
        NICHOLSON ....................................................................................... 17

    C.     NICHOLSON WAS NOT TREATED DIFFERENTLY FROM OTHERS
        SIMILARLY SITUATED ...................................................................... 18

V. LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS ................... 18

VI. THERE IS NO SPECIFIC OR SUBSTANTIAL EVIDENCE OF PRETEXT ..... 19

VII. CONCLUSION .............................................................................................. 20

i.

# TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................................ 15, 16

*Barbour v. Browner,*
    181 F.3d 1342 (D.C. Cir. 1999) ................................................................... 19

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................ 15

*Dale v. Chicago Tribune Co.,*
    797 F.2d 458 (7th Cir. 1986) ........................................................................ 19

*Fishback v. District of Columbia Dept. of Corrections,*
    86 F.3d 1180 (D.C. Cir. 1996) ..................................................................... 18

*Graham v. Long Island R.R.,*
    230 F.3d 34 (2d Cir. 2000) ............................................................................ 17

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ........................................................................................ 16

*Meiri v. Dacon,*
    759 F.2d 989 (2d Cir. 1985) ......................................................................... 15

*Pollard v. Rea Magnet Wire Co.,*
    824 F.3d 557 (7th Cir. 1987) ........................................................................ 19

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ........................................................................................ 16

*Richardson v. Nat. Rifle Ass'n,*
    871 F. Supp. 499 (D.D.C. 1994) ................................................................. 15

*St. Mary's Honor Center v. Hicks,*
    509 U.S. 502 (1993) ........................................................................................ 16

*Texas Dept. of Community Affairs v. Burdine,*
    450 U.S. 248 (1981) ........................................................................................ 16

ii.

**TABLE OF AUTHORITIES**
(continued)

*Vasques v. County of Los Angeles,*
  349 F.3d 634 (9th Cir. 2004) .................................................................... 17, 18, 19

*Villiarimo v. Aloha Island Air, Inc.,*
  281 F.3d 1054 (9th Cir. 2002) ....................................................................... 16

*Waterhouse v. Dist. of Columbia,*
  298 F.3d 989 (D.C. Cir. 2002) ....................................................................... 18

## **Rules**

Fed. R. Civ. P. 56 ........................................................................................... 15

## I.   **INTRODUCTION**

Defendant Hyannis Air Service, Inc. dba Cape Air ("Cape Air") selected Plaintiff Tiffany Nicholson to be one of eight pilots to staff Cape Air's new Micronesia flight operations beginning in 2004. The Micronesia routes utilized an ATR42 aircraft, a larger aircraft than the Cessna 402, which Cape Air utilizes in its other routes and which Plaintiff piloted for Cape Air prior to moving to Guam. Significantly, while the Cessna is a single pilot aircraft the ATR requires a flightdeck crew of two, a Captain and First Officer. As will be apparent in this memorandum, absolute cooperation between the Captain and First Officer is essential to safe operation of the aircraft. In the industry, such cooperation is referred to as "CRM", or Crew Resource Management. CRM requires flight crews to set aside any personal differences they may have and likewise requires each crewperson to have a cooperative personality and team approach to the complicated task of flying the aircraft. During ground school and initial training on the ATR42, Nicholson proved to be a competent pilot with acceptable CRM skills.

When the actual operations began, however, Nicholson's personality proved to be a difficult one and her CRM skills came up missing in action. She was hostile, combative and abrasive, insubordinate and arrogant.[1] Her unbecoming behavior as a pilot adversely affected the environment of the cockpit and her working relationships with co-pilots. Her misbehavior was deemed to render flight operations unsafe by everyone who evaluated her, including her captains, supervisors, and managers, including Cape Air's Pacific then-Regional Administrator, Russell Price. Price, who had been impressed by Nicholson's performance at ground school and initial training, provided her further opportunities to correct and improve her cockpit communication skills, that is, her CRM skills. Price developed a four-day training plan, each day allowing

---

[1] The industry *and the FAA* label such cockpit behavior as "machismo." The FAA officially classifies "machismo" as an undesirable pilot trait.

Case 1:06-cv-00027    Document 39    Filed 01/18/2008    Page 5 of 46

Plaintiff an opportunity to improve her CRM (as well as piloting) skills. However, Nicholson squandered each of those opportunities.[2] After wasting her opportunities to prove that she can cooperate and communicate within the cockpit, Nicholson was referred to a panel of managers at Cape Air's home base in Hyannis, Massachusetts. The managers reviewed the reports provided to them by Price and other pilots and discussed the matter with Nicholson. Rather than termination, Cape Air offered Nicholson an opportunity to keep flying. In particular, Cape Air offered an opportunity to return to her previous position as a Cessna 402 pilot and receive further training in the ATR42 with a view to re-qualifying to fly the ATR and return to Guam. Nicholson refused that opportunity and simply never reported back to work.

Nicholson brings this lawsuit claiming that the actions of Cape Air were discriminatory on the basis of her gender.[3] As the undisputed facts will show, nothing can be further from the truth. Nicholson was treated equally with her male counterparts. When she showed difficulty performing, she was afforded numerous opportunities to improve. When she failed to improve, she was offered her previous position with further opportunities to be retrained to return to the ATR42.

Though Nicholson may not like the fact that she was disciplined, she cannot assert any facts to show that Cape Air took any action against her because of her gender. Because there are no genuine issues of material fact to dispute that Nicholson was not performing adequately, that she was not treated any differently from her male counterparts, that Cape Air had a legitimate

---

[2] In one instance she was instructed to fly the jumpseat to observe to pilots with good CRM skills. However, when Price arrived at the aircraft to check on her she was asleep in the passenger cabin. In another instance where she was to the third in the cockpit to observe other pilots use of CRM, she showed up without her headset and thus would have had no means to listen to the other pilots talk to each other.

[3] At this juncture the Court may be wondering, what "actions" by Cape Air ? Indeed, Nicholson's "discipline" consisted of an offer of continued employment flying airplanes with no loss of pay or reduction in wages and an opportunity to re-qualify in the ATR.

business reason for disciplining her, and that Cape Air's reasons are without pretext, Cape Air is entitled to summary judgment.

## II.    GENERAL FACTS

### A.    CAPE AIR, AND NICHOLSON'S HISTORY WITH CAPE AIR.

Cape Air is a small regional airline based in Hyannis, Massachusetts, with a majority of its workforce being women. Markham Decl.[4], ¶ 3; Ex. M at 177:4-9. It employs between 80 and 100 pilots, including several senior female pilots who have spent more than ten years with the company. Markham Decl., ¶ 4; Ex. M at 177:10-23. It also has four women in upper management positions, and many more at the mid-management level, and has received an award for its record in hiring and promoting females at the workplace. Ex. M at 179:2-19; Ex. S at 70:19 - 71:5.

Nicholson started her employment with Cape Air in 2000 and was based out of Cape Air's Hyannis, Massachusetts and Florida operations flying a Cessna 402. Ex. K at 66:11. The 402 is a single pilot aircraft and as such Nicholson piloted the aircraft as a captain. Nicholson experienced some problems prior to transferring to Guam to work as a pilot in Cape Air's ATR42 [5] flight operations, but was overall a good pilot operating the Cessna 402 aircraft.

### B.    GROUND TRAINING AND SIMULATOR TRAINING

In 2004, Cape Air initiated operations in the Micronesia at the expense of $3 million, and selected eight pilots to be trained to operate the ATR42 aircraft - 4 captains and 4 first officers. Ex. K at 74:1-3; Ex. S at 69:7-12. All eight pilots required training in the ATR42 because Cape Air did not fly the ATR42 on any of its existing routes. Ex. P at 8:21-24. All eight pilots were

---

[4] Markham's Declaration is attached hereto as Exhibit U, pending the Court's permission to file the Declaration, which contains a facsimile signature.
[5] The ATR42 is a substantially larger aircraft than the single pilot Cessna 402 and, as noted above, requires a crew of two.

necessary for the operations, and a significant investment of $25,000 to $30,000 was required to train each of the eight pilots. Ex. O at 177:16-23, 178:8-13.

The ATR42 has a two-pilot cockpit: a captain and a first officer.[6] The captain has the overall responsibility for the flight and its safety. Ex. A; Ex. O at 31:11-16. Placement of authority in the captain arises out of safety concerns for the passengers, crew, and aircraft. Ex. O at 182:10 – 183:5. If a captain deems that a co-pilot flying as first officer is unsafe or in any manner jeopardizes safe operation of the aircraft, he has full discretion to remove the first officer. Ex. O at 29:1-3.

The authority of the Captain and the duties and responsibilities of the Captain and the First Officer are outlined in Cape Air's General Operating Manual ("GOM"), which is mandated by the FAA. Ex. A; Ex. P at 135:5-13. In the GOM, a First Officer is tasked with assisting the captain in an efficient manner, preparing all required forms, maintaining a high degree of crew coordination and cockpit discipline (i.e., CRM), and performing other duties required by the captain. Ex. A. Nicholson agrees that the captain is the final authority on "communication safety, timeliness, everything," and that the First Officer does, among other duties, what the captain delegates to her. Ex. K at 28:11-19, 41:21-22, 42:12-16.

The Guam pilots were selected based on seniority and regardless of gender, as is done in its Cessna 402 lines and throughout the airline industry. Ex. A at 72:24 - 73:2; Ex. P at 17:3-9, 108:24 - 109:4. Nicholson applied and was selected as a first officer based on her seniority. Ex. K at 78:11-14. As will soon be noted, soon after Cape Air's Micronesia operations began, Nicholson was disciplined over her deficient Crew Resource Management ("CRM") skills. CRM involves cockpit communication skills, as well as

> problem solving, working together as a team, using all the

---

[6] The ATR42 is also manned by one flight attendant, who is a member of the crew.

> resources available to you, including your co-pilot, your flight
> attendant, air traffic control, the company via radio, and basically
> all tools to maximize the safety and efficiency of a flight. In order
> for CRM to work well, people have to approach it with the right
> attitude and have a mutual respect.

Ex. P at 112:6-18; Ex. R at 43:5 – 44:20, 45:4-10. *See also* Ex. P at 10:5-9. Highly developed

CRM is absolutely essential to safe flying, and is so recognized across the industry and

understandably by the FAA.[7] Ex. R at 48:1-5. "There's still accidents occurring because

captains refuse to take input from first officers and also accidents where first officers sort of

mentally take over the cockpit and direct the flight." Ex. O at 145:6-10.[8] Nicholson

acknowledges the role of good communication skills as being necessary to fly the ATR. Ex. K at

139:4-12. All eight pilots were trained to proficiency and passed ground school and simulator

training, which included CRM training. Ex. O at 12:7; Ex. P at 10:10-15.

C.    FLYING EXPERIENCE

During the proving runs and the initial Guam operations, other pilots started noticing that

Nicholson displayed an attitude in the cockpit that made the flights unsafe, and reported their

experience and complaints to Price. *See* discussion on pp. 10-11, *infra*; Ex. R at 76:20-25. Also

at that time, Price, himself a career commercial airline pilot, assessed Nicholson as having

"[b]etter-than-average textbook knowledge, slightly below average stick-and-rudder skills, and

on the poorest edge of acceptability CRM." Ex. R at 73:24 – 74:5. Because of the complaints

from other pilots and his own assessment, he devised a plan to observe her CRM skills. Ex. R at

88:3-21. However, before Price could conduct his observations, on August 31, 2004, Cape Air

Captain Chuck White told Nicholson he was removing her from flight because she was unsafe to

---

[7] CRM originated back in the 1970s when NASA identified poor crew coordination as the cause of flying accidents.
Ex. O at 144:3-20.
[8] To highlight the critical need for CRM in the cockpit, it should be noted that lack of CRM was sighted by the
NTSB as a contributing cause of the crash of Korean Airlines Flight 801 as the aircraft was on final approach to
Guam International Airport. More than 200 persons died when Flight 801 essentially flew into the side of a
mountain at Nimitz Hill, ironically not more than a few hundred meters from navigational aides located there.

fly. Ex. K at 147:16-18. According to White, Nicholson displayed a bad attitude and poor communications skills, was difficult to get along with, and refused to answer checklists. Ex. Q at 63:15-23, 64:24 - 65:12. In her deposition, she admitted to failing to cooperate with White by completing a checklist by herself:

> Q.   Did you do anything that was not proper procedure during that flight?
>
> A.   Yes, I did.
>
> Q.   What did you do?
>
> A.   ...because Chuck was not completing the checklist and it needed to be done, I verbalized the challenges and the responses. It was not a coordinated effort between us. . . . [I]t's supposed to be two people, one challenging, one responding, reading each item on the checklist. And in this instance, it was just one person.

Ex. K at 154:8-10, 155:25 - 156:17. As captain of the flight, White had the authority to remove her. Ex. A; Ex. O at 29:1-3; Ex. P at 46:8-13.

White's removal of Nicholson from the flight was immediately and thoroughly discussed between Price in his capacity as Pacific Regional Administrator, Steve Phillips, Cape Air's Chief Pilot,[9] and David O'Connor, Cape Air's Director of Training. Ex. O at 29:7-10. White conveyed that it was impossible to work with Nicholson because of her behavior. Ex. O at 29:11-20. Price, Phillips and O'Connor, in their review and in their personal experiences with Nicholson, determined that that Nicholson displayed poor CRM thereby creating an unsafe flying environment and posing a risk to the passengers, crew and the aircraft.[10] Ex. P at 41:7-17.

---

[9] *See* Ex. P at 7:19-20.

[10] Though not to be dismissive of the need to fairly adjudicate this lawsuit, the paramount issue with which all were concerned, and which the Court must not lose sight of, was to avoid a situation whereby as a result of Plaintiffs attitude and poor CRM the passengers, crew and aircraft were put at risk of a fatal crash. If there ever was a situation where Cape Air decision makers must err on the side of safety and caution, this was it. The ugly alternative would be to be resigned to second-guessing themselves upon a crash or other incident causing injury, death, loss of aircraft, or all three.

4819-3808-3585.3.056785-00005

## D.  NICHOLSON'S RETRAINING

Price, Phillips and O'Connor rated Nicholson as the weakest in CRM of all eight pilots and yet decided it was worth it to retrain Nicholson to improve her CRM skills. Ex. O at 37:6-13; Ex. R at 63:12-16. The additional training was to be administered by Price, a certified pilot with fourteen years of experience at US Airways as a commercial transport pilot with excellent communication skills. Ex. O at 188:18-23; Ex. R at 15:24 – 16:1, 16-17.

Initially, Nicholson was advised to sit in on an observation of fellow pilots Kevin O'Connor and Phil Dery as they flew the ATR42, so that she could observe their CRM skills. Ex. K at 112:24 - 113:5, 169:5-7; Ex. O at 38:12-13. Nicholson acknowledged that observation is one form of learning, and that "any training will improve upon an ability that you have." Ex. K at 171:5-10; Ex. N at 38:9-12. Training by way of observing other proficient pilots is appropriate and is regularly used by Cape Air, and is accepted in the industry. Ex. O at 70:9-22, 71:12-18, 188:24 – 189:5; Ex. P at 128:14 – 129:20; Ex. R at 92:12 – 93:3. It was particularly appropriate in Nicholson's case in which

> she had gotten to the point where she was technically competent in the handling of the aircraft, but was not competent in her interpersonal relationships within the cockpit and communication within the cockpit. And for that, observing a proficient flight crew is very appropriate. And the FAA would consider it too.

Ex. O at 72:23 – 73:4.

Nicholson failed to take advantage of the opportunity to "learn by watching." Ex. K at 171:18-23. She sat in the first row of the aircraft during the critical final preflight preparation. Ex. R at 96:1-22. Upon arriving on the aircraft Mr. Price found her asleep in the passenger cabin and asked her why she was not in the cockpit. Ex. R at 94:87-16, 95:7 - 96:8. She responded that she did not want to get in the way. Ex. R at 96:23 - 97:2. She left early that day also, observing only one round trip for the entire day though she could have observed four. Ex. K at

Case 1:06-cv-00027    Document 39    Filed 01/18/2008    Page 11 of 46

172:2-9, 173:9-16. Even so, Price did not give up on Nicholson. Instead he devised a three-day plan of further training, on which he consulted with Phillips and Cape Air's Vice President of Human Resources, Linda Markham. Ex. R at 104:16 – 105:25. Price also advised Nicholson that she was being observed. Ex. K at 181:16, 21-24.[11] For the first day, Nicholson was tasked to fly with fellow pilot and captain John Kappeyne. Ex. K at 173:20-22. She arrived on that day without a required headset,[12] and was sent to retrieve a replacement headset, which meant that she missed out on part of the flying day.[13] Ex. K at 173:23 - 175:9. The remaining days of the additional training were also marked by poor CRM. On the second day, Nicholson was told she was insubordinate after refusing to shut an engine down at a captain's command. Ex. K at 125:20 - 126:17; Ex. P at 164 (being insubordinate is a CRM problem). She used negative sarcasm during the flight. Ex. R at 111:5-21. On the third day, Price set up a flight between Nicholson and White, on the same route in which White had previously removed her. On that flight, Nicholson acted with an attitude that was "defensive, antiauthoritarian, ego-driven." Ex. R at 119:22-25. Price, a career pilot mind you, believed her attitude made the flight one of his "top ten scary and dangerous flights" with a total breakdown of CRM. Ex. R at 114:13-15. The flight started off with an operational error on Nicholson's part, which caused Nicholson and White to argue, and ended with Price removing her from the flight. Ex. R at 118:4 - 121:22.[14]

---

[11] David O'Connor also observed Nicholson's CRM deficiencies, and pointed them out to her. Ex. O at 152:13 – 153:19.

[12] A headset is required and mandatory part of Cape Air's uniform for pilots. Ex. R at 107:3-7.

[13] Though Plaintiff complains that the "aircraft can be flown without a headset" that disingenuous statement only serves to further highlight her defensive and unsafe attitude. True, while the aircraft may be flown without the pilot wearing a headset, headsets and microphones are routinely worn by pilots so as to avoid having to shout at one another above the ever-present cockpit noise. Additionally, the integral microphone is used to communicate with air traffic control as well as other aircraft. Saying the aircraft can be flown with out a headset is a childish remark, like saying that a car can be driven without watching the road.

[14] The number of instances of Plaintiff's display of deficient CRM skills and failure to recognize these deficiencies is too numerous to list within the twenty-page limit of this Motion. Cape Air refers the Court to Exhibits B through F, and to the deposition testimony of O'Connor, Phillips, and Price. Ex. O at 33-34, 39-46, 48-51, 53-59, 69-74, 81, 84, 102, 122-24, 129-30; Ex. P at 48, 113-15, 117, 131-65; Ex. R at 62 – 70, 81 - 84.

While Nicholson claims that she "learns by doing," even when she worked in a CRM environment on these three additional days of training, she has admitted that her skills did not improve. Ex. K at 171:9-12, 182:18-22.

E.     NICHOLSON'S DISCIPLINE

Nicholson returned to Hyannis to meet with Phillips, Larry Gualtieri, Cape Air's Director of Operations, and Markham, to discuss what occurred on Guam. The panel members discussed the events concerning Nicholson with Russell Price, and also reviewed written reports from Russell Price, David O'Connor, Chuck White, pilot Jon Bleiman, and pilot Phil Dery. The panel also offered Nicholson an opportunity to discuss her CRM deficiencies, specifically, her unwillingness to work as a team member in the cockpit on several occasions.[15] Ex. P at 55:19-25, 58:15-19, 59:20 - 61:1.

1.     Specific Problems with Nicholson's CRM Skills

The panel's review concluded that Nicholson displayed an unsafe attitude and deficient CRM, such as those reported in the following examples:

a.     David O'Connor reported that Nicholson displayed a "machismo"[16] attitude and was dismissive. For example, on a flight piloted by O'Connor and Nicholson, Nicholson was flying too slow and nose-up on final approach to a landing, and O'Connor asked her to add more power, but her response was dismissive. Ex. E; Ex. O at 40:1-4, 11-19. Her exact response was to say "I got it" and yet she failed to add power and as a result the touch-down was exceedingly hard. Ex. E; Ex. O at 40:18-19, 43:3-5. O'Connor was concerned about her dismissive and unprofessional attitude, which was also displayed to other crew members.

---

[15] The Chief Pilot observed that after the discussions in Hyannis, Plaintiff still seemed unwilling to accept criticism. Ex. P at 59:4-17.
[16] "Machismo is one of the five hazardous attitudes that was defined by the FAA in an advisory circular. . . . It's one of five hazardous attitudes *that's incompatible with professional flying."* Ex. O at 51:13-17 (emphasis added).

Ex. E; Ex. O at 45:17-21, 49:19-23, 50:3-5, 151:10 – 153:4. In another instance, Nicholson was assigned to sit in the jump seat of a flight handled by O'Connor and another pilot. O'Connor asked Nicholson to assist in pretrial preparations and she responded that "ACM means I ain't doing nothing."[17] Ex. E; Ex. O at 71:19 – 72:2. O'Connor also observed Nicholson show up to work late, even though she was in the middle of an important evaluation period. Ex. O at 84:9-22. Overall, O'Connor was concerned that based on his personal experiences with Nicholson and what he learned from pilots' interactions with her, ***[s]he put at risk her fellow crew members and her passengers by intending to prove that she was better than anyone else.*** Ex. O at 53:21-23, 54:7-15, 54:23 – 55:4 (emphasis added).

       b.     Jon Bleiman reported that she ignored his callout requests and often responded to a request that it was "not her job". Ex. D.

       c.     Phil Dery, a Captain, reported and testified that he requested she accomplish a trend monitor, a standard callout on a flight, and she replied "that's not my job." Ex. F; Ex. L at 60:10-18.

Members of the Cape Air review panel were aware of these reports, in addition to a report submitted by Russell Price. Ex. C; Ex. R at 129:7-12, 130:7-9, 132:9-14. Each panel member had grave concern as even a slight mishap in CRM skills may result in disastrous consequences. Ex. M at 145:18-23, 150:17-22.

       2.     <u>The Panel's Decision.</u>

The panel came up with an action form that, in its final form, prescribed: (1) a mandatory referral to Cape Air's Employee Assistance Program (EAP) to receive counseling in communication and interpersonal skills, and suspension until EAP completed successfully; (2)

---

[17] "ACM" means auxiliary crew member or a jumpseater, a person in the observation seat of a cockpit. Ex. O at 72:1-2.

CRM training conducted by FlightSafety, a third-party flight instruction company;[18] (3) removal from flight status as an ATR42 crewmember, which may be reviewed in six months; (4) potential reinstatement as a 402 Captain including in the Pacific region;[19] (5) probation for six months; (6) potential termination should she be unable to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember. Ex. G. The basis for the discipline was

> Unable to interact and communicate effectively in a flightcrew environment. Failed to assist the captain the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM. Uncooperative attitude and inconsistent CRM skills created unsafe operative conditions in the cockpit.

Ex. G. The *Revised* Action Form also stated that "[a]ny future inability to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember will be grounds for termination." Ex. G. In other words, the discipline was appropriately progressive as it was designed to give Nicholson benefit of doubt and a fair opportunity to achieve the goal of returning to flight status in both the Cessna 402 and ATR42. As for the *additional* training prescribed for Nicholson in the Revised Action Form, Cape Air had every intention of ensuring that Nicholson received the training recommended for her. Ex. O at 155:14-17, 158:9-12; Ex. P at 171:8-12.

Nicholson appealed the Revised Action Form. Dan Wolf, President and CEO of Cape Air, conducted the review, with the assistance of Linda Markham, and upheld the Revised Action Form. Ex. S at 6:6-11. Nicholson did not accept the decision and refused to bid to fly as captain on the 402 line for which she was eligible. Ex. N 62:5-8. As a result, Cape Air had no

---

[18] If Nicholson elected to continue her employment under the Revised Action Form, this would have been her third round of training in CRM.

[19] In other words, she would be allowed to fly an aircraft she had flown with success previously, and would be allowed to stay on Guam, where she desired to live. Ex. G.

choice other than to conclude that Nicholson elected to abandon her job and resign. Markham Decl., ¶ 16. Plainly, during the entire disciplinary process, no one at Cape Air considered Nicholson's gender in making their decision. Ex. M at 184:3-8; Ex. P at 19:19-25, 111:3-8, 172:16-21; Ex. R at 151:16-20; Ex. T at 100:24 – 101:2.

3.    <u>Plaintiff's Failure to Recognize a Problem is Part of the Problem.</u>

Part of the problem was Nicholson's failure (or refusal) to recognize her errors and deficiencies, an attitude which continues to this day. Cape Air management believed that Nicholson's attitude and manner ***made her incompetent to fly*** and difficult to retrain her. Ex. O at 69:2-6, 10-13, 153:5 – 154:3; Ex. P at 48:3-20 (Nicholson felt she was confident, but reluctant to accept criticism). ***"[P]art of professionalism is admitting your own deficiencies and striving to improve upon them, and that was absent in this event. Tiffany displayed no sense of personal responsibility for her own circumstances."*** Ex. O at 81:10-14; *see also* Ex. R at 91:14-92:7. She had a "fault-finding mentality and an inability to both accept constructive criticism and to hear suggestions from crew members." Ex. O at 129:23 – 130:12. *See also* Ex. O at 157:23 – 158:2. That mentality is dangerous.

> A.    … And I found that when Tiffany was acting as the captain, she could be domineering to the point of stifling input from the first officer. And when she was a first officer, she could be fault finding to the point where she was advising the cockpit.
>
> Q.    You said that both situations are dangerous. Could you describe how.
>
> A.    Sure. In the 1970's there was a famous accident in Tenerife where a captain who wouldn't listen to his flight engineer and his co-pilot for KLM initiated takeoff in fog despite the fact that Pan Am was still on the runway, and they crashed into one another. The co-pilot and the flight engineer on the KLM flight both knew that something wasn't right, but were unable to get through to the captain.

> There have been other accidents in the regional airline industries especially where a weak captain is dominated by a first officer who is attempting to usurp the authority of the captain. And when the captain is not in charge, then the state of the cockpit degenerates to the point where everybody has poor situational awareness. And they've both controlled flight into terrain where they both lost situational awareness, and they ended up flying into the side of a hill.[20]
>
> In both those scenarios, there was either an overly domineering captain or a domineering co-pilot, and it can be quite dangerous.
>
> Q.     Okay. And your experience with Tiffany gave you concern as to the dangers of poor CRM when she was in the cockpit?
>
> A.     That is correct.

Ex. O at 145:11 – 146:17.[21]  O'Connor was also concerned that her poor attitude was a hazardous attitude identified by the FAA:  ***"Everybody has some aspects of a slight amount of hazardous attitude. The difference between everyone and Ms. Nicholson is most of us are able to assess it, talk ourselves out of it, and do the right thing. And for some reason, in Guam during that span of time, she was unable to do that."***  Ex. O at 176:8-17, 186:14 – 187:2 (emphasis added).    In addition to her failure to act professionally or accept criticism constructively, Nicholson failed to comply with the GOM's requirements to assist the captain or to maintain a high degree of crew coordination and cockpit discipline. Ex. O at 146:19 – 147:3, 147:20 – 148:14, 148:21 – 149:15.

Nicholson's testimony at her deposition confirms she had a different view of appropriate cockpit behavior.  For example, she testified that being difficult to get along with constitutes acceptable CRM behavior.  Ex. N at 19:1-15.  Nicholson also believed she did not have a

---

[20] Controlled flight into terrain is exactly what happened to Korean Air Flight 801.
[21] Price also discusses an instance where bad CRM caused a plane crash and 500 fatalities.  Ex. R at 49:4-14.

4819-3808-3585.3.056785-00005

Page 14 of 25

Case 1:06-cv-00027     Document 39     Filed 01/18/2008     Page 17 of 46

> There have been other accidents in the regional airline industries especially where a weak captain is dominated by a first officer who is attempting to usurp the authority of the captain. And when the captain is not in charge, then the state of the cockpit degenerates to the point where everybody has poor situational awareness. And they've both controlled flight into terrain where they both lost situational awareness, and they ended up flying into the side of a hill.[20]
>
> In both those scenarios, there was either an overly domineering captain or a domineering co-pilot, and it can be quite dangerous.
>
> Q.     Okay. And your experience with Tiffany gave you concern as to the dangers of poor CRM when she was in the cockpit?
>
> A.     That is correct.

Ex. O at 145:11 – 146:17.[21]  O'Connor was also concerned that her poor attitude was a hazardous attitude identified by the FAA:  ***"Everybody has some aspects of a slight amount of hazardous attitude. The difference between everyone and Ms. Nicholson is most of us are able to assess it, talk ourselves out of it, and do the right thing. And for some reason, in Guam during that span of time, she was unable to do that."***  Ex. O at 176:8-17, 186:14 – 187:2 (emphasis added).    In addition to her failure to act professionally or accept criticism constructively, Nicholson failed to comply with the GOM's requirements to assist the captain or to maintain a high degree of crew coordination and cockpit discipline. Ex. O at 146:19 – 147:3, 147:20 – 148:14, 148:21 – 149:15.

Nicholson's testimony at her deposition confirms she had a different view of appropriate cockpit behavior.  For example, she testified that being difficult to get along with constitutes acceptable CRM behavior.  Ex. N at 19:1-15.  Nicholson also believed she did not have a

---

[20] Controlled flight into terrain is exactly what happened to Korean Air Flight 801.
[21] Price also discusses an instance where bad CRM caused a plane crash and 500 fatalities.  Ex. R at 49:4-14.

4819-3808-3585.3.056785-00005

Page 14 of 25

Case 1:06-cv-00027     Document 39     Filed 01/18/2008     Page 17 of 46

problem with CRM skills, in spite of being told over and over again that she was being monitored for her CRM capabilities. Ex. K at 113:2-10, 171:5-23. She wrote letters to Cape Air admitting her CRM shortcomings, and only after bringing this lawsuit, retracted those statements. Exs. I and J.

## III.   STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment as a matter of law when the evidence demonstrates that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and for which that party will bear the burden of proof at trial, and therefore is designed "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 327 (1986). "The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). *See also Richardson v. Nat. Rifle Ass'n*, 871 F. Supp. 499, 501-03 (D.D.C. 1994) (summary judgment granted in race discrimination case because "evidence of discrimination that is merely colorable or not significantly probative cannot prevent the issuance of summary judgment").

Summary judgment is appropriate where the evidence which a plaintiff can offer in opposition would not support a verdict by a reasonable jury in favor of the plaintiff - in other words, where there is no "genuine issue" of the type which would require a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. "[T]he mere existence of a scintilla of evidence in support of plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."
*Id.* at 252.

## IV.  NICHOLSON DOES NOT HAVE A PRIMA FACIE CASE FOR GENDER DISCRIMINATION

Title VII jurisprudence involves a burden-shifting framework.  First, a plaintiff must prove a prime facie case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Specifically, she must show (1) that she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably.  *Id.* at 802.

If the plaintiff establishes a prima facie case, the burden of production - but not persuasion - then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  If the employer meets its burden of production, the burden shifts back to the Plaintiff to produce evidence that the stated reasons are pretextual "either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id; St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-256 (1981).  Nicholson must show that her gender "actually motivated the employer's decision," and that they had "a determinative influence in the outcome."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.* at 143.

## A.    NICHOLSON WAS NOT QUALIFIED FOR HER POSITION

The evidence is overwhelming and undisputed that Nicholson was not qualified to fly the ATR42 for Cape Air.  Each of her superiors testified that Nicholson exhibited the poorest level of CRM, as described in the factual portion of this Motion, and that she was not qualified to fly the ATR42 because of her deficient CRM skills.  Ex. P at 175:22-23, 176:16-21, Ex. O at 122:19-25.  Adequate CRM skills are essential for a pilot, particularly for the pilot of a passenger aircraft where passenger's lives are at stake.  She also did not fulfill the duties of a First Officer under the General Operating Manual, particularly the duties to assist the captain in an efficient manner, preparing all required forms, maintaining a high degree of crew coordination and cockpit discipline, and performing other duties required by the captain.  Rather, Nicholson acted in an insubordinate manner, as she readily admitted.

## B.    THERE ARE NO OTHER PILOTS SIMILARLY SITUATED TO NICHOLSON

To be similarly situated, Nicholson must show that another individual had a similar job and displayed similar conduct of comparable seriousness.  *Vasques v. County of Los* Angeles, 349 F.3d 634, 641 (9th Cir. 2004); *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (the standard for a similarly situated employee requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases).  While other pilots had initial unsatisfactory check rides in the simulator, and were given additional training, no other pilot was recognized for having CRM problems.  Ex. O at 17:2-5, 21:3-13; Ex. P at 26:7-13.  The pilots who received additional training "were on the scale of operating the aircraft and performance on the check ride.  Whereas Tiffany's was more towards having the proper attitude to communicate well and help in good crew resources management.  And so that was a little different than the technical skills that were knowledge of flying the airplane."  Ex. P at 141:24 – 142:9.  Therefore, no other pilot was similarly situated with Nicholson.

Case 1:06-cv-00027    Document 39    Filed 01/18/2008    Page 20 of 46

C.   NICHOLSON WAS NOT TREATED DIFFERENTLY FROM OTHERS
     SIMILARLY SITUATED

Even assuming that there are pilots who are similarly situated to Nicholson, Nicholson

cannot put forward any genuine issue of material fact showing she was treated differently from

her male counterparts by being taken off flying the ATR. Under Cape Air's procedures, if a pilot

fails a test, they are given another opportunity to pass. Ex. O at 14:12-15. If they fail a further

test, then they undergo a review to determine if there will be a further opportunity for training.

Ex. O at 14:15-18, 183:9-24. This is exactly the situation followed in Nicholson's case.

Nicholson was initially trained in CRM at ground school and passed. During the initial operating

experience, she displayed poor CRM skills, and was given further training at the direction of

Russell Price. Price evaluated her as having failed at those additional training opportunities.

The Revised Action Form prescribed by the disciplinary panel included further training, meaning

a *third* round of training. No other person had failed at a second round of training. Ex. O at

183:25 – 185:2. Thus, while Nicholson was not similarly situated to any other person, her

treatment did not differ from the Cape Air's prescribed module of training.

V.   **LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS**

Assuming Nicholson satisfies her prima facie case, which she does not as discussed

above, the burden shifts to Cape Air to provide a legitimate, non-discriminatory reason for

disciplining her. 349 F.3d at 641. In examining Cape Air's proffered explanation for

disciplining Nicholson, the Court may not "second-guess [the] employer's personnel decision

absent a demonstrably discriminatory motive." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989

(D.C. Cir. 2002). "The issue is not 'the correctness or desirability of [the] reasons offered ...

[but] whether the employer honestly believes in the reasons it offers.'" *Fishback v. District of

Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Anti-discrimination

statutes do not authorize courts to act as a "super-personnel department" to reexamine an employer's business decisions. *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

The legitimate, non-discriminatory business reasons for Nicholson's discipline and termination are well-established in the record; indeed, it is self-evident that she was unsafe to fly. She did not display adequate CRM skills, she showed a lack of personal responsibility for her actions, and she did not get along with her co-workers. All of these factors were considered by the panel of managers tasked to determine Nicholson's discipline. That same panel of managers - Phillips, Gualtieri and Markham – along with Cape Air President Dan Wolf considered reports of her lack of CRM, her lack of personal responsibility, and her inability to get along with other pilots when it determined her discipline, without any consideration to her gender.

## VI.    THERE IS NO SPECIFIC OR SUBSTANTIAL EVIDENCE OF PRETEXT.

Because Cape Air has articulated a non-discriminatory, legitimate business reason for Nicholson's discipline, in order to defeat summary judgment, Nicholson must put forward ***direct evidence*** showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence. 349 F.3d at 641. In this case, there is no evidence, direct or otherwise, of pretext. Therefore, to show pretext using circumstantial evidence, a plaintiff must put forward ***specific and substantial*** evidence challenging the credibility of the employer's motives. *Id.* at 642. With respect to pretext, even if the evidence underlying their decision was false, if the decision-makers honestly believed the pilots' letters and reports, their decision will be upheld. 281 F.3d at 1054 ("courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless"). "Even a reasoned decision based on incorrect facts is not evidence of pretext." *Pollard v. Rea Magnet Wire Co.*, 824 F.3d 557, 559 (7th Cir. 1987).

There is no evidence, direct or circumstantial, that Cape Air's decision to discipline Nicholson is not worthy of credence, or that a discriminatory reason more likely motivated Cape Air to discipline her. There is no direct or circumstantial evidence suggesting that any of the decision-makers (Phillips, Gualtieri, Markham or Wolf) are not credible or that their decision was motivated by discriminatory motives. Rather, all testified that they did not take Nicholson's gender into consideration, that they offered her a fair deal to receive additional training, and that they thought she was a good pilot on the Cessna 402. In fact, it makes absolutely no sense that Cape Air's proffered reasons are pretextual. Cape Air invested over $25,000 in Nicholson, and millions more in the Cape Air Micronesia operations. Cape Air's Micronesia's endeavor was expensive, and every pilot was needed to carry out the operations. Ex. R at 89:16-23, 103:12-19.

As the caselaw holds, Cape Air prevails if it reached a reasoned decision, even if based on incorrect facts. Cape Air's decision makers - some of whom witnessed first-hand Nicholson acting with poor CRM - honestly believed that Nicholson lacked CRM skills, in spite of their need for her piloting abilities to successfully carry out Cape Air's newly implemented Micronesia operations. Nicholson cannot put forward any specific and substantial evidence challenging Cape Air's motives as being merely pretextual.

## VII.  CONCLUSION

There is no genuine issue for trial in this case. Plaintiff cannot make out a prima facie case of discrimination because the record shows she was not qualified for her job, and she was not treated differently from the male pilots, whether similarly situated or not. Cape Air has presented a legitimate, non-discriminatory basis for disciplining her: her deficient and dangerous CRM skills.

As Plaintiff cannot show Cape Air's decision makers had a discriminatory motive, it is entitled to summary judgment in its favor.

DATED: Hagåtña, Guam, January 18, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
DAVID LEDGER
Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam  96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON, | CIVIL CASE NO. CIV06-00027 |
| Plaintiff, | |
| vs. | **DECLARATION OF ELYZE J. MCDONALD** |
| HYANNIS AIR SERVICE, INC. dba CAPE AIR, | |
| Defendant. | |

I, ELYZE J. MCDONALD, declare under penalty of perjury that the following statements are true and correct:

      2.     I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

      3.     I would testify competently as to these facts if called by the Court.

      4.     I am licensed to practice law before all courts in Guam.

      5.     I am an attorney for Defendant Hyannis Air Service, Inc. dba Cape Air.

6.        Attached hereto as Exhibit K is a true and correct copy of the pertinent pages of the certified Deposition of Tiffany Anne Nicholson taken on February 23, 2007.

7.        Attached hereto as Exhibit L is a true and correct copy of the pertinent pages of the certified Deposition of Philip A. Dery taken on May 17, 2007.

8.        Attached hereto as Exhibit M is a true and correct copy of the pertinent pages of the certified Deposition of Linda Markham taken on May 17, 2007.

9.        Attached hereto as Exhibit N is a true and correct copy of the pertinent pages of the certified Deposition of Tiffany Anne Nicholson taken on March 1, 2007.

10.     Attached hereto as Exhibit O is a true and correct copy of the pertinent pages of the certified Deposition of David O'Connor taken on May 22, 2007.

11.     Attached hereto as Exhibit P is a true and correct copy of the pertinent pages of the certified Deposition of Stephen G. Phillips taken on May 18, 2007.

12.     Attached hereto as Exhibit Q is a true and correct copy of the pertinent pages of the certified Deposition of Charles White taken on March 2, 2007.

13.     Attached hereto as Exhibit R is a true and correct copy of the pertinent pages of the certified Deposition of Russell C. Price taken on October 17, 2007.

14.     Attached hereto as Exhibit S is a true and correct copy of the pertinent pages of the certified Deposition of Daniel A. Wolf taken on May 23, 2007.

15.     Attached hereto as Exhibit T is a true and correct copy of the pertinent pages of the certified Deposition of Lawrence J. Gualtieri taken on May 23, 2007.

I declare under penalty of perjury under the laws of Guam that the foregoing is true, correct and complete (6 GCA §4308).

DATED: Hagåtña, Guam, January 18, 2008.

CARLSMITH BALL LLP

_signature_

ELYZE J. MCDONALD
Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air

## DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on the 18th of January, 2008, I will cause to be served, via hand delivery, a true and correct copy of the MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ELYZE J. MCDONALD; DECLARATION OF LINDA MARKHAM; EXHIBITS A - U; DECLARATION OF SERVICE upon Plaintiff's Counsel of record as follows:

> **Phillip Torres, Esq.**
> **TEKER TORRES AND TEKER, P.C.**
> **130 Aspinall Avenue, Suite 2A**
> **Hagåtña, Guam 96910**
>
> **Attorneys for Plaintiff Tiffany Anne Nicholson**

DATED: Hagåtña, Guam, January 18, 2008.

_____
ELYZE J. MCDONALD

# *Hyannis Air Service, Inc.*

# General Operating Manual

## Manual # Part 121

---

| | |
|---|---|
| Printed in U.S.A. | Issue Date: 15 Apr 06 |
| © 2006 Hyannis Air Service, Inc. | Rev. 3 |

EXHIBIT A

3. **Chief Pilot**
   *Ref: 119.65(a)(3)*
   *Ref: 119.67(b)*

   A.  Basic Function

   Meets the qualification and experience requirements of the FAR
   119 mandated for the Chief Pilot position. Responsible for
   compliance of company flight activities with applicable company
   policy and government regulations. Oversees all flight
   crewmember company activities. Reports to the Director of
   Operations.

   B.  Responsibilities

   •  Ensure base level functions are conducted in accordance
      with federal regulations, company and division policies

   •  Maintain flight crewmember records in accordance with FAA
      and company requirements

   •  Monitors scheduling of proficiency and line checks

   •  Coordinate proficiency checks and other training
      requirements with training to minimize the loss of
      crewmember time

   •  Monitor pilot compliance with physical examination
      requirements and FAA certificate requirements

   •  Review and resolve flight operations issues arising from
      operations irregularities

   •  Ensure pilot appearance, attendance, and personal conduct
      are in compliance with company policy

   •  Maintain currency and qualification in the at least one of the
      airplanes used in the certificate holders operation

   •  Highly knowledgeable of the entire contents of the General
      Operations Manual, Operations Specifications, and all
      Federal Aviation Regulations pertaining to company
      operations

   •  Immediately notify the Director of Operations of any
      discrepancy or incident that may affect the ability of the
      company to perform within the parameters of safety,
      regulatory compliance, and fiscal responsibility

---

*HYANNIS AIR SERVICE, INC.*

- Recommend changes to policies and procedures to the Director of Operations for implementation

- Conduct line supervisory flying to ensure the professionalism of pilots and overall pilot standards

- Represent the company in government, industry, and community activities relating to the Flight Department

C. Authority

- When delegated by the Director of Operations, assumes Operational Control of the airline.

- Directs the pilot work force in a safe and efficient manner to meet the operational requirements of the company

- Perform all other administrative duties as assigned by the Director of Operations

## 4. Director of Training

A. General Description

Responsible for overall management and operation of the company's crewmember and dispatcher training programs. The Director of Training monitors training program training and checking activities described in the FAA Approved FAR 121 Flight Operations Training Manual. Previous experience as a flight crewmember in 135 or 121 operations is required. Reports to the Director of Operations.

B. Responsibilities

- Conduct audits of in-house and contract training facilities in accordance with the Operations Specifications and applicable FAA guidance

- Ensure that all training and checks required by 14 CFR Part 121 are carried out in the manner described in Flight Operations Training Manual.

- Monitoring of Service Difficulty Reports, Mechanical Irregularity Reports and Employee Safety Reports to identify areas where changes in crewmember training may improve performance or safety

- Monitors classroom, drill, simulator and flight training sessions to determine compliance with program documentation

---

*HYANNIS AIR SERVICE, INC.*

- Provides for sufficient reserve crewmember coverage for unplanned absences

- Ensures crewmember qualifications prior to flight assignments

- Coordinates with SOC during irregular operations

- Searches for new technological developments to improve the efficiency and effectiveness of processes in the operation

- Makes recommendations for improving Crew Scheduling policies for crewmembers

- Administers an annual vacation award process for crewmembers

- Perform other duties as assigned.

## Subpart C: Flight Operations Personnel

*Ref: 121.135(b)(2)*

1. **Captain**

   *Ref: 91.3*          *Ref: 121.315*
   *Ref: 121.535*       *Ref: 121.549(a)*
   *Ref: 121.563*       *Ref: 121.709*

   A.   General Description

   The captain reports directly to the Chief Pilot. When assigned to a flight the captain exercises command authority and responsibility of the aircraft, passengers, cargo and crewmembers. The captain is to maintain, at all times, a professional and businesslike environment in the cockpit that is conducive to the safe and efficient conduct of the flight.

   B.   Responsibilities

   - The captain is directly responsible for, and is the final authority as to the operation of that aircraft. In an emergency requiring immediate action, the captain may deviate from any rule to the extent required to meet that emergency.

   - The captain will allow no one to distract any flight crewmember from their duties or to interfere in any way with the proper conduct of cockpit activity.

*HYANNIS AIR SERVICE, INC.*

- Supervise all crewmembers assigned to the flight, from pre-departure preparation until the completion of the flight, and counseling of these crewmembers as appropriate and necessary

- Maintain currency and qualifications in all respects with regard to the requirements of 14 CFR Part 121 and the company and for notifying the company of changes in such qualifications

- Ensures personal compliance with mandated flight and duty time limitations

- Shall be in uniform and in possession of the required certificates and documents appropriate for the flight(s) to be performed

- Initiate a pre-flight crewmember briefing prior to the first flight of each day to provide for an exchange of flight information and as an aid in establishing rapport and effective teamwork. The captain will follow the precepts of crew resource management at all times during the preparation for and conduct of flight operations

- Approve all completed flight paperwork, forms and reports required by the FAA and company to ensure accuracy and proper routing

- Log all aircraft maintenance discrepancies encountered in the Aircraft Maintenance Log and ascertain that the Aircraft Maintenance Log has been properly signed off by the appropriate maintenance personnel.

- Responsible for all flight records kept in the cockpit, but may delegate the duties to the first officer

- Ascertain that the cockpit door has been properly closed and secured for flight

- Ascertain that the aircraft library, proper equipment, appropriate and current charts, maps, enroute and approach manuals are onboard the aircraft prior to departure and the GPS database is current (as applicable).

- Conduct a proper pre-flight weather check for the route(s) about to be flown. If unsatisfactory conditions exist or are forecast, confers with the dispatcher to establish a mutually agreeable alternate route or appropriate action

*HYANNIS AIR SERVICE, INC.*

H536

- Ensure the flight is dispatched and operated within prescribed limits and weight requirements at all times

- Determines that the correct and sufficient amount of fuel, oil and other fluids are onboard before each departure

- Responsible for the proper servicing of the aircraft although actual refueling will normally be accomplished by a designated person or agency

- Responsible for preparation of reports on irregularities or incidents with regard to aircraft incidents, damage or flight irregularities

- Submit requested reports and recommendations concerning performance, conduct and upgrade possibilities of first officers

- Informs the company of the progress or delay of the flight

- Maintains a high degree of crew coordination and cockpit discipline and ensures the proper use of aircraft checklists at all times.

- The captain shall designate the pilot flying (PF) the aircraft and that pilot will maintain responsibility for aircraft control, navigation, and compliance with ATC clearances and/or instructions.

- The captain shall coordinate all taxi maneuvers and maintain constant vigilance in terminal ramp areas and when crossing taxiways and runways.

- In the event of the receipt of a specific and credible threat to the security of a flight, the captain as the Inflight Security Coordinator shall notify the crewmembers of the threat, any evaluation thereof and any countermeasures to be applied.

- The Captain will notify SOC and ATC as necessary when a security threat exists which requires the intervention of an outside source.

- The Captain will make the final decision as to whether or not to make the takeoff, or to have the aircraft deiced again.

- The captain shall be responsible for any operational restrictions, and for suspending operations whenever an airport condition report indicates that existing abnormal conditions may be hazardous or unsafe.

*HYANNIS AIR SERVICE, INC.*

- • The captain shall terminate the flight if any of the limitations contained in the MEL /CDL cannot safely be observed.

C. Authorities

- • The captain, in coordination with the flight attendant shall be the final authority for determination of suitability of an exit row passenger.

- • The PIC, each day, when passing through the base, will check the aircraft mailbox, pickup and insert any revisions that are there and return a signed transmittal sheet to the Base Administrator.

- • At stations where contract personnel not trained by the Company are used for deicing or anti-icing aircraft, the Captain will instruct equipment operators and supervise the process, or delegate this duty to the First Officer.

- • Perform other such duties that may be required or assigned by the Chief Pilot

## 2. First Officer
*Ref: 121.135(b)(12)*

A. General Description

The first officer is the second-in-command of the flight and is directly responsible to the captain assigned to the flight, and will assume command if the captain becomes incapacitated.

The first officer is administratively responsible to the Chief Pilot.

B. Responsibilities

- • Responsible for compliance with all Federal Aviation Regulations, company regulations, department policies, guidelines applicable to their duties

- • Maintain currency and qualifications in all respects with regard to the requirements of 14 CFR Part 121 and the company and for notifying the company of changes in such qualifications

- • Ensures personal compliance with mandated flight and duty time limitations

- • Shall be in uniform and in possession of the required certificates and documents appropriate for the flight(s) to be performed

*HYANNIS AIR SERVICE, INC.*

- Assists the captain in the most efficient manner possible to make certain that the preparation and completion of the flight is in accordance with the FAR's and company policies, and is accomplished at the highest level of safety and regulatory compliance

- Assumes a leadership position in the absence of the captain, making certain all assigned duties are accomplished in an expedient and efficient manner

C.   Authorities

- Prepare and maintain all required forms, including flight logs, charts, and reports as required by the captain for his review

- The first officer has the responsibility of aiding the captain in the safe and efficient conduct of the flight, from pre-flight planning through termination duties

- Maintains a high degree of crew coordination and cockpit discipline

- Responsible for acquiring the skills and judgment required of a captain

- At stations where contract personnel not trained by the Company are used for deicing or anti-icing aircraft, the first officer will instruct equipment operators and supervise the process, as delegated by the captain.

- Maintain constant vigilance in terminal ramp areas and when crossing taxiways and runways.

- Perform other such duties that may be required or assigned by the captain or the Chief Pilot

3.   **Dispatcher**

A.   Basic Function

The on-duty dispatcher will, in addition to fulfilling the duties and responsibilities of company and Federal regulations, coordinate the minute-to-minute daily operation of the airline, manage the flow of aircraft and crews in company operations and serve as the focal point for all communication, information and decisions affecting that flow. The on-duty dispatcher will have decision making responsibility during operation irregularities, after input from appropriate Flight, Maintenance and/or passenger service

---

*HYANNIS AIR SERVICE, INC.*

H539

To:    **Larry Gualtieri**    Director of Operations
       **Steve Phillips**     Chief Pilot
       **Craig Stewart**     Director of Safety

I never intended to write a letter like this, but the events and attitude of my co-pilot Ms Tiffany Nicholson has forced me to do this.

    All of us here in Guam, including me are bound to make mistakes and we do; that is not the issue. The issue is *how* you deal with the mistakes; that is what makes the difference.

    My first encounter with Tiffany was when Kappy, Kevin Tiffany and myself were in the Continental ops room reviewing the weather for our flight to Rota and Saipan. The forecast was such that it was unlikely that any of us would be departing soon. Kappy's airplane was already preflight, ours was not. I asked Kappy, if he would mind for us to use the power cart, so we could preflight and finish our Originating check-list. We therefore could leave as soon as the weather would improve. He had no problem with that at all. Tiffany immediately disagreed (she was Kappy's co-pilot), but since Kappy agreed I proceeded to the airplane. Shortly thereafter, Tiffany showed up and told me she disagreed with powering off her airplane and then powering on again. I explained to her, that we only needed it to finish our preflight; she would get it back as soon as we were done with it. Tiffany than snapped at me and said "ok, fine, but I don't want you to take the GPU, which is the rampies job"
I returned to my airplane with Kevin, and we started the checklist as far as we could take it, awaiting the GPU. After about 20 min, we still had no GPU and a rampie came up to the airplane and told me that Tiffany did not want to give the disconnect signal and he could therefore not disconnect the GPU. He further stated that it seemed that she was in a bad mood and he would not talk to her again.
I told him not to worry; I will take care of it.
I went back into the terminal to find Kappy, Dave O'Connor to let them know that Tiffany was not cooperating. After about 40 min., we finally got the GPU.
By than, the wx was getting better, we unfortunately did not get through the before start-checklist because the other plane needed the GPU. Dave O'Connor came to let us know that they needed it, I told him no problem.
The point is if we had gotten the GPU when we asked for it, both planes would have been ready to go at the same time, minimizing any further delays.

    The next week I was to fly with Russell Price, I had so much fun learning from Russell.
I found myself doing as much of the work as I could for him, pre flight, removing the overnight kit, and gear pins, signing the security sheet, getting the ATIS and clearance etc. I made it a point to be at the airport 1.5 hrs before the flight so I could do as much as I could for him. Russell thanked me for helping him; he mentioned though that I did not have to do that much for the other co-pilots. Russell hardly complained when I asked him if I could shoot a full approach in VFR conditions!

**DAY 1**

The next week did not go so well... I got to the airport at about 5.55 am for a 7.15 am departure. I started getting the weather and cell phone from the ops room at Continental, headed to the plane for the pre flight. When Tiffany showed up at 6.23 am, which I considered on time, she finished the preflight. I went into the cockpit to put the gear pins away. She came into the cockpit, sat down and told me that she did not have a headset or a calculator. Not long after that the flight attendant came into the cockpit and handed me the security form that needed to be initialed. When I signed them, Tiffany made a wise crack: "oh you are doing my job now". I asked her what was wrong and she stated that that was her job. When I flew with Russell, things like these were never an issue. It really made me feel like not helping her at all anymore. At this point, the overnight kit was still on the plane. I asked her if she was going to remove it. She said", maintenance was going too". Paul came into the cockpit and signed the log book; I asked for the originating checklist, it was completed...I then asked T. if she was aware of the MEL on the green hydraulic system. She said she was and we continued the checklist. I had already asked maintenance about the MEL,

it appeared to be a light sensor, not the system itself. Tiffany started the WB, she was about half way through the WB, and I asked her for the before Start Checklist. Annoyed she said, "It is too soon to start". I said I wanted to start in Hotel mode, get rid of the GPU and ground Air. She leaned forward, and in an angry voice said into the CVR "captain I disagree with your course of action!!!" I asked her what that statement meant. Tiffany stated we had a tailwind and would have a nacelle overheat if we started now. Looking at the ATIS that she road stating the winds were calm. I looked outside for some indication of the wind, and saw a butterfly flying by. I determined we had a very slight head wind. I told Tiffany we would be starting the engine. Tyffany reluctantly put down the WB, and read the before start check list. She went back to the WB, complaining that if I had just waited for her to finish her paperwork; I could have started both engines.

After starting nr 2, I had the ground Air and GPU removed. Paperwork was handed through the com window and then the nr 1 ehgine was started. The blocks were pulled and I asked T. if she was ready to taxi.

She said yes, so I released the parking brake and discovered that I had no brakes. I grabbed the parking brake and the plane came to a sudden stop. I told her, I had no brakes, she then said that was not possible because she claimed she had brakes on her side.

T. asked me to release the parking brake, so she could show me that she had brakes. I released it and she said her brakes were working fine. I asked her how they could be working fine if the green hydraulic system which controlled the normal braking. The pressure gage was reading 0 psi.

It was impossible for her brakes to be working. I looked up and the hydraulic pump was not on. After she turned it on, we had normal brakes.

We left the gate and performed the taxi checks, before t/o checks and departed Guam.

We did the climb checks, leveled off and did the cruise checks. Once at our cruising altitude, ATC asked us how we were navigating to ROTA since the NDB was out of service. I looked at Tiffany and asked her what she was going to tell him. She canceled our IFR clearance without asking me first. ATC told us to sq. VFR. Before we left I had specifically asked her not to pick up an IFR clearance, since the ROTA NDB was out of service and it was impossible for us to navigate IFR direct to ROTA.

As we descended into R., the weather was given to us as: wind out of the East, rain showers moving away form the field. On the downwind leg I asked her if she was comfortable with me doing a short approach in order to avoid some clouds heading towards final. She said "yes, I do mind", without any further explanation.

I was now forced to get closer to the clouds than I really wanted, but I made sure I remained clear of them. Rolling out on final, I was right on the VASI, and made a normal approach.

Before taxiing, T. tried to pick up an IFR clearance to Saipan. The NDB was still out of service in ROTA, and I did not want her to pick up an IFR clearance. She disagreed and tried to contact ATC. ATC has a hard time receiving us on the ramp in ROTA, she now wanted me to taxi towards the opposite side of the airport. I told her we could leave VFR and get advisory's, and the flight was to be conducted under VFR conditions.

There were numerous clouds West of the field, but we were taking off from runway 09 ,away from the clouds. T. was not happy with this decision, and she let me know this through her negative attitude.

Taxiing out of R., it was her leg to fly, I asked her to brief the t/o. All she said was

"company standards". I stopped the plane and asked for an acceleration altitude and more of a briefing than a simple "Company Standards". Her reply, "don't you know what the company standard is"?

I told her that before the t/o I wanted to know what her course of action is in case of an emergency. Her reply" well, we both went to training, you should know"

I told her that that was two months ago, so brief me. I elected to brief it for her, so I got a better idea what we were going to do as a crew.

All this was so distracting, that when we taxied out and into position for t/o, the taxi checklist and the before t/o checklist were not completed. We completed them and departed for Saipan.

We left VFR. Over the island of Tinian there were clouds and I asked her what her flight path was going to be. Tiffany replied that she was going directly to the field. I said no, that will get you into the clouds.

"I don't care if you go right or left, just remain clear of the clouds. If you go right, follow the channel for a close right base turn or if you go left of Tinian you will be on a long intercept for runway 07. Tiffany's

sarcastic reply was:" ok, what do you want me to do"? I told her that it doesn't matter to me," just stay clear of the clouds"

On final, T used the A/P and tried to engage the approach mode. I asked her not to do that, since this was going to get us straight into some clouds. Hand flying makes her uncomfortable, but she remained clear of the clouds.

The landing was nerve racking for me because of her nose high attitude, very low airspeed and the consequent slamming onto the runway and dropping the nose on the rollout. She put the engines in reverse, with out waiting for the low pitch light call out.

We were getting along bad enough as it was, so I elected not to give her any positive criticism especially with the attitude she had displayed thus far. I felt my hands were tied. I remained quiet.

The flight from S. to R. was my leg. The flight went as good as you can expect from a crew as divided as we were. There was virtually no communication at all.

T. was making radio calls with ATC and without a headset and her not communicating with me; it was difficult to know who was handling what radio.

Leaving R. it was T's leg. When we got to Guam, we were on a close downwind. I told her she should widen her downwind leg. Her reply:" well at least I did not fly through the clouds, like you did in R". I tried to explain to her, that I did not fly through the clouds in R, she did not want to hear it. I asked her what that that had to do with landing in Guam. There was a silence, she did not reply.

As we passed by the airport, I asked her where we were going. T. snapped at me and said very sarcastically" my Captain has to tell me when to turn base". I am guessing this comment came because of me telling her that her downwind leg was too close to the airport.

On landing, I told her that we had a 10,000 ft runway, so she did not have too land so short like she did in S. Same type landing, slow, nose high, dropping the plane onto the runway. The nose wheel landed firmly and she went into reverse before I could call the low pitch lights. She proceeded to use moderate braking and full reverse, even though I had told her we have a 10.00ft runway, we can almost roll-out to the end without all the braking and reverse. We now had to taxi clear on to F( halfway down the runway) . On the roll out I asked her if I had the controls, she did not reply. I asked again loudly," my controls" and still did not get a reply. I could not understand her reply, which caused great concern on my part because I did not know who was actually taxiing the plane.

T. snapped at me and said "don't yell at me". I said" if you would only communicate with me, I would not have to raise my voice. All these events were only the first half of our duty day.

The Nimitz VOR was out of service. We now had to go VFR, and the ceiling had dropped to 3200ft. She got the ATIS; I told her that we could not take off with anything less than 3500 ft. We had to wait for either the ceiling to increase, the VOR to come on line, or the NDB in R. to be functional. When the VOR came back into service, we left for S. T. accepted an IFR clearance direct ROTA, direct Salpan. Again with the R, NDB out of service. Since S. was landing runway 07, I changed the routing to A-221( Willy intersection, Nimitz( 020 R.) On that flight, T. had Russels headset, but the communications were still very strained.

She took control of the radio's, it was my leg, but once again I had no idea who was communicating on what radio.

On one of my legs into Guam, T. gave me the ATIS of "winds 300 dreg. At 12 kts and said we are landing at 24.R. I proceeded to runway 24 visually, and when I got closer to the runway the controller asked us if we knew Guam was landing 06. T. laughed at the controller and said we would enter the downwind. I was not happy with this carelessness and almost landing on the wrong runway, but felt helpless to bring this to her attention.

## DAY 2.

Day 2 was worse than day one. When I left my house for work, I had promised myself to put Day One behind me and try my hardest to make this day a better one than the first day. Unfortunately, the outcome was not as I had hoped for.

Getting in the plane at 6.00am, I removed the gear pins, remembering that T. did not want help with the preflight. I left the overnight kit installed, she performed the preflight, and consequently left the overnight kit on. I asked her why she did not remove it, her reply" that is not my job, this is for maintenance to take care of". She immediately picked up the company's cell-phone and without consulting me, called maintenance.

This flight was now going out late, because she refused to remove it.

We loaded the pax. 30 minutes prior to flight time. I asked for the originating checklist. It was performed and I asked for the before start checklist. I asked through the com window for the ramp help to remove the ground air, which was plugged in through the bottom of the plane. Tiffany stated that she was not done with her paperwork. I said it was close to flight time and while she finished her paperwork the ground air could easily be removed so we could get no2 engine started. T. was making signals to the ground crew on her side to wait to remove the ground air, thus undermining my authority. Trying my best to keep the peace, I did not discuss this with her.

We left the gate on time, instead of 10 min early. On the taxi out between a 737 and our company plane, I had to taxi slow as not too hit the planes on either side. I noticed an electric amber light on the CAP, I asked for the taxi checks, after clearing the two airplanes. Blatantly she said "No". I then stopped the plane and set the parking brake.

"What do you mean, NO" I asked her. T. said I had to give the t/o briefing before the taxi checklist could be read." .....so the taxi checklist would not be interrupted". I had to ask for the third time, "Taxi Checklist please". T. was angry and said, "brakes checked right; I replied brakes checked left and center". She then asked me for the t/o briefing. I completed the t/o briefing and T. in an angry voice said" are you know ready for the taxi checklist?" I asked her to stop with the attitude. Her reply was that I was doing things out of sequence. I said if I was doing things out of sequence, I was sorry but I do not need to hear the attitude. All the while the electrical AC wild light was on. All these disagreements between us as a crew, are so distracting that only when we got back too the checklist we noticed the fault light on the CAP. T. got out the QRH and run the checklist for AC wild failure.

While we did that, I was monitoring the engine gages and noticed the right engine NP was only at 68%. I told T. it was not an AC wild fault, because NP was not above 70.8%. I advanced the power lever on the nr 2 engine, the NP dropped, and was unstable.

T. continued to read the AC wild failure checklist, which to me was a clear indication she was not listening to me at all. Investigating this further, I noticed the ECU fault light was illuminated. I reset the ECU, the nr 2 engine came up to 77% immediately and all fault lights were now extinguished.

The taxi checks were completed as well as the before t/o checklist.

During the flight to Saipan, I transferred the controls to T. so I could review the approach plate. This was done at 11.000 ft, hdg 020. She said "my controls". I picked up the approach plate and T. said "cruise checks".

I said' what?" Again she said "cruise checks" I had forgotten the roles were reversed because I was no longer pilot flying. T. demanded cruise checks again. Since we were only 10 or 15 minutes into the flight, there were no changes yet in the altimeter setting. No ATIS was yet received. I said alt. same on the left, she said:" that is not the correct response". I looked up from the approach plate a second time and T. scalded me for not saying," altimeter set, 29.79. Set left and center, power mgmt to cruise, cruise checks complete". Since we had not yet received a current altimeter setting and she had moved the power management switch to "Cruise" herself, I failed to read it back, because I knew she had done it herself.

After the completion of our flight, the parking checks were completed. T. stated I am getting something to drink. I actually thought she was asking me if I wanted something to drink. T. then turned to me and said" what do you think I just said" My reply" I thought you asked me if I wanted something to drink" T. reply" no I am not asking for your permission, I am *telling* you I am getting something to drink .

I looked at her, took off my sunglasses and asked her what her problem was. She just turned and walked away.

Case 1:06-cv-00027    Document 39    Filed 01/18/2008    Page 40 of 46

At this point I had the entire attitude I could stand. I made the decision to remove her from the airplane after returning to Guam.

The next leg to Guam was T's. Because of the weather, we would be using the NDB to rwy 24. T. said that she was not good at NDB approaches. I said," I will help you if you need it". On the flight back to Guam she started to point out some of her weaknesses and how I could help her. To make her feel better, I pointed out some of the things that I needed to improve on as well.

I started to feel bad about calling ops to have her removed from the airplane. There was a little more CRM on this flight and improved communications. Along the way we worked as a team because of the step down fixes on the 24 approach.

We landed, taxied in and I started to contemplate on reversing my decision to remove her from the plane.

I told T. that we needed to talk. I told her that this last flight was getting better as far as us communicating was concerned, but I told her that the first flight was really bad.

We again started to argue and T. would not take any responsibility (blame) for any of the problems. Once again, not being able to communicate with her, I decided to stop trying and stuck with my earlier decision to have her removed from the airplane as my co-pilot.

These are some, not all of the events that took place. They do however are the most serious ones that let to my decision to remove T. as my co-pilot

I have tried my best to make it work, but to no avail.

I feel uncomfortable having put the company through this ordeal, but in the interest of safety and as wake-up call to all other crew members who would have to fly with her, I was left no other choice.

Chuck White.

# Observations On The CRM Retraining Of Tiffany Nicholson

August 31 to September 09, 2004

Tiffany was removed from flying, for insubordination, on 8/31/04 in GUM by her Captain, Chuck White. I arrived on the scene shortly thereafter and supported the decision for the short term and allowed the flight to continue with a replacement First Officer.

It was unfortunate that the situation brought itself to a head when it did because I had scheduled myself to fly and observe her for several days the following week. I was not however surprised. All of the Check Airman had lingering concerns from her IOE training, scoring Tiffany weak on cockpit communication skills. My concerns had resurfaced due to repeated comments from all of her Captains, who had recently flown and trained with her - that she was very weak on CRM skills and on working consistently as a team player in the cockpit. I had repeated questions from the pilot group on how I, if I were her Captain, might handle various comments and actions that she had said or done. They were looking for my mentoring and appeared to earnestly want to remedy the situation. The amount and type of disruption that she appeared to be bringing to the workplace urgently needed my attention and I moved her up to the top of my list. Fully functioning in the cockpit as a communicative partner is every bit as critical as raw flying skill.

Upon conversing with Tiffany on the aircraft, I was struck by the lack of any self reflection in her words. It would make a strong and lasting impression on me if a Captain ever chose to remove me from the workplace. She was very concerned only with the process by which she was removed and with the pay and scheduling issues.

I told her that she could not fly her next day, 9/1, because I was not able to observe. I also told her that I was disappointed that she was having difficulty, that I expected more effort from her and that I would accompany her all of the next week to assist her in building her skills and reestablishing a good rapport with her coworkers, so that they would have confidence in flying with her. At that time we also discussed how her lagging, inconsistent CRM skills were negatively affecting her ability to work with her co-workers and that we would have to work together very hard to integrate her back onto the team. I asked if there was anything I might do to help her remove obstacles to her performance.

I tried to speak constructively rather than critically so we could move forward but she was not overly enthusiastic. I knew we had a great CRM crew working both Saturday and Sunday. (Phil and Kevin) I asked her to pick a day to sit and observe them and watch how a good FO makes CRM work in the cockpit. This was to prepare her for next days of flying under my observation. She chose Sunday and then asked if she *had to* observe "the whole day", thus telling me she did not think there was much to learn. I was trying to be supportive at this point and not overbearing so I said no, the whole day (7 legs) was not necessary.

Very frustrated at this point, I came across Pierre, the CMI Chief Pilot. We enjoy a relationship where we seek each others support on a variety of issues. As he is responsible for 200 pilots in the region I felt he would have some insight into this situation and have advice he might share. After our conversation he asked if I might want him to speak with her on a personal, non Cape Air, pilot to pilot level, to let her know his thoughts on how to function as a crew. I took him up on the offer and gave him her number. I do not know the results as neither has offered and I do not want to pry into a personal conversation.

Sunday 9/5, her observation day, I went to the aircraft in order to help break the ice and to make sure that everything would get off on the right foot. I found Tiffany sleeping in Row One, while Phil and Kevin were in their final preparation for flight. She awoke and I asked her why she was not in the cockpit. She responded that she "did not want to get in the way". I told her to get up there as the preflight stage is where team building begins.

EXHIBIT C

H230

One example:   ATC "Turn left to a 360 heading"
               Chuck is flying and turns
               Tiff "He said 360"
               Chuck "Yup, that's what I'm doing"
               Tiff "No you're not"
               Chuck "Not sure what you're talking about I'm showing the blue heading bug on 360"
               Tiff "If you look close at the digital readout it shows 002 not 360"

Again, tone of voice playing a big role, she was very content with that use of their time and that she was technically correct. Meanwhile we were now further behind. It was very poor judgment on her part. Now, if something important came up, how eagerly would even the best trained Captain respond to her input?

Also another example, when asked to do something, a crew member can respond in a number of friendly and polite ways.....Sure / Yup / OK / Roger / Thanks / You Bet. Even a sarcastic YES SIR works if you say it with the right inflection and a twinkle in your eye. A common response from Tiffany is "Yes I will do that because it is the correct company procedure" Monotone.

At this point they were now making constant mistakes and had *totally failed* as a crew. My heart rate was maxed out as I had to interject several times on some important items. I became fully involved only with making sure that the flight would arrive safely.

Before, Leg Two had begun, I had called dispatch in order to alert them that I would be sitting as Captain for Leg Three. I knew the situation was deteriorating and had hoped that a leg with me flying would put us back on track. Now that we were at the gate, I had a tough decision to make. I had to make it while still shaking from observing the worst *FO CRM performance ever* which, in turn, had made it one of my top dozen flights where safety was seriously at issue.

I asked "So how do you both think the morning is going?" Chuck turned around pale and speechless. Tiffany turned around and said that it was "just like the last time they had flown on Tuesday" I asked for clarification "was that the day he removed you?" After she responded in the affirmative, I told them I was going to go clear immigrations and would return to discuss the afternoon plans after I did some thinking.

After reflecting, I decided that I could not allow the aircraft to be operated again like that and that I was incapable of putting myself in that observation position again. They certainly could not fly together. She was not assisting the Captain. I took into mind all of my observations from training, the comments and concerns of the pilots in the base and of the check airmen and my observations from watching her fly with two of our four Captains over the last three days. I decided that she must return to Hyannis.

I returned and told her that I was removing her from the trip and that she was to return to the airport at 4pm so I could have a longer discussion with her. I knew I would have more time with her then and wanted another manager to accompany me at the meeting. Peter agreed to do this with me. She failed to show up for the meeting. Details of that are found in an email to Larry and Steve.

I did critique Chuck in that he should have had her removed from the cockpit himself after Leg One. I explained that we expected our First Officers to be strong team contributors and to not allow for such poor performance in his workplace. He explained, and I accepted, that he was really trying to make it work and that since I was there, he was deferring to my greater experience.

At that point I reflected back to her IOE observations rides and how we had reaccommodated her training so she could attend to some personal issues. When we tried to reschedule these important sessions, there was initial resistance because she stated she had done enough observation. She did not seem to appreciate how much she could learn from watching others.

That evening, I called the Captain, to inquire about how she acted. He asked first "I thought she was going to be around all day?" It turns out she had only observed the first two flights and gone home at 09:10.

This is when I became seriously concerned. I could not help train her if she was unwilling to help herself. After we made a few phone calls back and forth and kept missing each other, I left her a message on 9/6 stating that I was disappointed that she had not utilized the opportunity that I provided her, that she had to realize that her job was at stake and I was confused because it appeared that she either did not care about improving her situation or was unwilling to do so. How was I to help her if she would not make the effort herself? She received but did not reply to my message.

I spoke with Steve Phillips a bit and shared my three day plan. Day One was to observe her fly with Kappy. I would not be a traditional Check Airman, but I would listen and watch how they overcame obstacles to their flight, how they communicated and how differences were resolved between them. Day Two, I would fly with her alone, and offer advice as we went along and debrief at the end of the day. Day Three I would observe her with Chuck again for the first time and help to mediate the situation and get them to function as a team.

Day One ended quickly for her, as she failed to bring her required headset, and thus not able to function as a required crewmember. To help fix the situation I did a quick search of the neighboring aircraft for an extra pair but found none. I told her she was not equipped for the job and that she had to go find a headset and to report back later in the day. We had the ability to not delay the flight by having me fill in as the FO. I wanted to impress upon her that we could accomplish the days flying mission without her. When she showed surprise, but apparently no responsibility about being removed from the job again by her Captain, I asked her how she thought she was to work on her communication skills if she could not hear her partner nor speak without shouting to him? She was nonresponsive as she exited the cockpit.

We ended up flying two of the seven legs all together, spoiling the chance for me to obtain extensive observation of her CRM strategies. The two legs I would rate as poor, despite much effort from the Captain. What I did observe was consistent with what I have seen in the past. When she is in the cockpit the mood is often very tense. I told them that tomorrow was a new day and we could put this day behind us and start fresh. That did force me to cancel the Russell as Captain, Tiffany as FO day, which was unfortunate.

I purposely arrived late to the cockpit on Day Two in the hopes that Tiffany and Kappy might speak amongst themselves and agree as a pair to try and impress me. Again my strategy was to observe and listen and only to minimally point out any errors. I wanted to watch how as a crew they acted to capture and correct errors and then move on. Also of interest was how they resolved ambiguities in the operation and differences of opinion amongst themselves.

There has yet to be the perfect flight flown and a pilot's job is to constantly adapt to constantly changing situations. It is critical in our ATR that one thinks as a team and that a FO supports the Captain. I have flown FO for close to 1000 Captains, and I certainly did not like every one, but it is the mark of my professionalism that the Captains that I personally did not enjoy, did not perceive anything but a professional attitude. The same consistent professional demeanor is missing in Tiffany. Her ego is never "left behind at the gate". This common aviation saying reflects how it is important for ones self image to not interfere with the flight.

Day Two was similar to the first. It was marked by poor CRM and I must lay the blame mostly on Tiffany. It is understood that Tiffany was under much pressure (of her own making) but Kappy was

really trying hard to make the best of it. A bit of light banter and talk was not well received and to his credit he tried to start anew on every leg and not let past disagreements fester. She was not receptive. Even when she says the right thing the tone of voice is very telling. A transcript would not convey the undercurrent of anger. I have spoken with her about her mood and tone at work before and how it is not professional that a coworker can tell her demeanor from 200 feet away.

There were many (far two many) disagreements constantly throughout the entire day. They would linger and grow. She was not supportive of her Captain, and to me appeared to be resentful of her subordinate position as FO. She takes more effort in emphasizing who is right rather than what is right. She often was correct in some subjects she brought up, but that is not the point. It is how and why you bring them up, and often when you discuss them. Timing and tact are so important. Having spent time building your relationship makes it easier. It is more difficult when you are nice to someone only when you want something back. Quoting chapter and verse in untimely situations is not productive and often dangerous. I have said to her over and over "pick your battles and pick your timing". She cared far too much when she was found to be wrong. It appeared to be taken as an assault to her ego, not as a chance to learn. She also appears to relish in exploiting inconsistencies, both actual and perceived, between various supervisors and also various training materials.

I actually did not debrief them as they had a very extensive debrief amongst themselves where they discussed all of their major concerns. It was the bright spot of the day as for the first time there was real communication.

Day Three, as previously mentioned, came without the benefit of the preceding day of flying with only myself and Tiffany. Pilot training is only a small part of my job and I could be critiqued for already having spent too much time with Tiffany and her training. I did feel that CRM is a critical skill to our operation and I really wanted this situation to work. I had installed a sense of belonging and team on the island and I hoped the extra week of mentoring might pay off and allow Tiffany to become a valued and reliable contributor.

I had a conversation with Chuck the previous night and discussed how important it was that he attempt to make this work, that he not accommodate any insubordination, but that he be firm and fair and hopefully friendly. I told him I expected him to make every effort to make her feel welcomed back into his "office".

There were several significant issues with the operation that needed my attention on the morning of Day Three and when I arrived in the cockpit they had been together for a while already and I immediately sensed an extremely tense workplace. I shifted my demeanor of silence from previous days to one of trying to quench the smoldering fires. Day Two had been rated poor and Day Three Leg One was close to a complete failure. I would have liked to have made a training video for a CRM class of how not to behave. She was belligerent. There was no sense of her wanting to make the situation work. Chuck was so rattled by her behavior that his welcoming gestures were quickly replaced by nervous, only as necessary, speaking. The essential CRM communication had ceased. I believe he was scared that I was finding her approach to the job acceptable. It was not.

Our job is such that there is often little time for reflection and even on the ground we must hustle extremely fast to get our tasks done. The next thing you know, there we are, flying at 3 to 4 miles a minute back to Guam. I emphasize that because it is so important to resolve differences of opinion and move on......the aircraft will be moving on even if you are not. One must not get bogged down, you must stay ahead. Leg Two was filled with the FO arguing with and antagonizing the Captain, most often over items that were very low on the priority scale.

## Confidential Summary

My belief after much reflection, based both upon direct observation of her actions and upon discussion of her past interactions with other crewmembers, and taking into account my varied experiences in the industry and my extensive CRM training, is that she has squandered her opportunities at correcting and addressing her deficiencies. She has not shown that she can consistently act as part of a safe cockpit team. This is a time when we should be adding to our pilot staff, nevertheless, I feel that she should not be allowed to return to the ATR.

One can imagine my disappointment that, even with my mentoring and attempts to foster her growth, she went from being my first choice as Assistant Chief Pilot to being a candidate for termination. Over the last three months we have had many conversations about how she could get along better with others. We have also allotted her four days of extra training solely for the purpose of enhancing her CRM skills. Similar extra training was extended to Kappy and Phil in the simulator and to Nehal and Mike in the aircraft. That training was well received and successfully completed. She, however, appears to be unwilling or unable to learn the necessary critical skills.

If the committee, after an extensive interview and debriefing with Tiffany, feels uniformly and strongly otherwise and elects to return her to Guam, I would recommend the following conditions:
1) A signed document stating how she intends to improve her deficiencies in crew communication
2) A 6 month probation
3) A 120 day prohibition from acting as a Captain on the ATR
4) An agreement that even when the prohibition ends, she must still have demonstrated the even higher CRM skills and aptitude needed to be a Captain

Finally she must commit to come to work consistently, on time, equipped for work, rested and with a "Can do" and professional attitude that will fully replace the unapproachable, uncommunicable, unsafe attitude that she so often carries into the workplace.

H234