September 6, 2004

Jonathan Bleiman
P. O. Box 3172
Hagatna, GU 96932-3172

Steve Phillips
Hyannis Air Service, Inc.
660 Barnstable Rd
Hyannis, MA 02601

Dear Steve:

I am writing to express my concern regarding Tiffany Nicholson's conduct as a first
officer, with the hope that the flight management team will take appropriate action.

On the nineteenth of August, you sat in the cockpit jumpseat for eight legs of flight while
I served as Captain and Tiffany Nicholson served as First Officer. Among the following
events, there are some that you did not observe, and others that you may remember.

During preflight preparation for two separate legs, when I asked Tiffany Nicholson for
the Before Engine Start checklist, I got no response from her. My request was ignored.
On the first occasion, I asked three times and received no response. On the second
occasion, she got out of her seat and left the cockpit without any response.

During flight and on the ground, when I asked Tiffany Nicholson to accomplish certain
tasks, I received a response that the requested task was "not my job" or "no, that's your
job." For example, when I asked her to make a cabin PA announcement during a period
when my workload was high but her's was not, she responded that she would not make
the PA because that was the Captain's job.

So many of my routine requests to Tiffany Nicholson were either ignored, denied, or met
with an argument, that it became difficult to count on reliable performance from her,
especially in a time of real need. Moreover, Tiffany Nicholson's attitude was a substantial
challenge, detriment and impediment to my capacity to exercise my authority as pilot-in-
command when necessary.

While I endeavor to be able to work well with all fellow crewmembers, I believe that the
attitude that Tiffany Nicholson has displayed is beyond reasonable limits. There is a
palpable lack of goodwill, sense of a common purpose, and team-minded cooperation in
Tiffany Nicholson's attitude. Efforts of mine and of others to foster a better rapport with
her have led me to the conclusion that her attitude is, so far, quite intractable.

I encourage you to take appropriate action.

Sincerely,

*Jonathan Bleiman*

Jonathan Bleiman

**EXHIBIT D**

September 14, 2004

To Whom It May Concern:

This document outlines my experiences in training Tiffany Nicholson. As director of training I served as her ground school instructor, I oversaw her simulator training, I conducted her 15% ride, and I conducted many hours of IOE with her in the jumpseat, the copilot's seat and in the captain's seat. Overall I would describe her as more confident about her knowledge and procedures than the average pilot. She has good hand-eye coordination and acceptable physical piloting skills. Unfortunately her abilities and knowledge are not always germane to the task at hand. As a copilot she frequently demonstrates an apparent arrogance and a fault-finding mentality that creates ill will in the cockpit. As captain, she has repeatedly demonstrated a machismo that if unchecked would stifle meaningful input from a first officer.

I experienced the machismo firsthand when I conducted one of her first training sessions in the actual airplane in late July. On short final to runway 7 in Saipan, Tiffany allowed herself to get too slow and was sinking too fast. I commanded her to add power. Rather than do so, she dismissed my command as a suggestion and responded "I got it." The resulting landing was as firm as I could have allowed. At the time, I was shocked that with so little time in the actual airplane she would respond to a command for more power from her evaluator with such a dismissive, cavalier attitude. During the debrief, I chastised her for her both her words and her manner, and cautioned her that in a crew environment, such behavior could be extremely detrimental to good crew coordination. She appeared to listen, but I did observe a recurrence of such an attitude about a week later. I was conducting IOE with Tiffany in the left seat. Nehal Zaidi was in the jump seat. Enroute, Nehal advocated for a lower power setting in order to offer the passengers less noise and greater comfort. He could not have been more deferential. His exact words were something like, "You know it is kind of nice in the back when you use 77% RPM. Russell uses it all the time." Tiffany dismissed him in a manner that you only read about in old books about crusty old captains who don't take kindly to input. Her exact words were, "Russell ain't here." That was it; no further discussion. I was blown away. An appropriate comment from her might have been something like, "I take your point, but I prefer this power setting for reason X...." Her complete rejection of Nehal's input without explanation would in my opinion absolutely stifle criticism in a critical phase of flight.

When Tiffany is not captain, her attitude has been problematic in other ways. I have repeatedly observed her correcting, as if she were a flight instructor, her captains for the most minor of verbal gaffes. Make no mistake, correct standard phraseology is essential in the cockpit, but her corrections lacked any sort of diplomacy and led to ill will. I also

noted that when she is not the captain, she appeared to have little interest in helping out. During one flight, I was conducting IOE with Jon Bleiman. The weather that morning was challenging. Jon was inside obtaining an update on the weather. I was in the cockpit conducting preflight checks. Tiffany was assigned to the jumpseat in order to observe and learn. I asked her if she could help us out by conducting the exterior preflight. Again, her response blew me away. She said, "ACM means I ain't doing nothing" (ACM means Additional Crew Member. It is the technical name for the jumpseater.) I thought she might be kidding, but indeed she retreated to the passenger compartment of the aircraft where she sat down with a magazine. In the end I got soaked because the rain arrived while I was still conducting my cockpit checks, and I had to preflight in the rain. I probably should have sent her home at that point, but frankly I was as confused by her attitude as I was angry. In any event I was there to observe and critique Jon more than her.

My most unusual interaction with Tiffany came on August 14th at 6:30 in the morning. I was in the cockpit conducting my preflight checks alone, because Tiffany was late. She arrived 15 minutes late at 6:30. When she entered the cockpit I observed she had a split lip and beginnings of a black eye. She informed me that she had run into a group of fighter pilots she had befriended in the last week as they were leaving the hotel that morning. One of the guys had picked her up and thrown her over his shoulder in horse-play, when he lost his balance and fell backwards causing her to hit her face on the ground. I believed her story. But I could not help but notice her absence of embarrassment. Here she was in IOE. She showed up late because of horse-play and she did not seem the least contrite. I would have expected a professional pilot undergoing IOE to show some remorse for their lack of personal responsibility. She showed none. Quite the contrary, she spent much of the day bemoaning her misfortune. In fact, the next day, she complained so much about her face-ache, that half-way through the day she had to leave. Please note, I in know way would reprimand her for calling out hurt; that was the right call given her inability to function in pain. I mention it only because of how she presented herself as the victim of circumstance. I could detect no sense of personal accountability or remorse. I found that most unusual in a professional pilot

In conclusion I would like to note that many of Tiffany's odd-ball comments and apparent unwillingness to work in a team may be the product of an unusual, sarcastic sense of humor. In person, in social settings, her sarcasm and humor go hand in hand in a way that is actually funny. Unfortunately, in the cockpit, it is very hard to tell, particularly when you are busy, whether Tiffany is trying to be funny, or if she really means what she says. That inscrutability makes it difficult to work with her. I think she possesses the ability and desire to the job safely and well, but she would have to commit to a serious personality adjustment in order to do so.


David O'Connor
Director of Training
Cape Air / Nantucket Airlines

Sept. 6, 2004

Dear Steve Phillips,

For your information ...

My one flight with Tiffany Nicholson as First Officer occurred during IOE with Dave O'Connor as ACM.

The Guam to Saipan flight was conducted in heavy rain and convective activity. Upon level-off, I asked Tiffany Nicholson to accomplish a trend monitor. The reply was "That's not my job."

Rather than create a confrontational atmosphere in the cockpit, I began recording the trend data. At this point, Dave O'Connor stated that it was Tiffany Nicholson's duty as First Officer. Tiffany Nicholson then proceeded to enter data on the AML form.

My concern ....

If in every flight a scenario of "not my job" arm wrestling occurs, safety is compromised due to lack of CRM cooperation. This attitude serves to undermine the ability of the Captain to rely on the First Officer in a critical situation.

I send this to you for your consideration.

Sincerely,

Phillip Dery

**EXHIBIT F**

# ACTION FORM (Revised)

**Date:** 9/24/04

**Employee's Name:** Tiffany Nicholson

**Manager's Name:** Stephen Phillips

| Verbal | Written-X | Termination other(specify)-X |
|---|---|---|
| | | (Suspension/Probation) |

**REASON OF ACTION (or Policy Violated):** Unable to interact and communicate effectively in a flightcrew environment. Failed to assist the captain in the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM. Uncooperative attitude and inconsistent CRM skills created unsafe operating conditions in the cockpit.

**CORRECTIVE MEASURE/PLAN:** Mandatory referral to EAP before resuming flight duties. Must attend Crew Resource Management class at FlightSafety as scheduled by the Training Department.

**TIMETABLE:** Effective 9/17/04

**CONSEQUENCES:** Suspended until EAP completed successfully. Removed from flight status as ATR 42 crewmember (may be reviewed in 6 months). May be reinstated as C-402 Captain. Placed on probation for 6 months. Any future inability to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember will be grounds for termination.

**EMPLOYEE COMMENTS:**

Signature does not signify agreement with this action, only that you have received and read.

Employee
Signature_____Date_____

Manager Signature _____Date_____

# ACTION FORM

**Date:**  9/17/04

**Employee's Name:**  Tiffany Nicholson

**Manager's Name:**  Stephen Phillips

**Verbal** _____ **Written-X** _____ **Termination** **other(specify)-X**
(Suspension/Probation)

**REASON OF ACTION (or Policy Violated):**  Unable to interact and communicate effectively in a flightcrew environment. Failed to assist the captain in the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM. Uncooperative attitude and inconsistent CRM skills created unsafe operating conditions in the cockpit.

**CORRECTIVE MEASURE/PLAN:**  Mandatory referral to EAP before resuming flight duties. Must attend Crew Resource Management class at FlightSafety as scheduled by the Training Department.

**TIMETABLE:**  Effective 9/17/04

**CONSEQUENCES:**  Suspended until EAP completed successfully. Removed from flight status as ATR 42 crewmember (may be reviewed in 18 months). May be reinstated as C-402 Captain excluding the Pacific region. Placed on probation for 6 months. Any future inability to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember will be grounds for termination.

**EMPLOYEE COMMENTS:**

Signature does not signify agreement with this action, only that you have received and read.

**Employee**
**Signature**_____**Date**_____

**Manager Signature** _Stth. Phil K_  **Date** _9-17-04_

EXHIBIT H

From: tnicholson@flycapeair.com
To: <sphillips@flycapeair.com>
CC: <lfitzgerald@flycapeair.com>, <tnicholson@flycapeair.com>
Date: Thu, September 16, 2004 9:18 pm
Subject: (no subject)

Thank you for giving me time after our initial meeting to research and develop solutions for improving my CRM skills.

After thinking about my situation considerably today, I have come up with several ideas and options that I think would help me.

I would like the opportunity to do IOE as an FO. I understand that as a Captain, I am technically qualified and should be able to perform the job as an FO. I am qualified to be a Captain and an FO. But, I believe there is a difference between just being qualified and actually performing Captain and FO responsibilities. I believe that FO IOE would considerably increase my CRM skills as an FO.

I consulted EAP about my situation looking for a recommendation. EAP is in contact with a counselor on Guam. I called her to discuss my situation. She has indicated that she can help me with my interpersonal and communication skills. We have set a tentative schedule for a series of appointments.

I believe that FO IOE along with communication training will make me a much more effective crew member.

I truly enjoy my career at Cape Air and look forward to a long and successful future with the Company on Guam.

Thank you for your time and attention
Tiffany

I have considered heavily the options offered on Friday, September 17 to successfully resolve the employment issues relating to my position in the ATR on Guam. I know at times I am difficult to get along and my CRM skills are not at the level of my co-workers, but I believe steps can be taken now to bring my level of CRM up to a more than sufficient ability.

I think FO IOE retraining and CRM skills training are still viable solutions to my problems. I continue to believe it is possible, with additional training, for me to be immediately and successfully reintegrated into the ATR crew environment on Guam.

I have admitted and Cape Air has said that my CRM skills are lacking. I am not asking for any special treatment. I am only asking for the same opportunities afforded to other Cape Air pilots that were found to be lacking in their skill. I am asking for additional training in the areas I am deficient so that I may continue at this time in the ATR program.

If there is a question as to whether or not I am up to the task of being successfully reintegrated at this time, I think that past performance has shown the company the extra efforts I am willing to put into all aspects of my job to get done tasks that are related and unrelated to my position as a pilot for Cape Air. Some tasks I have volunteered for and others have been asked of me by Cape Air.

During simulator training, my skill and performance was such that when I volunteered to be sim partners with Russell Price, it was agreed that I would make a good partner for him and for my own regularly scheduled sim partner, Jon Bleiman. Russell was highly complimentary of my performance, going so far as to say he would have me as his sim partner gladly for any other training or checkrides.

Two pilots failed their initial ground school tests and were given additional training to help them pass the written test and continue in the ATR program. Two pilots were deficient enough in there skills during simulator training to fail their initial simulator checkride. They were given enough additional training to become proficient enough to pass their checkride and continue in the ATR program. Another pilot, after being signed off from IOE was found to be deficient in his skills. He was given enough extra training to become proficient in his position and continue in the ATR program.

When the two Captains failed their initial checkrides, my skills were so highly thought of that I was asked to go back to Houston to be partners with them during retraining.

I realize that the simulator environment is different that the actual aircraft. My performance in the ATR has not matched my performance in the simulator. I believe that is partly due to being trained as a Captain and doing the job of an First Officer without First Officer training. My training as a Captain did qualify me for the position of First Officer, but the two jobs are different and I would have benefited from FO IOE along with my Captain IOE.

**EXHIBIT J**

I would like the opportunity to show Cape Air that a successful and immediate reintegration into the ATR is possible following immediate CRM training, run concurrently with communication skills training, followed by FO IOE in the ATR on Guam. Cape Air had enough confidence in my abilities in the ATR to allow me to assist in the training of three fellow pilots. I would like it if the company continued to have that same confidence in me and believe that I have the ability, given more immediate training, to continue to be a valuable member of the ATR program at this time.

I am willing to go to CRM training at Flight Safety, to participate in any CRM workshops available, and to see the woman recommended by EAP on Guam for as long as the company feel necessary.

I am only looking for an equal opportunity to be successful in my position as an ATR FO/CA. I have always believed that the company has done an admirable job in doing the right thing helping their employees when problems have occurred. Cape Air has always been there to help successfully resolve employee issues. I am asking for the company to extend that courtesy to me. Based on the integrity and honorability of Cape Air and my continuing long term commitment to be a safe and productive asset, I sincerely hope you will reconsider the options offered to me on September 17th.

Thank you for your time and attention. I look forward to hearing from all involved.

Tiffany

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON, | ) CIVIL CASE NO. CV06-00027 |
| Plaintiff, | ) |
| vs. | ) |
| HYANNIS AIR SERVICE, INC. dba CAPE AIR, | ) |
| Defendant. | ) |

DEPOSITION TRANSCRIPT

OF

# TIFFANY ANNE NICHOLSON

February 23, 2007

ORIGINAL

PREPARED BY:     GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** * Fax:(671)472-3094

**EXHIBIT K**

1     A    Being there for your crew. They come
2 to you with any issues or problems, being able
3 to make the required decisions, to not only
4 maintain the safety of the flight but the
5 timeliness, so forth. People's lives are in my
6 hands.

7     Q    So, these qualities that you've
8 mentioned, you believe to be your strength as a
9 captain?

10    A    Yes.

11    Q    Okay. What about in your rule as a
12 first officer, what do you consider your
13 strengths to be in that capacity?

14    A    The rules of first officer is very
15 similar to the captain, except that the first
16 officer does not have the final authority as to
17 what happens. The ultimate decision is from
18 the captain. Then again that includes the
19 communication safety, timeliness, everything.

20         And I also feel that as a first
21 officer, I was not afraid to question the
22 captain, "what you're doing is not safe", "what
23 you're doing is illegal", "are you sure this is
24 what you want to do?" And I also knew when to
25 give up an argument to maintain the safety of

1 necessary.

2  Q  Delegate to the first officer?

3  A  Yes.

4  Q  Okay.

5  A  Captain is responsible for the safe
6 completion, timeliness of the flight, making
7 sure that all rules, regulations, and
8 procedures are followed. And any maintenance
9 discrepancies that may have occurred in flight,
10 he's required to write up once the airplane
11 lands.

12  Q  Anything else?

13  A  Communicate with operations.

14  Q  Where is operations?

15  A  It depends on what the communication
16 would be. It would either be at the station
17 that you're landing at or at Hyannis.

18  Q  Okay. Anything else that the captain
19 does? (Laughs) Check his entire -- carry?

20  A  No, I can't think of anything.

21  Q  Okay. Now, what is the first officer's
22 role?

23  A  The first officer's role is also to
24 make sure that the aircraft is -- you know,
25 maintained, flown in a safe -- you know, safe

1  at all times, also responsible for timeliness.

2  The first officer, upon check-in, would
3  go out to the airplane, do his aircraft
4  acceptance checklist. He's required to do the
5  external pre-flight of the airplane. Both the
6  first officer and the captain are required to
7  review any prior maintenance, discrepancies,
8  making sure they've been fixed or signed off as
9  okay to fly, not repaired. The first officer
10 would be part of the crew brief.

11 The first officer would also be
12 responsible for checking the weather. Anything
13 delegated to him by the captain that would
14 include -- in the crew environment, the first
15 officer is responsible to do the weight and
16 balance on the airplane.

17 He's responsible for getting the
18 clearance for your routes to your destination.

19 He's responsible for calling to get
20 engine start, taxi instructions, takeoff
21 clearance. And then again once the airplane
22 takes off it reverts to -- the roles change to
23 pilot flying, pilot monitoring.

24 Once you land, the co-pilot, the first
25 officer is again back in his first officer role

1 A No.

2 Q Okay. Do you know Chuck White, or

3 Charles White?

4 A Yes.

5 Q Okay. How did you first meet him?

6 A At work.

7 Q Do you recall when you first met him?

8 Roughly a month or a year or time period?

9 A Summer of 2000, when I first started

10 working at Cape Air.

11 Q And what was he doing at Cape Air? I'm

12 sorry, was he employed there?

13 A Yes.

14 Q Okay. And what was he doing there?

15 A Pilot.

16 Q At some point, did you start dating,

17 you and Chuck start dating?

18 A Yes.

19 Q Do you recall when that relationship

20 first became a dating relationship?

21 A 2003.

22 Q Do you recall about when? Month or

23 time period?

24 A No, but we dated for approximately a

25 year.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    Q   Okay. Whose house was it?

2    A   Mr. Waltz (phonetic).

3    Q   Okay. Did you pay him rent?

4    A   Yes.

5    Q   Okay. I think you told me that you

6 started in Cape Air June of 2000, is that

7 correct?

8    A   Correct.

9    Q   Okay. And you initially started in

10 Hyannis?

11    A   Correct.

12    Q   Okay. Now, during that period of time,

13 when you started at Hyannis until when you

14 moved to Guam, did you -- did anyone at Cape

15 Air ever express any concern with respect to

16 your performance as a pilot?

17    A   No.

18    Q   Any negative evaluations?

19    A   No.

20    Q   Did you have any problems with the

21 company when you were with Cape Air prior to

22 moving to Guam?

23    A   Can you be more specific?

24    Q   Did you have any problems with the

25 company? I mean, did you ever complain about

1    there was a position available in Guam?

2    A    The first mention of Guam was summer

3    2003.

4    Q    And how did you receive notice of a

5    position in Guam?

6    A    It was announced by the company that

7    they were working on contracts with Continental

8    to fly on Guam.

9    Q    Okay.

10    A    Generally, that's what -- (pauses).

11    Q    And when did you find out that Cape Air

12    was going to operate in Guam? If you recall.

13    A    Beginning of 2004. To the best of my

14    knowledge, the beginning of 2004.

15    Q    And did Cape Air let its pilots know

16    that it would be needing pilots on Guam?

17    A    Yes.

18    Q    Okay. How was that announced?

19    A    Through the employee website, through

20    Dan Wolf's telephone message and word of mouth.

21    Q    When you first heard, were you

22    interested?

23    A    Yes.

24    Q    What was the process on -- what was the

25    process in which they, I guess, had people

1   apply for the --

2      A   It's a seniority-based bid.

3      Q   Okay.  So, how would that work?  Did

4   they offer it to everybody?

5      A   Yes.

6      Q   All the pilots?

7      A   Yes.

8      Q   Okay.  Do you how many pilots they

9   might have had at that time?

10      A   Approximately 120.

11      Q   Where there other female pilots that

12   they had in their employment at that time?

13      A   Two.

14      Q   Okay.  So, you -- did you bid for it?

15      A   Yes.

16      Q   Okay.  Did you ever indicate any -- let

17   me back up.  Did you ever talk about it, about

18   bidding with other pilots?

19      A   Yes.

20      Q   Okay.  And did you ever indicate to any

21   of them that you were interested in going?

22      A   No.

23      Q   Do you know -- and you were selected,

24   is that correct?

25      A   Yes.

1       Q    Okay.   Do you know how many pilots they

2 selected to go to Guam?

3       A    Eight.

4       Q    Eight, and do you know their names?

5       A    Yes.

6       Q    What are their names?

7       A    John Kappayne.

8       Q    Uh-huh.

9       A    Phil Derry.

10       Q    Yes.

11       A    John Blieman.   Charles White.

12       Q    Uh-huh.

13       A    Myself, Mike Syzmanski.

14       Q    Okay.

15       A    Kevin O'Conner. (unintelligible) with

16 Russell Price being management pilot.

17       Q    What was Russell Price's position

18 before everybody moved to Guam at Cape Air?

19       A    Cape Air Board of Directors, I believe.

20       Q    Okay.   And what was the -- do you

21 recall what sort of package they offered for

22 you to go to Guam?   And, I mean, like a raise

23 in pay or other benefits that you got if you

24 chose to go to Guam?

25       A    Certainly.   There was a pay scale that

1  time.

2    Q    Okay.   How  did  --  did  you  know  that

3  there  were  positions  available  for  captain  and

4  first officer?

5    A    Yes.

6    Q    And  did  you  indicate  which  one  you

7  wanted to be?

8    A    Yes.

9    Q    Okay.  And what did you tell Cape Air?

10   A    Captain, first.  First officer, second.

11   Q    And  how  does  Cape  Air  --  if  you  know,

12  how  did  Cape  Air  decide  who  was  captain  and  who

13  was first officer?

14   A    Based on seniority.

15   Q    Okay.  And when you moved to Guam, what

16  was your position?

17   A    I  was  a  captain  flying  as  a  first

18  officer.

19   Q    Does  that  mean  you  are  qualified  to  be

20  a captain?

21   A    Yes.

22   Q    Okay.      And   who   determines   that

23  qualification, the company?

24   A    The FAA.

25   Q    The  FAA,  okay.   So,  let's  talk  about

1 did.

2     Q   Do you know John Blieman?

3     A   Yes.

4     Q   Were you ever a co-pilot with John

5 Blieman?

6     A   Yes.

7     Q   Do you recall how many times?

8     A   I can think of one specific day. I

9 don't think there was any more than that.

10     Q   Okay. Do you recall if you were

11 serving as a first officer?

12     A   I was sitting on the first officer's

13 position, yes.

14     Q   Okay. I'm sorry, let me just back up

15 one second. The flight you took with Phil

16 Derry and that's Kevin O'Connor, right?

17     A   Correct.

18     Q   Were you being evaluated for that?

19     A   No.

20     Q   No; okay. Did anybody discuss with you

21 what you did on that flight when you observed

22 them?

23     A   No.

24     Q   Who asked you to observe that flight?

25     A   Steve Phillips.

1    Q    Do you know why?

2    A    Steve claims that my CRM skills were

3  lacking and thought that if I observed other

4  crew interactions that I would be able to learn

5  from them.

6    Q    Did you agree with him?

7    A    No.

8    Q    Why?

9    A    Because I did not think my CRM skills

10  were lacking.

11    Q    Did you tell him you didn't agree with

12  him?

13    A    At that point, I did not respond either

14  way.  He asked me to go on the flight, so I

15  went.

16    Q    Okay.  Did you learn anything?

17    A    No.  And that was the limit of the

18  discussion between Steve and myself after the

19  flight.  He asked what I learned; I said,

20  nothing.  That was it.

21    Q    Okay.  Okay.  We'll go back to John

22  Blieman.  Do you recall the date that was?  You

23  recalled you flew with him one day.  Do you

24  recall when that was?

25    A    It would have been either the second or

1  terminology, and generally overall hostile
2  towards me.  He told me that I asked too many
3  questions and I needed to just shut up.
4      Q    Anything else you recall?
5      A    That's it.
6      Q    Okay.  Now, those are things that
7  you've mentioned that you believe he did it
8  improperly.  Did he ever tell you that he
9  thought you did something improperly?
10     A    Yes.
11     Q    What did he tell you?
12     A    He told me that I was insubordinate,
13 and he didn't like my tone of voice.
14     Q    Anything else?
15     A    No.
16     Q    Okay.  Let's talk about when he yelled
17 at you during the flight.  Did that happen more
18 than once, that he yelled at you?
19     A    Yes.
20     Q    Okay.  Could you tell us what he yelled
21 at you?
22     A    What do you mean?  The specific words?
23     Q    Yeah.
24     A    Well, first off he yelled that I was
25 stupid, that he had the airplane under control,

1  he didn't need to hear what I was saying, he
2  could see the airport, he knew what his
3  altitude and airspeed was. And when I
4  questioned that these are required callouts he
5  said he didn't care. He didn't want to hear
6  it. He could handle the airplane.

7      He yelled at me when I told him that I
8  would not shut down the engine due to safety
9  reasons. He told me again that he had the
10 airplane under control and that he could handle
11 the situation. And after the second time I
12 said 'no' he shut the engine down himself,
13 which is also against procedures.

14     Q   Why did he say you were insubordinate?

15     A   Because I told him I wouldn't shut the
16 engine down and because I told him I was going
17 to continue to make required callouts.

18     Q   Okay.

19     A   All in full view of Russell Price.

20     Q   Is this -- why was Russell there?

21     A   To observe me.

22     Q   Okay. Why was he observing you?

23     A   Because of supposed safety related
24 issues that Mr. White brought up.

25     Q   Did you feel that you were using a bad

1     Q   Did you ever tell Cape Air that you

2 wouldn't fly with him again?

3     A   No.

4     Q   Okay. Would you say that you have good

5 communication skills?

6     A   Yes.

7     Q   Would you say that those were necessary

8 for flying the -- say, what kind of plane is

9 this?

10    A   ATR.

11    Q   The ATR?

12    A   Yes.

13    Q   40?

14    A   Yes, it is necessary

15    Q   Okay. Yes, okay. And did you have a

16 personal relationship with Chuck White when you

17 moved to Guam?

18     MR. TORRES: Are you talking about a

19 boyfriend-girlfriend?

20 BY MS. McDONALD:

21    Q   Were you ever his girlfriend when you

22 moved to Guam?

23    A   No.

24    Q   Were you friends?

25    A   I wouldn't say we were friends.

1      Q   What else -- did you say anything else
2   to her?

3      A   No.

4      Q   And   what   did   Linda   say   or   do   in
5   response?

6      A   She said okay.

7      Q   Okay.   Do  you  know  if  she  ever  talked
8   to Chuck White about it?

9      A   I do not know.

10     Q   Okay.   So there was a -- do you recall
11  a time when Chuck White took you off a flight?

12     A   Yes.

13     Q   Okay.   Now,  do  you  recall  what  date
14  that was?

15     A   August, 8/31/04.

16     Q   Did  he  give  you  a  reason  why  he  took
17  you off the flight?

18     A   He told me that I was unsafe to fly.

19     Q   Did  he  say  what  you  did  that  was
20  unsafe?

21     A   No.

22     Q   Did you ask him?

23     A   Yes.

24     Q   And he didn't say anything?

25     A   He  responded  by  saying  that,  when  he

1  this ESR?

2      Q    Who did you ask?

3      A    I can't remember.

4      Q    Okay.   Did he do anything on this day

5  that he threw you off?  Did he do anything that

6  gave you concern?

7      A    No.

8      Q    Did you do anything that was not proper

9  procedure during that flight?

10     A    Yes, I did.

11     Q    What did you do?

12     A    On the Guam-Saipan leg, I was the pilot

13  monitoring and Chuck had to get out some

14  papers, transfer control of the airplane to me.

15  We leveled off into the crew situation, at

16  which point the flying pilot asked the pilot

17  monitoring for the crew's checklist.

18          Chuck could not complete the crew's

19  checklist and there are maybe two or three

20  items on the crew's checklist.  I asked him

21  multiple times to complete the crew's

22  checklist.  He did not so I vocalized, I

23  verbalized the crew's checklist from memory

24  into the cockpit voice recorder, so that people

25  would know that it had been completed.

1    Q   Okay.  Let me see if I understand you.
2  You said you leveled to crews.

3    A   Correct.

4    Q   And in that situation, the pilot flying
5  asked  the  pilot  monitoring  for  the  crew's
6  checklist?

7    A   Correct.

8    Q   So  did  he  ask  you  for  the  crew's
9  checklist?

10   A   No, because I was pilot flying.  He had
11 transferred controls of the airplane to me.

12   Q   Oh, you were pilot flying --

13   A   Correct.

14   Q   -- at that point?  Okay.

15   A   Yes, for just a few minutes during that
16 leg, I was the pilot flying.

17   Q   Okay.  So you asked him for the crew's
18 checklist?

19   A   Correct.

20   Q   Okay.  And what happened?

21   A   He did not complete the checklist.

22   Q   Okay.  So, that's when you -- you said
23 you vocalized it?

24   A   Correct.

25   Q   Now,  okay.   So,  I  had  asked  you  what

1  was -- had you done something improper, what
2  was improper about that?

3     A    The pilot flying, the checklist is --
4  as we've discussed previous checklist or
5  challenge response, and in this situation
6  because Chuck was not completing the checklist
7  and it needed to be done, I verbalized the
8  challenges and the responses. It was not a
9  coordinated effort between the two of us.

10    Q    Okay. So, it was improper because you
11 weren't coordinating it, is that what you're
12 saying?

13    A    It's not the proper procedure because
14 it's supposed to be two people, one
15 challenging, one responding, reading each item
16 on the checklist. And in this instance, it was
17 just one person.

18    Q    So, is that something that caught the
19 attention of Cape Air that you had done this?

20    A    The only reason anybody outside of
21 Chuck and I would know is if he said something,
22 if somebody said something.

23    Q    Okay. Whose responsibility was it to
24 complete the checklist?

25    A    It's the pilot flying responsibility to

1  doing that observation prior to doing it?

2      A    Which ever one of them, like I said, it

3  very well could have been Russell Price, which

4  ever one of them told me to observe the flight.

5  We did discuss, you're on the flight to observe

6  the crew, to observe CRM and how Phil and Kevin

7  worked together.

8      Q    Okay.  So, you're not sure if it's him

9  or Steve, Phil, or Russell?

10     A    No, I'm not sure.  I think it's Steve.

11     Q    You think it's Steve?

12     A    But I'm -- I -- (pauses).

13     Q    And that occurred after Chuck removed

14 you from the flight?

15     A    Correct.

16     Q    And do you know how soon thereafter

17 that happened?

18     A    It would have been the first week of

19 September.  Some -- before the -- I believe

20 before the 5th.

21     Q    Okay.

22     A    I don't remember exactly which day, 1st,

23 2nd, 3rd, 4th, something like that.

24     Q    So it would have been some time between

25 I guess September 1st and September 5th?

```
1    Q    In the cockpit or in the plane.
2    A    He was not in the cockpit.  He may have
3 been on the airplane prior to the flight.  I
4 don't recall if he was there or not.
5    Q    Do you think that observation of other
6 pilots working together can be beneficial?
7    A    It depends on the person.
8    Q    What do you mean?
9    A    Some people learn by watching, some
10 people learn by doing.
11   Q    Okay.  Which one do you learn by?
12   A    Doing.
13   Q    Do you think you could've gained
14 anything by watching?
15   A    You can always gain a limited amount,
16 but again it depends on the kind of person and
17 how you were.  I'm a mechanical person.
18   Q    And I think earlier you said that you
19 didn't learn anything from that day; is that
20 correct?
21   A    No.
22   Q    You did not learn anything?
23   A    No, I did not learn anything.
24   Q    Okay.  Sorry, sometimes the questions
25 and answers get -- messed up.
```

1      A    That's okay.  I understand.

2      Q    Do you recall what time you went home

3  that day?

4      A    I couldn't give you a specific time,

5  but we did Guam out and back.  Meaning we left

6  Guam, went -- I don't remember specifically

7  where we went, probably Saipan or -- I'm not

8  sure if we went to Rota or not, but when we got

9  back to Guam, I left.

10     Q    Okay.

11     A    So, just one out and back to Guam.

12     Q    Were you in the cockpit that whole

13  time?  I mean, observing -- during your

14  observation, were you in the cockpit?

15     A    Yes.

16     Q    Okay.  Did you discuss some with

17  Russell Price later what happened that day?

18     A    In regards to --

19     Q    With regards to the observations that

20  you had.

21     A    There was a discussion about the

22  flight.

23     Q    With Russell?

24     A    Probably.

25     Q    Okay.  Do you recall what you said and

1    what he said?

2        A    No.

3        Q    You don't recall?

4        A    I'm sure there was a discussion and I'm

5    sure it had something to do with, what did you

6    learn, to which I would have responded, "Not

7    much, because I don't learn much by watching

8    what people do."

9        Q    Did Russell express any disappointment

10   during that conversation?

11       A    Yes.

12       Q    What was your response?

13       A    He was disappointed that I didn't stay

14   for the whole day of flying, to which I

15   responded that I was not told to observe the

16   whole day of flying.

17       Q    Did he say anything in response to

18   that?

19       A    I don't recall.

20       Q    Okay.    Thereafter, did he ask you to

21   fly with John Kappayne?

22       A    Yes.

23       Q    Okay.    Do you recall that time when you

24   flew with John Kappayne?

25       A    Yes.

1   Q   On that day, did you bring a headset?

2   A   My headset was broken.

3   Q   Okay.  So, did you bring it?

4   A   I don't think so.

5   Q   Okay.

6   A   I believe at that time, it was being

7   sent off for repairs.

8   Q   Did Russell say anything about the fact

9   that you didn't bring a headset?

10  A   He told me that because I didn't have a

11  working headset, that I was out of uniform and

12  therefore not able to perform the duties of the

13  first officer.  He told me to leave, to go to

14  maintenance and get a headset, at which time he

15  would take the responsibility of first officer

16  upon himself, even though he was not in a

17  uniform either.

18  Q   What do you mean by 'not in uniform'?

19  A   He was in khaki pants and a polo shirt.

20  Q   Okay, so you're talking about a pilot's

21  uniform.

22  A   Correct, yes.

23  Q   Okay.

24  A   Sorry.

25  Q   So, he said he would take on the rest

1  of the flights that day?

2     A   He   sent   me   to   maintenance   to   get   a
3  headset --

4     Q   Okay.

5     A   -- which   is   a   long   trip,   would   have
6  delayed the flight.  He did the flight.

7     Q   What did you do?

8     A   I went to maintenance.  I'm assuming I
9  went to maintenance and asked for a headset.   I
10  don't   specifically   recall   that   --   I   don't
11  remember.

12    Q   Did you end up flying that day?

13    A   Yeah, I did.

14    Q   Okay.   Because you might have gotten a
15  headset.

16    A   Yeah.

17    Q   Yeah, perhaps.

18    A   I did fly because, I mean, I have it in
19  my logbook as having flown that day.

20    Q   Okay.   What date does it say that you
21  flew?

22    A   September 5th and September 7th.

23    Q   Okay.   Both of those days you flew with
24  John Kappayne?

25    A   Yes.   I   believe   the   incident   in

Case 1:06-cv-00027     Document 39-2     Filed 01/18/2008     Page 34 of 47

1 also, but you take it for the joke that it is,
2 because I know I'm a good pilot and they knew
3 they were good pilots.

4 Q Was it Russell's idea to make you fly
5 with John Kappayne --

6 A Yes.

7 Q -- on those two days? It was Russell's
8 idea?

9 A Yes.

10 Q And do you know what his goal was in
11 setting that up?

12 MR. TORRES: Objection, it assumes facts
13 not in evidence.

14 BY MS. McDONALD:

15 Q Do you understand my question? Did,
16 did he ever tell you what his goal was?

17 A (to Mr. Torres) Are you still objecting
18 to the question?

19 MR. TORRES: You can answer if you
20 understand it.

21 A Russell related to me that he set up to
22 flight, the two days of flying with John
23 Kappayne, to observe me and my role in the
24 crew.

25 BY MS. McDONALD:

1    Q   So, did he say anything about whether

2 or not that goal was met?

3    A   No, I mean it was just an observation.

4 He observed me flying with Chuck -- with John.

5    Q   Did he indicate to you that he observed

6 something negative with what you did?

7    A   No.

8    Q   Even with the respect to your CRM

9 skills?

10    A   No.

11    Q   He didn't say anything about that?

12    A   No.   He did not make any negative

13 statements.

14    Q   Did he make any positive statements

15 about your CRM?

16    A   He said that I was doing a good job and

17 that I was performing my position correctly.

18    Q   Did you feel that your CRM skills had

19 improved because of those two days?

20    A   Because of those two days specifically,

21 no. But everyday that you work in a CRM

22 environment, your skills improve.

23    Q   Okay. So --

24    A   There was not any instruction during

25 those days.  It was strictly observation.

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 198 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 2nd day of April, 2007.

_____
George B. Castro

Page 1

IN THE DISTRICT COURT OF GUAM

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,          )
          Plaintiff,             )
                                 )
vs.                              )
                                 )
HYANNIS AIR SERVICE, INC.        )
d.b.a. CAPE AIR,                 )
          Defendant.             )
                                 )

DEPOSITION OF

PHILLIP A. DERY

HYANNIS, MASSACHUSETTS

MAY 17, 2007

.

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  Patricia Bracken, CSR No. 1455898

FILE NO.: A102878

**EXHIBIT L**

Page 58

1  relationship with Ms. Nicholson?
2      A. It was, prior to Guam, cordial. Cordial
3  while going through Guam and -- well, cordial.
4      Q. Okay. And that remains today. Is that
5  correct?
6      A. Yeah.
7      Q. I mean you have nothing against her?
8      A. No. I have --
9      Q. No reason --
10     A. No reason not to --
11     Q. -- to want her to fail or anything like
12  that?
13     A. No, not at all.
14     Q. And you only flew with her that one time?
15     A. That's correct.
16     Q. Generally, how would you characterize her
17  personality?
18     MR. TORRES: Objection. Vague.
19     A. I think Tiffany is intelligent. I think
20  that she is probably capable. I think probably
21  she -- I think she probably has her points where
22  she wants to be difficult and tries to be
23  difficult. Other than that, I don't know.
24     Q. During ground school, did Chuck White
25  ever verbalize to you or to you in a group of other

Page 59

1  people that he wanted to get back with her, with
2  Ms. Nicholson?
3      A. No. I would not have that discussion.
4      Q. Now, you said that you had to retake a
5  check ride. Is that correct?
6      A. Yes.
7      Q. Was it important for the company that the
8  pilots succeeded at training?
9      A. Well, yeah, I suspect it was very
10  important. It was a big undertaking for the
11  company to have received this assignment, if you
12  will, or this appointment from Continental
13  Micronesia to go out there and fly larger planes.
14  And so they were very, very interested in seeing
15  everybody succeed.
16     Q. Okay. Now, you had mentioned that you
17  suspected that she was unhappy that she was not
18  captain. Is that correct?
19     A. I suspect so, yes.
20     Q. Okay. Now, was there a time in which she
21  had wanted the company to hire more pilots? Do you
22  recall that?
23     A. Yeah. I think -- you know, I'm not going
24  to say unhappy not being a captain. I think there
25  was a disappointment in the pay scale. The pay

Page 60

1  scale is a significant difference I think between
2  being a captain and the first officer. And I know
3  initially Tiffany was interested in trying to get
4  the company to have more than just eight pilots go
5  out there. And she actually solicited, I think, to
6  a couple of people on occasion with a letter that
7  she wanted to start saying that we should have more
8  people going out there, more captains and more
9  crews.
10     Q. Now, in your letter, Exhibit 30, you
11  wrote that her reply to your request to accomplish
12  a trend monitor was that's not my job. Is that
13  still accurate --
14     A. Yes.
15     Q. -- with your recollection --
16     A. Yes.
17     Q. -- of what happened that day?
18     A. Yes, that is.
19     Q. So if Ms. Nicholson said that she never
20  said that, would her statement be inaccurate?
21     A. Yes.
22     Q. Okay. And did David O'Connor on that
23  flight tell her to do the trend monitor?
24     A. Yes. The scenario was, to the best of my
25  recollection, was that we leveled off, and we said

Page 61

1  let's call a cruise check. And while we were
2  en route between Guam and Saipan, we were about
3  10,000 feet, which would be the altitude necessary.
4  It was going to be our only time on that particular
5  day where we were going to be above that altitude.
6  And so I said, Tiffany, let's go ahead and get the
7  trend monitor done. And she said that that wasn't
8  her job to do that. She said, that's not my job.
9      And that particular day was kind of a nasty
10  weather day, and rather than get into a big to do
11  about it, I didn't say anything. And Dave O'Connor
12  interjected and said, no, Tiffany, that is your
13  job. You go ahead and do that trend monitor. And
14  then Tiffany said, well, okay.
15     Q. So it was your understanding that it was
16  her job?
17     A. Oh, yeah.
18     Q. And it appeared to be the understanding
19  of David O'Connor as well?
20     A. Yes.
21     Q. Were there any other problems on that
22  flight that you had?
23     A. During that particular flight that went
24  from there to Saipan, no.
25     Q. Other than it was conducted in heavy

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this ___6th___ day of ___June___, 2007.

_Patricia Bracken_

Patricia Bracken, CSR No. 1455898

```
 1              IN THE DISTRICT COURT OF GUAM

 2

 3                               C.A. No.: CV 06-0027

 4                                        )
                                          )
 5   TIFFANY ANNE NICHOLSON,              )
                Plaintiff,                )
 6   vs.                                  )
                                          )
 7   HYANNIS AIR SERVICE, INC.            )
     d.b.a. CAPE AIR,                     )
 8             Defendant.                 )
                                          )
 9

10

11

12                   DEPOSITION OF

13                   LINDA MARKHAM

14               HYANNIS, MASSACHUSETTS

15                   MAY 17, 2007

16

17

18   ATKINSON-BAKER, INC.
     COURT REPORTERS
19   (800) 288-3376
     www.depo.com
20

21   REPORTED BY:  Patricia Bracken, CSR No. 1455898

22

23

24

25   FILE NO.: A102878
```

Page 1

1    Q. So typically you don't get back to the
2 employee then?
3    A. I don't know the percentage how often the
4 director of safety does get back, but it is not
5 part of the process that they have to get back.
6    Q. Okay. I just want to summarize so that
7 we can --
8    A. I mean he gets hundreds of these reports.
9 It could be as little as, you know, a mechanical on
10 a particular plane that somebody is referring to
11 that doesn't put down a name. There's lots of
12 reasons why employees would fill out a safety
13 report.
14    Q. Just to be clear, your understanding is
15 that the pilots that went out and Russell Price
16 went out to start the operation in Guam had not had
17 any prior EEO or Title 7 training during your
18 tenure as a director?
19    A. Correct.
20    Q. Russell Price was, for all intents and
21 purposes, the boss out there responsible for
22 overseeing the operation and the pilots,
23 notwithstanding the chief pilot Steve Phillips,
24 correct?
25    A. Correct.

Page 142

1    Q. The pilots that went out there were
2 selected on a basis of seniority or asked for the
3 position on the basis of seniority and had
4 successfully completed the training?
5    A. Correct.
6    Q. That would be ground school simulation,
7 CRM, and FAA-mandated training?
8    A. Correct.
9    Q. The person who is responsible for that
10 training is David O'Connor?
11    A. Correct.
12    Q. And he would also be a certifying person
13 as well as Flight Safety?
14    A. Correct.
15    Q. Have you ever received any information
16 that David O'Connor has ever falsified any of the
17 training records?
18    A. No.
19    Q. Signed off on training that didn't
20 happen?
21    A. No.
22    Q. You, to the extent that you are
23 management at Cape Air, was aware of the
24 relationship between Mr. White and Tiffany
25 Nicholson, that they were involved in a

Page 143

1 boyfriend-girlfriend relationship while employed at
2 Cape Air?
3    A. Prior to going out to Guam?
4    Q. Yes.
5    A. Yes.
6    Q. And you had an opportunity to review
7 Mr. White's deposition, and in that deposition, he
8 said he didn't want to work with her at one point.
9 Another time he said that if she had remained his
10 girlfriend, that this wouldn't have happened to
11 her?
12    A. Right.
13    Q. As an advocate before the panel
14 consisting of Steve and Larry, that is Steve
15 Phillips and Larry Gaultieri, you, at one point,
16 suggested that they should be retraining for CRM
17 for Tiffany Nicholson. Fair to say that?
18    A. Yes.
19    Q. And that suggestion was rejected by the
20 panel. Is that correct?
21    A. That there should be additional training?
22    Q. Right.
23    A. I don't think it was rejected outright,
24 no. I think we agreed that we were going to
25 provide additional training.

Page 144

1    Q. Okay. But she would get additional CRM
2 training so that she could maintain her position in
3 Guam?
4    A. So that she could maintain her position
5 in Guam after a successful probationary period.
6 You seem to be missing --
7    THE WITNESS: Do you want to give him that
8 other disciplinary action?
9    MR. TORRES: Can I have a copy of this?
10    MS. McDONALD: Yes.
11    Q. And this was revised on 9/24, a week
12 later?
13    A. Correct.
14    Q. And the difference between this and the
15 other one is the elimination of the language
16 regarding the Pacific region?
17    A. Correct.
18    Q. Was there a determination by the
19 committee that -- by the initial panel that her
20 crew resource management skills were such that she
21 was unsafe to fly? A safety hazard?
22    A. In that environment, yes. In a two-man
23 environment, a two-pilot environment.
24    Q. So she would be safe to fly as a 402
25 captain?

Page 145

37 (Pages 142 to 145)

1  she was unsafe about, and he backed off with the
2  statement that she was unsafe. Did you see that in
3  his deposition?
4      A. Yes.
5      MR. TORRES: All right. Let's take five
6  minutes. And we're only going to be another five
7  or ten minutes.
8
9      (Recess)
10
11     Q. Just continuing with our summarizing here
12  to make sure I understand things correctly, was
13  Tiffany viewed by Cape Air as being unsafe to fly?
14     A. In the ATR?
15     Q. Period.
16     A. No.
17     Q. But she was viewed as being unsafe to fly
18  in the ATR?
19     A. Correct.
20     Q. And that was based upon the conclusion of
21  the panel, the investigation of the panel?
22     A. Correct.
23     Q. And I'll have an opportunity to talk to
24  the other panel members, but the investigation that
25  you performed was basically based on your
                                        Page 150

1  consultation with Mr. Price and your review of
2  Russell's letter and O'Connor's letter and Chuck
3  White's letter?
4      A. And Steve Phillips.
5      Q. And a conversation with Steve Phillips or
6  conversations?
7      A. He was a check airmen as well and did
8  some of the IOE training.
9      Q. Okay. So those conversations?
10     A. Yes.
11     Q. And Cape Air had no concerns about the
12  competency of the CRM skills of Chuck White or any
13  of the other pilots?
14     A. Not to my knowledge.
15     Q. When Tiffany wrote her email
16  September 29th and alleged that she had been a
17  victim of sexual harassment and treated unfairly,
18  Cape Air looked at that as an extension of her
19  appeal as opposed to being new claims which would
20  initiate any new investigations, correct?
21     A. That was part of her appeal, correct.
22     Q. And to the best of your knowledge,
23  Tiffany was paid the wages that were referred to in
24  her separation letter, or at least you believe that
25  Tiffany had received the wages referred to in her
                                        Page 151

1  separation letter, correct?
2      A. Yes. I have my assistant actually
3  looking through the payroll to find out if that had
4  been done. I think there were two different things
5  that may have gotten confused with regard to her
6  pay. One of them was retro pay as captain, and
7  then it was retro pay based on where she should
8  have been as a captain, what year she should have
9  come in at. There was a pay scale depending on
10  what year captain she should have come in at. I
11  think one of those had been paid, and perhaps there
12  was another retro one where Tiffany should have
13  come in at a year five captain. And there was a
14  retroactive check that she have been paid for that.
15  We're looking into that.
16     Q. But your testimony is that you thought
17  she had already received that pay? It hadn't been
18  withheld for any reason?
19     A. No. That's right. Correct.
20     Q. Is it your understanding that Tiffany
21  received retraining in Guam before she came to
22  Hyannis on September 9, 2004?
23     A. Was it my understanding that she received
24  retraining in Guam?
25     Q. Yes.
                                        Page 152

1      A. It was my understanding that there was an
2  attempt made to give her retraining at Guam.
3      Q. Okay. So to the extent that you're
4  aware, did Cape Air view her observation of Phil
5  Dery and Kevin O'Connor as retraining?
6      A. Did the company view that as retraining?
7      Q. Yes.
8      A. Yes.
9      Q. And the day one plan or three-day plan,
10  did they view that as retraining?
11     A. What number is that just so I can --
12     Q. It's referred to in Russell Price's
13  letter.
14     A. Can you give me what section that's in so
15  I can refer to it?
16     Q. It's page 231.
17     MS. NICHOLSON: It's 24.
18     A. Day two?
19     Q. Let me get the page number at the bottom.
20     A. I don't have any page numbers.
21     Q. Yes, I think it's page 2. Yes, it is
22  page 2.
23     A. I purposely arrived late to the cockpit
24  on day two, that one?
25     Q. No. Looking at page -- no. It's
                                        Page 153

39 (Pages 150 to 153)

Case 3:06-cv-00027   Document 59-2   Filed 01/18/2008   Page 43 of 47

**Page 174**

1  created, correct?
2      A. I don't recall the time that the comment
3  was made.
4      Q. What's the difference between SIM
5  training and IOE?
6      A. SIM training is a simulator of an
7  aircraft. That's basically what it is. It's the
8  simulation of an aircraft. They go through general
9  procedures and do as much training as possible in a
10  simulated environment before the pilots are allowed
11  to do IOE training, which is initial operating
12  experience, which is in the environment that
13  they're going to be working in the airplane.
14      Q. And so IOE is an actual -- it's
15  experience in an actual airplane?
16      A. That's correct.
17      Q. And so the circumstances of those two are
18  completely different?
19      A. Again, I'm not a trainee, and I'm not a
20  pilot, but to my knowledge, it is different, yes.
21  It's your last part of your -- it's my
22  understanding that it's the last part of the
23  training.
24      Q. Okay. To your knowledge, has Chuck White
25  ever been reported for CRM issues?

**Page 175**

1      A. No.
2      Q. And he remains with Cape Air to this day.
3  Is that correct?
4      A. Correct.
5      Q. And to this day, he still has not -- I
6  mean nobody has written letters about his CRM --
7      A. No.
8      Q. -- abilities?
9      A. No.
10      Q. Okay. Now, right after Ms. Nicholson
11  received the action form, she submitted a bid for
12  an ATR. Is that correct?
13      A. That's correct.
14      Q. And that's not what was available to her?
15      A. That's correct.
16      Q. And was she notified that she wasn't
17  eligible to bid for the ATR --
18      A. Yes, she was.
19      Q. -- prior to her submitting that?
20      A. Yes, she was.
21      Q. What do you make of her doing it that
22  way?
23      A. I think it was Tiffany's way of making a
24  statement that she wasn't going to bid the 402, and
25  she was trying to make a statement.

**Page 176**

1      Q. Mr. Torres also asked you about EEO
2  training. And in your decades of experience in HR,
3  is it common for an employer to offer EEO training
4  to all the employees on an annual basis?
5      A. No.
6      Q. Usually they do it during a new hire
7  orientation the way Cape Air does?
8      A. Correct.
9      Q. With respect to the aspects of training
10  and to the extent you've given any testimony on the
11  training that Tiffany received or the training that
12  was given at ground school, is that just based on
13  your understanding as being the HR person at
14  Cape Air?
15      A. Are you talking about the training that
16  Tiffany received as a pilot or --
17      Q. I'm talking about any aspects of training
18  that appear to be technical. I mean that's just
19  based on your understanding?
20      A. Yes.
21      Q. And not based on your understanding as
22  being actually involved in giving training or
23  anything like that?
24      A. Correct.
25      Q. So the appropriate person to respond to

**Page 177**

1  those inquiries about training would be David
2  O'Connor or Steve Phillips?
3      A. Or Russell Price.
4      Q. Or Russell Price, okay. Let me ask you
5  what percentage of Cape Air's work force is female?
6      A. I would say probably 55 percent.
7      Q. So more than the majority of the people
8  employed by Cape Air are women?
9      A. Correct.
10      Q. And what about amongst the pilot work
11  force? Does Cape Air have any female pilots?
12      A. Yes, we do.
13      Q. Okay. Who would those be and how senior
14  are they?
15      A. Meg Siderwicz I believe is the most
16  senior female pilot. I believe she's probably in
17  the top ten of the seniority list. Marilyn Rhude,
18  Ellen Heggland, Sue Daily. She may be part-time
19  now, but she's full time, part-time. We have
20  another ATR pilot in Guam, Nicole Minglone, who is
21  currently in Guam right now. We probably have
22  about ten other pilots on the seniority list that
23  are female pilots.
24      Q. Okay. And does Cape Air continue to
25  recruit female pilots?

45 (Pages 174 to 177)

1    A. Yes.

2    Q. Okay. Would you say that Cape Air has --

3    A. Actually, we are a member of Women In

4 Aviation.

5    Q. What is that?

6    A. Women In Aviation is an association for

7 women female pilots or flight attendants, and we go

8 to their shows, and we do recruiting at their

9 programs. And we have an employee that is one of

10 the presidents of one of the local associations. I

11 believe it's out of New Bedford.

12    Q. Okay. So Cape Air has an employee in an

13 organization that helps women female pilots --

14    A. Obtain jobs.

15    Q. -- obtain jobs?

16    A. Correct.

17    Q. And Cape Air participates in that?

18    A. Our pilot recruiter goes to the shows and

19 tries to recruit, yes. We just went to one a

20 couple of weeks ago in Orlando.

21    Q. Would you say that Cape Air has a very

22 family friendly atmosphere?

23    A. Yes.

24    Q. It allows flexible hours for people with

25 children. Is that correct?

Page 178

1    A. Yes.

2    Q. Are there females that are among

3 Cape Air's senior management?

4    A. Yes.

5    Q. Could you list who they are?

6    A. Myself, Lisa Kiele, Cindy Beaton, Karen

7 Langfield, who is the VP of finance,

8 L-A-N-G-F-I-E-L-D, Michelle Haynes.

9    Q. Okay. And what about amongst the

10 mid-level management?

11    A. We have several station managers that are

12 females, and we have a few directors. Maureen

13 Supka is the director of airport services. Susie

14 Silva is the director of customer relations. Ellen

15 Holloman who is the new regional administrator in

16 Guam.

17    Q. So there are females represented in every

18 level of Cape Air's work force?

19    A. Yes.

20    Q. I think today we produced a copy of the

21 2004 handbook or excerpts that relate to EEO and

22 discipline. Here's a copy of the page on

23 discipline. If you look at the bottom left-hand

24 corner, it says 05/12/04. What is the significance

25 of that?

Page 179

1    A. That is the revision date.

2    Q. So this was in effect after May 12, 2004?

3    A. Correct.

4    Q. Could you read that to yourself?

5    A. Am I reading the disciplinary action?

6    Q. The disciplinary action.

7    A. Okay.

8    Q. Is there anything that Cape Air did

9 that's in contrast? With respect to Ms. Nicholson,

10 is there anything that Cape Air did that is in

11 contrast with what's stated here under disciplinary

12 action?

13    A. No. I don't see anything.

14    Q. Okay. She was given an action form that

15 outlined her discipline. Is that correct?

16    A. That's correct.

17    Q. She reviewed a request of the action. Is

18 that correct?

19    A. That's correct.

20    Q. And it was reviewed. Is that correct?

21    A. That's correct.

22    Q. And the review was performed by Dan

23 Wolf --

24    A. That's correct.

25    Q. -- with your assistance in conveying what

Page 180

1 had happened --

2    A. Correct.

3    Q. -- at the first process?

4    A. Correct.

5    Q. But you weren't part of Mr. Wolf's

6 decision? I mean you didn't come to the decision

7 with him. Is that correct?

8    A. I provided guidance, correct.

9    Q. Right. But the decision was ultimately

10 his as --

11    A. That's correct.

12    Q. -- you testified today?

13    A. That's correct.

14    Q. And it says something about Russell Price

15 giving further training to Ms. Nicholson. What did

16 you -- before he put that plan into action that we

17 saw, what was your role in that?

18    A. I think the role was -- my role was to --

19 I think my role was to make Tiffany successful. I

20 think our ultimate goal was to provide her the

21 additional training that she needed, and Russell

22 came up with the plan.

23    Q. Did you advise him to be objective about

24 that?

25    A. Absolutely.

Page 181

46 (Pages 178 to 181)

Q. And you advised him to have a meeting
with her?

A. Yes.

Q. And do you know what happened with that
meeting?

A. I'm not certain that the meeting
happened. I know there was a meeting that was set
up, and there was some confusion. And I don't
think Tiffany made the first meeting. I'm not sure
if there was a follow-up meeting.

Q. Are you aware of what experience Russell
Price had to give her further training? His
background?

A. I mean just based on his letter, yes.

Q. Right. But he was a pilot. Is that
correct?

A. Oh, Russell's own personal background?

Q. Yes.

A. Russell had numerous years of experience
in a two-pilot environment with US Airlines.

Q. And so he --

A. He was well versed in CRM and knew the
importance of CRM skills.

Q. So he would have had experience in order
to evaluate the proper type of training to give

Page 182

Ms. Nicholson?

A. Absolutely.

Q. Now, there's been some inference that
perhaps all these pilots had been conspiring to
write these letters. Do you put any weight in that
allegation?

A. I don't because I don't even think some
of these pilots hung out or anything, so --

Q. You didn't know them to be good friends
or --

A. No.

Q. -- wanted to group together or do
anything like that?

A. No.

Q. To your knowledge, did any of them have
any motives in writing letters to Cape Air?

A. Not in my mind.

Q. In coming to the first action form and
the discussions that took place between you and
Larry Gaultieri and Steve Phillips, did
Ms. Nicholson's gender ever come up as an issue?

A. No.

Q. Did you see the issue of gender come up
prior to that in discussions with Russell Price?

A. No.

Page 183

Q. Or with Chuck White?

A. No.

Q. Did her gender ever come up as an issue
when you talked with Dan Wolf?

A. No.

Q. Did her gender have anything to do with
the action that was taken against her?

A. No.

Q. Do you know what Mike Szymanski has been
doing since he left Cape Air?

A. I received a call from an oil company
requesting information on Mike Szymanski, and
obviously I can't give out any kind of confidential
information over the phone without an employee
release. And he proceeded to tell me that Mike
used to work for him in a CFO capacity in the
Dallas area.

Q. And did he tell you if Mike was still
with that company?

A. He said Mike left in the middle of the
night and took proprietary information with him.

Q. Okay. And that's sort of the same modus
operandi that he had with Cape Air. Is that
correct?

A. That's correct.

Page 184

Q. He left in the middle of the night and --

A. Correct.

Q. -- didn't tell anybody?

A. Correct.

Q. Do you recall if he had attendance issues
while he was at Cape Air?

A. I believe there was attendance issues as
well as tardiness issues.

Q. Okay. Thank you.

MR. TORRES: I just have some additional
follow up.

MS. McDONALD: Do you think I can just take a
quick break?

MR. TORRES: Sure.

(Recess)

RE-EXAMINATION BY MR. TORRES:

Q. Were you aware that at or about the time
of the start-up of the Guam operation, that one of
the thoughts was that Cape Air would make Tiffany
Nicholson an assistant chief pilot out there?

A. I recall we had the assistant chief pilot
position posted, and we had several applicants for
the position that we interviewed.

Page 185

47 (Pages 182 to 185)

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 6th day of June, 2007.

_Patricia Bracken_

Patricia Bracken, CSR No. 1455898