**Page 78**

1  an operating headset?
2  A. Yes.
3  Q. When you were flying with her, didn't she
4  have problems with her headset?
5  A. That I don't remember.
6  Q. Why wasn't there additional headsets at
7  Cape Air?
8  A. It's not the company's responsibility.
9  In fact, it's in our manuals that each pilot is
10  responsible for having their own operating headset.
11  Q. But a headset goes down, and you don't
12  have any additional headsets. They have to be
13  ordered from the States, right? I mean they don't
14  go down the store and just go buy one, right?
15  A. Actually, maintenance has headsets that,
16  in a pinch, we could borrow from them. And now, we
17  actually do have a spare headset assigned to each
18  airplane in case the FAA wishes to observe from the
19  jump seat.
20  Q. Did you -- did Russell tell you that when
21  she didn't have an operating headset, that he went
22  looking for one and could not find one anywhere?
23  A. I don't recall.
24  Q. But you do recall that she didn't have an
25  operating headset?

**Page 79**

1  A. I do recall that Russell had informed me
2  she did not have an operating headset. That would
3  be a pilot showing up without the required
4  equipment.
5  Q. Headsets break?
6  A. They do.
7  Q. All equipment breaks?
8  A. Correct.
9  Q. But Russell didn't tell you that he went
10  looking for one, and there was none to be found?
11  A. If he did, he went over and above what he
12  was required to do. But I don't recall that.
13  Q. He's the boss over there. Are there
14  parameters to his role as the boss? It's not my
15  job kind of thing? Is that what you're saying?
16  A. I'm sorry. I don't understand the
17  question.
18  Q. Well, you're saying he went -- if he
19  looked for a headset for another pilot, he went
20  over and above what he was required to do. Does
21  that mean that he --
22  A. I was speaking in his capacity as a
23  captain. If any captain was in the cockpit, and a
24  co-pilot showed up without an operating headset,
25  then really the person that has the inoperative

**Page 80**

1  headset or has no headset has the professional
2  obligation to seek solutions themselves. It's that
3  person's obligation to look for solutions.
4  Q. And the fact that Russell is the boss, he
5  doesn't have an obligation to assist his pilots in
6  whatever might come up?
7  A. Specific to that event, no.
8  Q. Let's go back to your letter.
9  A. Sure.
10  Q. If you look at the second page of your
11  letter, you were talking about August 14th. Why is
12  it that your paragraph there says nothing about the
13  alcohol, nothing about your judgment allowing her
14  to fly that day?
15  A. Two reasons. Number one, it was not and
16  did not form any part of the disciplinary action
17  against Tiffany, so it was irrelevant. What was
18  relevant, what was a lack of personal
19  responsibility was her showing up late, disheveled,
20  and really surprisingly telling me a tale about woe
21  is me, look at my lip, look at my eye, look at my
22  lip, look at my eye, instead of showing up and
23  saying, wow, I'm sorry I'm late, Captain. I'll
24  explain why later. Where are we in the pre-flight?
25  How can I help? That's why I mention -- I don't

**Page 81**

1  mention the alcohol, number one. And number two, I
2  didn't want to say anything that would leave a
3  black mark on her record.
4  Q. Or your record, right?
5  A. No. I disagree with that. I am quite
6  comfortable and confident explaining my own
7  deficiencies. And I am happy to tell the world
8  that I made the wrong call on this particular
9  morning.
10  And you know, part of professionalism is
11  admitting your own deficiencies and striving to
12  improve upon them, and that was absent in this
13  event. Tiffany displayed no sense of personal
14  responsibility for her own circumstances. The fact
15  that she was late was because the world conspired
16  against her. It wasn't because she had done
17  anything to put herself in a position to be late.
18  And for me, that's the most relevant issue. And
19  that's what I'm trying to address in this
20  paragraph.
21  Q. Did you tell Dan Wolf that you let
22  Tiffany get on this ride when you believe she
23  shouldn't have gotten on this ride?
24  A. You know, at the time, no.
25  Q. Did you tell Larry Gaultieri?

Page 82

1    A. You know, at the time, no. Maybe later
2  that day, later that week, yeah.
3    Q. So when I asked them if they know that
4  you let her get on a ride that you believe she
5  shouldn't have gotten on, they will say, yeah,
6  we're well aware of it?
7    A. You know, I don't know. I can't speak
8  for what they will say or what they won't say. I
9  think that I mentioned it to Larry. I don't
10  remember when. I know I mentioned it to Russell
11  either that day or the next day. I don't
12  specifically remember discussing it with Dan Wolf.
13    Q. So your concern then, as you just said,
14  was the fact that she was late and disheveled.
15  Your paragraph here says nothing about her being
16  disheveled.
17    A. An unfortunate choice of words. Let me
18  retract it. The fact that she was late, and rather
19  than displaying a sense of remorse --
20    Q. For being late?
21    A. -- for being late, she had the unusual
22  attitude of showing up late and wanting to give us
23  really a sob story bemoaning her misfortune.
24  Repeatedly she said, wow, look at my lip, look at
25  my eye, look at my lip, look at my eye. It was

Page 83

1  quite remarkable.
2    Q. That could be accomplished in those first
3  three sentences of that paragraph?
4    A. Yes. It probably could be. And if I was
5  more verbose than I needed to be, than so be it.
6    Q. Okay. So this letter is being written at
7  the request of Linda Markham concerning discipline
8  I assume or information relative to discipline?
9    A. Information relative to Tiffany's
10  attitude. Now, if Tiffany was deficient in
11  attitude and manner which led to her being a danger
12  in the cockpit, this letter is my characterization,
13  my attempt at characterizing those instances where
14  I saw elements of that.
15    Q. Do you know who -- well, going back to
16  this being late, Chuck White has had many instances
17  with his tardiness for flights?
18    A. I do not know that. I have no specific
19  knowledge of Chuck being late.
20    Q. Would you necessarily know that?
21    A. I wouldn't necessarily know that unless I
22  was flying with him.
23    Q. Jon Bleiman has many instances of being
24  late?
25    A. I'm sorry. Are you telling me, or are

Page 84

1  you asking me? Because I don't know that.
2    Q. Are you aware if Jon Bleiman has had many
3  instances of being late?
4    A. I'm not aware of that.
5    Q. And unless you were flying with him, you
6  wouldn't necessarily know that?
7    A. If it became a pattern, I would probably
8  hear about it.
9    Q. So this pilot being late fifteen minutes
10  on August 14th, you believe it to be a significant
11  event?
12    A. I do believe it to be a significant event
13  especially in light of the fact that this was part
14  of a continuing evaluation. This is initial
15  operating experience. Initial operating experience
16  is the last hurdle in the course of a pilot's
17  two-month ordeal to become qualified to fly the
18  airplane out in Guam. You're being continuously
19  evaluated by supervisory pilots. And I do find it
20  remarkable that on a flight in initial operating
21  experience a pilot would show up fifteen minutes
22  late.
23    Q. You're aware that on or about
24  September 17th a proceeding or hearing was held
25  with Cape Air, and Cape Air decided to issue an

Page 85

1  action notice against Tiffany formally disciplining
2  her regarding her continued flying of the ATR 42?
3  You're aware of that?
4    A. I am aware of that.
5    Q. The parties that were involved in that
6  decision was Linda Markham, Steve Phillips, and
7  Larry Gaultieri. After you wrote this letter, do
8  you know whether or not it went to those three
9  people?
10    A. I'm sure it went to Linda Markham. I do
11  not recall whether I addressed it to those two. I
12  don't recall. I don't know.
13    Q. You're sure because you -- did you give
14  it to Linda?
15    A. I don't recall.
16    Q. Then why are you sure?
17    A. Because that would be normal for a letter
18  like this. It just would be the norm.
19    Q. Was this a part of an email or an
20  attachment to an email, or was it through
21  intercompany mail?
22    A. I don't recall. For me to walk it over
23  would be easy. For me to email it would be easy.
24  For me to email it and walk it over would be easy.
25  I don't recall which way it went.

22 (Pages 82 to 85)

Page 102

1    Q. Do you know why Cape Air wouldn't give
2 her the opportunity to attend a course like that
3 six-hour course you taught yesterday?
4    A. She did have the opportunity to attend
5 it. It was part of her initial training.
6    Q. Okay. And why then didn't they give her
7 an opportunity for retraining in that regard?
8    A. I see it as part of the action form.
9 There was an opportunity to attend Flight Safety's
10 generated CRM. Part of, I think, her problem was
11 that Tiffany rejected her colleagues. She thought
12 that she could not benefit from her colleagues.
13 She had already demonstrated that she had
14 difficulty listening to her colleagues. So it was
15 our thinking that, all right, we'll give her an
16 opportunity to listen to, you know, a company's CRM
17 course. Perhaps she'll respect them if she doesn't
18 respect us.
19    Q. So is it your opinion she didn't respect
20 you, Cape Air, or whoever "us" is?
21    A. In my opinion, Tiffany had a difficult
22 time finding the positives in her colleagues.
23    Q. Can you turn the page, please?
24    A. Sure.
25    Q. Look at 614, the note there.

Page 103

1    A. Uh-huh.
2    Q. This isn't being qualified as referring
3 to callouts. It simply says excellent CRM and
4 situational awareness. What does that mean to you?
5    A. It means that on June 14, 2004, Tiffany
6 demonstrated excellent CRM and situational
7 awareness.
8    Q. Did you know that Chuck White and Tiffany
9 Nicholson were living together when they were
10 living out in Hyannis? That they were a couple?
11    A. I knew that they had dated previously,
12 but I wasn't privy to the particulars of their
13 personal life. My understanding was that they had
14 dated, that it was in the past, and by all outward
15 appearances, they appeared to work well
16 professionally together. And by that I mean I had
17 the opportunity to teach both of them in the
18 classroom, and they appeared to behave as
19 professionals.
20    Q. Are you aware of any policy at Cape Air
21 that discourages or prevents fraternization between
22 employees?
23    A. Among coworkers, I am not. Among
24 management personal to subordinates, then yes, that
25 is discouraged.

Page 104

1    Q. Is there a policy to that effect?
2    A. Boy, I don't know. I honestly don't
3 know.
4    Q. Do you recall whether you've ever seen a
5 written policy to that effect?
6    A. I honestly don't know. To me, it's so
7 automatic, it would be just -- I mean it's my code
8 of conduct. I wouldn't even have to think about
9 it.
10    Q. Can you recall any conversation with
11 anybody at Cape Air that enlightened you as to that
12 code of conduct or policy?
13    A. I recall years ago attending a
14 presentation for all managers in which somebody
15 spoke to us about the importance of not
16 fraternizing with subordinates and being on guard
17 against sexually harassing others.
18    Q. You attended a sexual harassment class
19 while employed with Cape Air?
20    A. Yeah. I think I can say that I have. I
21 don't recall the date or time, but I can recall
22 sitting in a room, not unlike this, in a hotel and
23 a lawyer speaking to us about sexual harassment.
24    Q. Do you remember the year?
25    A. No, I don't.

Page 105

1    Q. Do you remember the lawyer's name?
2    A. No, I don't.
3    Q. Was it a female?
4    A. I believe so.
5    Q. Did you get a certificate or any sort of
6 certification from that attendance?
7    A. No.
8    Q. So what was the topic or topics?
9    A. I haven't even thought about this in
10 years until you asked me about it.
11    MS. McDONALD: Objection. Relevance as to
12 this line of questioning.
13    Q. Did this training involve training on
14 discrimination?
15    A. I don't recall.
16    Q. Retaliation?
17    A. Yeah. I think -- you know what? I think
18 that discrimination retaliation was probably
19 covered.
20    Q. Was it Title 7 training?
21    A. I don't know.
22    Q. It's in the past?
23    A. Yes. It's in the past, but certainly
24 taken to heart, and it has formed part of my code
25 of conduct.

27 (Pages 102 to 105)

Case 1:06-cv-00027    Document 39-5    Filed 01/18/2008    Page 3 of 16

**Page 122**

1  overly familiar with the procedures.
2  Q. Is it your understanding that when she's
3  called for a disciplinary proceeding like that,
4  that she's presented with the charges against her
5  and asked to give her explanation?
6  A. Again, I must say that this is not my
7  area of expertise. I assess people in training and
8  their abilities and competence and safety, but I
9  haven't been present at any disciplinary hearings
10  like that.
11  Q. Have you ever been told by anybody at
12  Cape Air that the specific allegations set forth in
13  your letter dated September 14, 2004 were presented
14  to Tiffany?
15  A. Boy, I think I probably was by Linda, but
16  I'm not a hundred percent sure. I assume that when
17  I signed it, that it would be presented to Tiffany,
18  painful though it was.
19  Q. Do you have an opinion, as we sit here
20  today, whether or not she is capable or could be
21  capable to fly the ATR 42?
22  A. Based on the fact that she didn't avail
23  herself of the opportunities to change her behavior
24  and the underlying attitudes that cause that bad
25  behavior, then my opinion is no, she is not.

**Page 123**

1  Q. Have you had occasion to talk to her
2  within the last three years -- two-and-a-half
3  years?
4  A. I have seen her on one or two occasions
5  and exchanged guarded pleasantries.
6  Q. Any discussion regarding her separation
7  from Cape Air?
8  A. I listened to her.
9  Q. What did she tell you?
10  A. She told me that she rejected the action
11  form. I don't know if she specifically mentioned
12  it as a form. She told me that she didn't think
13  that the company's assessment was fair, and that
14  she wouldn't accept it. And I think I shrugged and
15  wished her well.
16  Q. So at the time that this was being
17  formulated, this action form, you didn't have any
18  objection to putting her through CRM class at
19  Flight Safety or EAP interpersonal communications?
20  A. I thought that the two were integral. I
21  thought that she would probably gain the most
22  benefit from the counseling services of the EAP
23  network, and that they might help her get at the
24  underlying issues that were causing her to have an
25  attitude that was incompatible with her performance

**Page 124**

1  in the cockpit. And then once she dealt with that,
2  that she might benefit from some CRM training from
3  somebody other than me, from somebody other than
4  anybody else at the company, just to give her a
5  fresh perspective. But I felt that those two items
6  were essential.
7  Q. So are you saying that you thought that
8  she would eventually return as opposed to what you
9  just said, that you thought she was not competent
10  to fly?
11  A. Based on the fact that she didn't avail
12  herself of the opportunities, she's not competent.
13  If she had at the time demonstrated the type of
14  personal responsibility and any kind of ownership
15  of her difficulties out there, then I would have
16  hoped that she would have.
17  Q. In your prior testimony, you said that
18  you don't recall if you ever mentioned the
19  August 14, 2000 flight incident regarding alcohol
20  with anybody other than Russell?
21  A. No. I think I mentioned it to -- I think
22  I said in my testimony, and correct me if I'm
23  wrong, but I think I did, at some point, mention it
24  to Larry and to Linda, but I don't recall whether
25  or not Dan was specifically included in those

**Page 125**

1  conversations.
2  Q. When you said it to Larry, the director
3  of operations, did he show concern about the
4  decision you had made that day?
5  A. No, I don't think so. I think he showed
6  sympathy. Nobody wanted to see anybody, Tiffany or
7  anybody else, make such a monumental screw up that
8  they would get themselves terminated for a
9  substance problem. It's a horrible thing when it
10  happens. When a pilot does that, it's in the
11  papers. It's a black eye on the entire industry.
12  And it's a horrible personal tragedy for the one
13  individual. And I don't think anybody wanted to
14  see that happen.
15  Q. But I was asking -- okay. You said he
16  showed sympathy. Sympathy for you or for Tiffany
17  or for both of you?
18  A. You know, it was a conversation on the
19  phone. So for me to say "show" is an incorrect
20  characterization. It was something that I could
21  only hear. But through the phone, I think he was
22  disappointed in her. I think the attitude would be
23  like, oh, boy. The best characterization would be,
24  oh, boy.
25  Q. Okay. He was disappointed in her, but

32 (Pages 122 to 125)

Page 126

1  there was no substantiation that she --
2      A. Exactly. Well, I'm sorry. Ask your
3  question.
4      Q. -- was unfit to fly because of alcohol?
5      A. That is correct. There was no
6  substantiation that she was unfit to fly because of
7  alcohol. And that is why it did not form any part
8  of the disciplinary action against her.
9      Q. So was Larry concerned about your
10 decision making in that regard since you,
11 obviously, to this day are concerned about the
12 decision you made?
13     A. I don't know. I don't know if Larry was
14 concerned that I made a bad decision or not. I
15 don't know.
16     Q. You are though?
17     A. I am. I am disappointed that I didn't
18 remove her.
19     Q. Are you disappointed you didn't even
20 mention it in your letter?
21     A. No, I'm not. I didn't think that it was
22 germane to any of the disciplinary actions that
23 were taking place with Tiffany.
24     Q. Do you see a contradiction there?
25     A. No, I don't. If I had put it in my

Page 127

1  letter, it would have been -- it would have become
2  part of or clouded the issues surrounding her
3  performance in the cockpit. And there were enough
4  behavioral issues apart from any question of
5  alcohol consumption that that's where the focus of
6  a disciplinary action should have been. Tiffany
7  didn't have an opportunity to refute whether or not
8  she was safe to fly, and I didn't remove her from
9  the flight. But here we are years later, and I
10 still vividly remember it, and so it's relevant to
11 me.
12     Q. Looking at your letter, looking at that
13 second page, second paragraph, you talk about her
14 face, the injury to her face?
15     A. Yes.
16     Q. And you say, quote, I could detect no
17 sense of personal accountability or remorse.
18     A. Yes.
19     Q. What were you expecting to hear or see?
20     A. A professional pilot is responsible for
21 showing up. And if they're --
22     Q. She did show up.
23     A. On time. A professional pilot is
24 responsible for showing up on time.
25     Q. Do you expect to see remorse on every

Page 128

1  pilot that's fifteen minutes late?
2      A. I do, particularly during a training
3  event or during an evaluation period. Absolutely.
4  I would expect a darn good explanation.
5      Q. Now, if you expect that, why doesn't it
6  show up in their personnel folder if it's that much
7  of an event to you as director of training?
8      A. Why wouldn't it show up in her personnel
9  folder?
10     Q. Right.
11     A. I can answer that quite simply. I didn't
12 want to cast aspersions on Tiffany's record.
13     Q. Isn't that your job though? You're the
14 director of training. Isn't that your job to make
15 sure that the people in the cockpit --
16     A. Yeah.
17     Q. -- are trained properly and adequately?
18     A. Certainly. And to the degree --
19     Q. And being late --
20     A. I'm sorry. Go ahead.
21     Q. -- and that being late and being
22 unprofessional and lacking the proper amount of
23 personal accountability, if it is important, then
24 why don't you put it in their folder?
25     A. Because it was my sincere hope that by

Page 129

1  the end of her evaluation period, which is a period
2  spanning a couple of weeks out on Guam, that she
3  would have mended her ways. And if she had, I
4  didn't want her to have anything that would follow
5  her, you know, any personnel file or training
6  records are accessible to future employers. And I
7  didn't want anything like that to harm her in
8  future employment opportunities.
9      So if Tiffany had been able to mend her ways
10 and show up on time, be professional, accept
11 responsibility for her shortcomings, then it would
12 be a shame if one instance of showing up late
13 followed her in her future.
14     Q. Okay. And all the documentation I've
15 seen that is post August 14th showed no instances
16 of her ever coming in late again. Are you aware of
17 any?
18     A. I'm not aware of any. But the lack of
19 personal responsibility is part and parcel the
20 pattern of behavior that we witnessed.
21     Q. But you're talking about one occasion.
22 And now you're calling it a pattern of behavior?
23     A. The pattern of behavior or the lack of
24 personal responsibility and the lack of ownership
25 of her own deficiencies. What I've identified in

ATKINSON-BAKER, INC. COURT REPORTERS

1 (800) 288-3376

Page 130

1  my letter and what I identified in my experience
2  both flying with Tiffany and observing her was a
3  fault-finding mentality and an inability to both
4  accept constructive criticism and to hear
5  suggestions from crew members.
6      For example, on a flight with Phil Dery, when
7  Phil was telling her, Tiffany, you're high, you
8  need to increase your rate of percent to get down,
9  she didn't listen. That is the same sort of lack
10 of personal responsibility and an inability to
11 hear. So it's not an instance of isolation. It's
12 part of a pattern of behavior.
13     Q. You know, I read your letter, and I think
14 you write well. And this paragraph deals only with
15 August 14, 2004, and it's summarized in the last
16 two sentences there. And now, you're telling me
17 that that summary relates to something that you
18 don't even talk about here?
19     A. That's right. Because at the start of my
20 letter, I outline my experiences in training with
21 Tiffany Nicholson, and I hit the three biggies.
22 There are others that form part of a mosaic that I
23 think illustrates what was going on with her
24 personality in the cockpit; for example, the flight
25 I just mentioned with Phil Dery, that, you're

Page 131

1  right, I don't include in my letter. But taken as
2  a whole, I think you can see a pattern.
3      Q. But where do you expect to take it as a
4  whole when you don't even see it?
5      A. Well, I imagine -- I'm sorry. I didn't
6  understand your question.
7      Q. She didn't follow up with you?
8      A. I'm sorry?
9      Q. And she didn't follow up with you on this
10 letter?
11     A. She who?
12     Q. She being Linda Markham, the person who
13 requested this letter from you.
14     A. Well, if more information was needed, I
15 would certainly have been able to provide it. I
16 thought that it would be good in an initial letter
17 to limit my observations to a few of the more
18 noteworthy. And as it turns out, others had
19 similar experiences that they contributed.
20     Q. And you, yourself, didn't contact Linda
21 Markham to discuss your letter with her?
22     A. I'm sorry. It was three years ago. I
23 don't recall if I contacted her to discuss my
24 letter or not.
25     Q. In talking about machismo or macho as

Page 132

1  it's discussed in the --
2      A. Advisory circular?
3      Q. -- advisory circular, you agree that this
4  is talking about pilots who are doing things
5  that -- pilots who take risks and perhaps place
6  people's safety in jeopardy?
7      A. I would agree only in that that's how
8  it's described in one section of the advisory
9  circular. In another section of the advisory
10 circular, attitudes are characterized as personal
11 predispositions. So I disagree with you that
12 machismo means the act of taking chances or taking
13 risks. I would state rather that macho is an
14 attitude and a personal predisposition that can
15 lead to such behavior.
16     Q. But I'm talking about the definition
17 attributed to the FAA advisory circular. I'm not
18 making my own definition here.
19     A. Nor am I. I'm referring to the advisory
20 circular as well.
21     Q. Okay. So did you ever discipline her for
22 taking risks in order to impress others?
23     A. As you characterize it, no, I did not.
24     Q. Take a look at Exhibit 2. This is the
25 pilot record information request. Can you explain

Page 133

1  what the purpose of this document is?
2      A. Sure. This is to comply with the Pilots
3  Record Improvement Act of 1997 so that future
4  employers will know about a pilot's success or
5  failure.
6      Q. Is it mandated by federal law?
7      A. Yes.
8      Q. So there's no surprises, and employers
9  know what the other employer knew --
10     A. Sure.
11     Q. -- the extent of the questioning --
12     A. Uh-huh.
13     Q. -- with the ultimate goal that they want
14 to insure people's safety when they're up in the
15 air?
16     A. Correct.
17     Q. So you'll see that it says on page 3,
18 that within the last five years, a pilot has never
19 tested positive or refused to submit to a test?
20     A. Correct.
21     Q. Do you have any issue with that response?
22     A. No. That is correct.
23     Q. The second one, is that within the last
24 five years, the pilot has not tested positive or
25 refused to submit to an alcohol test?

34 (Pages 130 to 133)

Page 142

1    Q. So if she had applied at a company that
2 had that policy, she probably would not have been
3 hired?
4    A. Correct.
5    Q. Now, I think in your letter -- let me go
6 through that a little bit in detail. Now, you
7 noted in the first paragraph that she is confident
8 about her knowledge and procedures more than the
9 average pilot?
10    A. Yes.
11    Q. What would you -- what sort of skills are
12 you talking about there that she has more than the
13 average pilot?
14    A. In her flying ability and just in her
15 knowledge of systems, she's more confident than the
16 average pilot that I fly with or work with.
17    Q. Okay.
18    A. Most have a sort of what I would
19 characterize as a healthy level of self doubt. Not
20 so much that you're constantly second guessing
21 yourself, but you're open to the possibility that
22 you could be wrong.
23    Q. And then that is, I guess, counter
24 balanced by the last two sentences in which you say
25 that she demonstrates an apparent arrogance and a

Page 143

1 fault-finding mentality that creates ill will in
2 the cockpit. And the next sentence says, as
3 captain, she has repeatedly demonstrated a machismo
4 that, if unchecked, would stifle meaningful input
5 from a first officer.
6    A. Yes.
7    Q. Do you have any examples of that, or is
8 that based on your experience with her --
9    A. Yes. Well --
10    Q. -- flying that month of August?
11    A. My experience that month, which consisted
12 of statements like, Russell ain't here, when Nehal
13 suggested that 77 percent rpm provides a quieter,
14 more comfortable environment for the passengers,
15 that sort of dismisses -- yeah, well, he ain't here
16 kind of comment is -- that harkens back to the days
17 of crusty old captains who wouldn't take input from
18 anybody.
19    Other examples, I write them out in my letter
20 where I asked for the pre-flight, and she said, ACM
21 means I ain't doing nothing. These were quite
22 noteworthy because they were most unusual and
23 contrary to our company mantra. It's in one of our
24 handbooks, I'm not sure which, where it states that
25 employees are expected to have a "can do" attitude

Page 144

1 and to help out. And it was quite contrary to that
2 and quite remarkable.
3    Q. Now, you do the CRM training these days,
4 is that correct, for Cape Air?
5    A. Yes, I do.
6    Q. And do you have a section of the
7 presentation in which you talk about the origins of
8 CRM?
9    A. Yes, I do.
10    Q. What are those origins?
11    A. Well, in the 1970's, NASA conducted a
12 study where they identified human factors as the
13 leading cause of accidents. Prior to that point,
14 planes crashed despite the best efforts of captains
15 and their crew to deal with it, but there were some
16 spectacular bad examples of crew coordination that
17 led to fatalities. And airlines identified human
18 factors as the area where, if they want to improve
19 flight safety, that's where they should direct
20 their attention.
21    Q. And is it a concern of Cape Air that its
22 pilots, particularly in the ATR, be able to have
23 good CRM?
24    A. Yes. CRM is applicable to both the
25 single-pilot environment where a single pilot has

Page 145

1 to identify and direct their resources to achieve
2 safety and utility, but it's also applicable in the
3 two-pilot environment as well. And in the
4 two-pilot environment, the underpinnings of good
5 communication skills and interpersonal skills
6 really come to the floor. There's still accidents
7 occurring because captains refuse to take input
8 from first officers and also accidents where first
9 officers sort of mentally take over the cockpit and
10 direct the flight. Both situations are dangerous.
11    And I found that when Tiffany was acting as
12 the captain, she could be domineering to the point
13 of stifling input from the first officer. And when
14 she was a first officer, she could be fault finding
15 to the point where she was advising the cockpit.
16    Q. You said that both situations are
17 dangerous. Could you describe how?
18    A. Sure. In the 1970's there was a famous
19 accident in Tenerife where a captain who wouldn't
20 listen to his flight engineer and his co-pilot for
21 KLM initiated takeoff in fog despite the fact that
22 Pan Am was still on the runway, and they crashed
23 into one another. The co-pilot and the flight
24 engineer on the KLM flight both knew that something
25 wasn't right, but were unable to get through to the

Page 146

1  captain.
2      There have been other accidents in the
3  regional airline industries especially where a weak
4  captain is dominated by a first officer who is
5  attempting to usurp the authority of the captain.
6  And when the captain is not in charge, then the
7  state of the cockpit degenerates to the point where
8  everybody has poor situational awareness. And
9  they've had controlled flight into terrain where
10 they both lost situational awareness, and they
11 ended up flying into the side of a hill.
12     In both those scenarios, there was either an
13 overly domineering captain or a domineering
14 co-pilot, and it can be quite dangerous.
15     Q. Okay. And your experience with Tiffany
16 gave you concern as to the dangers of poor CRM when
17 she was in the cockpit?
18     A. That is correct.
19     Q. I'm going to show you a document,
20 Exhibit A, general operating manual. Have you seen
21 this document before?
22     A. Yes.
23     Q. And what is it?
24     A. It's our general operating manual.
25     Q. And it's for 121 operations?

Page 147

1      A. Yes.
2      Q. Does that include ATR?
3      A. Correct.
4      Q. Now, looking at -- if you look at the
5  page on the bottom right-hand corner starting at
6  538, there's a description in the middle under
7  first officer. Do you know what this document
8  actually does in terms of the operations of
9  Cape Air?
10     A. Yes. It lays out the duties and
11 responsibilities of flight operations personnel.
12     Q. Okay. So this description of a first
13 officer, would that have applied to
14 Ms. Nicholson --
15     A. Yes.
16     Q. -- during her time at Cape Air --
17     A. Correct.
18     Q. -- flying the ATR?
19     A. Correct.
20     Q. Now, if you look quickly through that
21 list, are there elements of CRM that are
22 incorporated into the responsibilities and
23 authorities?
24     A. Certainly. Assisting the captain in the
25 most efficient manner, preparing all required

Page 148

1  forms, including flight logs, charts, and reports
2  as required by the captain for his review. Aiding
3  the captain in the safe and efficient conduct of
4  the flight from pre-flight planning through
5  termination duties, and other such duties that may
6  be required or assigned by the captain. These are
7  the areas where I think Ms. Nicholson fell short.
8      Q. And what about -- you didn't mention the
9  third bullet point under authorities.
10     A. Third bullet point under authorities,
11 maintaining a high degree of crew coordination and
12 cockpit discipline. That's correct.
13     Q. That's an elementary CRM?
14     A. It certainly is.
15     Q. Okay. Now, so you've identified the
16 first bullet point on the page that's marked H539
17 on the bottom and the first, second, and third
18 bullet points under authorities, as well as the
19 last. Is that correct?
20     A. That is correct.
21     Q. Now, in your experience with
22 Ms. Nicholson, did she comply with -- was there
23 ever a time when she did not comply with any of
24 these bullet points?
25     A. Yes.

Page 149

1      Q. And which one are you talking about and
2  which experience?
3      A. Well, certainly in my experience,
4  performing other such duties that may be required
5  or assigned by the captain, for example, asking her
6  to pre-flight, preparing and maintaining all
7  required forms, including flight logs, that would
8  be an instance where she was asked to conduct the
9  trend monitoring. And frankly, with regard to
10 maintaining a high degree of cockpit discipline,
11 she fell short.
12     Q. How so?
13     A. Not showing up on time and not being in a
14 fit state to fly. And the poor attitude was
15 indicative of poor cockpit discipline.
16     Q. And if you look at the top right-hand
17 corner, it says 21 June '04?
18     A. Yes.
19     Q. What is the significance of that?
20     A. That's the revision date on this
21 particular manual. The manual gets revised
22 regularly.
23     Q. Would this have been in effect during the
24 time that Ms. Nicholson was experiencing
25 difficulty?

38 (Pages 146 to 149)

Page 150

1    A. Yes.
2    Q. Now, going back to your letter, which is
3 Exhibit 29, and let's go back to the second
4 paragraph on the first page. And there's the
5 instance where she allowed herself to get too slow
6 and was sinking too fast. You commanded her to add
7 power. Rather than do so, she dismissed your
8 command as a suggestion and responded, I got it.
9 Now, what was the manner in which she responded to
10 you?
11    A. Dismissive.
12    Q. Could you be more specific?
13    A. It was dismissing my command for more
14 power in an urgent, almost emergency situation as a
15 mere suggestion. And it was indicative of a lack
16 of respect I guess. Not that I was personally
17 offended. I was not. But I was shocked.
18    Q. Now, it says after that that during a
19 debrief, you chastised her for both her words and
20 her manner and cautioned her that in a crew
21 environment, such behavior could be extremely
22 detrimental to good crew coordination?
23    A. Yes.
24    Q. Do you remember what you said to her?
25    A. I don't remember the exact words. I do

Page 151

1 remember her not being very responsive. I wasn't
2 sure if I got through.
3    Q. And what do you mean by her not being
4 responsive?
5    A. I don't think she said much of anything
6 in response other than uh-huh.
7    Q. And did it end at that, or did she ever
8 ask you for more help on that?
9    A. No. It ended at that.
10    Q. And then in that same paragraph, you're
11 talking about the instance with Nehal. At the
12 bottom, you assess that her complete rejection
13 absolutely stifled criticism in a critical phase of
14 flight. Can you describe that a little bit more?
15    A. Yes. Nehal's suggestion was just about
16 passenger comfort, but it was phrased in a way that
17 was very much a pattern of an assertive statement
18 where Nehal was endeavoring to get his opinion
19 known to the captain. And it was emblematic of the
20 type of statements that co-pilots have to make all
21 the time when they have a suggestion for a captain.
22    In this case, it was simply about changing
23 the rpm for passenger comfort, but it reminds me of
24 the co-pilot in the KLM flight trying to get the
25 captain to understand that we are not cleared for

Page 152

1 takeoff, and the captain dismissing him. When you
2 dismiss suggestions of subordinates in the manner
3 that she did, it has a tendency to stifle future
4 suggestions. In this case, it wasn't about Flight
5 Safety, but in the future, it could have been.
6    Q. Might that affect crew coordination?
7    A. Absolutely.
8    Q. Which is one of the requirements under
9 the operating manual?
10    A. Correct.
11    Q. And it's also an exhibit of poor CRM?
12    A. Yes.
13    Q. Okay. You go on to say that you've
14 observed her correcting her captain for minor
15 mistakes.
16    A. Uh-huh.
17    Q. You personally observed that?
18    A. Yes.
19    Q. Do you recall any instances?
20    A. I can remember instances where her fellow
21 pilots would make a minor verbal gaff, an incorrect
22 phraseology, and Tiffany was quick to correct them
23 whether or not it was relevant to the safety of
24 flight at that time in such a way that was both
25 distracting and unproductive. Specific times, yes.

Page 153

1 For example, if a pilot said a thousand to go
2 instead of saying 10,000 for 11,000, she would
3 immediately point that out. Those types of things
4 occurred with regularity.
5    Q. Okay. And would you ever point out to
6 her that she was having issues with her CRM or at
7 least with interpersonal skills?
8    A. Absolutely.
9    Q. And how many times do you think you
10 pointed that out to her?
11    A. Boy, at least -- I don't know. The
12 communication skills, I don't know. Two or three.
13 I'm not sure.
14    Q. Two to three times perhaps?
15    A. Sure.
16    Q. And that would have been prior to
17 August 31st that you had those conversations with
18 her?
19    A. Yes.
20    Q. So if she had said that she had no idea
21 that she was having problems with her communication
22 skills prior to August 31st, would her statement be
23 inaccurate?
24    A. I don't know. I don't know if she was in
25 a position where she was capable of listening.

39 (Pages 150 to 153)

Page 154

1    Q. So she might not have recognized that
2  there was criticism?
3    A. Correct.
4    Q. Before Guam or on Guam, did Ms. Nicholson
5  or Chuck White ever mention to you that they didn't
6  want to fly with each other?
7    A. No. No, they did not.
8    Q. And was there anything about their
9  behavior towards each other that caused you concern
10 that they shouldn't fly?
11   A. No, there was not.
12   Q. Did they act in a professional manner
13 towards each other?
14   A. They did.
15   Q. What motivated you to write Exhibit 29?
16   A. Is it the letter?
17   Q. Yes, your letter.
18   A. It appeared we were heading down a road
19 towards disciplinary action that might not have a
20 happy outcome, and I wanted to make sure that our
21 experiences were properly documented.
22   Q. Are you aware of any incidents of
23 retaliation against Ms. Nicholson at the workplace?
24   A. No, absolutely not.
25   Q. Do you have any interest in pushing out

Page 155

1  Ms. Nicholson from her employment at Cape Air?
2    A. No. In fact, I was saddened that she
3  didn't accept the plan of action or the action
4  form. I had --
5    Q. Why were you saddened?
6    A. Well, I don't like to see anybody get
7  terminated, and I didn't wish her any ill will.
8  And I thought she might greatly benefit from
9  especially the counseling services of the EAP
10 network and possibly from just taking a step back
11 from the whole ATR experience until she could work
12 out whatever personal issues were causing her to be
13 unable to perform as needed.
14   Q. If she had accepted the action form,
15 would you have seen to it that she received the
16 training that is mentioned in there?
17   A. Absolutely.
18   Q. Let's look at the action form. Do you
19 have a copy in front of you?
20   A. I do not.
21   MR. TORRES: The revised?
22   MS. McDONALD: The revised.
23   Q. We can look at it together. Let's start
24 with the reason of action. Now, had you seen this
25 document at the time it was issued?

Page 156

1    A. I don't think I actually saw the actual
2  document, but I was aware of its contents.
3    Q. Okay. So under reason of action for
4  policy violated it says, unable to interact and
5  communicate effectively in a flight crew
6  environment. Is that your understanding of her
7  deficiency?
8    A. Yes. In fact, it's consistent with the
9  presentation I gave on Friday on communication.
10 Now, communication -- at the heart of communication
11 is the precept that the message sent is the one
12 received. And I think, unfortunately with Tiffany,
13 sometimes she had an awful time communicating
14 effectively in that regard. There were times when
15 I just wasn't sure was she being sarcastic, or was
16 she trying to make a bad joke. But then when you
17 would query her, like is she serious? When she
18 says ACM means I ain't doing nothing, and then you
19 see her kicking back in the front row of the
20 passenger compartment with a magazine, you have to
21 assume that she is serious. I'm not sure that it
22 was her intent to be as disruptive as she was, but
23 she was having significant communication
24 difficulties, and that was a problem.
25   Q. So even if it wasn't her intent to be

Page 157

1  unable to interact and communicate effectively, it
2  was happening?
3    A. Yes. Sadly, even if it wasn't her
4  intent, that was what was happening.
5    Q. And then the second sentence says, failed
6  to assist the captain in the most efficient manner
7  possible to make certain flights were accomplished
8  at the highest level of safety as required by the
9  GOM. Is that consistent with your experience with
10 her?
11   A. Quite.
12   Q. And that's what we talked about earlier
13 when we referred to the general operating manual?
14   A. Yes.
15   Q. And then finally, the last sentence,
16 uncooperative attitude and inconsistent CRM skills
17 created unsafe operating conditions in the cockpit.
18 Is that consistent with your experience with her?
19   A. That is consistent with my assessment and
20 my experience. Absolutely.
21   Q. And for instance, one example would have
22 been the "I got it" comment?
23   A. The "I got it", the "well, he ain't
24 here", the "ACM means I ain't doing nothing", and
25 the attitude of fault finding that were totally

40 (Pages 154 to 157)

Page 158

1  counter-productive to really the team-oriented
2  environment that is a crew.
3      Q. Now, I notice it says uncooperative
4  attitude and inconsistent CRM skills. Were her CRM
5  skills inconsistent in your view?
6      A. They were. I think that Tiffany was
7  capable when she wanted to be capable, but for some
8  reason, and I don't know why, they took a nose dive
9  at some point in Guam.
10     Q. Okay. So then under the corrective
11 measure, there's a referral to EAP. What was the
12 point in that referral? What benefit would she
13 have received?
14     A. Well, if, in fact, Tiffany was a capable
15 pilot and someone who could do the job if she had
16 the correct attitude, the idea of referring her to
17 EAP was to let her receive counseling outside the
18 company in a no-jeopardy environment where they're
19 not going to talk to us and tell us what they
20 talked about. It's an outside company that simply
21 says yes, this person successfully completed
22 counseling, or no, they didn't. And she would feel
23 free to maybe get at some of the questions that
24 were causing her to fail.
25     Q. Okay. If she was willing to have a

Page 159

1  session or several sessions of EAP, do you think
2  she would have benefitted from that?
3      A. Absolutely. Yeah.
4      Q. And then it also recommends or states a
5  corrective measure of attending CRM class at Flight
6  Safety as scheduled by the training department.
7  That would have been your department?
8      A. Yes.
9      Q. And did you have every intention of
10 scheduling the CRM classes pursuant to the
11 corrective measure?
12     A. Certainly.
13     Q. What would that have required in terms of
14 scheduling that?
15     A. Not a great deal. She would have had to
16 go to Houston or possibly Atlanta. We would have
17 put her up there, and she would have attended a CRM
18 course put on by our contract trainers.
19     Q. And in a certain respect, would that have
20 been a repetition of a class she had taken
21 previously?
22     A. It would have been qualitatively
23 different because it would have come from different
24 instructors, and it would have offered a fresh
25 perspective.

Page 160

1      Q. But the skills would be the same as --
2      A. Yes.
3      Q. -- she had learned previously?
4      A. Yes. The precepts of CRM have been laid
5  out for decades and refined, and we're all working
6  from the same play book, but perhaps she would have
7  benefitted from a fresh instructor. And we wanted
8  to afford her that opportunity.
9      Q. Now, there are certain consequences that
10 are listed here on the revised action form. One is
11 that she is suspended until EAP is completed
12 successfully, removed from flight status as ATR 42
13 crew member, and may be reviewed in six months.
14 She could be reinstated as a C-402 captain. It
15 doesn't contain a limitation on excluding a
16 specific region.
17     A. Right.
18     Q. Is that consistent with your
19 understanding?
20     A. Yes.
21     Q. She was able to bid for a 402 line in
22 Guam?
23     A. Yes, she could have bid for a 402 in
24 Guam. And I understand that Tiffany went through
25 quite a bit to get her dogs out to Guam. And I was

Page 161

1  happy to see that revised because I didn't want her
2  to take them away from Guam, have to take them back
3  to Guam, and subject them to the quarantine again.
4  That would have been awful. So I was pleased that
5  the revised action form afforded her the
6  opportunity to fly -- to continue to fly in Guam
7  for the benefit of her and her dogs.
8      Q. Okay. It also says she's placed on
9  probation for six months, and any future inability
10 to maintain a positive attitude in the work
11 environment based on teamwork or inability to
12 fulfill the duties and responsibilities of a flight
13 crew member will be grounds for termination. And
14 that would just be standard for anybody --
15     A. Standard probationary language.
16     Q. -- in terms of sort of the attitude that
17 people are required to have at Cape Air, a positive
18 attitude?
19     A. Yes. That's correct.
20     Q. So what it looks like in the consequences
21 is that she was going to get further training in
22 two ways, EAP and through Flight Safety. She was
23 able to live in Guam and fly an aircraft that she
24 had previously flown and didn't have any problems
25 flying previously, and that she could potentially

41 (Pages 158 to 161)

Page 174

1  this list that you think Ms. Nicholson displayed?
2      A. Yes. Antiauthority.
3      Q. Okay. And what does it say about
4  antiauthority.
5      A. It's characterized by the "don't tell me"
6  attitude. Or one can substitute the phrase "not my
7  job". This attitude is found in people who do not
8  like anyone telling them what to do. In a sense,
9  they are saying no one can tell me what to do.
10  They may be resentful of having someone tell them
11  what to do or may regard rules, regulations, or
12  procedures as silly or unnecessary. However, it is
13  always a prerogative to question authority if you
14  feel it is in error.
15      Q. Now, later in this advisory circular --
16  wait. Let me back up.
17      So how did she exhibit the antiauthority
18  hazardous attitude?
19      A. With repeated instances of telling fellow
20  crew members "that's not my job". She perhaps
21  thought she was pointing out that they were in
22  error, but she stepped way over the line.
23      Q. Now, let's go back to -- I'm sorry. At
24  the end, second page from the end, page 14, it
25  looks like what the advisory circular does is give

Page 175

1  a hypothetical situation and then a few examples.
2  So let's look at the one on the bottom that says,
3  resignation hazardous attitude. Could you just
4  look at that real quick and read it?
5      A. Sure. This is a quiz to see if you can
6  identify the hazardous attitude at play, and they
7  give a situation. Your co-pilot shows up for duty,
8  and you notice the co-pilot's behavior is somewhat
9  out of the ordinary. You know your co-pilot has a
10  cold. When questioned, the co-pilot said maybe it
11  was the antihistamine or he or she took the night
12  before. Although your aircraft requires a crew of
13  two, you decide to ignore your co-pilot's
14  drowsiness and inattention. Which of the following
15  alternatives best illustrates the resignation
16  reaction.
17      Q. Okay. So this one is looking for the
18  resignation reaction?
19      A. Yes. And this was -- the resignation was
20  not an attitude that Tiffany exhibited, but each
21  one of the potential answers exhibits one of the
22  hazardous attitudes. What is your question?
23      Q. Well, my question would be, which one of
24  the answers matched the one that displayed a macho
25  hazardous attitude?

Page 176

1      MR. TORRES: Objection. Relevance.
2      A. You could fly this jet by yourself
3  anyway, that one.
4      Q. And is that something that is similar to
5  what you saw or heard Ms. Nicholson display?
6      A. It's an example of a macho attitude that
7  I saw Ms. Nicholson display.
8      Q. So did it concern you that her attitude
9  was the sort of attitude that's pointed out as
10  hazardous by the Federal Aviation Administration?
11      A. Yes, it did. Everybody has some aspects
12  of a slight amount of hazardous attitude. The
13  difference between everyone else and Ms. Nicholson
14  is most of us are able to assess it, talk ourselves
15  out of it, and do the right thing. And for some
16  reason, in Guam during that span of time, she was
17  unable to do that.
18      Q. Mr. Torres asked you whether you thought
19  Ms. Nicholson was fit to fly based on her
20  performance, and you had indicated that there are
21  other factors besides performance?
22      A. On the instance of August 14th --
23      Q. Right.
24      A. -- I think was his question.
25      Yes. Fitness to fly is a self-assessment

Page 177

1  that we all make. And the outcome, a successful
2  outcome of the flight, is not an apt way of
3  determining whether or not the person was fit to
4  make the flight in the first place.
5      Q. What are generally the factors that
6  determine fitness to fly?
7      A. The FAA and another advisory circular
8  puts out the "I am safe checklist", which stands
9  for illness, medication, stress, alcohol, fatigue,
10  and emotion. And a pilot needs to self-assess
11  whether or not they're free of those external
12  influences prior to making a flight.
13      Q. So generally, that's the checklist that
14  you would use to self-assess?
15      A. Correct.
16      Q. You had also stated earlier that Cape Air
17  wanted everyone to succeed at this new venture in
18  Guam?
19      A. Yes.
20      Q. Did that include Ms. Nicholson?
21      A. Of course. We invested a significant
22  amount of money in training these eight pilots, and
23  we needed all of them.
24      Q. Right. I mean the other option would
25  have been that Cape Air hired people that were

Page 178

1  already experienced part 121 pilots and put them
2  out in Guam. Is that correct?
3      A. That was considered, but it would have
4  been contrary to the seniority system that is
5  sacred at any airline. So we wanted everybody to
6  have the opportunity to fly the big airplane based
7  on seniority.
8      Q. Okay. Does it make any sense to you that
9  Cape Air would have invested money in
10  Ms. Nicholson, put her through training, and sent
11  her out to Guam in order to see her fail?
12      A. No. It would have been contrary to the
13  business practice and common sense.
14      Q. Okay. You touched briefly on your
15  experience as a -- I'm sorry -- as a flight
16  instructor.
17      A. Yes.
18      Q. Where was that again? Daniel Webster
19  College?
20      A. Yeah. After I got out of college and
21  went to Flight Safety Academy in Vera Beach,
22  Florida where I obtained commercial certificates
23  and instructor ratings, I then went to Daniel
24  Webster College, and I taught there for
25  three-and-a-half years. Daniel Webster College is

Page 179

1  a collegiate aviation institution in Nashua,
2  New Hampshire.
3      Q. And you said you held various positions
4  there?
5      A. Yes. I think by the time I finished at
6  Daniel Webster, I was an assistant chief pilot, and
7  I trained in primary instructing aerobatics,
8  gliding, and crew coordination in single-engine and
9  multi-engine airplanes.
10      Q. And could you tell us more about your
11  experience teaching crew coordination and CRM?
12      A. Yes. It was a very rewarding experience.
13  In order to be qualified to teach CRM in a
14  multi-pilot environment, the instructors had to go
15  through a continuing education process, twice
16  weekly classes, be mentored, and then certified to
17  teach. And it was a unique instructing opportunity
18  because you would actually be in the back seat
19  watching two college students fly the airplane and
20  doing their best to coordinate as a crew. I had
21  the opportunity to see some exceptionally bad CRM
22  and some exceptionally good CRM.
23      Q. And you did that for how long?
24      A. That was the last year of my instruction
25  at Daniel Webster, maybe a year and a half. And

Page 180

1  then I was hired at Cape Air.
2      Q. Cape Air has a current female pilot
3  working in Guam. Is that correct?
4      A. Yes.
5      Q. And to your knowledge, has she had any
6  problems while working with the male pilots that
7  are assigned to Guam?
8      A. Not at all, no. She does a fine job.
9  I've flown with her, and I have found her to be
10  among the best first officers we have.
11      Q. Now, how long -- when you guys were doing
12  the ground school, and you had CRM trainings, was
13  that one full day?
14      A. Six hours.
15      Q. Six hours?
16      A. Yes.
17      Q. And the training program that you had,
18  was that approved by the Federal Aviation
19  Administration?
20      A. Yes. And I think we had a representative
21  sitting in on it, a representative from the FAA
22  sitting in on it.
23      Q. During the CRM part or all of the ground
24  school?
25      A. During various parts of the ground

Page 181

1  school, and I think during the CRM part. They
2  would pop in and out throughout the entirety of the
3  initial training monitoring it for content.
4      Q. Do you recall how Ms. Nicholson -- what
5  her approach was to ground school?
6      MR. TORRES: Objection. Vague.
7      A. Unremarkable. She successfully completed
8  ground school.
9      Q. And your role during ground school was?
10      A. A ground instructor.
11      Q. Now, was Ms. Nicholson trained as a
12  captain or first officer or both?
13      A. Both.
14      Q. In what capacity? Or how was she trained
15  in both?
16      A. She was qualified as a captain and
17  qualified as a first officer. In the course of
18  training at Flight Safety, you sit in both seats
19  with your SIM partner, so you alternate right seat,
20  left seat, right seat, left seat. And then out in
21  Guam, we conducted IOE as a captain and then
22  continued to observe her operating as a first
23  officer.
24      Q. Okay. So you said she was qualified as a
25  first officer?

ATKINSON-BAKER, INC. COURT REPORTERS        1 (800) 288-3376

Page 182

1    A. Yeah. At the time, someone who is
2 qualified as a captain would automatically be
3 qualified as a first officer.
4    Q. So she received sufficient training to
5 operate as a first officer?
6    A. Yes.
7    Q. And the training was the training that
8 was provided and approved by the FAA?
9    A. Correct.
10    Q. How important is it for a first officer
11 not to be insubordinate?
12    A. Terribly important. At the inception of
13 CRM training in the late '70s, a great deal of it
14 focused on making sure that first officers felt
15 empowered to object to domineering captains. And
16 that remained a theme through the '80s. In the
17 '90s, the pendulum swung in a slightly different
18 direction after some accidents where the state of
19 the cockpit shifted over to the right seat, and
20 co-pilots unintentionally or intentionally usurped
21 the authority of weak captains, and the environment
22 degenerated. And that became an increasing safety
23 concern.
24    So it is terribly important that there be a
25 captain, and that the captain be the one to

Page 183

1 ultimately have the final authority as to the
2 conduct of the flight, and that a first officer
3 have the interpersonal communication and diplomacy
4 skills to effectively communicate without
5 undermining.
6    Q. Okay. So that concern harkens all the
7 way back to the origin of CRM?
8    A. Yes.
9    Q. Well, let me ask you this. If any of the
10 persons that were trained in ground school or in
11 SIM training or during IOE -- let's say they didn't
12 pass any aspect of the three phases I just
13 mentioned to you, and they didn't pass a second
14 time as well, for example, after being given
15 additional training, would they be able to fly the
16 ATR?
17    A. A second failure would merit, at the very
18 least, a meeting with the chief pilot and an
19 assessment as to whether or not to continue. A
20 second failure would have resulted, in the very
21 least, in a conference with the chief pilot and an
22 assessment as to whether or not they be allowed to
23 continue. And in all likelihood, they would not
24 have.
25    Q. Okay. So let's say Phil Dery. He didn't

Page 184

1 pass the check ride, right?
2    A. Uh-huh.
3    Q. That's what we talked about or you talked
4 about earlier today. Let's say he didn't pass a
5 second check ride --
6    A. He probably would not have gone to Guam.
7    Q. Okay. And he would not have flown an
8 ATR?
9    A. That is probably the case.
10    Q. Okay. So let's say Ms. Nicholson, she
11 passed SIM training, ground school. She started
12 exhibiting difficulties with CRM. And you and
13 Russell Price, and with the guidance of Steven
14 Phillips, came up with an additional training
15 program, correct?
16    A. Correct.
17    Q. And she also didn't take advantage of
18 those opportunities. Is that correct?
19    A. Correct.
20    Q. So in the same way, I mean that justifies
21 not putting her back in the ATR? I mean that's
22 consistent with the pattern of not letting people
23 go back into the aircraft after they don't pass a
24 second time?
25    A. Correct. She did not pass a second time.

Page 185

1 She didn't avail herself of the opportunity to
2 pass.
3    Q. Did Chuck White ever tell you one on one
4 or before a group of people that he wanted to get
5 back together with Ms. Nicholson?
6    A. Definitely not.
7    Q. Did he ever imply that to you?
8    A. Definitely not.
9    Q. Now, you also talked about Alyssa Rojas
10 earlier today and how she didn't end up in Guam
11 because she was sort of the backup.
12    A. Correct.
13    Q. Did that have anything to do with her
14 gender?
15    A. No, of course not.
16    Q. Was that based on her seniority?
17    A. Yes. She didn't have seniority. She was
18 a part-time first officer. Meg Siderwicz would
19 have ended up in Guam if she had wanted to. She
20 was my SIM partner as I went through training at
21 Flight Safety. But she elected not to head to
22 Guam.
23    Q. Who is Meg Siderwicz?
24    A. She's one of our most senior pilots and a
25 check airman at the company.

Case 1:06-cv-00027     Document 39-5     Filed 01/18/2008     Page 14 of 16

Page 186

1  Q. And she's a woman?
2  A. Yes.
3  Q. Do you know how long she's been at
4  Cape Air?
5  A. Boy, I think she's number two or three on
6  the seniority list. Almost as long as there's been
7  a company.
8  Q. Are there other senior female pilots?
9  A. Many. I'm somewhat proud of the fact
10 that Cape Air has a higher ratio of female pilots
11 than most airlines.
12 Q. I'm almost done.
13 A. I hope my daughter will be one.
14 Q. Was it difficult to talk to Ms. Nicholson
15 about the issues she was having with CRM?
16 A. It was very difficult to talk with
17 Ms. Nicholson about these issues.
18 Q. Why is that?
19 A. She wasn't receptive at that time.
20 During that span of time in Guam, for some reason,
21 she was not receptive to constructive criticism or
22 much communication, whether it was because her face
23 hurt, and she couldn't listen to you, or she was
24 dissatisfied with her colleagues being less worthy
25 than she in her own assessment. It was very

Page 187

1  difficult to communicate with Tiffany about her
2  deficiencies.
3  Q. Did she ever seem that she understood
4  what you were telling her?
5  A. I'm sorry. Could you restate the
6  question?
7  Q. Did she ever -- to you, did she ever
8  display some sort of ability to understand what you
9  were telling her and a willingness to put that into
10 her future flights?
11 A. Difficult to say. The proof is in the
12 future flights. Whether or not someone has
13 actually listened to you, you find out on
14 subsequent flights. I would have to say that based
15 on subsequent flights, she didn't listen.
16 Q. Now, you do the CRM training for Cape Air
17 pilots. Is that correct?
18 A. I do.
19 Q. And is there -- have you imported into
20 your lessons any of your experiences with
21 Ms. Nicholson and her CRM issues?
22 A. I have.
23 Q. Okay. What would that be?
24 A. Well, we -- without naming names, we all
25 draw on experiences when we come to CRM training.

Page 188

1  We draw on the past experiences. And one example
2  that we use in class is when you're -- when the
3  pilot you're flying with appears to be off heading
4  by one degree, what's the correct way of pointing
5  it out. And it stands out because this was a story
6  that one of our pilots mentioned that drove him
7  crazy flying with Tiffany, you know, being vectored
8  by air traffic control and challenging weather and
9  being told by her you're not on your correct
10 heading. Well, what is my correct heading?
11 Correct heading is 360. Well, it looks like I'm on
12 a heading of 360. You're not on your correct
13 heading. Well, what is my correct heading? 360.
14 But I'm on 360. No, you're not. You're on a
15 heading of 359. In that instance, that
16 hair-splitting fault-finding example is a
17 discussion point for improper crew coordination.
18 Q. Was Russell Price qualified to administer
19 the additional training for Ms. Nicholson?
20 A. Very qualified. His fourteen years of
21 experience at US Airways and at regional airlines
22 prior to that and his excellent communication
23 skills make him very well qualified.
24 Q. Can a person -- a pilot learn from
25 watching others?

Page 189

1  A. Yes. And in fact, one of the hallmarks
2  of a professional pilot is to try to draw on the
3  good, identifying the good habits of others, and
4  trying to learn from that and hopefully not the
5  bad.
6  And I have to go.
7  Q. Okay. One last question.
8  In your experience working with John
9  Kappeyne, Jon Bleiman, Phil Dery, Chuck White, and
10 Russell Price, does it make any sense that there
11 would be some sort of conspiracy to push out
12 Ms. Nicholson from Guam because she was a woman?
13 A. Definitely not. In fact, all of the
14 people that you list I think were senior to
15 Ms. Nicholson. So you know, it would be completely
16 inconsistent with a pilot's mentality. The old
17 pilot joke, two pilots are at a funeral -- no. Two
18 pilots are in a pilot lounge, and one says, hey,
19 did you hear about old Joe? And the other says,
20 no, what about old Joe? And the other pilot says,
21 old Joe kicked the bucket. And the other one says,
22 gee, that's too bad. What was his seniority
23 number? That's the way pilots think. There would
24 be no motive for getting rid of somebody who was
25 junior to you unless the person were truly

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this 7th day of June, 2007.

_Patricia Bracken_

Patricia Bracken, CSR No. 1455898