IN THE DISTRICT COURT OF GUAM

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,                    )
          Plaintiff,                       )
                                           )
vs.                                        )
                                           )
HYANNIS AIR SERVICE, INC.                  )
d.b.a. CAPE AIR,                           )
          Defendant.                       )
                                           )

DEPOSITION OF

STEPHEN G. PHILLIPS

HYANNIS, MASSACHUSETTS

MAY 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  Patricia Bracken, CSR No. 1455898

FILE NO.:  A102879

**EXHIBIT P**

1    It's basically your testimony under oath.
2    And please answer as fully and competely as you can
3    answer.  And when this testimony is over, there's
4    going to be a transcript made of it.  You'll get a
5    copy of that transcript.  You'll have an
6    opportunity to review that with about a 30-day
7    period to do so.
8    If you want to make any changes because it's
9    incorrect in some way, you're entitled to do that.
10   However, if you make a substantive change that
11   affects your answer that was previously given, I
12   have a right to comment on that in trial and
13   impeach you, if we so choose, with regard to your
14   first answer or the veracity of your first answer.
15       A.  Okay.
16       Q.  So today is there any reason why you
17   can't give me full and complete answers?  Are you
18   on any medication or anything like that?
19       A.  No.
20       Q.  I think that the questions I'll be asking
21   you, you'll probably know all the answers to.  I
22   don't know if you've had an opportunity to review
23   any documents in anticipation of your testimony
24   today.  Did you get to do that?
25       A.  Yes.

1        Q.  What documents were you able to review?
2        A.  There were some letters from other pilots
3    that were written.
4        Q.  How about emails?  Correspondence?
5    Anything of that nature?
6        A.  I did not review that.
7        Q.  Okay.  All right.  Let's go over your
8    background a little bit.  How long have you been
9    with Cape Air?
10       A.  Almost 12 years.
11       Q.  And when you first started with Cape Air,
12   what was your job?
13       A.  A 402 captain.
14       Q.  And what's your present position?
15       A.  System chief pilot.
16       Q.  And in 2004 -- most of the events we'll
17   be talking about are those that occurred in 2004 in
18   Guam and in Hyannis.
19       In 2004, what position did you hold?
20       A.  Chief pilot.
21       Q.  You're now the assistant chief pilot?
22       A.  No.  System.
23       Q.  Oh, a system chief pilot?
24       A.  Uh-huh.
25       Q.  What is that?

1        A.  It's basically the same thing as a chief
2    pilot.  It just encompasses the whole company.
3    It's a different title.
4        Q.  And as chief pilot, what are your duties?
5        A.  I oversee the pilot group and supervise
6    and manage safety and efficiency.
7        Q.  How many pilots are under your
8    supervision?
9        A.  Approximately 120 right now.
10       Q.  And in 2004, Cape Air started a new
11   operation in Guam?
12       A.  Yes.
13       Q.  And what role did you play in that?
14       A.  I was the chief pilot at the time and --
15   do you mean what position was I in?
16       Q.  Well, let me just -- I'll just ask you
17   specifically.
18       At that time, the pilots that were selected
19   to go to Guam were all flying 402 planes, right?
20       A.  Yes.
21       Q.  And then they were going to be flying an
22   ATR 42, and they were required to be trained to be
23   able to do that?
24       A.  Yes.
25       Q.  And then they went to -- they did ground

1    school training here in Hyannis?
2        A.  Yes.
3        Q.  And then went on to Houston to do
4    simulator training?
5        A.  Correct.
6        Q.  And the CRM was part of that simulation
7    training, right?
8        A.  Yes.
9        Q.  What role did you have in that training,
10   the training that occurred here in Guam (sic) and
11   in Houston?
12       A.  I didn't do any of the training.
13       Q.  Did you have a role in that at all?
14       A.  I was in the class as well receiving
15   training.
16       Q.  Who gave the training?
17       A.  David O'Connor did the majority of the
18   training.
19       Q.  Okay.  How about flight -- do you guys
20   hire outside assistance to do the training in
21   Houston?
22       A.  Flight Safety is who we use for simulator
23   training.
24       Q.  What did David O'Connor teach?
25       A.  Basic indoctrination, and I believe he

1  did system training as well.
2      Q. What is CRM training?
3      A. CRM training is to learn about crew
4  resource management.
5      Q. And what is crew resource management
6  about?
7      A. Crew resource management is enhancing
8  communication to be able to use all available
9  resources to maximize safety in the cockpit.
10     Q. Is there a course that you were taking in
11 Houston that's called CRM? Or how was that taught?
12     A. For CRM we had some guest lectures come
13 in from the industry that taught us about CRM in
14 Hyannis. And it's incorporated into the training
15 that you receive in the simulator.
16     Q. In terms of hours, what's the total
17 simulator hours that were given down there?
18     A. I'd have to check all the people's
19 flights because I don't recall exactly.
20     Q. Okay. Well, just ballpark?
21     A. I think you get between 10 to 15 hours in
22 the simulator.
23     Q. Are there evaluations being done of your
24 performance in the simulator?
25     A. Yes.

1      Q. Who does that?
2      A. The instructor.
3      Q. Would that be the Flight Safety people?
4      A. Yes.
5      Q. Do you remember the names of any of those
6  Flight Safety people?
7      A. I'm not sure. I do remember some of the
8  instructors' names. I'm not sure if they were the
9  ones teaching.
10     Q. Do you know who Brian Shea is?
11     MS. NICHOLSON: Sheatz.
12     A. Brian Sheatz?
13     Q. Sheatz.
14     A. Yes. I've met him.
15     Q. Who was that?
16     A. He was, I believe, a part-time safety
17 instructor and also an examiner.
18     Q. Do you remember him from the training in
19 2004 as being one of the examiners?
20     A. Yes.
21     Q. So simulator training is 10 to 15 hours,
22 and within that simulation training is CRM
23 training, correct?
24     A. Yeah. I think that's an approximation of
25 the hours, but they do incorporate CRM training.

1      Q. Fair to say that all the pilots who were
2  going to Guam it was the first time that they were
3  going to be in a two-pilot cockpit plane?
4      A. For all the pilots? No. I think at
5  least one had previous -- I'm not sure of
6  everybody's experience, but I know at least one had
7  previous two-pilot crew experience.
8      Q. Who do you think that was?
9      A. Russell Price.
10     Q. What was Russell's position over there?
11     Well, before I ask that, did you ever go to
12 Guam yourself?
13     A. Yes.
14     Q. And so do you know what Russell's
15 position was in Guam?
16     A. Yes. He was a Pacific administrator.
17     Q. And did he answer to you?
18     A. No.
19     Q. Who was his boss?
20     A. I believe he reported to Dan Wolf.
21     Q. So you're the boss of all the pilots, and
22 then who do you report to? Who is your boss?
23     A. Currently or at the time?
24     Q. At that time.
25     A. My boss was -- I reported to the director

1  of operations, Larry Gaultieri.
2      Q. And you said Russell was Pacific
3  administrator. What does that mean to you? When
4  you were there, what -- well, explain to me what
5  the Pacific administrator was as you understood it.
6      A. Well, he was tasked with the overall --
7  overseeing the whole operation out there, more
8  specifically having to do with the safety of the
9  operation, helping the pilots get experience, and
10 dealing with Continental, our partner.
11     Q. Okay. He was the guy that scheduled the
12 flights for pilots? Would it be fair to say that
13 he was the main arm then for Cape Air on Guam?
14     A. I'm not sure what you mean by the main
15 arm, but he was overseeing the whole operation,
16 yes.
17     Q. How many times did you go to Guam in
18 2004?
19     A. I was there in -- I think it was August
20 for the startup of the operation.
21     Q. Do you remember the startup date?
22     A. It was August 1st I believe. I think it
23 might have been the 1st. I'm not sure.
24     Q. So you were there for that period of
25 time? How long did you stay?

1    A. Almost seven weeks.
2    Q. And what were your responsibilities
3  during those seven weeks?
4    A. I was there to participate in the FAA
5  certification process and fly during the proving
6  runs for the FAA.
7    Q. So you were there seven weeks. When did
8  you first arrive? Do you remember?
9    A. I don't recall the date. It was after
10 the startup of the 402, but before the ATR came on
11 line.
12   Q. So I think Tiffany and Russell went there
13 in early June or mid-June, and you followed shortly
14 after, right?
15   A. Yes.
16   Q. And you were gone by when?
17   A. I'm just trying to recall the start date.
18   Q. Well, let me correct myself. I said
19 June. I think they were there in early July.
20   A. Okay.
21   Q. Because you're still going through
22 training in mid-June.
23   A. Okay.
24   Q. But you came right after that?
25   A. Very shortly after that, yes.

1    Q. So you were gone by the middle of August?
2    A. Yeah. It was about six-and-a-half weeks
3  after I arrived. I forget the departure date.
4    Q. How long have you known Tiffany?
5    A. Can you tell me her -- it was when she
6  started at Cape Air that I first met her.
7    Q. She started in the year 2000. You were
8  working at Cape Air at that time?
9    A. Yes.
10   Q. How long have you been in a management
11 position, chief pilot, or a similar position?
12   A. I believe I the assistant chief pilot in
13 2000.
14   Q. So for most of the time that the two of
15 you have been at Cape Air, you've been her boss?
16   A. In some capacity, yeah. Assistant chief
17 pilot and then chief pilot.
18   Q. How many times have you actually flown
19 with her or worked with her?
20   A. Flown with her? I'm not sure if we did
21 any 402 flying together. We did some flying in the
22 ATR together.
23   Q. Do you remember when? Was that in Guam?
24   A. Yes.
25   Q. And what was the reason for the flight?

1    A. That was her operating experience.
2    Q. The IOE?
3    A. Yes.
4    Q. And other than that, did you ever fly
5  with her on a commercial flight?
6    A. I don't recall.
7    Q. So you recall the IOE flight?
8    A. Yes.
9    Q. Any other flights?
10   A. Are you referring to the 402?
11   Q. The 402 -- well, no. Any flights that
12 you've flown with her.
13   A. It's possible I may have flown with her.
14 I've flown with a lot of the pilots, but I don't
15 recall that occasion if I did.
16   Q. Nothing significant?
17   A. No.
18   Q. How about the ATR 402? Other than that
19 IOE, do you recall anything specific?
20   A. I remember I think observing a flight
21 sitting in the jump seat.
22   Q. Do you remember when that might have
23 been? Was it before or after operations started?
24   A. This is after operations started.
25   Q. And who was the pilot on that flight that

1  you remember -- or captain I mean?
2    A. I believe it was Jon Bleiman.
3    Q. Do you know on what basis the pilots were
4  selected to go to Guam?
5    A. Yes.
6    Q. And what was that?
7    A. There was a bidding process.
8    Q. Was it purely based on seniority?
9    A. Yes.
10   Q. And is Cape Air unionized?
11   A. They are now. They were not at the time.
12   Q. But other than the seniority, was there
13 any sort of evaluation done of the pilots regarding
14 their competency or that you wanted these pilots
15 out there?
16   A. No, not that I know of.
17   Q. Okay. So just the longer you've been
18 with the company, the better the opportunity you
19 had?
20   A. Yes.
21   Q. Does that sort of imply that if you've
22 been there for a long time, you kind of know what
23 you're doing?
24   A. It could imply that, yeah. It's not what
25 I was thinking, but yeah.

1    Q. All right. What were you thinking?
2    A. I guess I should say that's not what I
3  would think of the seniority system, but that's the
4  process that we use for determining who got to go.
5    Q. How often are pilots evaluated at
6  Cape Air?
7    A. Captains are given a check ride every 6
8  months. And first officers are required once every
9  12 months.
10   Q. The training that was done in Houston,
11  was that captain training? First officer training?
12  Both?
13   A. It was both.
14   Q. And were all the pilots undergoing both
15  training?
16   A. Let's see. Some pilots were being
17  qualified as captains. Some were being qualified
18  as first officers.
19   Q. Do you know what Tiffany was being
20  qualified as?
21   A. She was being qualified as a captain.
22   Q. Are you aware of whether Cape Air has a
23  policy that prohibits or somehow infringes on
24  employees' ability to fraternize with each other,
25  whether it's employee and employee or employee and

1  management?
2    A. Could you repeat that again?
3    Q. Does Cape Air have a policy, or are you
4  aware of any policy by Cape Air that prohibits
5  fraternization between employees and employees or
6  between employees and management?
7    A. No.
8    Q. You are aware that Chuck White and
9  Tiffany were involved in a relationship while they
10  were in Hyannis?
11   A. Yes.
12   Q. And they were both -- and by the time
13  they were headed for Guam, they were no longer
14  involved in a relationship? It had ended?
15   A. Are you asking me that?
16   Q. Yes.
17   A. I don't recall what the status of that
18  relationship was at that time.
19   Q. But you knew that they were boyfriend and
20  girlfriend at one time?
21   A. At one point, yes.
22   Q. And that they were no longer living
23  together in that relationship?
24   A. I didn't know their living arrangements.
25  I just had heard that they had a relationship.

1    Q. Do you remember having a conversation
2  with Chuck White before he went out to Guam as a
3  pilot?
4    A. In reference to?
5    Q. In reference to his relationship with
6  Tiffany.
7    A. No.
8    Q. Before we did this deposition, we had the
9  opportunity to take the deposition of Chuck White.
10  And Chuck, in his deposition in response to
11  questions, said that you had approached him to have
12  a conversation about is there going to be a problem
13  with you going out to Guam and working with
14  Tiffany. Does that refresh your recollection?
15   A. I don't recall that, no.
16   Q. Do you recall having any kind of
17  conversation like that with Tiffany Nicholson?
18   A. No.
19   Q. Did you have any concerns about any of
20  the pilots who were going out to Guam? And we can
21  do this one by one.
22   A. Yeah. Okay.
23   Q. How about John Kappeyne? John has had
24  his troubles with the company --
25   A. Yeah.

1    Q. -- as a captain?
2    A. Right.
3    Q. Did you have any concerns about him?
4    A. Not specifically. I guess we had -- you
5  know, we thought about the things that had happened
6  with John before, but I don't know if it was a
7  concern.
8    Q. Some of the -- well, why don't you tell
9  me what some of those things were.
10   A. John had previously been --
11  MS. McDONALD: I'll just object first about
12  relevance. You can continue to answer.
13  THE WITNESS: Continue?
14  MS. McDONALD: Yes, you can continue.
15   A. He had been disciplined for certain
16  safety issues prior to going to Guam.
17   Q. Those were incidents that happened in
18  Hyannis and Florida?
19   A. I recall one in Hyannis or actually I
20  think it was Nantucket.
21   Q. Which one are you talking about?
22   A. John had taxied out with a door open.
23   Q. And that's an FAA violation as well as a
24  safety violation?
25   A. I don't know necessarily that it's an FAA

1    Q.  Is R. Scott LaForge still with the
2  company?
3    A.  No.
4    Q.  Is he also with Island Air, if you know?
5    A.  No, he's not.  I do not believe he's with
6  them now.
7    Q.  How about Phil Dery?  Any concerns about
8  Phil?
9    A.  Are you talking about before he went out
10  or --
11    Q.  Yes.
12    A.  No.  He had to be retrained in the
13  simulator to pass his check ride, but that was it.
14    Q.  So going back a moment.  So once those
15  people were selected, are you basically being told
16  these are the group of people that are going to
17  Guam, and you're going to oversee that, or do you
18  have any sort of role in the selection?
19    A.  My role was to put out the bid to the
20  group.  And from the results of the bid, based on
21  seniority, select the people according to the bid.
22    Q.  Okay.  So then this is just a group you
23  got?  It was sort of like put on your lap?  These
24  are the guys, and this is the girl?
25    A.  Yeah.  That's the group that the bidding

1  process --
2    Q.  Automatically selected pretty much?
3    A.  Yeah.
4    Q.  So Phil Dery, he goes out there, and
5  he had -- we had an opportunity to take his
6  deposition yesterday.  He said that he failed the
7  simulator training.  And I think he said he failed
8  the check ride also.
9    A.  That's the part that I was talking about,
10  the check ride that he failed.
11    Q.  Okay.  And because he failed the check
12  ride, he had to go to additional training?
13    A.  Yes.
14    Q.  When somebody fails a check ride, they
15  basically are grounded or lose their rights to fly
16  until such time as they are recertified, right?
17    A.  Correct.
18    Q.  And in Phil Dery's case, he had to do
19  additional training.  Was there an issue as to
20  whether or not he should have additional training?
21    A.  No.  I believe he was just given -- let's
22  see.  I don't recall any issue as to whether or not
23  he should receive training.
24    Q.  As far as you were concerned, there
25  wasn't an issue?

1    A.  No.
2    Q.  Who approves the initial training?
3    A.  Normally the director of training.
4    Q.  That would be?
5    A.  David O'Connor.
6    Q.  Are you asked for input when you find
7  that somebody has failed a check ride?
8    A.  Sometimes, yeah.
9    Q.  In this case were you?  In Phil Dery's
10  case?
11    A.  Yeah, I think I was.
12    Q.  Did you have any issue with him doing the
13  necessary additional training to qualify?
14    A.  No.
15    Q.  Phil also testified that in ground
16  school, he failed, and then they go through the
17  process of reviewing the test and the answers, and
18  then everything was okay.  Do you remember that?
19    A.  I didn't remember that until it was
20  brought to my attention.
21    Q.  But you recall that?
22    A.  I guess I'm aware of it now.
23    Q.  You were aware of it when it happened
24  though or thereabouts?
25    A.  I don't recall being aware of it then,

1  but I probably was aware of it.
2    Q.  Okay.  Kevin O'Connor went out to Guam?
3    A.  Yeah.
4    Q.  Any issues with him?
5    A.  No.
6    Q.  How was his performance?  How long did he
7  stay on Guam?
8    A.  I don't recall the time.  I think it was
9  about a year.
10    Q.  Did you ever fly with Kevin in the
11  ATR 42?
12    A.  I don't know if I necessarily flew with
13  him, but I remember observing him.  I either flew
14  with him or observed him.  I forget which.
15    Q.  Do you remember -- and I realize we're
16  talking almost three years ago.
17    A.  Yeah.
18    Q.  Do you remember when that might have
19  occurred?
20    A.  This was during that seven-week period
21  that I was out there.
22    Q.  Anything stand out?
23    A.  No.  I thought he was a good employee, a
24  good pilot.
25    Q.  How about Phil Dery?  Did you ever fly

1    Q. Have you ever had to bench a pilot
2  because you felt he was unsafe?
3    A. We've removed pilots from flying status,
4  yes.
5    Q. For being unsafe?
6    A. For potentially being unsafe.
7    Q. Give me an example of which one you're
8  thinking of.
9    A. I can't recall names or dates, but we
10 have removed pilots for flat spotting tires or --
11   Q. What is flat spotting?
12   A. Just skidding and causing a flat tire.
13 There was a time when I think someone went off the
14 runway and hit a sign in Nantucket. I'm just
15 trying to recall different instances.
16   Q. So those are errors which manifested
17 themselves as opposed to just an interpretation
18 that somebody is unsafe as opposed to this
19 situation, right?
20   A. Yeah. Those were both in a single-pilot
21 environment.
22   Q. So is this the first time that you've
23 heard of another pilot saying this person is off
24 the plane because they're unsafe during your tenure
25 as chief pilot?

1    A. Yeah, that was the first occurrence.
2  That was at the beginning of us flying with two
3  pilots.
4    Q. Was there any review of Chuck White's
5  decision done by you?
6    A. Yes.
7    Q. What review was that? Did you talk to
8  Chuck?
9    A. I believe I talked to Chuck, yes.
10   Q. Do you remember when?
11   A. It was within a day or two of it
12 happening.
13   Q. And do you recall what that conversation
14 was?
15   A. Not specifically. I know there is a
16 written statement about it.
17   Q. And which written statement would that
18 be?
19   A. From Chuck White.
20   Q. You mean Chuck White's letter?
21   A. Yes.
22   Q. Did you request that letter?
23   A. I don't recall requesting it. I may
24 have, but I don't recall requesting it.
25   Q. I think his testimony was that it was an

1  unsolicited letter that he felt compelled to write.
2    A. Okay.
3    Q. Do you know if Russell Price requested a
4  letter?
5    A. I don't know if he did.
6    Q. From the deposition with Chuck White, he
7  indicated that Russell said it was his call, but
8  that he was in concurrence with his decision. And
9  when they landed on Guam, they already had another
10 first officer ready to continue with the subsequent
11 flights. Did you know that?
12   A. After the fact I did.
13   Q. So is it fair to say that Russell Price
14 agreed that she was unsafe?
15   A. I think they were referring to the unsafe
16 environment in the cockpit.
17   Q. Stemming from what?
18   A. From the poor interactions and
19 communication and I guess stress that was being
20 caused in the cockpit.
21   Q. But you're aware that these two people
22 have a history?
23   A. Are you referring to their previous
24 relationship?
25   Q. Yes.

1    A. Yes.
2    Q. And in talking to Chuck, did you raise
3  that issue with him?
4    A. I can't recall whether I did or not.
5    Q. Can I call you Steve?
6    A. Yes.
7    Q. Did you concur with the conclusion,
8  Chuck's conclusion and Russell's conclusion, that
9  she was unsafe? And I'm talking about in the day
10 or so after you were aware of it and you talked to
11 Chuck.
12   A. Well, you keep referring to Tiffany being
13 unsafe, but I recall it as --
14   Q. I'm just using the word that was used by
15 Chuck White.
16   A. I recall it as the unsafe environment
17 being caused by Tiffany's interactions.
18   Q. Well, then I don't understand the
19 distinction. Unsafe environment or unsafe to fly,
20 there's a distinction there?
21   A. I guess what I'm referring to is that
22 it's important for both pilots to really
23 communicate to have the maximum safety.
24   Q. Are you married?
25   A. I am.

1      A. I can't recall the exact conversation,
2  but after reading this, I believe it was similar to
3  what he spells out here.
4      Q. And in his testimony -- did you get a
5  chance to review Chuck White's deposition?
6      A. No.
7      Q. Okay. In his deposition, he sort of
8  backs off when he's talking about -- or he explains
9  his comments in here a little bit differently. I
10  was trying to get an understanding of whether you
11  concurred with the decision to pull her off the
12  plane and what specific information went into that
13  thinking.
14      So first of all, did you concur with the
15  decision?
16      A. Yes. Based on what he told me at the
17  time, yes.
18      Q. And what specifics led you to believe
19  that she should be grounded?
20      A. Because he felt that there was an unsafe
21  environment being created. And if that's his
22  opinion, then he's the captain and the final
23  authority of the flight.
24      Q. So his inability to communicate
25  effectively with her and her inability to

1  communicate effectively with him to make it work in
2  essence?
3      A. He came to the conclusion that it was not
4  working.
5      Q. Okay. What is CRM?
6      A. Crew resource management.
7      Q. And is that communication skills?
8      A. That's a part of it, yes.
9      Q. Is there a way to correct the problems
10  that Chuck White identifies in his letter or told
11  you about that flight? Is crew resource management
12  one of the things that could possibly impact that
13  situation?
14      A. Yeah. I think that -- well, crew
15  resource management is a term, but I believe that
16  was -- there was not good crew resource management
17  at that time.
18      Q. Could we simplify that even by saying
19  there was just simply not good communication skills
20  between the two of them?
21      A. Well, I think it would be an
22  oversimplification.
23      Q. I'm sorry?
24      A. I think that would be oversimplifying it.
25      Q. Well, it is a communication breakdown

1  that leads to an unsafe issue, true?
2      A. Yeah.
3      Q. Is there any reason why the company or
4  you didn't think that Tiffany would benefit from
5  additional training in crew resource management?
6      A. I think she seemed reluctant to accept
7  any advice or criticism in that area.
8      Q. And what period of time are you talking
9  about?
10      A. While she was in Guam going through that
11  initial operating experience.
12      Q. Okay. So she felt that she was competent
13  in those areas during that period of time. Fair to
14  say? Or your impression anyway?
15      A. Yeah, I think so. It would be for her to
16  answer.
17      Q. Okay. But it was your impression that
18  you felt that she felt she was confident, or it
19  appeared that way to you?
20      A. Yes.
21      Q. Then she was sent back to Hyannis
22  September 9, 2004. Who told her to come back here?
23      A. I believe there was a discussion with
24  myself, Larry, and Russell.
25      Q. But do you know who placed a call to her

1  and told her to come to Hyannis?
2      A. I think I recall making the arrangements
3  for that to happen.
4      Q. Did you tell her that she was coming back
5  here for a disciplinary proceeding, or did you tell
6  her just to come to Hyannis?
7      A. I believe we indicated that it was to
8  discuss the events that happened in Guam and why
9  she was removed from flying.
10      Q. And then when she comes back here on or
11  about September 14th or September 15th, she is
12  given an action form. Were you the person who gave
13  it to her, or do you know who gave it to her?
14      A. I believe I gave the action form.
15      Q. Yesterday we did a deposition of your HR
16  director who said that she was given the action
17  form, and a couple of days before, there was going
18  to be a hearing on the 17th so that she might have
19  an opportunity to mitigate the situation. Is that
20  your understanding of what took place?
21      A. She always gets a copy of the action
22  forms, and she was involved with the meeting with
23  Tiffany.
24      Q. And then on the 17th, she is formally
25  given the action form?

1  a committee that reviewed the discipline of
2  Tiffany, and that was you, Larry, and Linda. Is
3  that right?
4      A. Yes.
5      Q. When did that panel meet?
6      A. It was during Tiffany's trip from Guam.
7      Q. On or about September 17th, or would it
8  have been sometime before that?
9      Well, let me back up. Was there actually a
10 point where the three of you sat down at a table
11 and went through a hearing process?
12     A. The three of us being myself, Larry, and
13 Linda?
14     Q. Yes.
15     A. I believe there was.
16     Q. And when did that occur?
17     A. I don't recall the exact timing, but I
18 think it was -- just to be sure I'm answering
19 correctly, you're talking about to review the
20 action form that I drew up?
21     Q. This is the conclusion of that. I mean
22 the outcome of that, right?
23     A. This is the outcome of -- are you
24 suggesting that this is the outcome of the
25 conversation the three of us had?

1      Q. Right. Is that an incorrect assumption?
2      A. Yes.
3      Q. I don't know if you guys are -- you being
4  you, Linda, and Larry -- are communicating by email
5  or actually sitting down and having a discussion
6  about the discipline of Tiffany. That's what I'm
7  trying to determine. Was it an actual sitdown, or
8  was it just going back and forth, conversations,
9  telephone, email, or what have you?
10     A. We did it numerous ways. I believe we
11 sat down together.
12     Q. And when did that occur?
13     A. I don't know the exact date, but it was
14 on or about the 17th I would say or somewhere
15 during the process of determining what to do.
16     Q. And when you had that sitdown, did
17 Tiffany appear before you, before the three of you?
18     A. Yes.
19     Q. Was she notified of what Cape Air's
20 complaints or concerns were?
21     A. Yes.
22     Q. Was she -- and what were those complaints
23 or concerns?
24     A. The fact that she was not getting along
25 with fellow pilots in the cockpit.

1      Q. Was she told which pilots?
2      A. Well, at least one. There may have been
3  others.
4      Q. So that would have been Chuck White?
5      A. Yes.
6      Q. So she still had an inability to get
7  along with Chuck White in the cockpit. Was she
8  referred to any specific instance and asked to
9  respond to that?
10     A. I believe during our meeting, we spoke
11 about, yeah, that occasion or the day that Chuck
12 removed her from flying.
13     Q. But any specific conversation? Any
14 specific instance? This is what you're accused
15 of -- you know, this is what you're accused of not
16 having done in the cockpit? Anything like that?
17 How do you respond to that kind of thing? Was she
18 expected to respond? That's what I'm talking
19 about.
20     A. Yes, she was expected to respond. It was
21 kind of a two-way thing, hearing her side of it, as
22 well as answering to what we had heard.
23     Q. But did you tell her what you heard?
24     A. I'm sure that was most likely discussed
25 during the meeting, yeah.

1      Q. And so what do you remember your telling
2  her? This is the allegation, and what's your
3  response?
4      A. I don't recall the exact wording, but I
5  remember that we discussed the flight with Chuck
6  White and probably subsequent flights that she had
7  or was going to be doing some observing on and
8  flying as well since the removal.
9      Q. Is there a tape recording or any sort of
10 transcript of that hearing process?
11     A. Not that I'm aware of.
12     Q. Is there a reason that there isn't?
13     A. We've never used tape recorders.
14     Q. This process of appearing before you,
15 that's laid out in the handbook? That's an
16 employee right to address the disciplinary action,
17 right?
18     A. Say again? The employee's right to --
19     Q. Have you seen the Cape Air handbook?
20     A. Yes.
21     Q. And when somebody is being disciplined or
22 when you have disciplined somebody in the past,
23 they have certain rights under the handbook?
24     A. I know that there's a process spelled out
25 in the handbook, yes.

1    Q. What's your understanding of how that
2  process works?
3    A. That they have -- if they're not happy,
4  they can appeal that decision.
5    Q. But the initial decision? This is the
6  initial decision that can be appealed?
7    A. Uh-huh.
8    Q. So in that initial decision, they have an
9  opportunity to respond to what is Cape Air's
10 concerns?
11   A. Yes.
12   Q. But to respond, you have to be told what
13 they are, correct?
14   A. Correct.
15   Q. So what's your recollection of what she
16 was told?
17   A. I believe that she was told or asked
18 about the unwillingness to work as a team member in
19 the cockpit on several different occasions.
20   Q. Did she say that she was unwilling to
21 work in the cockpit with other pilots?
22   A. I don't recall her saying that.
23   Q. Do you recall -- what do you recall her
24 responses to Cape Air's concerns were?
25   A. It's hard to recall her exact words, but

1  I think that she didn't necessarily agree with --
2  let's see -- agree with the extent of the problems
3  that we were hearing about.
4    Q. But the problems, as I have heard from
5  the depositions of Chuck and Linda and
6  correspondence that we received in discovery, are
7  that we're talking about a person's inability to
8  communicate with their fellow pilot that may or may
9  not compromise safety of the passengers on the
10 flight.
11   A. Not only to communicate, but to
12 cooperate.
13   Q. And it was your impression then that she
14 was still unwilling to mitigate that situation? I
15 mean that's what this point was all about. Is that
16 true?
17   A. Yes. After her discussion, I believe we
18 rethought and drew up a different action form with
19 different consequences.
20   Q. But was it your conclusion that led to
21 the presentation of the action form, the initial
22 action form, that she was unwilling or unable to
23 mitigate the situation?
24   A. Yes.
25   Q. And what led you personally to that

1  conclusion?
2    A. Based on the attempts to try and work
3  with her in Guam on subsequent flights with Russell
4  Price and the other interactions that she's had
5  with the other pilots.
6    Q. Okay. But you're getting that
7  information from Russell Price. It's not
8  firsthand? You're not there to observe it
9  yourself?
10   A. I was not in Guam, correct.
11   Q. So you're getting that information from
12 Russell Price?
13   A. Some of it, yes. I mean he was not the
14 only one I got information from.
15   Q. Who else did you get firsthand
16 information from?
17   A. There were other letters that I have
18 read.
19   Q. Are you talking about the letter from
20 Phil Dery? Is that one of them?
21   A. Phil Dery and I believe there was one
22 from David O'Connor and I believe one from Jon
23 Bleiman.
24   Q. Okay. And you read all of those and
25 Chuck White's letter also, right?

1    A. Yes.
2    Q. You read all of those before
3  September 17th, right?
4    A. I don't recall the dates I read them.
5    Q. Did you read them before the initial
6  hearing? Were they part of the input that impacted
7  your decision?
8    A. I think the information was. I'm not
9  sure if the actual letters -- I can't recall the
10 date of the letters in reference to this date.
11   Q. As chief pilot, those letters have to
12 raise concerns with you obviously?
13   A. Yes.
14   Q. Did you follow up with those pilots
15 individually to discuss what they were talking
16 about in there, or were you just taking it as
17 gospel?
18   A. I recall talking with David and Chuck. I
19 recall flying with Jon and talking with him
20 personally about his concerns.
21   Q. When was that?
22   A. With Jon?
23   Q. Yes.
24   A. In Guam during that initial July, August
25 period I believe.

1 ATR 42?
2    A. No. It's my understanding that we would
3 do CRM training for her.
4    Q. And that the only time she could go back
5 and do it -- well, why do you say that? Is there
6 any documentation that says that?
7    A. I think it was in the action form. Let
8 me take a look at it. I think that was an
9 expectation that we would want.
10    Q. It's not in the action form. Is there
11 any other documentation that says you can take the
12 CRM training?
13    A. Can I take a look at that?
14    Q. Sure. I think it was Exhibit 26.
15    MS. McDONALD: I would object that we're not
16 looking at the final action form. So there are
17 additional documentation.
18    A. It is in there, right? That's what I'm
19 looking at now. I'm referring to the action form
20 dated 9/17 where it says, must attend crew resource
21 management. I mean that was our intention.
22    Q. Okay. And the management referral to the
23 EAP, what was that for?
24    A. That was a very important part of it
25 based on her willingness to cooperate well and get

1 along with fellow employees and have the
2 appropriate attitude to do well.
3    Q. Do you know who -- when you wrote this,
4 there's this contemplation of a review, initially
5 18 months, subsequently 6 months?
6    A. Correct.
7    Q. Do you know who, or was there any
8 discussion of who would be doing that review?
9    A. It would be the same people that were
10 involved with this action form.
11    Q. Okay. So that would have been yourself
12 and Larry?
13    A. Myself and Larry mostly, yes.
14    Q. Assuming the two of you are still with
15 Cape Air?
16    A. Yes.
17    Q. Let's go back then just to clarify.
18 Exhibit 35, we talked about this earlier. She is
19 talking about the desire to do the CRM skills. She
20 talks about it in the third paragraph, and she
21 talks about it in the second-to-the-last paragraph.
22    A. Okay.
23    Q. Doesn't there seem to be some sort of
24 misunderstanding here?
25    A. No. Because based on what we saw, it was

1 not working well with her as an ATR cockpit crew
2 member and her inability to work well with the
3 pilots out there. And although we felt that
4 additional EAP and crew resource management
5 training might help resolve that, it had gone
6 beyond what would be appropriate to let her stay
7 out there in the ATR at that time. That's why we
8 decided to review it after six months.
9    Q. Okay. I have no further questions.
10    MS. McDONALD: I'm probably going to take
11 more than 18 minutes.
12    MR. TORRES: Take as long as you need to
13 take.
14
15 EXAMINATION BY MS. McDONALD:
16    Q. Let me ask you a few questions about your
17 background. How long have you been at Cape Air?
18    A. It will be 12 years in June. So just
19 under 12 years.
20    Q. And how did you start at Cape Air?
21    A. As a 402 captain.
22    Q. And how long have you been a pilot?
23    A. I've been a pilot since 1981.
24    Q. And in your experience in the industry,
25 is seniority bidding something that's applied

1 industry wide --
2    A. Yes.
3    Q. -- regardless of gender?
4    A. Yes.
5    Q. Could you tell me a little bit about the
6 expense that Cape Air incurred to bring out the
7 pilots to Guam?
8    A. Yeah. It's a significant training
9 expense that is compiled with relocation monies
10 that are given to people to move out there. I
11 believe the estimate was about $25,000 per pilot.
12    Q. $25,000 per pilot, okay. So there's
13 definitely an investment with each pilot that you
14 sent down?
15    A. Yes.
16    Q. And you wouldn't have just squandered
17 that, or Cape Air wouldn't have just squandered
18 $25,000 on a pilot just to see them fail. Is that
19 correct to say?
20    A. That's correct, yes.
21    Q. And you do have senior female pilots in
22 your pilot core. Is that correct?
23    A. Yes.
24    Q. Okay. Can you give some names and tell
25 us how long they've been with Cape Air?

1    A. Yes. I would say the most senior female
2 pilot is Meg Siderwicz who was there since the
3 conception of the company. And we're going back to
4 like 1988 I believe. And Marilyn Rhude has been
5 with Cape Air since 1985. Kim Mazzoleni within a
6 year after that I believe. Oh, I'm sorry. Ellen
7 Heggland is also a senior pilot going back to about
8 1995 or '96.
9    Q. So Cape Air does have a history of
10 retaining female pilots?
11    A. Oh, yes.
12    Q. And do you continue to recruit female
13 pilots to work for Cape Air?
14    A. Yes.
15    Q. And is there currently a female pilot
16 working out in Guam?
17    A. There is.
18    Q. And how long has she been there?
19    A. I believe it has been 18 months.
20    Q. How is it determined with respect to the
21 pilots that were going to Guam who was going to be
22 a captain and who was going to be a first officer?
23    A. That is determined by their seniority.
24    Q. Okay. With the company?
25    A. Yes.

1    Q. And it's not based on gender?
2    A. No.
3    Q. When you were talking with Mr. Torres
4 earlier about disciplinary actions that you take
5 with respect to Ms. Nicholson or any other pilot,
6 did gender ever come into play in your
7 decision-making?
8    A. No.
9    Q. I'm just following up on some of the
10 questions that he asked you. You had responded
11 that during the time that Ms. Nicholson was flying
12 on the way back from Saipan to Guam with Mr. White
13 that the passengers were not affected by her
14 piloting. Do you recall saying that?
15    A. Yeah. I don't believe they were
16 affected. I mean I had no reason to believe that
17 they would have been affected.
18    Q. And that's because that plane wasn't in
19 an emergency situation. Is that correct?
20    A. There was no emergency situation, right.
21    Q. If she had an attitude problem, and if
22 there was an emergency situation, would it be
23 possible that the passengers would be affected?
24    A. If there was an emergency, and she --
25 yes, that's a possibility.

1    Q. And I think he also asked you to -- he
2 asked you about whether communications -- or
3 communication was the same thing as CRM, and you
4 said it was a part of it?
5    A. Yes.
6    Q. So I want to give you the opportunity to
7 tell us exactly what CRM encompasses.
8    A. Okay. CRM is -- I mean good
9 communication is a part of crew resource
10 management. Crew resource management also involves
11 problem solving, working together as a team, using
12 all the resources available to you, including your
13 co-pilot, your flight attendant, air traffic
14 control, the company via radio, and basically all
15 tools to maximize the safety and efficiency of a
16 flight. In order for CRM to work well, people have
17 to approach it with the right attitude and have a
18 mutual respect.
19    Q. Okay. So if one person is saying things
20 sarcastically, that would not be good CRM. Is that
21 correct?
22    A. That's correct. Yes.
23    Q. Or if they were being belligerent or
24 anything like that?
25    A. That goes against the objectives of good

1 CRM, yes.
2    Q. Okay. For example, I believe there was
3 one time when you were on a flight with
4 Ms. Nicholson, and there was some interaction with
5 the flight attendants. Do you recall that
6 incident?
7    A. Yes. During the time before the flight?
8    Q. Right, before the flight.
9    A. Yes. She was -- I believe we were doing
10 IOE at the time. Tiffany was flying as the captain
11 in the beginning stages of her IOE, and the flight
12 attendant had come up. And Tiffany had a comment
13 on how he was wearing his shirt sleeves. The
14 uniforms had kind of longer shirt sleeves, so he
15 had elected to roll them up I think above the elbow
16 to look a little more neat in his opinion. And
17 there was a little bit of an interaction in the
18 cockpit when he came up to either do a briefing or
19 give us some passenger information. Tiffany didn't
20 approve of the rolled up sleeves and had him roll
21 them down.
22    Q. Was there something in the way that she
23 communicated that to him that seemed odd to you?
24    A. Yeah, it did seem odd to me. Because
25 actually, at first, we thought she might have been

1  joking because it looked fine, and there was no
2  reason to think otherwise. But I got the
3  impression that she was trying to show her
4  authority as the captain now.
5      Q. So I mean this wasn't one of the
6  incidents that I guess you considered when you were
7  considering discipline. Is that correct?
8      A. No. No. That was solved that day on the
9  spot with a conversation.
10     Q. What do you mean with a conversation?
11     A. Well, I think the flight attendant was
12 looking toward me to like, you know, why is she
13 raising this issue? And you know, basically,
14 should I comply? And I just kind of nodded to say,
15 okay, that's fine. We can solve this at another
16 venue. And I think I included that in my debrief
17 after the day's flying that I didn't consider
18 that -- although she is the pilot commanding the
19 flight, I think it would be more important to set a
20 good tone and a good relation with the crew members
21 you have than to start off the flight or the day's
22 flying with a negative interaction over a petty, at
23 least in my opinion, a petty circumstance.
24     Q. Okay. So even though it wasn't one of
25 the incidents that you relied on, definitely you

1  have had, when you were looking at the other
2  letters and reports that you were receiving, you
3  had, at that point, some firsthand experience with
4  Tiffany exhibiting sort of a negative tone in the
5  cockpit?
6      A. Yes.
7      Q. Now, Mr. Torres also asked you about
8  Tiffany -- or Ms. Nicholson's willingness to take
9  further training. Do you recall that line of
10 questioning? And he showed you an exhibit in which
11 she says -- Exhibit 35, the second paragraph, I
12 think was what he was referring to.
13     A. Here we go.
14     Q. Do you recall that line of questioning?
15     A. I remember the question. I don't recall
16 the exact questions at this point.
17     Q. That's fine. It's been a long day. But
18 in fact, if she was willing to do CRM training,
19 Cape Air was also willing to give her further CRM
20 training in the revised action form. Isn't that
21 true?
22     A. Yes.
23     Q. All right. So let's get the revised
24 action form.
25     MS. McDONALD: You guys have a copy of it,

1  right?
2      MR. TORRES: Yes.
3      Q. So this is the document that you're
4  seeing for the first time today. Is that correct?
5  You hadn't referred to this document earlier?
6      A. In this meeting we haven't. I have seen
7  it earlier.
8      Q. Right. Okay. So is further CRM training
9  part of the consequences that are listed under the
10 revised action form?
11     A. Yes.
12     Q. Okay. So --
13     A. I'm sorry. Under the corrective measure
14 plan.
15     Q. Under the corrective measure plan.
16 That's right. Okay. So Cape Air was willing to
17 give her the training, and she was willing to get
18 additional training. Is that accurate?
19     A. Yes.
20     Q. Okay. She wanted different kinds of CRM
21 training, but you were willing to give her CRM
22 training. Is that correct?
23     A. Yes.
24     Q. Okay. So basically, you guys and
25 Ms. Nicholson were in agreement that she should

1  take further CRM training?
2      A. Yes. It looks like we were actually
3  mandating it.
4      Q. Right. And the reason why she didn't
5  receive the further CRM training is because she
6  didn't accept the action form?
7      A. That's correct.
8      Q. And so at some point, she doesn't accept
9  it, and that makes her angry when she takes the CRM
10 training that you had prescribed?
11     A. That's correct.
12     Q. Now, let's go through the revised action
13 form a little bit more.
14     A. Okay.
15     Q. Under corrective measure, slash, plan, it
16 says mandatory referral to EAP before resuming
17 flight duties. Why was that part of the corrective
18 measures?
19     Let me ask you it in a different way. How
20 did you see that as being a measure that would be
21 corrective with respect to Ms. Nicholson?
22     A. Basically because, you know, Tiffany
23 understood the concepts from CRM. She wasn't
24 applying them. The knowledge I believe was there.
25 It was just a matter of implementing that. And her

1    A. Yeah, good communication skills are a
2  responsible skill to have.
3    Q. So if she was having weak cockpit
4  communication skills, she technically wasn't
5  complying with the requirements of the general
6  operating manual?
7    A. True. It would be lack of crew
8  coordination and cockpit discipline.
9    Q. Is this manual something that
10  Ms. Nicholson would have had available to her and
11  should have read --
12    A. Yes.
13    Q. -- prior to becoming an ATR pilot?
14    A. Yes.
15    MR. TORRES: I'm sorry. Could you point me
16  again to the part of the general operating manual
17  you're referring to?
18    MS. McDONALD: It says H539 on the bottom.
19  It's under First Officer, and then we're looking at
20  C, Authorities. It's the third point.
21    Q. And then looking back at the Exhibit 24,
22  Russell Price's letter, in the third paragraph, he
23  said that he was struck by a lack of any self
24  reflection in her words. What does that mean to
25  you?

1    A. Basically, that she wasn't owning up to
2  or accepting the fact that she had fallen short on
3  this.
4    MR. TORRES: I'm sorry. I didn't hear the
5  end of that.
6    THE WITNESS: That she was falling short of
7  her responsibilities.
8    Q. Now, looking at the bottom, it talks
9  about -- the bottom paragraph, it talks about the
10  day in which Ms. Nicholson was to observe Phil Dery
11  and Kevin O'Connor. Do you see that?
12    A. I do.
13    Q. And it says that he found her sleeping
14  while they were in the final preparation for
15  flight. Is that something that you had heard?
16    A. Yes.
17    Q. So earlier when Mr. Torres was asking you
18  about was there a problem with Tiffany on the day
19  that she was supposed to observe Phil Dery and
20  Kevin O'Connor with her leaving early after she was
21  told she could do so? There was an additional
22  problem that day? Is that correct? And that would
23  be her doing the sleeping?
24    A. Oh, yes, before she left, right.
25    Q. What's the problem with her sleeping

1  while she was supposed to be observing Phil Dery
2  and --
3    A. Well, the intent of the observation day
4  was to give her an opportunity to see how the job
5  was supposed to be done correctly with good CRM to
6  be demonstrated to her, and she wasn't taking the
7  opportunity for that or having the ability to learn
8  from it while she was sleeping. She wasn't taking
9  advantage of the outline that we had set up for
10  her.
11    Q. So she couldn't learn while she was
12  sleeping?
13    A. Correct.
14    Q. And then on the next page, first
15  paragraph, the last sentence of the first paragraph
16  says she did not seem to appreciate how much she
17  could learn from watching others. What does that
18  mean to you?
19    A. I don't think she fully appreciated the
20  opportunity that one can learn from others by
21  observing them without the pressure of having to
22  perform the duty instead of just observing it. I
23  think it's often used in different training
24  programs as a way to give a person a chance to
25  enhance their skills by observing it being done

1  correctly or learning from other's mistakes, either
2  way.
3    Q. Right. Have you, yourself, benefitted
4  from watching other people perform their duties?
5    A. Oh, definitely.
6    Q. And that would be in the context of you
7  being trained as a pilot?
8    A. Yes. Yes. For example, both in the
9  simulator I've had the opportunity to observe other
10  people flying, and I've also had the opportunity to
11  observe other people when I'm flying in the
12  airplane sitting in the observer's seat for the
13  purpose of -- for the benefit of myself to gain
14  knowledge.
15    Q. Okay. So you thought this was a
16  perfectly fine way of training somebody on CRM
17  skills to observe people that could do CRM
18  effectively?
19    A. Yes. That was one important part of it,
20  yes.
21    Q. And then in the third paragraph further
22  down it says, this is when I became seriously
23  concerned I could not help train her if she was
24  unwilling to help herself. Is that the same
25  unwilling attitude that you had heard about and had

1 can't have a tense environment.
2     Q. Which -- oh, I'm sorry. Were you
3 referring to page 17 at the top?
4     A. Yes.
5     Q. In that first bullet point?
6     A. Correct.
7     Q. Assist the captain in the most efficient
8 manner possible to make certain that the
9 preparation and completion of the flight is in
10 accordance with the FAR's and company polices, and
11 is accomplished at the highest level of safety and
12 regulatory compliance. That's what you were
13 referring to?
14     A. That's correct. And also to maintain a
15 high degree of crew coordination and cockpit
16 discipline.
17     Q. Going back to Exhibit 24, in the
18 second-to-the-last paragraph and sort of towards
19 the bottom of that paragraph, it says the same
20 consistent professional demeanor is missing in
21 Tiffany. Her ego was never left behind at the
22 gate. What did that mean to you when you read it?
23     A. Basically that, you know, if you have any
24 ego or things going on in your life, you need to
25 forget about that in the cockpit environment or any

1 personal problems or anything like that or else
2 that could interfere with your ability to have a
3 good, comfortable, relaxed cockpit environment for
4 communicating well.
5     Q. The general operating manual, is this
6 something that Cape Air was required to put
7 together --
8     A. Yes.
9     Q. -- in order to run the ATRs?
10     A. That's correct.
11     Q. And that's required by the Federal
12 Aviation Administration?
13     A. That's correct.
14     Q. Going on to the next page of Mr. Price's
15 letter, at the top it says, a bit of light banter
16 and talk was not well received. And to his credit,
17 he tried to start anew on every leg and not let
18 past disagreements fester. And then it also says
19 later that a transcript would not convey the
20 undercurrent of anger. How does that -- does that
21 display poor CRM skills?
22     A. Yes, it does.
23     Q. How so?
24     A. Because it seems like, you know, he was
25 trying to set a good, relaxed tone in the cockpit

1 and set them up for success, and she was not
2 receptive to that apparently. As far as the
3 undercurrent of anger, I think he's referring to
4 the fact that you can say the same words in a
5 different tone, and they can have very different
6 meanings to the person receiving them. And so that
7 would all, you know, set up a tense cockpit if the
8 manner of speaking that you were communicating with
9 was -- had an undercurrent of anger in it.
10     Q. That would affect the communication that
11 the two pilots would have between each other?
12     A. It would affect it and probably prevent
13 good communication, yeah.
14     Q. And that would actually be quite
15 dangerous in an emergency situation?
16     A. In an emergency situation, yeah, you
17 definitely rely on good communications to safely
18 resolve the issues. So that could definitely
19 affect it.
20     Q. Okay. Would you say that if somebody was
21 to use an angry tone, that the person that they
22 were using that tone with would be less trustful of
23 the other person?
24     MR. TORRES: Objection. Calls for
25 speculation.

1     Q. Do you understand my question?
2     A. Can you repeat it once more?
3     Q. Sure. If someone was using an angry
4 tone, would that create an atmosphere of distrust
5 or mistrust?
6     MR. TORRES: Same objection.
7     A. Yeah, it's something that would. I think
8 it would also prevent the person who was being
9 spoken to in that tone from wanting to initiate
10 conversation. It would probably limit the amount
11 of good communication between them. If they didn't
12 want to be spoken to in that manner, they wouldn't
13 ask questions.
14     Q. Moving on to the next paragraph of
15 Exhibit 24, Mr. Price's letter, it says there were
16 far too many -- there were many, far too many
17 disagreements constantly throughout the entire day.
18 Do you see that?
19     A. Yes.
20     Q. They would linger and grow. She was not
21 supportive of her captain, and to me appeared to be
22 resentful of her subordinate position as FO. She
23 takes more effort in emphasizing who is right
24 rather than what is right. She often was correct
25 in some subjects she brought up, but that is not

1  the point. It is how and why you bring them up and
2  often when you discuss them. Timing and tact are
3  so important. So the part about her not being
4  supportive of her captain, would that be something
5  that was not in compliance with the general
6  operating manual?
7      A. Yes, it would.
8      Q. And would that also be a display of poor
9  CRM skills?
10     A. Definitely, yeah.
11     Q. Where in the general operating manual
12  would it require her to be supportive of her
13  captain?
14     A. Well, under the general description of
15  her position, or I should say of the position of
16  the first officer, the first officer is the second
17  in command of the flight and is directly
18  responsible to the captain assigned to the flight
19  and will assume command if the captain becomes
20  incapacitated.
21     Q. Okay. So you're referring to page 16
22  under general description for the first officer?
23     A. That's correct.
24     Q. So if she wasn't supportive of her
25  captain, she wasn't complying with the general

1  operating manual?
2      A. Yes. I think it also says in another
3  bullet to assist the captain in the most efficient
4  manner possible to make sure that the
5  preparation -- I think we read this earlier as
6  well -- preparation and completion of the flight is
7  in compliance with the FAR's and company policies
8  and accomplished in the highest level of safety and
9  regulatory compliance.
10     Q. Okay. And then what about under
11  authorities? Are there other points under
12  authorities in which Ms. Nicholson wasn't
13  complying?
14     A. Yes. On the bottom bullet it says,
15  perform other such duties that may be required or
16  assigned by the captain or chief pilot.
17     Q. And what about other authorities, the
18  second bullet point? Is that another --
19     A. Yes. The first officer has the
20  responsibility of aiding the captain in the safe
21  and efficient conduct of the flight from pre-flight
22  planning through termination duties.
23     Q. Okay. Later in this letter, I guess in
24  the second-to-the-last paragraph, Mr. Price notes
25  that Ms. Nicholson was being belligerent. Is that

1  also a display of poor CRM skills?
2      MR. TORRES: Can you tell me where you are
3  right now?
4      MS. McDONALD: Exhibit 24, page 232,
5  second-to-the-last paragraph.
6      Q. In the middle of that second-to-the-last
7  paragraph, it says she was belligerent?
8      A. Yeah. Belligerent is definitely not
9  conducive to good crew resource management.
10     Q. Now, on the last page of Mr. Price's
11  letter -- can you turn to the last page?
12     A. Okay.
13     Q. This is the confidential summary. You
14  read this part of the letter also. Is that right?
15     A. I did, yes.
16     Q. And he says in the first paragraph
17  towards the middle, she has not shown that she can
18  consistently act as part of a safe cockpit team.
19  Did that concern you?
20     A. Yes.
21     Q. And why is that?
22     A. Because her job is to be part of a good,
23  safe cockpit team. That's necessary, and it's her
24  primary role really.
25     Q. Now, in the second paragraph towards --

1  more towards the bottom, he sort of summarizes the
2  training. He says we have also allotted her four
3  days of extra training solely for the purpose of
4  enhancing her CRM skills. Those would be the four
5  days, to your understanding, that he had mentioned
6  earlier in his letter?
7      A. Yes.
8      Q. Okay. And then it says similar extra
9  training was extended to Kappy and Phil in the
10  simulator and to Nehal and Mike in the aircraft.
11  Are you aware of Mr. John Kappeyne and Phil Dery
12  receiving extra training in the simulator?
13     A. Yes.
14     Q. And you're aware of Nehal Zaidi and Mike
15  Szymanski getting extra training in the aircraft?
16     A. Yes.
17     Q. And so the additional training that she
18  received, the four extra days, in your mind, was
19  that also equivalent to the retraining or
20  additional training that these other pilots had
21  received?
22     A. Well, that was additional training,
23  however, it was for a different circumstance
24  really. Their shortcomings were on the scale of
25  operating the aircraft and performance on the check

1  ride.  Whereas Tiffany's was more towards having
2  the proper attitude to communicate well and help in
3  good crew resource management.  And so that was a
4  little different than the technical skills that
5  were knowledge of flying the airplane.
6      Q.  So they had different difficulties.
7  Would that be accurate?  They had different skills
8  that they needed help with?
9      A.  Yes.
10     Q.  And because John Kappeyne and Phil Dery
11 possibly needed more training in the simulator,
12 that was the type of additional training they
13 received.  Is that correct?
14     A.  Yes.
15     Q.  And was -- if Ms. Nicholson's problem was
16 with her CRM skills, was there a certain solution
17 that would address her CRM skills?
18     A.  Yes.  And that that was through what we
19 suggested as the EAP counseling to identify and
20 help her resolve any issues that may be
21 contributing towards her inability to perform good
22 crew resource management in the cockpit, as well as
23 potentially some more targeted crew resource
24 management training as well.
25     Q.  Okay.  The EAP program or the people that

1  she would be working with, would those be people
2  licensed or certified --
3      A.  Yes.
4      Q.  -- to give counseling on communication
5  skills?
6      A.  The EAP counselors, they have specialists
7  in all different areas.  They would leave that up
8  to them to determine which counselor would be the
9  best suitable for the situation.  That was the
10 intent.
11     Q.  Okay.  So there would be a certified
12 professional that would be able to identify what
13 she needed assistance with?
14     A.  Yes.  After we outlined the shortcomings
15 from our perspective.
16     Q.  Okay.  And then in the last paragraph it
17 says, finally, she must commit to come to work
18 consistently, on time, equipped to work, rested and
19 with a "can do" and professional attitude that will
20 fully replace the unapproachable, uncommunicable,
21 unsafe attitude that she so often carries into the
22 workplace.  Now, did you feel that these were
23 reasonable requirements that she come to work
24 consistently, on time, and equipped?
25     A.  Yes.

1      Q.  And what about the requirement that --
2  Russell had suggested that she come with a "can do"
3  and professional attitude.  Was that a reasonable
4  requirement?
5      A.  Yes.  It's very important for any pilot
6  to have a good professional attitude with a "can
7  do", approachable, communicable, and safe attitude.
8  It's definitely required and necessary.
9      Q.  Okay.  I'm going to move on to
10 Mr. O'Connor's letter, which is Exhibit 29.  Now,
11 you read this entire letter, correct?
12     A.  Yes.
13     Q.  And you utilized this as part of your
14 consideration of the disciplinary measures that you
15 were going to take against Ms. Nicholson.  Is that
16 correct?
17     A.  Yes.
18     Q.  But also the information had been
19 communicated to you earlier before you received --
20     A.  Correct.  This is basically a summary.
21 We had talked about the specific things that are
22 outlined in this letter.
23     Q.  Now, in the first paragraph, if you take
24 a look at it, it looks like in the beginning,
25 Mr. O'Connor compliments her piloting skills.  And

1  then he says, unfortunately, her abilities and
2  knowledge are not always germane to the task at
3  hand.  As a co-pilot, she frequently demonstrates
4  an apparent arrogance and a fault-finding mentality
5  that creates ill will in the cockpit.  Is that
6  consistent with your understanding of how she was
7  acting out in Guam --
8      A.  It is.
9      Q.  -- with other pilots?
10     A.  Yes.
11     Q.  And is that, a display of arrogance and
12 fault-finding mentality that creates ill will in
13 the cockpit, does that display poor CRM skills?
14     A.  Yes, it does.
15     Q.  And I believe he gives an example in the
16 second paragraph, second sentence, on short final
17 to runway 7 in Saipan, Tiffany allowed herself to
18 get too slow and was sinking too fast.  I commanded
19 her to add power.  Rather than do so, she dismissed
20 my command as a suggestion and responded I got it.
21 You read that part of the letter?
22     A.  I did read it, yes.
23     Q.  And what did you make of that?
24     A.  That instead of the appropriate action of
25 just complying with the command to add power --

1 maybe she felt somewhat intimidated by the command
2 and basically tried to handle it herself without
3 the input from the captain or from the pilot in
4 command.
5     Q. So that appears to be a breakdown in
6 communication when she dismisses a command?
7     A. Yes. I mean a more appropriate response
8 would be to, you know, say, okay, adding power or
9 some kind of acknowledgment that the person has a
10 concern, and you would be doing something about it.
11     Q. Now, towards the middle of that
12 paragraph, he discusses an incident in which Nehal
13 Zaidi was in the jump seat. Do you see that
14 towards the middle right there?
15     A. Okay.
16     Q. And then he says something to the effect
17 of, you know, it is kind of nice in the back when
18 you use 77 percent rpm. Russell uses it all the
19 time. And then he notes that Tiffany dismissed
20 him. And her exact words were Russell ain't here.
21 What did you make of that when you read that part
22 of the letter?
23     A. It's unfortunate. It's another
24 indication of her not really accepting input from a
25 fellow crew member. I mean I think he was trying

1 to offer some helpful suggestions that would make a
2 more comfortable environment. That was an accepted
3 practice by the company and an approved power
4 setting that may have had a benefit during that
5 flight. And I think he was referring to Russell
6 using it all the time because he had been pretty
7 much the leader in training the pilots and getting
8 them online out there. And apparently, she just
9 kind of dismissed it that his comment wasn't
10 relevant because Russell wasn't here. So she
11 wasn't really accepting any input from the
12 co-pilot.
13     Q. So you had heard reports that she was not
14 receptive to criticism? Would that be accurate?
15     A. Yes.
16     Q. And this would be an example of when she
17 wasn't accepting any criticism?
18     A. Well, it would be an example of her not
19 accepting any suggestions.
20     Q. In the next paragraph it says -- in the
21 second sentence, I have repeatedly observed her
22 correcting, as if she were a flight instructor, her
23 captains for the most minor of verbal gaffes. Do
24 you see that?
25     A. Yes.

1     Q. What did that mean to you when you read
2 that?
3     A. There was reports of her trying to
4 nitpick a fine detail and take that opportunity to
5 point that out to the other crew member in a manner
6 that was trying to show some authority I think.
7     Q. And would this undermine the teamwork
8 aspect of CRM?
9     A. It would because you're trying to work
10 together as a team, and you're trying to set up an
11 environment of trust where you want to get input
12 from each other. And you know, even if the person
13 is making a slight mistake, there's better ways to
14 have it corrected than to do it in a manner that
15 was outlined in other letters here.
16     Q. Okay. Now, in that same paragraph, but
17 on the next page, it talks about an instance in
18 which David O'Connor was conducting IOE with Jon
19 Bleiman. And he says Tiffany was assigned to the
20 jump seat in order to observe and learn. I asked
21 her if she could help us out by conducting the
22 exterior pre-flight. She said ACM means I ain't
23 doing nothing. And then in parentheticals, it says
24 ACM means additional crew member. It is the
25 technical name for the jumpseater. Did you read

1 that part of the letter?
2     A. Yes, I did.
3     Q. What did that mean to you when you read
4 it?
5     A. I think that was another example of her
6 not really wanting to accept what she had the
7 opportunity to learn from by observing and also not
8 to want to participate in a helpful manner to have
9 an efficient flight or team building. Basically,
10 the statement ACM means I ain't doing nothing is
11 kind of a sarcastic way of saying you don't really
12 want to participate in that.
13     Q. So even in light of that, her
14 unwillingness to participate, Cape Air was still
15 willing to give her additional training in CRM,
16 correct?
17     A. Yes.
18     Q. Now, the next paragraph talks about an
19 incident in which she arrived to work late, and she
20 had a split lip and the beginnings of a black eye.
21 Did that come to your attention?
22     A. It did.
23     Q. Did it come to your attention somewhere
24 around the day that it happened? And I see in this
25 paragraph that it says August 14th. Do you see

1 that?
2     A. Yes.
3     Q. It's in the beginning of the paragraph.
4     A. I see it.
5     Q. So did that come to your attention around
6 that day or shortly thereafter?
7     A. Yes.
8     Q. And what did you do about that incident?
9     A. Well, it was concerning to me and others
10 because one of our employees obviously got hurt.
11 And you know, it was -- I think we wanted to find
12 out how it happened and if there was anything
13 inappropriate that we could help her with. It was
14 mostly out of concern really.
15     Q. So when you saw this, the thing that
16 sparked you was there was something wrong -- well,
17 not something wrong with her, but something had
18 happened to her?
19     A. Yes.
20     Q. And you wanted to help her?
21     A. Correct.
22     Q. Did you consider that she had been
23 potentially abused by somebody?
24     A. I did, yes. That thought came across my
25 mind, yes.

1     Q. So your concern was just to make sure
2 that she was okay, and that she received the proper
3 assistance?
4     A. Yes, if she needed it.
5     Q. If she needed it, okay. Going on to
6 Exhibit 30, which is the next exhibit, and it's the
7 letter from Phil Dery addressed to you. And you've
8 seen this letter, right?
9     A. Yes.
10     Q. Now, here, Mr. Dery reports that on a
11 flight with Tiffany Nicholson as first officer, he
12 asked her to accomplish a trend monitor, and her
13 reply was that's not my job. Now, what did you
14 think when you read that?
15     A. I think it's disappointing because it's
16 another example of her not wanting to work as a
17 team. If he asked her to do it, it is part of her
18 job. It's basically, again, just uncooperative
19 attitude and not working well in the crew
20 environment.
21     Q. Okay. And a response like that, that's
22 not my job, is that something that would be
23 effective CRM in your opinion?
24     A. No. No, that's not good CRM.
25     Q. Okay. And would that be promoting crew

1 coordination and cockpit discipline as required in
2 the general operating manual?
3     A. No. That would go against that.
4     Q. The next exhibit is Exhibit 31. And
5 that's the letter from Jon Bleiman addressed to
6 you. You've seen this letter before?
7     A. Yes.
8     Q. And the contents of the letter were part
9 of your decision on the discipline?
10     A. Yes.
11     Q. Now, if you look at the third paragraph,
12 he talks about during pre-flight preparation, he
13 asked Ms. Nicholson for the before engine start
14 checklist, and he says I got no response from her.
15 My request was ignored. On the first occasion, I
16 asked three times and received no response. On the
17 second occasion, she got out of her seat and left
18 the cockpit without any response. What did that
19 mean to you when you read this letter or when you
20 heard about this letter?
21     A. Well, it's discouraging. You try to
22 picture the scenario, and if that happened to a
23 crew member, I think that it would almost be
24 intimidating to the person she does that to. It's
25 kind of almost a show of lack of respect when you

1 just ignore someone. Even if you had a reason for
2 not wanting to do it, you should communicate that
3 clearly so that both people are on the same page.
4     Q. Okay. Now, is the -- as the first
5 officer, is completing part of the checklist one of
6 their responsibilities?
7     A. Yes.
8     Q. And is complying with a duty that is
9 assigned to you from a captain, is that also one of
10 the responsibilities as a first officer?
11     A. It is. It's listed under C, authorities,
12 to perform such duties that may be required. Oh,
13 I'm sorry. I'm looking at the wrong one.
14     Performed or required by the captain or the
15 chief pilot.
16     Q. So when he asked her for the checklist
17 and she wasn't complying, she wouldn't have been
18 complying with the responsibilities under the
19 general operating manual?
20     A. That's true, yes. And if she had a
21 reason to suggest that maybe it wasn't the
22 appropriate time for a checklist, she should
23 communicate that reason or make an alternate
24 suggestion in a positive tone rather than to just
25 ignore someone.

1    Q. Okay. And so what happened here is that
2  she didn't respond, and she left the cockpit
3  without a response, right?
4    A. Apparently so.
5    Q. So she didn't actually communicate any
6  suggestions back to Mr. Bleiman?
7    A. No.
8    Q. And then in the next paragraph, it talks
9  about that he asked her to accomplish certain
10 tasks, and he received a response that the
11 requested task was not my job or no, that's your
12 job. And the phrase "that's not my job", that
13 seems consistent with something that another pilot
14 has reported, right?
15   A. Yes, it does.
16   Q. And sort of in the same line or same part
17 of the general operating manual, she was, as a
18 first officer, required to perform duties that were
19 assigned to her. Is that correct?
20   A. Yes.
21   Q. From the captain?
22   A. That's correct. Perform other such
23 duties that may be required or assigned by the
24 captain or the chief pilot.
25   Q. Okay. So even if it's not her job, if

1  it's assigned to her, she would be responsible for
2  doing it?
3    A. Yes. If it was a reasonable request,
4  yes.
5    Q. Do you have any reason to believe that
6  Mr. Bleiman would give her an unreasonable request?
7    A. No.
8    Q. Okay. And then in the next paragraph, he
9  says that so many of my routine requests to Tiffany
10 Nicholson were either ignored, denied, or met with
11 an argument, that it became difficult to count on
12 reliable performance from her, especially in a time
13 of real need. Moreover, Tiffany Nicholson's
14 attitude was a substantial challenge, detriment,
15 and impediment to exercise my authority as pilot in
16 command when necessary. You read that paragraph?
17   A. I've previously read it. I didn't follow
18 along on this one. Which one were you reading?
19   Q. This one.
20   A. Okay. Yes, I have read that before.
21   Q. Did that cause you any concern, this
22 comment from Mr. Bleiman?
23   A. Yes, it definitely caused concern.
24   Q. Okay. And why is that?
25   A. It was another example of setting up an

1  environment that could degrade the communication to
2  a point where good crew resource management wasn'
3  a possibility, which could also affect safety.
4    Q. And you also read the letter from Chuck
5  White?
6    A. I did.
7    Q. And are aware otherwise of the contents
8  that are in the letter?
9    A. Yes. For the most part, yes.
10   Q. Okay. So that's Exhibit 32. Are there
11 instances in this letter which you read that caused
12 you concern about her CRM skills?
13   A. There are, yes.
14   Q. Now, on the second page of that letter
15 towards the middle, there's a paragraph -- I guess
16 the formatting is kind of off. It says here, as we
17 descended. Do you see that in the middle of the
18 page?
19   A. I do, yes.
20   Q. The sentence after that says, on the
21 downwind leg, I asked her if she was comfortable
22 with me doing a short approach in order to avoid
23 some clouds heading towards final. She said yes, I
24 do mind, without any further explanation. Would
25 that be one example in which you thought she had

1  displayed poor CRM skills?
2    A. Yes. Once again, that's another example
3  of not offering any help. Just saying that you
4  mind something without explaining why or having an
5  further communication about it to come up with a
6  good solution is just intimidating to the person
7  that asked the question.
8    Q. Okay. And then a little bit later,
9  there's a paragraph that starts out, there were
10 numerous clouds. Do you see that?
11   A. Yes, I do.
12   Q. And it says, there were numerous clouds
13 west of the field. We were taking off from runway
14 09 away from the clouds. T was not happy with this
15 decision, and she let me know this through her
16 negative attitude. Do you know if T refers to
17 Ms. Nicholson?
18   A. Yes. I view that as being Tiffany,
19 right.
20   Q. And what did you make of his notation
21 that she had a negative attitude?
22   A. I'll just read through that once more.
23   Q. Sure.
24   A. Well, I guess he's giving some more
25 specifics below it. It says when they're doing the

1 takeoff briefing, when he asked her for the
2 briefing, she just said company standards. And
3 he's looking for expansion on that to just review
4 what those standards are so that both people are
5 assured of the correct actions should something go
6 wrong.
7 Q. Okay. So you're right. Below that is a
8 little bit more detail as to the exchange between
9 the two of them. It looks like he asked her to
10 brief the takeoff. Is that what T/O means,
11 takeoff?
12 A. Yes.
13 Q. All she said was company standards. I
14 stopped the plane and asked for an acceleration
15 altitude and more of a briefing than a simple
16 company standards. Her reply, don't you know what
17 the company standards is? I told her that before
18 the takeoff, I wanted to know what her course of
19 action is in case of emergency. Her reply, well,
20 we both went to training. You should know. Is
21 that sort of the negative attitude that he was
22 referring to?
23 A. Yes. It seems to be, yeah.
24 Q. And then it looks like at the bottom of
25 that paragraph, he notes that this was so

1 distracting, that when we taxied out and into
2 position for takeoff, the taxi checklist and the
3 before takeoff checklist were not completed. Did
4 that cause you any concern?
5 A. Yes. I mean I think we're starting to
6 see how these negative interactions in the cockpit
7 can have a detrimental affect on the highest
8 standard of safety in a cockpit.
9 Q. On the next page, page 3 of his letter,
10 towards the middle, I think you'll see it says, as
11 we passed by. Do you see that?
12 A. I do.
13 Q. As we passed by the airport, I asked her
14 where we were going. T snapped at me and said very
15 sarcastically, my captain has to tell me when to
16 turn base. So what did you -- did that cause you
17 concern that she was snapping back at him and being
18 sarcastic?
19 A. It seems to be. I mean it's hard to
20 really get the -- not being there and not getting
21 the tone of what was going on in the cockpit. But
22 I read that as a comment that was probably not
23 necessary.
24 Q. Okay. And there were other instances in
25 this letter which he notes that she was snapping at

1 him. Is that right?
2 A. Yes. Down at the bottom, yeah.
3 Q. It says, T snapped at me and said don't
4 yell at me.
5 A. That's correct.
6 Q. And on the next page, there seems to be
7 an incident where it starts out, we left the gate
8 on time, in the middle?
9 A. Yes.
10 Q. If you could just read through that?
11 A. We left the gate on time instead of ten
12 minutes early. On the taxi out, between a 737 and
13 our company plane, I had to slow -- I had to taxi
14 slow as not to hit the planes on either side. I
15 noticed an electric amber light on the CAP. I
16 asked for the taxi checks after clearing the two
17 airplanes. Blatantly she said no. I then stopped
18 the plane and set the parking brake.
19 Q. Okay. So did that part cause you any
20 concern, her response?
21 A. Yes. Again, it's just another short
22 abrupt negative comment with no explanation. And
23 it was basically disobeying a command from the
24 captain without an apparently good reason.
25 Q. Is there a -- in the general operating

1 manual under the responsibilities of the captain,
2 is there a responsibility of the captain to insure
3 the use of aircraft checklists?
4 A. Yes.
5 Q. Okay. Do you know where that might be
6 identified?
7 A. I'll do that. I'll find it.
8 Here is a paragraph that says, maintains a
9 high degree of crew coordination and cockpit
10 discipline and insures the proper use of aircraft
11 checklists at all times.
12 Q. Okay. What page would you be looking at?
13 A. It's page 15 of the GOM.
14 Q. And that would be towards the middle?
15 A. Yes.
16 Q. So the captain is supposed to insure the
17 proper use of aircraft checklists at all times?
18 A. That's correct.
19 Q. Is the first officer supposed to respond
20 to that and assist the captain in coordinating
21 those checklists?
22 A. Yes. That's true.
23 Q. So if she wasn't assisting with the
24 checklist, then she wouldn't be complying with her
25 responsibilities as a first officer?

1    A. Correct.
2    Q. And that would harm the captain's
3  abilities to perform or to insure the checklists
4  were done?
5    A. Yes, that would be --
6    Q. Or would hamper his ability?
7    A. Hamper his ability to be sure that they
8  get completed, yes.
9    Q. Let me ask you about going back to the
10 initial training in ground school and IOE.
11   A. Okay.
12   Q. Do you know whether Ms. Nicholson was
13 trained as a first officer or a captain?
14   A. She was trained as a captain.
15   Q. As a captain? With respect to CRM
16 skills, is there a distinction between the skills
17 she would have learned if she was trained as a
18 first officer instead?
19   A. CRM skills in general are applicable to
20 both pilots. It's basically having to do with
21 teamwork, good communication, and interactions with
22 all the people involved in the flight to make it a
23 success.
24   MR. TORRES: Objection. Nonresponsive.
25   Q. I mean is what you're saying that CRM

1  skills are not tailored, you know, as to each
2  position? They both sort of -- well, let me
3  rephrase that.
4    Can you learn -- can your CRM skills be
5  different if you were trained as a first officer as
6  opposed to a first captain?
7    MR. TORRES: Objection. Vague.
8    Q. You can answer that.
9    A. Let me think of a proper response. The
10 two cockpit members have different roles in the
11 cockpit to perform, but the communication skills
12 that are covered in CRM are common.
13   Q. Okay. They're common, okay. Do you
14 recall if Ms. Nicholson ever asked you to be
15 trained as a first officer?
16   A. She had requested, I think after this
17 disciplinary action, to go through initial
18 operating experience as a first officer.
19   Q. What about during ground school or SIM
20 training or IOE? Do you recall her requesting
21 that?
22   A. No.
23   Q. And if -- well, let's just say that she
24 had. Would your response have been that you didn't
25 have any time for that?

1    A. No.
2    Q. Is it important for a first officer not
3  to be insubordinate?
4    A. Yes. It's very important.
5    Q. And that would be covered by the
6  responsibilities in the general operating manual?
7    A. Yes.
8    Q. And under authorities, particularly the
9  last authority where it says, perform other such
10 duties that may be required or assigned by the
11 captain or the chief pilot?
12   A. Yes.
13   Q. And also, at the top of that same page
14 where it says, assist the captain in the most
15 efficient manner possible. If you were
16 insubordinate, you wouldn't be assisting the
17 captain in the most efficient manner possible. Is
18 that correct?
19   A. No. That would be just the opposite.
20   Q. Does being difficult affect CRM?
21   A. Yes.
22   Q. How so?
23   A. It makes it more of a challenge for the
24 two people to obtain a common goal and communicate
25 well, which is important for the maximization of a

1  safe environment.
2    Q. Let me ask you about Alyssa Rojas. Is
3  that name familiar to you?
4    A. Yes.
5    Q. Do you know how to spell that?
6    A. I believe it's A-L-Y-S-S-A, R-O-J-A-S.
7    Q. Did she go through ground school with the
8  rest of the pilots slated to go to Guam?
9    A. She went through the basic indoctrination
10 of ground school.
11   Q. Do you know what happened to her at that
12 point?
13   A. I believe she completed that portion of
14 the training, but she was included in the class as
15 a backup or a standby extra person in the class in
16 case, for some reason, one of the eight people
17 selected for that group was not able to go.
18   Q. Okay. So if one person, for instance
19 Phil Dery, said he no longer wanted to complete the
20 training, Alyssa Rojas would take his place in the
21 class?
22   A. She would have taken his place in the
23 class. He was hired as a captain. There would
24 probably be a shift in captain and first officers
25 because she would probably obtain a first officer

1    Q. Based on his experience?
2    A. Yes.
3    Q. And to your knowledge, had anybody
4 complained about the CRM skills of Phil Dery or
5 Kevin O'Connor?
6    A. No.
7    Q. Were the additional training
8 opportunities that were given to Ms. Nicholson,
9 were those intended to help her?
10    A. Yes.
11    Q. And do you think if she was willing, she
12 would have learned something from those
13 opportunities?
14    A. Yes. I think the opportunity to learn
15 was there. If she was willing, it could have been
16 a good opportunity, yeah.
17    Q. Now, you're familiar with all the people
18 that provided you with feedback about
19 Ms. Nicholson, right? You've worked with them
20 before they went to Guam?
21    A. Yes.
22    Q. In your mind, does it make sense to you
23 that there was some sort of conspiracy that they
24 were trying to push her out of Guam?
25    A. No.

1    Q. Based on what you know of their
2 personalities and their work history?
3    A. No. I don't think there was anything
4 like that.
5    Q. Okay. Did you think they were trying to
6 pick on her because she was a woman?
7    A. No.
8    Q. You said earlier that Cape Air was
9 sincere in its wanting Ms. Nicholson to get further
10 training and perhaps return to the ATR if she
11 completed that training. Is that correct?
12    A. Yes.
13    Q. And what was the point of offering her
14 the ability to work on the 402 again?
15    A. Well, in that case, she would still
16 remain employed by us and still have the
17 opportunity to continue to improve her skills and
18 interpersonal skills with assistance from the EAP
19 and other training and give her a chance to
20 demonstrate to us her ability to get along with
21 others that would be suitable for a two-person
22 crew.
23    Q. Okay. And the two-person crew is not the
24 same -- or the Cessna doesn't require a two-person
25 crew. Is that correct?

1    A. That's correct. After the captain has
2 obtained 100 hours. There is one time when the
3 Cessna does require two pilots, but that's just in
4 the beginning stages if the weather is what they
5 call IFR, instrument flight rules.
6    Q. So if Ms. Nicholson -- do you know if she
7 was beyond that point where she needed --
8    A. She was beyond that, yes. She did not
9 require any.
10    Q. So they weren't the same concerns with
11 her flying, and that's why you asked her to --
12    A. Correct.
13    Q. -- go back to the --
14    A. That's right. They were different than
15 her flying skills.
16    Q. Did you consider her gender at any time
17 in considering the disciplinary action taken
18 against her?
19    A. No.
20    Q. Do you know if Linda Markham ever
21 considered her gender?
22    A. I'm sure it was not a consideration in
23 the action taken.
24    Q. Had Ms. Nicholson ever complained to you
25 that she didn't want to work with Chuck White prior

1 to the discipline?
2    A. No, I don't think so.
3    Q. And to your knowledge, there weren't any
4 issues with them working together. Is that
5 correct?
6    A. Not prior to this occurrence. I mean
7 there was obviously after this happened.
8    Q. Afterwards, right. Did you have
9 confidence in both of them that they were
10 professionals on the job.
11    A. Prior to this happening?
12    Q. Yes.
13    A. Yes.
14    Q. With respect to the pay issues, have
15 those been resolved to your knowledge?
16    A. Yes.
17    Q. Okay. And --
18    A. I hesitate because there was a part of it
19 that they were unsure of as of recent, but from
20 what I understand now, it has been resolved.
21    Q. And if it hasn't been resolved, would
22 that be intentional?
23    A. No.
24    MR. TORRES: Objection. Calls for
25 speculation.

1    Q. I mean you would not have unintentionally
2  withheld pay from Ms. Nicholson if she earned it.
3  Is that correct?
4    A. I would never intentionally withhold pay,
5  yes. Correct.
6    Q. Did you feel that Ms. Nicholson had
7  issues with -- or part of her attitude had to do
8  with her not being a captain?
9    A. I'm sorry. Could you say that once more?
10   Q. Did you feel that some of her issues on
11 the job stemmed from her not being a captain?
12   A. I did get that impression, yeah.
13   Q. And that was just based on -- her ability
14 to be a captain was just based on seniority. Is
15 that right? Her seniority in the company?
16   A. Yes. She was trained as a captain, but I
17 think her position was going to be a first officer
18 that was capable of flying in the left seat as
19 well.
20   Q. Okay. Nothing further.
21
22 RE-EXAMINATION BY MR. TORRES:
23   Q. I'd like to follow up on answers you've
24 given in the last hour.
25   First of all, during that hour, I don't think

1  I heard you say anything really good about Tiffany
2  Nicholson. Were you in agreement that she should
3  remain as a pilot for Cape Air?
4    A. Yes.
5    Q. Okay. Why?
6    A. Because I think she had the
7  potential to --
8    Q. The potential or the ability?
9    A. Both.
10   Q. I'm talking about what might be for her
11 to remain as a pilot.
12   A. Okay. Well, if she was willing, I think
13 she had the ability to --
14   Q. Okay. Again, perhaps you misunderstand
15 my question. We're not talking about potential or
16 might have the ability. We're talking about her
17 remaining as a pilot.
18   A. Yes.
19   Q. Which presumes that the ability is
20 already there. So were you concerned that she did
21 not have the proper ability to be a pilot?
22   A. Not to be a 42 pilot, no. I think she
23 had the ability to do the 402 position.
24   Q. And why did you think she had the ability
25 to be a 402 pilot?

1    A. She had demonstrated the ability
2  satisfactorily prior to going into the ATR.
3    Q. The ability to work the crew?
4    A. No. The ability to fly the Cessna 402
5  and operate in that environment.
6    Q. Does that require the ability to work
7  with crew, ground crew?
8    A. With ground crew, occasionally, yes.
9    Q. Deal with passengers?
10   A. Yes.
11   Q. Deal with the tower?
12   A. Yes.
13   Q. Meet all the mechanical ability and
14 mental ability of being a pilot?
15   A. Yes.
16   Q. But she wasn't qualified to be an ATR 42
17 pilot?
18   A. Well, qualifications, she had the
19 qualifications for an ATR 42 pilot, except that she
20 didn't demonstrate the necessary interpersonal
21 skills for the two-pilot cockpit environment.
22   Q. Okay. And you had proposed that that
23 would be addressed through the ESP?
24   A. EAP.
25   Q. EAP. Thank you.

1    A. Yes.
2    Q. Is the EAP interpersonal skills part of
3  the training in Houston or in Hyannis for the
4  ATR 42 pilots?
5    A. Interpersonal skills, that would be
6  addressed through the EAP program.
7    Q. No. But my question was, was that part
8  of the training that the pilots went through?
9    A. Well, it's talked about in CRM training,
10 and it's pointed out how important those skills are
11 during CRM.
12   Q. Would you agree with me that talking
13 about it and training in it are two different
14 things?
15   A. Well, we don't train someone towards
16 their attitude.
17   Q. I mean counseling somebody in their
18 interpersonal skills to improve them.
19   A. Counseling them is not part of the normal
20 training.
21   Q. Do you believe then that every pilot that
22 was in Guam had excellent interpersonal skills,
23 interpersonal communication skills?
24   A. I don't know if I would necessarily say
25 they were all excellent, but they were all

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this ___7___ day of ___June___, 2007.

_Patricia Bracken_
Patricia Bracken, CSR No. 1455898