IN THE DISTRICT COURT OF GUAM

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,               )
          Plaintiff,                  )
                                      )
vs.                                   )
                                      )
HYANNIS AIR SERVICE, INC.,            )
d.b.a. CAPE AIR,                      )
          Defendant.                  )
                                      )

DEPOSITION OF

DANIEL A. WOLF

HYANNIS, MASSACHUSETTS

MAY 23, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  Patricia Bracken, CSR No. 1455898

FILE NO.: A103990

**EXHIBIT S**

## Page 6

1    We'll try not to talk over each other.  So
2  you can let me finish my question.  And the
3  deposition can be used in court just like your
4  actual testimony under oath.
5    A.  Okay.
6    Q.  I understand that you're the president
7  and CEO of Cape Air?
8    A.  Hyannis Air Service, Incorporated.
9    Q.  And you've had that position since how
10  long?
11    A.  Since the company was founded.
12    Q.  1990?
13    A.  Actually, the company was incorporated in
14  April of 1988.
15    Q.  And then there was a merger in 1994 with
16  Nantucket Airlines?
17    A.  That's correct.
18    Q.  So you're the guy?  You're the last line?
19  You're Harry Truman?
20    A.  Yes.  I'm the founder and the CEO, yes.
21    Q.  I understand that -- well, we've had the
22  opportunity to do a lot of depositions as you
23  probably know.  So I'll refer back to a lot of the
24  testimony.
25    I understand that Linda Markham came on board

## Page 7

1  in about 2000, and that she sort of formalized an
2  HR department that hadn't existed before then,
3  correct?
4    A.  Yeah.  She was our first full-time
5  director of human resources.
6    Q.  And Cape Air has -- and when I say
7  Cape Air, I'm talking about the corporation.
8    A.  Yeah.
9    Q.  And Cape Air has a handbook that it gives
10  to its employees that sets out the expectations of
11  the company and certain remedies that they may
12  have, correct?
13    A.  Yeah.
14    Q.  In the time that you've run Cape Air, has
15  Cape Air conducted any training in Title 7
16  discrimination, disparage treatment, retaliation,
17  anything like that?
18    A.  As part of our new hire orientation, we
19  do train in those areas.
20    Q.  How about people who have been here
21  for -- I don't know how long -- let's say been here
22  for more than five years?  Any training within the
23  last five years?
24    A.  I know that Linda has -- and the person
25  to ask really would have to be Linda because she's

## Page 8

1  delegated with the task of making sure that the
2  employees are trained.  So my answer would really
3  be to defer to Linda as far as exactly the
4  specifics of the training that has been done.
5    Q.  I've looked you up and done a little
6  homework on you.  You're well respected in the
7  community I see.  Are you the kind of guy who is a
8  hands-on manager, a micro manager, or do you like
9  to delegate and rely on others or in between?
10    A.  In areas that I'm a subject matter expert
11  where I know what I'm talking about, I like to
12  certainly be involved and participate because I
13  think the more smart people that are involved in
14  making a decision and participating in making a
15  decision, the better.  So in areas that I'm an
16  expert, I certainly am involved and actively
17  participate.
18    In areas that I don't know and areas that I'm
19  not an expert, I make sure that I don't micromanage
20  so that the people who are the experts have the
21  ability to make the decisions.
22    Q.  Which areas do you consider yourself an
23  expert in for the purposes of that response?
24    A.  Well, specifically, I'm certainly an
25  expert in the piloting of a Cessna 402, the

## Page 9

1  maintenance of a Cessna 402.  I assume you're
2  talking about operational because as far as the
3  business is concerned, at this point, I consider
4  myself an expert in the business matters, corporate
5  matters, governance, and all the things that go
6  into managing and running a company.  But
7  specifically as it relates to the technical side of
8  the business, my expertise is really in the
9  single-pilot Cessna 402 end of the business.
10    Q.  Are you a pilot also?
11    A.  Yes, I am.
12    Q.  And how long have you been flying?
13    A.  I've been a pilot for -- this will be my
14  29th year.
15    Q.  And do you continue to fly commercially,
16  or is that something you no longer do?
17    A.  I continue to fly commercially in the
18  Cessna 402, a single-pilot operation.  I've never
19  been trained to fly a bigger airplane.  The
20  Cessna 402 is the biggest airplane I've ever flown.
21    Q.  In 2004, Cape Air was certified for part
22  121 flying, and that's your operation in Guam.  Is
23  that correct?
24    A.  That is correct.
25    Q.  And initially, you flew the 402s, and

3 (Pages 6 to 9)

Case 1:06-cv-00027    Document 39-8    Filed 01/18/2008    Page 2 of 11

Page 66

1  part of that process, and that we were doing, as a
2  company, what we could to support Tiffany, but also
3  honor the requirement we have of safety.
4      Q. So you uphold the decision that the panel
5  makes with the modification that she can return
6  back to Guam?
7      A. Yes. And you know, since the issue had
8  been crew resource management, and the Cessna 402
9  is a single-pilot operation, I felt as though
10  flying the Cessna 402, since it didn't involve the
11  reason that the disciplinary action had been taken,
12  was certainly a good place for Tiffany to stay
13  engaged in the company.
14      Q. Right. And so you felt that was a
15  reasonable element of the action form?
16      A. Yeah.
17      Q. Okay. And was the process satisfied in
18  your view, the process that was undertaken in the
19  discipline of Ms. Nicholson?
20      A. Yes. I was actually sad that she didn't
21  accept the offer to come back and fly the 402 and
22  work back into the ATR.
23      Q. Why were you sad?
24      A. Because I have very good feelings for
25  Tiffany, and I wish she was still with the company.

Page 67

1      Q. As part of that action form, there's
2  mention that she may be reviewed to go back into
3  the ATR in six months. Is that -- would there be
4  any reason that Cape Air would not be sincere in
5  offering that she be reevaluated to go back into
6  the ATR?
7      A. I would have done everything I could have
8  done relative to the process to see that Tiffany
9  got back into the ATR.
10      Q. And the action form also offers her to
11  fly a 402 in Guam. And there was a 402 operating
12  in Guam at that time. Is that right?
13      A. Yeah.
14      Q. So she did have the option to go back to
15  Guam and continue to work there?
16      A. Yes.
17      Q. Cape Air no longer flies the 402s in
18  Guam. Is that correct?
19      A. That's correct.
20      Q. And when did that service terminate?
21      A. The 402s came back from Guam in June of
22  2005 I believe.
23      Q. Okay. So that would have been --
24      A. They came back in time to catch the busy
25  season here in New England.

Page 68

1      Q. So that would have been nine months after
2  the action form and the discipline thereabouts?
3      A. Without using my fingers, yes. If that's
4  the right number, yeah. I mean I guess the
5  question you're asking is was there an opportunity
6  to go back into the 402 in Guam at that point, and
7  the answer is yes.
8      Q. So the decision to uphold the panel's
9  decision with the modifications and the revised
10  action form, that was a decision of your making as
11  an independent reviewer?
12      A. I participated in an independent review.
13  I mean Linda and I discussed it together. I wanted
14  to offer something to Tiffany that Tiffany could
15  accept so that she could stay with the company.
16      Q. Okay. And it's your understanding that
17  part of the corrective measure would be that
18  Ms. Nicholson be given a further opportunity for
19  additional training in CRM?
20      A. Yes.
21      Q. And did that seem reasonable to you?
22      A. It seemed reasonable. And it was my hope
23  and belief that Tiffany would end up back in the
24  ATR 42.
25      Q. Have you seen anything or heard of

Page 69

1  anything that the process that is outlined in the
2  handbook has not been followed in Ms. Nicholson's
3  case?
4      A. No. I think the process has been
5  followed. I think opposing counsel even said the
6  process has been followed.
7      Q. Can you give us a little bit of
8  information about the investment that Cape Air had
9  in its Micronesia operation?
10      A. Cape Air invested about three-and-a-half
11  million dollars the first year in 2004, which
12  contributed to a significant loss in 2004 overall.
13      Q. And per pilot, how much would that
14  investment equate to?
15      A. The trainings -- I believe somewhere
16  between 25 and $30,000. And then you've got
17  relocation expenses. So somewhere between 30 and
18  $40,000 per pilot.
19      Q. So does it make any sense that you would
20  make that sort of investment in a pilot, and as
21  CEO, allow that opportunity to be wasted by any
22  pilot?
23      A. No. And in fact, the decision we made to
24  hire pilots who weren't qualified and train them
25  rather than hiring qualified trained pilots was

Page 70

1  really to support the people who had made the
2  contribution here. So the expectation was that it
3  was worth spending the extra money to invest in
4  having existing employees have that opportunity.
5      Q. So you did -- I mean there was an option
6  available that you can hire people who had already
7  had the experience and didn't need to be trained?
8      A. That had type ratings in the air.
9      Q. In the airplane?
10     A. Yeah, in the airplane.
11     Q. Cape Air is also known for its
12 encouragement of women in the work force. Isn't
13 that correct?
14     A. We work hard to make it a work
15 environment that all people, regardless of gender,
16 preference, race, religion, and creed feel
17 comfortable and have the opportunity to reach for
18 their dreams. Let's put it that way.
19     Q. Okay. Cape Air recently -- or in 2004
20 received an award from the Massachusetts Women's
21 Political Caucus Educational Fund. Is that
22 correct?
23     A. Yes.
24     Q. And do you know what that award related
25 to?

Page 71

1      A. It was in recognition of the fact -- it
2  does sound old in this context to be saying it, but
3  it was in recognition of the opportunities and the
4  realization of those opportunities for women in the
5  workplace.
6      Q. Would one of those examples be, for
7  instance, the company paying part of Lisa Price's
8  tuition in law school? Would that be one example
9  of how Cape Air supports its female employees?
10     A. Uh-huh. Yes. I'm sorry.
11     And I think it's reflected in the management
12 makeup of Cape Air. It's reflected in our
13 involvement in Women In Aviation organizations.
14 It's a reflection of the values of the people who
15 are running the company.
16     Q. When Ms. Nicholson came back to Hyannis
17 to discuss what happened in Guam, there was a time
18 in which you had a discussion with her yourself.
19 Is that correct?
20     A. Yes.
21     Q. And did she ever raise with you any
22 issues with a relationship with Chuck White when
23 she had that discussion with you?
24     A. I don't remember.
25     Q. Okay. And how about did she raise any

Page 72

1  issues regarding a relationship or a rumored
2  relationship with Russell Price?
3      A. I don't think so.
4      Q. In the disciplinary process in the
5  independent review that you participated in, with
6  respect to Ms. Nicholson, has that differed from
7  any other disciplinary process that Cape Air has
8  undertaken with respect to any male pilots?
9      A. No.
10     Q. Just a few more. While this process was
11 undergoing, the disciplinary process and the
12 appellate review, to your recollection, did
13 Ms. Nicholson ever raise any issues of sex
14 discrimination?
15     A. No.
16     Q. So what Cape Air was undertaking to
17 review was actually just a performance issue?
18     A. Yes.
19     Q. Was safety one of the considerations when
20 you were participating in the appellate review
21 of -- was safety one of your objectives insuring
22 that the aircraft was safe when you were doing the
23 appellate review?
24     A. Yeah. The reason the process exists as
25 it does, and the reason that I don't exert

Page 73

1  influence over the outcome relative to issues of
2  capability, competence, aptitude in the cockpit is
3  because I don't want my decisions to have any
4  influence on the outcome relative to safety.
5      So the answer is yes. I mean there is a
6  process which insulates me from unduly having an
7  impact on safety, potentially an adverse impact on
8  safety.
9      Q. For that you rely upon your chief pilot,
10 and in this case, the director of operations as
11 well?
12     A. Yes. The entire flight management team
13 as well as the training department.
14     Q. To make a determination of what is safe
15 and unsafe?
16     A. That's correct. And I intentionally
17 separate myself from that part of the process.
18     Q. Okay. And then you rely on Linda Markham
19 to make sure that the process was followed as well
20 as giving Ms. Nicholson an opportunity to
21 participate?
22     A. Yes.
23     Q. Okay. Okay. Thank you very much.
24 Nothing further.
25     MR. TORRES: I just have one.

19 (Pages 70 to 73)

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this __13th__ day of __June__, 2007.

_Patricia Bracken_
Patricia Bracken, CSR No. 1455898

IN THE DISTRICT COURT OF GUAM


C.A. No.: CV 06-0027


TIFFANY ANNE NICHOLSON,           )
          Plaintiff,              )
                                  )
vs.                               )
                                  )
HYANNIS AIR SERVICE, INC.,        )
d.b.a. CAPE AIR,                  )
          Defendant.              )
                                  )


DEPOSITION OF

LAWRENCE J. GAULTIERI

HYANNIS, MASSACHUSETTS

MAY 23, 2007


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:  Patricia Bracken, CSR No. 1455898


FILE NO.: A103990

EXHIBIT T

ATKINSON-BAKER, INC. COURT REPORTERS                    1 (800) 288-3376
Case 1:06-cv-00027    Document 39-8    Filed 01/18/2008    Page 6 of 11
b8056c94-82fd-4c65-8dc6-e0759e80b939

Page 98

1    A. Yes.
2    Q. And then in the last sentence of the
3  revised action form it says, any future inability
4  to maintain a positive attitude in the work
5  environment based on teamwork or inability to
6  fulfill the duties and responsibilities of a flight
7  crew member would be grounds for termination. Did
8  that sound to you to be a reasonable request --
9    A. Yes.
10   Q. -- that she maintain a positive attitude
11  in the work environment?
12   A. Yes.
13   Q. Is that something that you require of
14  your employees?
15   A. Yes.
16   Q. Of all employees?
17   A. Yes.
18   Q. And fulfilling the duties and
19  responsibilities of a flight crew member, is that
20  something that you expect of your employees?
21   A. Flight crew members, yes.
22   Q. Flight crew members?
23   A. Uh-huh.
24   Q. Okay. This wasn't a -- the revised
25  action form was not a termination. Is that

Page 99

1  correct?
2    A. Correct.
3    Q. It was a plan in order to assist her in
4  improving her CRM skills?
5    A. Correct. And getting back to the duty
6  position that she ultimately wanted to be at.
7    Q. So Ms. Nicholson rejected this action
8  form, the revised action form?
9    A. Yes.
10   Q. She rejected the training that was
11  offered to her?
12   A. Yes.
13   Q. I mean through the revised action form?
14   A. Through the revised action form. And
15  then I believe she came up with that email, which I
16  think was after that. And again, I'm not sure of
17  the dates and times.
18   Q. Now, I think that email is actually --
19  please look at Exhibit 46, which I believe the
20  email part is dated September 19th.
21   A. Okay.
22   Q. So she's asking on September 19th for
23  further training. This revised action form, I
24  believe, is dated September 24th. Is that
25  consistent --

Page 100

1    A. Yes.
2    Q. -- with your understanding?
3    A. Yeah.
4    Q. And you've seen this document?
5    A. Yes.
6    Q. The revised action form?
7    A. Yes.
8    Q. So you offer her further training. She
9  asks for it on September 19th, you offer it on
10  September 24th, and she rejects it later. Is that
11  right?
12   A. That's my understanding of the facts
13  after that, yes.
14   Q. Did she tell you why she rejected it?
15   A. I don't believe I had any further
16  conversations with her after that.
17   Q. In addition to rejecting the opportunity
18  to be further trained in CRM, she rejects the
19  ability to stay in Guam and work with Cape Air as a
20  402 captain?
21   A. Yes.
22   Q. She rejects the opportunity to take EAP?
23   A. Yes.
24   Q. Did Ms. Nicholson's gender ever come into
25  consideration for you when you were evaluating her

Page 101

1  CRM skills and the disciplinary action?
2    A. No.
3    Q. Do you recall how much Cape Air invested
4  in each pilot that was trained to fly the ATR?
5    A. That was in the neighborhood of $25,000 a
6  piece.
7    Q. Per pilot?
8    A. Per pilot. And that was soup to nuts
9  sort of. It was the whole package of ground
10  school, flight training, transition.
11   Q. Okay. Was training the pilots a
12  significant investment for Cape Air?
13   A. Absolutely.
14   Q. Did it make sense that Cape Air would
15  invest $25,000 per pilot, send them out to Guam,
16  and set them up just to see them fail?
17   A. No.
18   Q. In fact, that wasn't your intention
19  because you had offered her further training and to
20  stay with the company and be reevaluated with ATR.
21  Is that correct?
22   A. That's correct.
23   Q. To your knowledge, has there been a
24  female pilot working on Guam since Ms. Nicholson's
25  departure?

Case 1:06-cv-00027   Document 39-8   Filed 01/18/2008   Page 7 of 11

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this _13th_ day of _June_, 2007.

_Patricia Bracken_

Patricia Bracken, CSR No. 1455898

## DECLARATION OF LINDA MARKHAM

I, LINDA MARKHAM, declare under penalty of perjury that the following statements are true and correct:

1.    I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.    I would testify competently as to these facts if called by the Court.

3.    I am the Vice-President of Human Resources at Hyannis Air Service, Inc. dba Cape Air ("Cape Air"), a small regional airline based in Hyannis, Massachusetts.

4.    Over the past several years, Cape Air has employed on average 100 pilots.

5.    I have been personally involved in reviewing letters and other documentation and business records concerning Tiffany Nicholson's employment and discipline at Cape Air. These letters and documents, attached to this Declaration, are kept in the normal course of business in Ms. Nicholson's personnel file at Cape Air, over which I have custody.

6.    Attached hereto as Exhibit A is a true and correct copy of pages of Cape Air's General Operating Manual concerning the duties and obligations of captains and first officers operating in the ATR42 aircraft. This document is kept in the normal and ordinary course of Cape Air's business.

7.    Attached hereto as Exhibit B is a true and correct copy of a letter drafted by Cape Air pilot Charles White which pertains to his work experience with Ms. Nicholson. This letter was placed in Ms. Nicholson's personnel file at Cape Air.

8.    Attached hereto as Exhibit C is a true and correct copy of a letter drafted by former Cape Air Pacific Regional Administrator Russell Price which pertains to his work

9.     Attached hereto as Exhibit D is a true and correct copy of a letter drafted by former Cape Air pilot Jon Bleiman which pertains to Mr. Bleiman's work experience with Ms. Nicholson. This letter was placed in Ms. Nicholson's personnel file at Cape Air.

10.     Attached hereto as Exhibit E is a true and correct copy of a letter drafted by Cape Air Director of Training David O'Connor which pertains to Mr. O'Connor's work experience with Ms. Nicholson. This letter was placed in Ms. Nicholson's personnel file at Cape Air.

11.     Attached hereto as Exhibit F is a true and correct copy of a letter drafted by Cape Air pilot Phillip Dery which pertains to Mr. Dery's work experience with Ms. Nicholson. This letter was placed in Ms. Nicholson's personnel file at Cape Air.

12.     Attached hereto as Exhibit G is a true and correct copy of the Revised Action Form issued to Ms. Nicholson. This Revised Action Form was placed in Ms. Nicholson's personnel file at Cape Air.

13.     Attached hereto as Exhibit H is a true and correct copy of the first version of the Action Form concerning Ms. Nicholson. This first version of the Action Form was placed in Ms. Nicholson's personnel file at Cape Air.

14.     Attached hereto as Exhibit I is a true and correct copy of a September 16, 2004 email sent by Ms. Nicholson to Steve Phillips, Cape Air's Chief Pilot, and "cc" to "Linda Fitzgerald". This email was placed in Ms. Nicholson's personnel file at Cape Air.

15.    Attached hereto as Exhibit J is a true and correct copy of a September 19,

2004 email sent by Ms. Nicholson to Steve Phillips, Cape Air's Chief Pilot, and "cc" to me, Dan

Wolf, and Larry Gualtieri. This email was placed in Ms. Nicholson's personnel file at Cape Air.

16.    When Tiffany Nicholson failed to accept the terms of the Revised Action

Form which allowed her to fly as a Cessna 402 Captain, she was considered to have abandoned

her employment at Cape Air.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true, correct and complete.

DATED: _Thursday_, January _17_, 2008.

_Linda Markham_
LINDA MARKHAM