1 **TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
2 HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601

**FILED**
3 DISTRICT COURT OF GUAM

4 *Attorneys for Plaintiff*

FEB 0 1 2008

5 **JEANNE G. QUINATA**
**Clerk of Court**

6

7 IN THE DISTRICT COURT OF GUAM

8 ----------

9 TIFFANY ANNE NICHOLSON,                )    CIVIL CASE NO. CV 06-00027
                                         )
10            Plaintiff,                 )
                                         )    **PLAINTIFF'S OPPOSITION TO**
11    vs.                                )    **DEFENDANT'S MOTION FOR**
                                         )    **SUMMARY JUDGMENT;**
12 HYANNIS AIR SERVICE, INC.             )    **CERTIFICATE OF SERVICE**
   d.b.a. CAPE AIR,                      )
13                                       )
              Defendant,                 )
14

15 ----------

16        Plaintiff, Tiffany Anne Nicholson, hereby files her Opposition to Defendant's Motion for

17 Summary Judgment pursuant to Fed.R.Civ.P. 56. This Opposition is supported by the accompanying

18 Declarations of Samuel S. Teker and Tiffany Anne Nicholson, Exhibits 1 through 12, and the records

19 and files for this action.

20        Dated at Hagåtña, Guam, on February 1, 2008.

21                                          **TEKER TORRES & TEKER, P.C.**

22

                                           By_____
23                                            **PHILLIP TORRES, ESQ.**
                                             Attorneys for Plaintiff

# I.

## INTRODUCTION

Defendant has moved for Summary Judgment to dismiss Plaintiff's Title VII claims of discrimination based on sex and disparate treatment. Under Title VII, an employer may not "discriminate against an individual with respect to his …terms, conditions, or privileges of employment because of her sex. 42 U.S.C. 2000e-2(a)." Defendant asserts that there are no disputes of material facts. Defendant's Motion sets forth "general facts" regarding the Plaintiff's history of employment with Defendant. Defendant recounts Plaintiff's ground training and simulator training, Plaintiff's flying experience and Plaintiff's retraining on the ATR 42. Defendant explains its discipline of the Plaintiff, her problems with Crew Resource Management skills ("CRM") and the decision of Cape Air's disciplinary panel and appellate panel.

Throughout its Motion, Cape Air makes a number of conclusory statements about Nicholson which are disputed by Nicholson, contradicted by Cape Air's management and employees or are unfounded. At page two of its Motion, Cape Air states that Nicholson "was hostile, combative and abrasive, insubordinate and arrogant." Two sentences later she is characterized as "unsafe by everyone who evaluated her". On page 4 of the Motion, Cape Air states that "Nicholson experienced some problems prior to transferring to Guam…" On page 6 of the Motion, Cape Air states that Chuck White removed Nicholson from flying on August 31, 2004 "because…she was unsafe to fly." Many of those statements are not facts. Other "facts" set forth in Defendant's pleading are disputed by Plaintiff and contradicted by Defendant's actions and the actions and statements of its employees, all of which constitute a dispute of material facts. Plaintiff, in her Declaration of Facts attached hereto and incorporated herein by reference as Exhibit "1," sets forth her statement of facts which also contradict many of Defendant's facts.

1    The undisputed facts are that Plaintiff has been flying since 1993. She began her
2    employment with Cape Air in 2000 as a Captain piloting the Cessna 402 aircraft. Nicholson
3    Declaration, Exhibit 1. Cape Air is a company with six hundred (600) employees and, therefore, is
4    a company subject to the statutory provisions of Title VII of the Civil Rights Act of 1964. Cape Air
5    is an employee owned company with thirty percent (30%) of its stock owned by employees and
6    former employees including Nicholson.

7    Russell Price was a director of Cape Air and was selected to be the Regional Administrator
8    for Cape Air operations when it began flying commercially in Guam on August 1, 2004. The
9    Plaintiff was one of eight pilots who were part of the initial team of pilots who flew out of Guam
10   when Cape Air began its operations on August 1, 2004. Their selection was based on seniority and
11   Nicholson was the only female pilot assigned to Guam at that time. Nicholson Declaration, Exhibit
12   1. All eight pilots were flying the ATR 42 aircraft, a two-pilot cockpit aircraft, for the first time.
13   Attached hereto and incorporated herein by reference as Exhibit 2, is Nicholson Deposition
14   Transcript dated March 1, 2007. Exhibit 2, 34:25-35-06. All pilots were required to successfully
15   complete ground school and flight simulator training in order to qualify to fly the ATR 42 and all
16   pilots did successfully complete those trainings.

17   Defendant set forth the proper analysis for Summary Judgment and the Supreme Court's
18   standard for review of Title VII discrimination cases first enunciated in *McDonnell Douglas Corp.*
19   *v. Green*, 411 U.S. 792 (1973). Plaintiff must set forth a prima case of discrimination. *Id.* at 802.
20   "The requisite level of proof necessary to establish a prima facie case for Title VII …on summary
21   judgment is minimal and does not even rise to the level of a preponderance of the evidence." *Wallis*
22   *v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

23   Once that is done, the burden shifts to the Defendant to articulate a legitimate,

1  nondiscriminatory reason for its actions. ***McDonnell Douglas***, 411 U.S. at 802. If the employer

2  meets its burden, the burden then shifts back to the Plaintiff to show by direct or circumstantial

3  evidence that a discriminatory reason, or reasons unworthy of credence, actually motivated the

4  employer's decision. ***Villarimo v. Aloha Island Air, Inc.***, 281 F.3d 1054, 1062 (9th Cir. 2002)

5  (citations omitted).

6      Cape Air argues that Nicholson fails to set forth a ***prima facie*** case of gender discrimination.

7  It is not disputed that Nicholson is a member of a protected class. Cape Air argues that Nicholson

8  was not qualified for her job; that no other pilots were similarly situated to Nicholson and that

9  Nicholson was not treated differently from other pilots.

10     **A.      NICHOLSON WAS QUALIFIED.**

11     Cape Air asserts that Nicholson was not qualified to fly the ATR 42 aircraft because of

12  deficient CRM skills and failure to cooperate. (Defendant's Motion for Summary Judgment at p.17).

13  Nicholson asserts that her skills were adequate to fly the ATR 42 but that she could also benefit from

14  additional training. Attached hereto and incorporated herein by reference as Exhibit "3," is the

15  Deposition Transcript of Plaintiff dated February 23, 2007. Exhibit 3, 181:09-187:22. Attached

16  hereto and incorporated herein by reference as Exhibit "4," is the Deposition Transcript of Lawrence

17  J. Gaultieri dated May 23, 2007. Exhibit 4, 62:24- 64:14. Attached hereto and incorporated herein

18  by reference as Exhibit "5," is Plaintiff's email of September 16, 2004. Exhibit 5. Attached hereto

19  and incorporated herein by reference as Exhibit "6," is Plaintiff's email of September 19, 2004.

20  Cape Air's assertion that Nicholson is unsafe to fly is contradicted by the evaluations of Price,

21  O'Connor, Phillips and the statements of White.

22     Nicholson was part of the initial team of pilots who went to Guam to fly the ATR42 aircraft.

23  The pilots were selected from a pool of employee pilots who applied. The selection process was

purely on the basis of seniority. None of the selected pilots had ever flown the ATR 42, which is a two-pilot aircraft. All of the selected pilots underwent training to learn how to fly the ATR42. Pilots had to attend and pass ground school training and simulator training. Simulator training included CRM training. Ground school training was conducted by Cape Air and simulator training was conducted by Flight Safety, an independent training organization. Attached hereto and incorporated herein by reference as Exhibit "7," is David O'Connor's Deposition Transcript dated May 22, 2007. Exhibit 7, 15:17-16:10. All pilots received the same level of training, including CRM, and all pilots eventually passed their training.

The pilots then proceeded to Guam where they underwent FAA required certification flying and initial operating experience (IOE) flying. IOE training flights were conducted by Steve Phillips, Cape Air's Chief Pilot and David O'Connor, Cape Air's Director of Training. Phillips and O'Connor were on Guam for about six weeks and left on or about August 20, 2004 after they completed all training to their satisfaction. At no time during her ground school, Simulator, FAA Certification and IOE training did Nicholson fail any part of her training, nor was she ever disciplined, written up or counseled for deficient CRM skills or any other deficiencies.

On August 31, 2004, Nicholson was removed from flying by her Captain, Chuck White, after returning from a round trip flight from Guam to Saipan. White was the Captain on the morning flight from Guam to Saipan and Nicholson was the First Officer. After the flight to Saipan White made the decision to remove Nicholson from flying because he felt she was unsafe to fly. Defendant's Exhibit 3 at 147:16-18.White's authority to do so was confirmed by Cape Air's system of operations and by Russell Price, Cape Air's regional administrator for Guam. However, despite White's conclusion about Nicholson being unsafe, White had Nicholson pilot the aircraft from Saipan to Guam with a planeload of passengers.

1        Neither White nor Price ever told Nicholson why she was removed from the flight. Exhibit

2  3 at 149:14-151:4. White's action of removing Nicholson from flying set off a chain of events that

3  eventually led to Nicholson being terminated from her employment at Cape Air. Contrary to Cape

4  Air's assertion at page 17 of its Motion that Nicholson was not qualified to fly, no one ever

5  determined that. Price did not tell O'Connor that Nicholson was unsafe to fly. Exhibit 7, 35;10-

6  36:19. O'Connor wrote, as the last sentence in his September 14, 2004 letter (a copy of which is

7  attached hereto as Exhibit "8," and incorporated herein by reference),"I think she possesses the

8  ability and desire to (sic) do the job safely and well....". Chuck White admitted that, notwithstanding

9  his statement that Nicholson was unsafe, he had her pilot the plane back from Saipan to Guam on

10  August 31, 2004 and he was unsure whether his problems with Nicholson were because she was his

11  old girl friend or because she was unsafe to fly with. Attached hereto and incorporated herein by

12  reference as Exhibit "9," is the Deposition Transcript of Charles White dated March 2, 2007.

13  Exhibit 9, 66:09-67:23. Thus, a material dispute of fact exists as to whether Nicholson was unsafe

14  to fly or had deficient CRM skills making her unsafe to fly.

15        **B.**    **OTHER PILOTS WERE SIMILARLY SITUATED.**

16        Cape Air asserts that other pilots are not similarly situated. Nicholson was one of eight pilots

17  flying the ATR42 in Guam. Cape Air argues that although other pilots had training issues, no other

18  pilot was having CRM problems and, therefore, they were not similarly situated. That is a distinction

19  without a difference. Nicholson's alleged inadequacies were actually less severe than the other

20  pilots' failures. Failure to pass ground school, simulator training or check rides results in automatic

21  disqualification from the ATR 42 program. A pilot must retrain and retest to pass and regain status.

22  Nicholson's problems were subjective and didn't automatically disqualify her from flying as

23  evidenced by her piloting the flight from Saipan to Guam on August 31, 2004 after White had

1      supposedly determined that Nicholson's CRM skills were deficient. All pilots with deficiency issues

2      were subject to remedial measures by Cape Air and, thus, Nicholson was similarly situated to her

3      fellow pilots at Cape Air.

4          **C.**     **NICHOLSON WAS TREATED DIFFERENTLY THAN OTHER SIMILARLY SITUATED PILOTS.**

5

6      Finally, Cape Air argues that Nicholson was not treated differently than the other similarly

7      situated pilots. ALL of Nicholson's fellow pilots who failed ground school and simulator training

8      got additional training and additional opportunities to correct their failures and stay in the ATR 42

9      program. Nicholson requested the same from the disciplinary panel in Hyannis in emails to the panel

10     on September 16th and 19th, 2004, and at the hearing on September 17, 2004, so she could stay in the

11     ATR 42 program. Notwithstanding Cape Air's assessment that she needed additional training in

12     CRM and interpersonal skills, she was denied the opportunity afforded other pilots to retrain and stay

13     in the ATR 42 program. Phil Dery and Nehal Zaide failed ground school and were allowed to retrain

14     and retest to pass. Dery also failed simulator training. Attached hereto and incorporated herein by

15     reference as Exhibit "10," is the Deposition Transcript of Stephan G. Phillips dated May 18, 2007.

16     Exhibit 10, 27:04-28:14. Dery was given additional training to afford him the opportunity to retest

17     and pass. John Kappayne failed his check ride in simulator training. A check ride failure is serious

18     and means the pilot is grounded. Exhibit 10, 27:14-17. Kappayne was allowed to retrain and take

19     the check ride again to pass. Nicholson went through a formal disciplinary process and the others

20     did not. Once the Action Form and CRM training by Flight Safety was mandated, Nicholson was

21     still excluded from the ATR 42 program. Thus, Nicholson was treated differently from her similarly

22     situated pilots.

23     ///

## DEFENDANT HAS NOT MET ITS BURDEN SHOWING NICHOLSON WAS TERMINATED FOR A LEGITIMATE NON-DISCRIMINATORY REASON

Cape Air asserts that it terminated Nicholson for non-discriminatory business reasons because she was unsafe to fly. Cape Air also asserts that Nicholson had inadequate CRM skills, lacked personal responsibility and didn't get along with other pilots. The disciplinary review panel determined in its Action Form dated September 17, 2004 and in the revised Action Form dated September 24, 2004that Nicholson "was unable to interact and communicate effectively in a flight crew environment...created unsafe operative conditions in the cockpit." That was the unlawful excuse for removing her from the Guam ATR program because she was the only woman pilot and the men didn't want to fly with her.

Nicholson was suspended from flying without pay until she completed an EAP interpersonal communications program (specifics undefined). She had to complete a CRM class at Flight Safety which would be scheduled by Cape Air. Cape Air could reinstate Nicholson as a 402 Captain but removed her from the ATR42 program for at least six months. Nicholson would also be on probation for six months. She also had to fulfill her duties and responsibilities at work and maintain a positive attitude or she could be fired. Under Cape Air's hand book rules Nicholson had a right to an independent review of the panel's decision and she exercised her right to that review because she wanted to stay in the ATR 42 program.. Dan Wolf, Cape Air's CEO, and Linda Markham made up the review panel and upheld the decision of the disciplinary panel.

Although at first glance it may appear that Cape Air found Nicholson to be deficient in her CRM skills and honestly believed in the reasons it offered for Nicholson's discipline, a closer look demonstrates that it could not honestly believe in the reasons it offered to take her out of the ATR

42 program, and ultimately terminate her employment. To have done so, logic requires, at a minimum, that Cape Air had actually investigated the Guam allegations against Nicholson and her responses to the allegations taking into account Cape Air's knowledge of the flight operations and personnel in Guam.

On August 20, 2004 O'Connor and Phillips left Guam without voicing or documenting any concerns about Nicholson's skills. Eleven days later Chuck White's action of removing Nicholson from the cockpit created the initial concern over Nicholson's CRM abilities and days later she was suspended from flying. Guam's evaluation contradicted Nicholson's history. Prior to August 31, 2004, no one had approached her as a co-employee or management to inform her of any problems with her skills nor had she been disciplined by Cape Air prior to August 31, 2004. Exhibit 3, 164:7-13. Nicholson went though all of her training without suffering the serious competency problem experienced by other ATR 42 pilots. Flight Safety rated her on June 14, 2004 as having excellent CRM. *See* Exhibit "11" attached hereto and incorporated herein by reference. The FAA certification flights and the IOE flights conducted by Phillips and O'Connor for Cape Air fail to document any CRM deficiencies against Nicholson. Nicholson's former boyfriend claims she was unsafe and removes her from the cockpit due to poor CRM. Nicholson never received an explanation from White or Russell Price about why she was removed from flying. Exhibit 3, at 149:14-151:4.

The sources of the CRM allegations were White and Price. Cape Air knew that Nicholson and White had been involved in a romantic relationship in 2003 which lasted approximately one year and ended prior to their relocation to Guam. Before the trip to Guam, White's boss, Stephen Phillips, felt the need to take White aside and asked him whether or not he could fly with Nicholson in light of their previous relationship. Exhibit 9, 35:15-36:23. While in Guam, White continued to

1  pursue Nicholson with the hopes of rekindling their relationship but Nicholson was no longer

2  interested in a romantic relationship with White Exhibit 3, 144;10-145:08.

3  White testified in deposition that he did not want to work with Nicholson. Exhibit 9, 39:09-

4  22, 93:12-18. He also testified that he did not want to see Nicholson disciplined as a result of his

5  September 6, 2004 letter. Exhibit 9, 93:09-94:13. He just didn't want to work with her. A week or

6  so after Nicholson was terminated White saw her in a bar and with mean spirit told her "normally

7  I can't stand the site (sic) of your face." Exhibit 9, 98:11-13. He also told her that if they were still

8  together she would never have been fired. Nicholson relayed that information to Linda Markham but

9  never got a response back from Cape Air. Exhibit 3, 162:01-163:14, Exhibit 2, 90:6-12.

10  Notwithstanding management's knowledge of their past history no one from Cape Air talked to

11  White about the sum and substance of his letter to satisfy themselves about what had happened in

12  the air and the appropriateness of his actions. Exhibit 9, 86:08-88:22.

13  Rumors began to circulate among the male pilots that Nicholson and Russell Price were

14  having an affair. Management in the home office in Hyannis, Massachusetts, as well as the pilots and

15  employees of Cape Air in Guam were aware of the rumors. *See* the Deposition Transcript of Linda

16  Markham, dated May 17, 2007 attached hereto as Exhibit "12" and incorporated herein by reference.

17  Exhibit 12, 50:25-54:06, 146:02-148:10. Markham informed Dan Wolf, Cape Air's CEO of the

18  rumors and she confronted Price. Despite denying the rumors Markham did not believe Price

19  understood the need to be professional in his job and activities with employees. Exhibit 12, 54:7-17.

20  White also confronted Russell Price about whether he was having a sexual relationship with his ex-

21  girlfriend. Exhibit 9, 117:20-118:23.

22  On or about September 6, 2004, Phillip Dery and Jon Bleiman also wrote letters complaining

23  of Nicholson. John Kappayne wrote a letter on September 9, 2004 and David O'Connor wrote his

1    letter on September 14, 2004 also complaining of Nicholson. Russell Price wrote an undated letter

2    on or about September 6, 2004. None of the pilots ever talked to any of the panel members.

3         On or about September 9, 2004, Nicholson was sent to the company's headquarters in

4    Hyannis, Massachusetts to meet with management personnel.

5         By September 14, 2004, without Nicholson's input, Cape Air had already decided on

6    Nicholson's discipline. On September 14, 2004, Nicholson was handed an Action Form setting forth

7    Cape Air's proposed discipline. Nicholson was told to review it during the week and come back on

8    Friday, September 17, 2004 for a hearing and explain why the company should not institute those

9    actions. On September 17, 2004, management personnel consisting of Stephen Phillips, Larry

10   Gaultieri and Markham convened as a disciplinary panel as set forth in Cape Air's Handbook. David

11   O'Connor, the Director of Training was not part of the review panel. In his September 14, 2004

12   letter, O'Connor stated that Nicholson had the ability and desire to do the job safely. In his

13   deposition he stated that retraining was appropriate if the pilot was qualified, proficient and had the

14   aptitude to succeed. Exhibit 7, 13:14-23. The only person the panel spoke to was Russell Price. No

15   one went to Guam to investigate nor did anyone talk to the other pilots. The panel only relied upon

16   the letters and the oral conversation with Price in making their decision on the Action Form.

17        Further proof that Cape Air could not honestly believe that Nicholson should be removed

18   from the ATR 42 program is because it never apprized her of any specific charges or allegations

19   regarding her conduct. Instead, the panel told her that she had inadequate CRM and pilots didn't

20   want to fly with her. She was told about the letters written by her co-worker pilots and management

21   yet she was denied the right to review them and respond to them even though she requested the

22   opportunity to do so. Without specific charges to respond to, Tiffany Nicholson maintained her

23   position that she was not guilty of unsafe flying and that her CRM skills were adequate to be a pilot

1    on the ATR 42 flights. Notwithstanding Nicholson's denial of the accusations, the panel issued the

2    Action Form which, among other things, denied Nicholson the right to fly the ATR 42 aircraft or to

3    fly in Guam. Exhibit 4, 42:14-45:04, 61:24-63:14. Nicholson had also written to the panel members

4    a day earlier and proposed additional training to remain in the ATR 42 program.

5         After the Action Form was issued, Nicholson wrote an email, on September 19, 2004, to

6    Markham, Gaultieri, Phillips and Daniel Wolf, Cape Air's CEO. In the email, Nicholson tells them

7    that she wants to successfully resolve the employment issues relating to her position in the ATR

8    program on Guam. She understood the impact of the September 17 Action Form in that if she didn't

9    acknowledge the company's concerns, even though she might disagree, she could still benefit from

10   additional training, addressing Cape Air's concerns to stay in the ATR 42 program. She accepted

11   responsibility that she could be better and said she is not asking for any special treatment, just wants

12   to be treated as other pilots whose skills were found lacking in the earlier stages of the ATR

13   program. Nicholson went on to explain how other pilots who failed at various stages of the ATR

14   program were given additional training and additional opportunities to succeed and stay in the

15   program and she wanted to be treated the same way. In page two of her email, Nicholson said,

16        I would like the opportunity to show Cape Air that a successful immediate
         reintegration into the ATR is possible following immediate CRM training, run
17        concurrently with communication skills training, followed by FO IOE in the ATR on
         Guam...I am willing to go to CRM training at flight safety, to participate in any
18        CRM workshops available and to see the woman recommended by EAP on Guam
         for as long as the company feels necessary...I am only looking for an equal
19        opportunity to be successful in my position as an ATR FO/CA...I sincerely hope you
         will consider the options offered to me on September 17, 2004.

20

21        On September 24, 2004, Nicholson was served a revised Action Form. The revised Action

22   Form was identical to the first Action Form except that she would be allowed to fly the 402s in the

23   Pacific region and she could have her removal from flight status on the ATR 42 reviewed in six

months instead of eighteen months. Thus, Nicholson's goal to remain in the ATR 42 program was not permitted by Cape Air. Nicholson would be allowed to fly in Guam as a 402 captain after she had completed her EAP training and CRM training.

Nicholson appealed the revised Action Form, as was her right, under the Cape Air Handbook. She was entitled to an independent evaluation of the actions taken by the panel. However, she did not have an independent evaluation. The evaluators were Wolf and Markham. Markham also was part of the initial panel, thus, it was not an independent review.

The disciplinary panel did not make a transcript of the proceedings nor was an audio tape of the proceedings made. Wolf did not talk to Gaultieri or Phillips about the decisions they made or the factors that went into their decisions. Without a record and without discussing the assessments made by Gaultieri and Phillips, Wolf did not make an independent assessment. Wolf saw his role as making sure the initial discipline process had been effectuated and validating the actions taken by the disciplinary panel. Exhibit 9, 38:01-58:16

Cape Air management team was 9000 miles away from Guam and it could not have honestly believed that the reasons for removing Nicholson from the ATR program were valid when they knew her performance history, knew that Price and White has discriminatory reasons to be biased against her, didn't talk to those who flew with her, didn't investigate and confront her with the allegations or allow her to defend herself and didn't accept her willingness to do whatever was necessary to stay in the ATR program. Instead Cape Air just did what it wanted to do.

## III.

### NICHOLSON'S TERMINATION WAS A PRETEXT FOR DISCRIMINATION

The material facts of whether Nicholson was unsafe to fly are in dispute. The evidence

1  shows that Nicholson was the only female pilot in Guam flying the two pilot aircraft. White did not

2  want to fly with Nicholson. Price and Nicholson were the subject of sexual rumors and Price was

3  confronted on at least two occasions about it, once by management and once by White. The reviewed

4  letters from the pilots regarding Nicholson were all written on September 5th or 6th, 2004, suggesting

5  that they were solicited or planned. Although Cape Air gave Nicholson a hearing, it failed to

6  reasonably investigate the allegations against her, confront her with the allegations and give her an

7  opportunity to defend herself, thus, making it easy to intentionally impose discipline that removed

8  her from the ATR 42 program. No record of the hearing was made and no independent review was

9  conducted by Cape Air as provided in the company handbook. By imposing discipline upon

10  Nicholson that treated her differently from her male counterparts, and by removing her from Guam

11  and the ATR 42 two-pilot cockpit, Nicholson raises factual issue by direct and circumstantial

12  evidence that Cape Air's acts constitute violations of Title VII by intentionally discriminating against

13  Nicholson based on gender and disparate treatment.

14  ## IV.

15  ## CONCLUSION

16  Plaintiff has set forth a ***prima facie*** case of discrimination. Defendant has not met its burden

17  articulating a legitimate non-discriminatory reason for its actions. Plaintiff has proffered evidence

18  of intentional discrimination in the actions taken against Plaintiff.

19  Based on the foregoing, Plaintiff respectfully requests the Court deny Defendant's Motion

20  for Summary Judgment in its entirety as Defendant has established that fact issues exist.

21  **TEKER TORRES & TEKER, P.C.**

22
   Date: February 1, 2008                  By _____

23                                          **PHILLIP TORRES, ESQ.**
                                           Attorneys for Plaintiff

**TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910

1

# CERTIFICATE OF SERVICE

The undersigned certifies that on this date I caused to be served, via hand delivery, a file-stamped copy of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, together with Plaintiff's Notice of Motion and Motion for Leave to File Facsimile Declaration of Facts on the following:

> Elyze J.T. McDonald, Esq.
> Carlsmith Ball
> Suite 401
> Bank of Hawaii Building
> Hagåtña, Guam 96910

DATED at Hagåtña, Guam, on February 1, 2008.

_____
**SAMUEL S. TEKER**

# Exhibit
# 1

**TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE:  (671) 472-2601

Attorneys for Plaintiff
*Tiffany Anne Nicholson*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON, ) | CIVIL CASE NO. CV 06-00027 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **DECLARATION OF FACTS** |
| ) | |
| HYANNIS AIR SERVICE, INC. ) | |
| d.b.a. CAPE AIR, ) | |
| ) | |
| Defendant. ) | |

**I, TIFFANY ANNE NICHOLSON,** hereby declare as follows:

1. I am over the age of eighteen (18) years and the Plaintiff in the above-captioned case.

2. I am a pilot and have been certified to fly since September 1993.

3. I began my employment with Cape Air in 2000 as a captain flying the Cessna 402 aircraft.

4. Cape Air is a company with more than six hundred (600) employees

5. Cape Air is an employee owned company with thirty percent (30%) of its stock owned by its employees. I am a shareholder of Cape Air.

6. Once on Guam, Cape Air provided cultural sensitivity training but Cape Air never provided training regarding Title VII discrimination or retaliation. Cape Air never reviewed its sexual harassment policy with me during my employment with Cape Air.

1

7.      Russell Price was the Regional Administrator for Cape Air operations on Guam when Cape Air began flying commercially on Guam on August 1, 2004.

8.      I am one of eight pilots, and the only woman, who were part of the initial team of pilots who flew on Guam when Cape Air began its operations on August 1, 2004.

9.      All eight pilots were flying the ATR-42 aircraft, a two-pilot cockpit aircraft, for the first time.

10.     All pilots were required to successfully complete ground school, flight simulator training and Initial Operating Experience (IOE) in order to qualify to fly the ATR-42. Failure to successfully complete ground school, simulator or IOE training meant a pilot was disqualified from flying the ATR-42 aircraft.

11.     Russell Price and Stephen Phillips also took the training to qualify to fly the ATR-42 aircraft.

12.     In 2004, David O'Connor was the Director of Training of Cape Air.

13.     In 2004, Larry Gualtieri was the Director of Operations of Cape Air.

14.     In 2004, Stephen Phillips was the Chief Pilot on Guam.

15.     Stephen Phillips and David O'Connor are pilots and members of Cape Air's management. They were on Guam in July and August 2004 conducting IOE flights to comply with FAA requirements. Cape Air also conducted additional flights to ensure the pilots were capable of carrying out their duties in the operation of the ATR-42.

16.     On or about August 22, 2004, I was awarded my ATR flights for the months of September and October and I had a flight schedule for the months of September and October on the ATR-42.

17.     Stephen Phillips and David O'Connor completed their tasks and left Guam on or about August 20, 2004. I was not disciplined or found to have deficient skills by either Phillips or O'Connor before they left Guam.

2

18.   I was involved in a romantic, boyfriend-girlfriend, relationship with Charles White in 2003 which lasted approximately one year and ended prior to our coming to Guam.

19.   Prior to moving to Guam and while on Guam, Charles White continued to pursue me with the hopes of rekindling our relationship but I was no longer interested in a romantic relationship with him.

20.   During simulator training in Houston, Rumors began to circulate among the male pilots that Russell Price and I were having an affair and the rumors continued on Guam. I was not aware of the rumors at that time. Russell Price was the Regional Manager and married at the time.

21.   The rumors were known by management in the home office in Hyannis, Massachusetts, as well as the pilots and employees of Cape Air on Guam.

22.   On the morning of August 31, 2004, Charles White was the Captain and I was the First Officer "FO" on a flight from Guam to Saipan. I piloted the plane back to Guam.

23.   Upon returning to Guam, I was removed from the aircraft because Charles White, while on Saipan, notified dispatch that I was unsafe to fly. I disagreed with his decision.

24.   Prior to August 31, 2004, no one had approached me, either co-employees or management, to inform me of any problems with my skills nor had I been disciplined by Cape Air in any manner prior to August 31, 2004.

25.   On or about September 6, 2004, Charles White, Phillip Derry and Jon Bleiman all wrote letters complaining about me. John Kappeyne wrote his letter on September 9, 2004 and David O'Connor wrote his letter on September 14, 2004 also complaining of me. Russell Price wrote an undated letter complaining about me on or about September 6, 2004.

26.   Jon Bleiman asserts that his letter was solicited and demanded by Russell Price and was required to be of a derogatory nature towards my skills as a pilot.

3

27.     On or about September 9, 2004, I was sent to the company's headquarters in Hyannis, Massachusetts to meet with management personnel.

28.     By September 14, 2004, without my input, Cape Air had already decided on my discipline and I was handed an Action Form setting forth Cape Air's proposed discipline to me.

29.     I was told to review it during the week and come back on Friday, September 17, 2004 for a hearing and explain why the company should not institute those actions against me.

30.     On September 17, 2004, management personnel consisting of Stephen Phillips, Larry Gualtieri and Linda Markham convened as a disciplinary panel as provided for in Cape Air's Employment Handbook.

31.     I was not apprized on those specific charges or allegations instead the panel told me that I had inadequate CRM and pilots did not want to fly with me.

32.     I was told about the letters written by my co-worker pilots and management yet I was denied the right to review them and respond to them even though I requested the opportunity to do so.

33.     Without specific charges to respond to, I maintained my position that I was not guilty of unsafe flying and that my CRM skills were adequate to be a pilot on the ATR-42.

34.     Even though I denied all of the charges, the committee issued the Action Form which, among other things, denied me the right to fly the ATR-42 aircraft or to fly on Guam.

35.     I understood the impact of the September 17 Action Form in that if I didn't acknowledge the company's concerns, even though I might disagree.  I knew I could benefit from additional training and wanted to address Cape Air's concerns and stay in the ATR 42 program.

36.     I accepted responsibility and said that I was not asking for any special treatment and want to be treated as other pilots whose skills were found lacking in the earlier stages of the ATR program.

4

37. I explained how other pilots who failed at various stages of the ATR program were given additional training and additional opportunities to succeed and stay in the program and I wanted to be treated the same way.

38. After the Action Form was issued, I wrote an email, on September 19, 2004, to Linda Markham, Larry Gualtieri, Stephen Phillips and Daniel Wolf. In the email, I told them that I wanted to successfully resolve the employment issues relating to my position in the ATR program on Guam.

39. On page two of my September 19, 2004 email, I said,

> I would like the opportunity to show Cape Air that a successful immediate reintegration into the ATR is possible following immediate CRM training, run concurrently with communication skills training, followed by FO IOE in the ATR on Guam...
>
> I am willing to go to CRM training at flight safety, to participate in any CRM workshops available and to see the woman recommended by EAP on Guam for as long as the company feels necessary...
>
> I am only looking for an equal opportunity to be successful in my position as an ATR FO/CA...I sincerely hope you will reconsider the options offered to me on September 17, 2004.

40. On September 24, 2004, I was served a revised Action Form. The revised Action Form was identical to the first Action Form except that I would be allowed to fly the 402s in the Pacific region. My removal from flight status on the ATR-42 would be reviewed in six months instead of eighteen months. My goal to remain in the ATR-42 program was not permitted by Cape Air. I would only be allowed to fly on Guam as a 402 Captain after I had completed my EAP training and CRM training.

41. I appealed the revised Action Form, which was my right, under the Cape Air Handbook. I am entitled to an independent evaluation of the actions taken by the initial panel. However, I did not have an independent evaluation. The evaluators were Daniel Wolf, the CEO of Cape Air, and Linda Markham, the Human Resources Manager of Cape Air. Linda Markham also was part of the initial panel, thus, it was not an independent review.

5

42.     The disciplinary review panel did not make a transcript of the proceedings nor was an audio tape of the proceedings made.

43.     Daniel Wolf did not talk to Larry Gualtieri or Stephen Phillips about the decisions they made or the factors that went into their decision. Without a record and without discussing the assessments made by Larry Gualtieri and Stephen Phillips, Daniel Wolf did not make an independent assessment.

44.     Daniel Wolf saw his role as validating the actions taken by the disciplinary panel notwithstanding that the panel issued two Action Forms in this case.

45.     Since I had appealed the September 24, 2004 Action Form and the review of disciplinary action was still under way, in September, I bid for a schedule that my seniority allowed for work during the month of October as an ATR FO or Captain. My bid was rejected.

46.     On October 29, 2004, I was terminated.

47.     I filed the discrimination claim with the Equal Employment Opportunity Commission alleging that I had been discriminated on the basis of sex and disparate treatment since I was treated differently than other pilots.

48.     On or about June 30,/ 2005, the EEOC issued a letter to sue. I timely filed suit against Cape Air.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated at  ANCHORAGE, AK  on  30 JANUARY , 2008.


_Tiffany Anne Nicholson_ (signature)
**TIFFANY ANNE NICHOLSON**

6

# Exhibit
# 2

IN THE DISTRICT COURT OF GUAM

| TIFFANY ANNE NICHOLSON, | ) CIVIL CASE NO. CV06-00027 |
|---|---|
| Plaintiff, | ) |
| vs. | ) |
| HYANNIS AIR SERVICE, INC.<br>dba CAPE AIR, | ) |
| Defendant. | ) |

DEPOSITION TRANSCRIPT

OF

# TIFFANY ANNE NICHOLSON

March 1, 2007

COPY

PREPARED BY:   GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel.(671)688-**DEPO** • Fax.(671)472-3094

1    was the second.

2        Q    Okay.    Oh,    is    this    what    we're

3    referencing earlier when we had left to go to

4    Guam --

5        A    Correct.

6        Q    -- and so you're asked to go back to

7    Houston?

8        A    Correct.    Russell    Price    and    David

9    O'Connor asked me to go back to Houston for

10   simulator    training    to    assist    the    other    two

11   captains in their training and I was unable.

12       Q    Okay.    The next paragraph says, in the

13   second sentence, "My performance in the ATR has

14   not    matched    my    performance    in    the    simulator".

15   What do you mean by this?

16       A    Again,    these    are    all    statements    that    I

17   made because I believed I was going to lose my

18   job.    The company believed that I was deficient

19   in my CRM skills.

20           I was trying to come up with alternate

21   methods    of    maintaining    my    job    and    trying    to

22   come    up    with    anything    to    maintain    my

23   situational    --    where    I    was.    The    company    had

24   offered me termination to motion or resignation

25   and    I    believed    that    making    some    of    these

1  statements would make the company offer me
2  other options and therefore I would not lose my
3  job. I think that my performance in the ATR
4  improved with everyday that I flew and that it
5  was at the same level as my simulator training,
6  if not better.

7      Q  Okay. So, you're saying that this
8  statement was not true, the second sentence
9  that is?

10     A  I'm saying that there are statements
11 that I made in concession to the company
12 statements. But, no, I do not believe that my
13 performance in the ATR was lacking.

14     Q  Okay.

15     A  After the initial meeting and on or
16 about September 17th, I was asked to, you know,
17 to write a letter like this, coming up with
18 other reasons why the company should keep me.

19         There was initially a letter that I
20 wrote that was never sent to the company that
21 makes no concessions about my inability but
22 just offers other options. A co-worker of
23 mine, Craig Bentley, recommended that I not
24 send in that letter because Dan Wolf only
25 wanted to hear that he was right and that I was

1   not warranted.

2   Q   Okay.

3   A   There was never any kind of dialogue,

4   question asked to explain any of the

5   situations.

6   Q   Okay.

7   A   And after this was over, when Mr. White

8   told me that if we were still -- that if we

9   were together, I would still have my job.

10  There was no action in regards to that.  There

11  was no action taken about my supposed safety

12  for flying.

13  Q   Anything else?

14  A   Not that I can recall at the moment.

15  Q   You said with reference to Paragraph

16  20, Linda Markham asked if you could receive

17  additional training.  Who was she asking that

18  of?

19  A   I do not know.  It was a statement that

20  she made.   I'm assuming she was asking my

21  bosses.

22  Q   She told you she had asked?

23  A   Yes, she did.

24  Q   Okay.  When did she say that?

25  A   I do not recall specifically.  It was

# Exhibit 3

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON, | ) CIVIL CASE NO. CV06-00027 |
| Plaintiff, | ) |
| vs. | ) |
| HYANNIS AIR SERVICE, INC.<br>dba CAPE AIR, | ) |
| Defendant. | ) |

DEPOSITION TRANSCRIPT

OF

# TIFFANY ANNE NICHOLSON

February 23, 2007

COPY

PREPARED BY:    GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** * Fax:(671)472-3094

1     A    Can you clarify that?

2     Q    In light of your past history --

3     A    Uh-huh.

4     Q    -- when you got to Guam, did you ever

5 discuss how you were going to work together?

6     A    I understand.   No, we never had a

7 conversion in Guam --

8     Q    Okay.

9     A    -- about working together.

10     Q    Did you ever tell him you wanted to be

11 his girlfriend again?

12     A    No.

13     Q    But he had told you he wanted you back?

14     A    Correct.

15     Q    Okay.   How many times that he tell you

16 that?

17     A    Several.   Before and after.   Before we

18 moved to Guam and after I was terminated.

19     Q    Oh, after you were terminated he also

20 said that?

21     A    Uh-huh.

22     Q    Did you ever tell anybody at Cape Air

23 that you didn't want to work with him?

24     A    No.

25     Q    With Chuck white?

1    A    No.

2    Q    Did you ever ask to re-assign with him?

3    A    No.

4    Q    How did he react to your resistance to

5    get back with him?

6    A    On one occasion, he cried.  On other

7    occasions, he got mad.  On other occasions, he

8    was responseless.

9    Q    When you found out that Chuck was going

10    to be on Guam, did you think about not going?

11    A    No.

12    Q    You still wanted --

13    A    I never thought about not going, I

14    still wanted to go.

15    Q    You still wanted to go?

16    A    Yes.

17    Q    Okay.  And in light of your past

18    relationship, did you have any concerns about

19    working with him?

20    A    I knew that I can be professional about

21    our relationship and I was not concerned that I

22    was going to have a problem.  I was concerned

23    that he was going to.

24    Q    And did you ever tell anybody at Cape

25    Air that you thought he might have a problem

1    Q    What else -- did you say anything else
2    to her?
3    A    No.
4    Q    And   what   did   Linda   say   or   do   in
5    response?
6    A    She said okay.
7    Q    Okay.   Do you know if she ever talked
8    to Chuck White about it?
9    A    I do not know.
10   Q    Okay.   So there was a -- do you recall
11   a time when Chuck White took you off a flight?
12   A    Yes.
13   Q    Okay.   Now, do you recall what date
14   that was?
15   A    August, 8/31/04.
16   Q    Did he give you a reason why he took
17   you off the flight?
18   A    He told me that I was unsafe to fly.
19   Q    Did he say what you did that was
20   unsafe?
21   A    No.
22   Q    Did you ask him?
23   A    Yes.
24   Q    And he didn't say anything?
25   A    He responded by saying that, when he

1  to you?

2      A   "When you get back to Guam tell her

3  she's relieved through the day and do not

4  discuss the situation with her any further".

5      Q   So when you guys got to Saipan, he had

6  told you you were unsafe to fly?

7      A   He did not tell me I was unsafe to fly

8  until we got back to Guam.

9      Q   Okay. So, did you know that he had

10  called Operations?

11      A   No.

12      Q   Did you do anything that was unsafe?

13      A   No.

14      Q   Did he ever tell you specifically what

15  you did that was unsafe?

16      A   No. Nobody did, ever.

17      Q   Russell Price then talked to you about

18  it?

19      A   Russell and I talked about it

20  afterwards only because I've stayed at the

21  airport until he returned.

22      Q   What did you tell Russell?

23      A   I told Russell that I didn't understand

24  why I was being relieved of duty. I didn't

25  understand why after Operations was informed

1 that I was unsafe, why I was allowed to
2 continue flying the airplane. I mean, I
3 actually flew the plane after Chuck said I was
4 not safe to fly.

5 I didn't understand what had happened.
6 He was told Rus- -- Chuck was told not to
7 discuss the situation with me. Then I wanted
8 to know what I did that was unsafe.

9 Q Have you -- I mean, have you thought
10 about what you might have done to have him tell
11 people that you were unsafe?

12 A No. I've thought about it. I have not
13 been able to come up with anything.

14 Q When you were talking with Russell
15 about it, what did he say?

16 A He told me that it was Chuck's
17 prerogative as the captain to send somebody
18 home for being unsafe, which is true. He told
19 me that we would have a meeting later on the
20 day to -- I'm sorry, that was a different
21 discussion. He told me he didn't -- that it
22 was Chuck's prerogative to send me home if he
23 considered me unsafe to fly. He didn't know
24 the circumstances why I was unsafe. That was
25 it.

1    Q   Okay.   Did  you  have  that  further

2   discussion  about  it?   Did  you  have  a  further

3   discussion  with  Russell  about?

4    A   No.

5    Q   Did  you  fill  out  an  employee  safety

6   report  about  the  incident?

7    A   Yes,  I  did.

8    Q   Okay.   I  want  to  hand  you  a  document.

9   It  says,  Employee's  Safety  Report.   Is  that  the

10  ESR  that  you  filled  out?

11   A   Yes,  it  is.

12   Q   Okay.   (to  court  reporter)Can  we  mark

13  that  as  Exhibit  1?

14        (Defendant's  Exhibit  1  was  marked  for

15  identification)

16        How  would  characterize  the  way  the

17  flight  was  going  that  day  with  Chuck?

18        MR.  TORRES:  Objection,  which  link?

19        MS.  MCDONALD:  We're  talking  about  the

20  one  where  he  threw  her  off.

21        MR.  TORRES:  Saipan-Guam  or  Guam  to

22  Saipan?

23        MS MCDONALD:  The  whole  flight.

24   A   Can  you  restate  the  question  please?

25  How  would  I  --

1    Q   I understood.  Thank you for clarifying

2  that.  Okay.  Has Chuck White committed any

3  conduct against you that you would consider to

4  be harassing?

5    A   Yes.

6    Q   What has he done?

7    A   Approximately the first week of

8  November, I saw Mr. White out in public.

9    Q   What month, what year is this?

10    A   2004.  Sorry.

11    Q   Okay.

12    A   Shortly after my official termination

13  first week of November 2004, I saw Mr. White

14  out in public.  My friend that I was with said,

15  "Be the better person, just say hello".

16       I approached Mr. White, said, "Hello,

17  how are you doing, how are the things at Cape

18  Air?"  His response was, "I can't talk to you".

19  When I said "Why", he came back and said, "I

20  haven't had enough to drink yet."  And I said

21  "I am very sorry for that", to which he

22  responded that, "None of these had happened, I

23  would still have my job if we were together."

24    Q   He told you that you would still have

25  your job if you were together?

1     A   He told me that I would still have my

2 job if him and I were still together.

3     Q   What did you say?

4     A   Nothing. I smack him across the face,

5 walked out the door, went hung, called Linda

6 Markham of Human Resources, relayed the

7 information, she said she would talk to Dan

8 Wolf and get back to me and I never heard

9 another word about it.

10    Q   Where did this occur? Do you recall?

11    A   Here on Guam?

12    Q   Where?

13    A   Oh, Light House.

14    Q   At Light House?

15    A   Uh-huh.

16    Q   Okay. Before you went up and approach

17 him, had you told somebody at Light House that

18 you were still in love with him?

19    A   No.

20    Q   Are you aware if other pilots

21 complained about you?

22    A   Can you be more specific?

23    Q   Specific about the pilots' names?

24    A   I don't understand your question. I

25 mean, can you ask a more specific question?

1    MR.    TORRES:    (unintelligible;
2 overspeaking)  levels,  other  pilots  and  the
3 nature of complaint.
4 BY MS. McDONALD:
5    Q    Okay.
6    A    Where,  when,  who,  what,  you  know,  I
7 mean -- (pauses).
8    Q    Are  you  aware  if  anybody  complained
9 about  you,  your  behavior,  or  your  skills  as  a
10 co-pilot?
11    A    No.
12    Q    You're not aware?
13    A    No.  Not until after Chuck sent me home
14 on August 31st.
15    Q    Okay.  And  then  after  that  time,  when
16 was  the  first  time  you  found  out  that  someone
17 had  complained  about  you,  about  your  skills  and
18 technique?
19    A    I  can't  give  you  a  specific  day.  It
20 would  have  been  during  the  first  week  of
21 September.
22    Q    Do  you  recall  what  the  complaint  was?
23    A    Poor CRM and insubordination.
24    Q    Do  you  know who  complained?
25    A    No.

1 also, but you take it for the joke that it is,

2 because I know I'm a good pilot and they knew

3 they were good pilots.

4     Q   Was it Russell's idea to make you fly

5 with John Kappayne --

6     A   Yes.

7     Q   -- on those two days? It was Russell's

8 idea?

9     A   Yes.

10     Q   And do you know what his goal was in

11 setting that up?

12     MR. TORRES: Objection, it assumes facts

13 not in evidence.

14 BY MS. McDONALD:

15     Q   Do you understand my question? Did,

16 did he ever tell you what his goal was?

17     A   (to Mr. Torres) Are you still objecting

18 to the question?

19     MR. TORRES: You can answer if you

20 understand it.

21     A   Russell related to me that he set up to

22 flight, the two days of flying with John

23 Kappayne, to observe me and my role in the

24 crew.

25 BY MS. McDONALD:

1   Q   So, did he say anything about whether
2   or not that goal was met?

3   A   No, I mean it was just an observation.
4   He observed me flying with Chuck -- with John.

5   Q   Did he indicate to you that he observed
6   something negative with what you did?

7   A   No.

8   Q   Even with the respect to your CRM
9   skills?

10  A   No.

11  Q   He didn't say anything about that?

12  A   No.   He did not make any negative
13  statements.

14  Q   Did he make any positive statements
15  about your CRM?

16  A   He said that I was doing a good job and
17  that I was performing my position correctly.

18  Q   Did you feel that your CRM skills had
19  improved because of those two days?

20  A   Because of those two days specifically,
21  no.   But everyday that you work in a CRM
22  environment, your skills improve.

23  Q   Okay. So --

24  A   There was not any instruction during
25  those days.  It was strictly observation.

1     Q   Right.

2     A   No feedback other than to say, you're

3 doing your job just fine.

4     Q   Okay.   I mean, we touch on that

5 incident earlier today and you had sounded like

6 those were -- he was being -- he was yelling at

7 you, so he was being kind of mean, would you

8 say that; would you agree with me?

9     A   Yes.

10     Q   Okay. So, you know, did you feel that

11 you were being challenged to improve your

12 skills because of his behavior?

13     A   No, I felt I was being berated and

14 belittled.

15     Q   Okay.

16     A   It was not constructive criticism, it

17 was yelling.

18     Q   Okay. Soon thereafter, did Russell

19 suggest that you fly with Chuck White?

20     A   Again, in the same situation as John

21 Kappayne with Russell observing the flights.

22     Q   Okay. Russell was in observation role?

23     A   Correct.

24     Q   Do you recall what date that was?

25     A   The first day that Mr. White, Russell

1   Price and myself flew together was 9/8/2004.

2       Q   Was there another day?

3       A   September 8th, September 9th.

4       Q   September 9th; there were two days?

5       A   Correct.

6       Q   Okay.  Do you recall what happened on

7   those two days?

8       A   The  first  day  of  flying  --  is  there

9   anything in specific?  I mean, can you ask a

10  more specific question?

11      Q   Was  their  debriefing  afterwards  with

12  Russell on those two days?

13      A   (pauses)

14      Q   Let  me  back  up,  let  me  ask  you  this.

15  Did Russell state why he wanted you to fly with

16  Chuck White?

17      A   No.

18      Q   He didn't?

19      A   No.

20      Q   He just told you to show up to work and

21  --

22      A   Yes.

23      Q   -- take us on flight; okay.

24      A   When he scheduled the flights, he said

25  I'm scheduling you two flights with John, two

1  flights with Chuck, I will be observing. That

2  was it.

3      Q   Did you understand that to be, him

4  giving you opportunities to show him what your

5  skills were as a pilot?

6      A   Yes.

7      Q   Okay. Did you consider those

8  opportunities to be training opportunities?

9      A   No.

10     Q   No. Why not?

11     A   They were strictly observation, there

12  was no training, no constructive criticism.

13     Q   But you received his observations, is

14  that correct?

15     A   The only discussion that we had as far

16  as an improvement of skills was, maybe you

17  shouldn't ask so many questions.

18     Q   That was the only feedback that you

19  received?

20     A   That was the only constructive

21  criticism I received, the other feedback was

22  all positively. You're doing a fine job,

23  you're doing a good job, you're doing your job

24  correctly.

25     Q   So, when you were taking those flights

1   with Chuck White on September 8 and September
2   9, were there any disputes between you and
3   Chuck on those days?
4       A    None that I recall.
5       Q    Nothing?
6       A    No.
7       Q    How would you rate your CRM skills on
8   those days?
9       A    Excellent.
10      Q    Do you recall Chuck White telling you
11  anything about your skills or what you were
12  doing that was improper?
13      A    Which -- no.
14      Q    No?
15      A    No.
16      Q    Chuck White did not point out to you
17  anything that was wrong with what you were
18  doing on those two days?
19      A    Wrong in regards to what?
20      Q    Against procedure?
21      A    No.
22      Q    Unsafe?
23      A    No.
24      Q    You said you had excellent CRM skills
25  that day?

1     A   Yes, I believe I did.

2     Q   What did Russell Price say about that,

3 about your CRM skills that day?

4     A   He said the second day was better than

5 the first.

6     Q   What was the difference for the second

7 day?

8     A   I'm not sure.  I think that there were

9 fairly  --  similar  situations.  We  both

10 performed our jobs.  CRM seemed to be working

11 to me.

12     Q   That day were you -- on either day,

13 September  8  or  September  9,  were  you

14 belligerent at anytime during those flights?

15     A   No.

16     Q   Were you ever angry --

17     A   No.

18     Q   -- during those days?  Was there ever a

19 time in which you were not cooperative on those

20 two days?

21     A   During the flights?

22     Q   Yes.

23     A   No.

24     Q   Do you recall Chuck White doing

25 anything that was improper or against