# Exhibit

# 4

IN THE DISTRICT COURT OF GUAM

# CERTIFIED COPY

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,            )
            Plaintiff,             )
                                   )
vs.                                )
                                   )
HYANNIS AIR SERVICE, INC.,         )
d.b.a. CAPE AIR,                   )
            Defendant.             )
                                   )

DEPOSITION OF

LAWRENCE J. GAULTIERI

HYANNIS, MASSACHUSETTS

MAY 23, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Patricia Bracken, CSR No. 1455898

FILE NO.: A103990

1

1    relations?

2         Q.   Right.

3         A.   No, not unless there were more dots to

4    connect to it or if it impeded on the safety of a

5    flight.

6         Q.   How about morale of coworkers when

7    somebody is allegedly having a relationship with

8    management?  Have you ever had to deal with that

9    situation?

10        A.   No.

11        Q.   Do you see it as a problem?

12        A.   It could be a problem, yeah.  I mean this

13   seems awful hypothetical.

14        Q.   Had you known or had you heard of the

15   rumor, whether it's true or not, would that have

16   caused you to question, for example, Russell

17   Price's letter to you regarding discipline of

18   Tiffany Nicholson?

19        A.   Had I heard --

20        Q.   Had you been aware of that rumor.

21        A.   I don't recall the time line of when I

22   heard the rumor and when the letter was written, so

23   I can't --

24        Q.   I understand that.  I said would that

25   raise a concern for you?

1      A.   It may have.

2          Q.   Let's talk about that action form.

3    Actually, I'll show you what we've marked as

4    Exhibit 53.   This is the revised action form.

5    There was one issued on the 17th, and that one is

6    found at Exhibit 26.   Was this the outcome of the

7    hearing on September 17th?

8          MS. McDONALD:   Could you specify which

9    document you're referring to?

10          MR. TORRES:   This is Exhibit 26.   We'll go

11   with this one first.

12          A.   I believe that was the follow up to the

13   meeting, yes.

14          Q.   In this document, she is suspended from

15   flying in Guam.   Is that correct?

16          A.   It appears that way, yes.

17          Q.   Why was that action taken?

18          MS. McDONALD:   Objection.   The action -- I

19   thought the testimony is that this deals with

20   action not taken.   I'd ask you to rephrase your

21   question.

22          Q.   You can answer my question if you

23   understand it.

24          A.   Could you repeat the question, please?

25          Q.   Under consequences, Tiffany was barred

```
 1    from flying in the Pacific region. Why was that
 2    action taken?
 3           MS. McDONALD:  Same objection.
 4           A.   I don't specifically recall, but I think
 5    it was just time to give her the opportunity to
 6    cool down and reassess and reevaluate herself to
 7    see how she could better become a crew member in
 8    the ATR.
 9           Q.   Okay.  Well, those are two different
10    things.  So she's barred from flying the ATR 42
11    under this --
12           A.   Yes.
13           Q.   -- for 18 months?
14           A.   Uh-huh.
15           Q.   But she has the opportunity to fly the
16    402?
17           A.   Uh-huh.
18           Q.   But she can't go to Guam.  What's the
19    problem with Guam?
20           A.   I don't specifically recall why
21    Mr. Phillips put that sentence in there.
22           Q.   But was this the panel's determination,
23    or was this just Steven Phillips' determination?
24           A.   I believe at the time it was the panel's
25    determination.
```

1           Q.   Okay.  So what was the rationale in
2    saying we don't want you out in Guam?
3           A.   I don't recall what the rationale was.
4           Q.   But you would agree that that's what this
5    says?
6           A.   At the time, yes.  And I believe we
7    reevaluated that.
8           Q.   And do you -- you're correct.  It was
9    eliminated from the revised action form on the
10   24th.  Do you know why?
11          A.   I believe it was because we didn't want
12   to place any undue hardship on the employee who had
13   moved out to Guam, moved out there with her
14   animals.  And it was very difficult for her as an
15   employee, and we didn't want to -- we wanted to
16   treat her fairly.
17          Q.   Was it something that she responded to
18   you, or did you -- how did you panel view these
19   facts?  How were they interpreted differently at
20   this point than at the time of the action form, the
21   revised action form?
22          A.   I don't specifically recall.
23          Q.   Under the revised action form, she's
24   still suspended from flying the ATR 42?
25          A.   Uh-huh.

```
 1    have happened to you.  He was talking about her

 2    termination with Cape Air.  Had you ever been

 3    informed of that?

 4         A.   No.

 5         Q.   Are you surprised by that knowing Chuck

 6    White?

 7         A.   I mean a conversation in a bar?  I don't

 8    know how long either or both of them had been in

 9    the bar or what they were drinking at the bar.

10         Q.   I'm just asking you about the comment.

11         A.   I have no knowledge of the validity or

12    the content -- or the context of that comment.

13         Q.   I'm asking you to assume that it's true,

14    that Chuck White testified that it was true.  Would

15    that create concern for you?

16         MS. McDONALD:  Objection.  Speculation and

17    mischaracterization of Chuck White's testimony.

18         Q.   Would that create concern for you?

19         A.   It depends on how I heard it, who I heard

20    it from, and what the context of the conversation

21    was.

22         Q.   Well, did you hear it?

23         A.   No.

24         Q.   So today is the first time you heard it?

25         A.   Yes.
```

```
 1            Q.  If you'll -- do you know who Joan
 2    Ackerstein is?
 3            A.  Yes.
 4            Q.  Have you had occasion to talk to Joan
 5    Ackerstein about your role in the discipline
 6    decisions?
 7            MS. McDONALD:  Objection.  Privileged.
 8            MR. TORRES:  Well, I'm not asking about any
 9    conversation.  I'm just asking whether he had a
10    conversation.
11            MS. McDONALD:  Same objection.  Privileged.
12            MR. TORRES:  Not to answer then?
13            MS. McDONALD:  No, don't answer that.
14            Q.  Can you take a look at Exhibit 46,
15    please?  And if you'll look at the second page,
16    this is an email that was sent from Linda Markham
17    to Joan Ackerstein written to Steve Phillips from
18    Tiffany Nicholson dated September 19, 2004, and
19    it's cc'd to Linda Markham and yourself.  Do you
20    remember seeing it?
21            A.  Sitting here now, I don't recall reading
22    it, no.  I'm sure I did, but at the time, I got 80
23    emails a day, so --
24            Q.  In your opinion, did you think that
25    Tiffany understood the severity of Cape Air's
```

```
1   concerns prior to September 17, 2004?
2        And to be a little more specific, Cape Air is
3   concerned about her communication and her CRM
4   skills.  Did Tiffany think they were adequate?
5        A.  Did Tiffany think they were adequate?
6        Q.  Yes.
7        A.  I think she did, yes.
8        Q.  And then obviously, she's given an action
9   form which makes it very clear what Cape Air's
10  feelings are.
11       A.  Yes.
12       Q.  And then she writes this email.  In this
13  email, she is back-pedaling trying to maintain her
14  status in the ATR.  And basically, she's saying
15  I'll do whatever you guys want if I can go and stay
16  in the ATR.  Why wasn't that option given back to
17  her?
18       A.  I believe at the time, because we decided
19  that we had already come up with our revised action
20  form, that's the sequence of events that we felt we
21  wanted to go by.
22       Q.  But I think the significance of this is
23  saying, okay, I'll do everything you want, but I   •
24  just don't want to be suspended from the ATR.  I
25  want to be able to go back to the ATR.  Why was
```

| 1 | that not an option for the panel or for Cape Air, |
| 2 | if you know? |
| 3 | A. Because we felt at the time that she |
| 4 | needed the six months to reevaluate herself and do |
| 5 | the EAP and do the Flight Safety training and then |
| 6 | reenter the program. We thought it was a fair and |
| 7 | equitable solution. |
| 8 | Q. Why the six months? Why six months? |
| 9 | A. To give her time to think about the areas |
| 10 | that she needed to improve on. |
| 11 | Q. But I mean why six months as opposed to |
| 12 | three months or thirty days? |
| 13 | A. I'm not really sure. It's somewhat |
| 14 | arbitrary I'm sure. You know, why not three years? |
| 15 | Q. Did you view her being taken off the |
| 16 | ATR 42 flight status as a demotion? |
| 17 | A. From ATR first officer to a 402 captain |
| 18 | as a demotion? |
| 19 | Q. Right. |
| 20 | A. No. |
| 21 | Q. You didn't? |
| 22 | A. No. |
| 23 | Q. Why not? |
| 24 | A. Well, typically, the rate of ascent would |
| 25 | be to be an ATR co-pilot to a 402 captain to an ATR |

64

# Exhibit 5

From: tnicholson@flycapeair.c .n
To: <sphillips@flycapeair.com>
CC: <lfitzgerald@flycapeair.com>, <tnicholson@flycapeair.com>
Date: Thu, September 16, 2004 9:18 pm
Subject: (no subject)

Thank you for giving me time after our initial meeting to research and develop solutions for improving my CRM skills.

After thinking about my situation considerably today, I have come up with several ideas and options that I think would help me.

I would like the opportunity to do IOE as an FO. I understand that as a Captain, I am technically qualified and should be able to perform the job as an FO. I am qualified to be a Captain and an FO. But, I believe there is a difference between just being qualified and actually performing Captain and FO responsibilities. I believe that FO IOE would considerably increase my CRM skills as an FO.

I consulted EAP about my situation looking for a recommendation. EAP is in contact with a counselor on Guam. I called her to discuss my situation. She has indicated that she can help me with my interpersonal and communication skills. We have set a tentative schedule for a series of appointments.

I believe that FO IOE along with communication training will make me a much more effective crew member.

I truly enjoy my career at Cape Air and look forward to a long and successful future with the Company on Guam.

Thank you for your time and attention
Tiffany

# Exhibit
# 6

From: &lt;tnicholson@flycapeaii..om&gt;
To: &lt;rprice@flycapeair.com&gt;
Date: Sun, September 19, 2004 6:25 pm
Subject: (no subject)

Thank you very much for your honestly on the phone the other day. I am
sorry you feel that me working in Guam would cause you too many headaches.
I am interested to know why. I understand that was not the appropriate
time to discuss the situation. I am sure you needed to fly. But, as I
already stated, I am interested in hearing your reasons. Please email me
when you find the time. I think hearing from you would help me resolve my
current situation.

Thank you for your time.
Tiffany

0075

# Exhibit

# 7

# CERTIFIED COPY

C.A. No.: CV 06-0027

)
TIFFANY ANNE NICHOLSON,                    )
             Plaintiff,              )
                         )
vs.                                        )
                         )
HYANNIS AIR SERVICE, INC.,                 )
d.b.a. CAPE AIR,                           )
             Defendant.              )
                         )

DEPOSITION OF

DAVID O'CONNOR

HYANNIS, MASSACHUSETTS

MAY 22, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Patricia Bracken, CSR No. 1455898

FILE NO,: A10398E

1     A.   I've taught ground schools so many times
2  that, you know, the particulars of one particular
3  ground school don't stand out in my memory.
4     Q.   Phil Dery testified last week, and he
5  said that he had not successfully completed an
6  exam.
7     A.   Oh, I didn't understand your question.
8  Are you referring to a flight check in the
9  simulator?
10    Q.   No.  I'm referring to ground school.
11    A.   I don't recall Phil failing a ground
12 school test.  He may have.  If he did, he was
13 retrained and passed it.
14    Q.   Okay.  When somebody does fail and goes
15 through retraining, is there an issue?  Is there
16 someone who has to approve the retraining?
17    A.   Generally, the director of training has
18 to approve of the retraining.  It happens from time
19 to time that somebody may not pass a test.  If they
20 are qualified and proficient and appear to have the
21 aptitude, it is entirely appropriate that that
22 person is retrained, given another opportunity.
23 · And if they pass on a retest, then they're
24 considered to have been trained to proficiency.
25    Q.   So is it an automatic thing, or do you

```
 1    that's basically their business.  Flight Safety
 2    does training for a large number of airlines
 3    throughout the world.
 4         Q.  So it was the first time you did the 121
 5    training.  Is that correct?
 6         A.  It is the first time we had done the 121
 7    training.  That is correct.  It's not my first time
 8    through Flight Safety.  I went through several
 9    months earlier with the initial cadre of what were
10    to be the check airmen in the airplane.  And we did
11    that training and got qualified in the aircraft
12    before we actually had an aircraft.
13         Q.  Okay.  Do you remember when the Hyannis
14    portion ended and the Houston portion began?  The
15    dates?
16         A.  I don't know the dates, no.
17         Q.  Why Flight Safety?  Are they the only one
18    doing it, or was there a selection?
19         A.  They basically have a monopoly in the
20    industry on the training of airline crew.
21         Q.  And do you view their --
22         A.  They have an excellent reputation.  I
23    have used their facilities in the past.  In fact,
24    Flight Safety has an academy in Vero Beach, Florida
25    that does training for airlines around the world.
```

```
 1    I went through that myself when I got out of
 2    college.  I was satisfied with their training based
 3    on reputation, my own evaluation, and their
 4    expertise in the field.  That's why we chose Flight
 5    Safety.
 6         Q.  Do they still -- are they still a
 7    contract --
 8         A.  Yes.
 9         Q.  -- for Cape Air?
10         A.  Yes.
11         Q.  Was there a reason why you, yourself,
12    didn't do the training as opposed to Flight Safety
13    since you were the director of training?
14         A.  Well, I went with my pilots to Houston to
15    help to participate with them in the evenings after
16    their simulator sessions to practice the flows and
17    the procedures and the callouts, but it was a
18    workload issue.  That's their bread and butter.
19    That's what they do day in and day out.  They train
20    people in those simulators and in that aircraft.
21    So I wanted to avail myself of their facilities.
22         Q.  Would it be fair to characterize then
23    that you worked in conjunction with Flight Safety
24    and FAA in getting the pilots through this
25    training?
```

| 1 | work together as a crew, then it's entirely |
| 2 | appropriate for the captain to say I cannot fly |
| 3 | with this individual on this particular day. |
| 4 | Please get me another co-pilot. Please assess this |
| 5 | co-pilot. And that's a decision he's well within |
| 6 | his rights to make. |
| 7 | Q. And is that what Chuck White did on that |
| 8 | day? |
| 9 | A. That is my understanding, yes. |
| 10 | Q. So it's not your understanding that Chuck |
| 11 | said that she was unsafe to fly with? |
| 12 | A. In the heat of the moment, Chuck may have |
| 13 | used that language. But as you have already |
| 14 | pointed out, I didn't speak directly with him at |
| 15 | that time. But I rely on his assessment as a |
| 16 | captain, as we must, and I support that decision. |
| 17 | Now, just because a captain says this person is |
| 18 | unsafe doesn't mean we're going to take that at |
| 19 | face value and say, that's it, this person is |
| 20 | unsafe. We will evaluate the person and make our |
| 21 | own assessment. |
| 22 | Q. Okay. Who is the "we" in that sentence? |
| 23 | "We" will evaluate? |
| 24 | A. The training department, the chief pilot, |
| 25 | and if necessary, human resources. |

```
 1          Q.   You did talk to Russell though?

 2          A.   Yes.

 3          Q.   Did Russell tell you that Tiffany was

 4   unsafe to fly the ATR 42?

 5          A.   Russell, I think he flew subsequent to

 6   this event with Chuck and Tiffany.  And I believe

 7   you have the sequence of events in front of you.  I

 8   do not.  But is that correct that Russell observed

 9   the two of them flying?

10          Q.   Yes.  But we will get there.  And I know

11   there's a story you want to tell here, and there's

12   a story that I want to have understood here.  So I

13   have to ask that you listen to my question and

14   answer it.  So that last question was, did Russell

15   tell you that she was unsafe to fly the ATR 42?

16          A.   He did not, at that time, tell me that

17   Tiffany was unsafe to fly the ATR 42, nor could he.

18   We would evaluate her subsequent to this and make

19   that assessment ourselves.

20          Q.   Okay.  Do you know why she wasn't put

21   back flying the very next day?

22          A.   I don't know what the schedule was the

23   very next day, no.  No, I don't know why she wasn't

24   put back the very next day.  But it's an unusual

25   circumstance for a captain to remove a co-pilot.
```

# Exhibit

# 8

September 14, 2004

To Whom It May Concern:

This document outlines my experiences in training Tiffany Nicholson. As director of training I served as her ground school instructor, I oversaw her simulator training, I conducted her 15% ride, and I conducted many hours of IOE with her in the jumpseat, the copilot's seat and in the captain's seat. Overall I would describe her as more confident about her knowledge and procedures than the average pilot. She has good hand-eye coordination and acceptable physical piloting skills. Unfortunately her abilities and knowledge are not always germane to the task at hand. As a copilot she frequently demonstrates an apparent arrogance and a fault-finding mentality that creates ill will in the cockpit. As captain, she has repeatedly demonstrated a machismo that if unchecked would stifle meaningful input from a first officer.

I experienced the machismo firsthand when I conducted one of her first training sessions in the actual airplane in late July. On short final to runway 7 in Saipan, Tiffany allowed herself to get too slow and was sinking too fast. I commanded her to add power. Rather than do so, she dismissed my command as a suggestion and responded "I got it." The resulting landing was as firm as I could have allowed. At the time, I was shocked that with so little time in the actual airplane she would respond to a command for more power from her evaluator with such a dismissive, cavalier attitude. During the debrief, I chastised her for her both her words and her manner, and cautioned her that in a crew environment, such behavior could be extremely detrimental to good crew coordination. She appeared to listen, but I did observe a recurrence of such an attitude about a week later. I was conducting IOE with Tiffany in the left seat. Nehal Zaidi was in the jump seat. Enroute, Nehal advocated for a lower power setting in order to offer the passengers less noise and greater comfort. He could not have been more deferential. His exact words were something like, "You know it is kind of nice in the back when you use 77% RPM. Russell uses it all the time." Tiffany dismissed him in a manner that you only read about in old books about crusty old captains who don't take kindly to input. Her exact words were, "Russell ain't here." That was it; no further discussion. I was blown away. An appropriate comment from her might have been something like, "I take your point, but I prefer this power setting for reason X...." Her complete rejection of Nehal's input without explanation would in my opinion absolutely stifle criticism in a critical phase of flight.

When Tiffany is not captain, her attitude has been problematic in other ways. I have repeatedly observed her correcting, as if she were a flight instructor, her captains for the most minor of verbal gaffes. Make no mistake, correct standard phraseology is essential in the cockpit, but her corrections lacked any sort of diplomacy and led to ill will. I also

H240

noted that when she is not the captain, she appeared to have little interest in helping out. During one flight, I was conducting IOE with Jon Bleiman. The weather that morning was challenging. Jon was inside obtaining an update on the weather. I was in the cockpit conducting preflight checks. Tiffany was assigned to the jumpseat in order to observe and learn. I asked her if she could help us out by conducting the exterior preflight. Again, her response blew me away. She said, "ACM means I ain't doing nothing" (ACM means Additional Crew Member. It is the technical name for the jumpseater.) I thought she might be kidding, but indeed she retreated to the passenger compartment of the aircraft where she sat down with a magazine. In the end I got soaked because the rain arrived while I was still conducting my cockpit checks, and I had to preflight in the rain. I probably should have sent her home at that point, but frankly I was as confused by her attitude as I was angry. In any event I was there to observe and critique Jon more than her.

My most unusual interaction with Tiffany came on August 14th at 6:30 in the morning. I was in the cockpit conducting my preflight checks alone, because Tiffany was late. She arrived 15 minutes late at 6:30. When she entered the cockpit I observed she had a split lip and beginnings of a black eye. She informed me that she had run into a group of fighter pilots she had befriended in the last week as they were leaving the hotel that morning. One of the guys had picked her up and thrown her over his shoulder in horse-play, when he lost his balance and fell backwards causing her to hit her face on the ground. I believed her story. But I could not help but notice her absence of embarrassment. Here she was in IOE. She showed up late because of horse-play and she did not seem the least contrite. I would have expected a professional pilot undergoing IOE to show some remorse for their lack of personal responsibility. She showed none. Quite the contrary, she spent much of the day bemoaning her misfortune. In fact, the next day, she complained so much about her face-ache, that half-way through the day she had to leave. Please note, I in know way would reprimand her for calling out hurt; that was the right call given her inability to function in pain. I mention it only because of how she presented herself as the victim of circumstance. I could detect no sense of personal accountability or remorse. I found that most unusual in a professional pilot

In conclusion I would like to note that many of Tiffany's odd-ball comments and apparent unwillingness to work in a team may be the product of an unusual, sarcastic sense of humor. In person, in social settings, her sarcasm and humor go hand in hand in a way that is actually funny. Unfortunately, in the cockpit, it is very hard to tell, particularly when you are busy, whether Tiffany is trying to be funny, or if she really means what she says. That inscrutability makes it difficult to work with her. I think she possesses the ability and desire to the job safely and well, but she would have to commit to a serious personality adjustment in order to do so.


David O'Connor
Director of Training
Cape Air / Nantucket Airlines