CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air



FILED
DISTRICT COURT OF GUAM

FEB 22 2008

JEANNE G. QUINATA
Clerk of Court

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| TIFFANY ANNE NICHOLSON,<br><br>       Plaintiff,<br><br>vs.<br><br>HYANNIS AIR SERVICE, INC.<br>dba CAPE AIR,<br><br>       Defendant. | CIVIL CASE NO. CIV06-00027<br><br><br>**DEFENDANT'S TRIAL BRIEF;<br>DECLARATION OF SERVICE** |

4812-7012-5058.1

ORIGINAL

# TABLE OF CONTENTS

**Page**

I.   GENERAL FACTUAL BACKGROUND ........................................................................ 1

II.  FACTUAL CONTENTIONS ................................................................................... 4

    A.   CAPE AIR, AND NICHOLSON'S HISTORY WITH CAPE AIR ...................... 4

    B.   GROUND TRAINING AND SIMULATOR TRAINING ................................... 4

    C.   FLYING EXPERIENCE ................................................................................. 6

    D.   NICHOLSON'S RETRAINING ..................................................................... 7

    E.   NICHOLSON'S DISCIPLINE ........................................................................ 9

        1.   SPECIFIC PROBLEMS WITH NICHOLSON'S CRM SKILLS .......... 10

        2.   THE PANEL'S DECISION ................................................................. 11

        3.   PLAINTIFF'S FAILURE TO RECOGNIZE A PROBLEM IS PART OF THE PROBLEM ................................................................... 12

III. LEGAL DISCUSSION ........................................................................................ 13

    A.   NICHOLSON CANNOT PROVE A PRIMA FACIE CASE FOR GENDER DISCRIMINATION ...................................................................... 13

        1.   NICHOLSON WAS NOT QUALIFIED FOR HER POSITION ........... 14

        2.   PLAINTIFF WAS NOT SUBJECT TO ADVERSE EMPLOYMENT ACTION ..................................................................... 14

        3.   THERE ARE NO OTHER PILOTS SIMILARLY SITUATED TO NICHOLSON ..................................................................................... 14

        4.   NICHOLSON WAS NOT TREATED DIFFERENTLY FROM OTHERS SIMILARLY SITUATED ...................................................... 15

    B.   LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS ............... 15

    C.   THERE IS NO SPECIFIC OR SUBSTANTIAL EVIDENCE OF PRETEXT .................................................................................................... 16

IV. DAMAGES ..................................................................................................... 17

    A.   BACKPAY .................................................................................................. 18

        1.   ANY BACKPAY AWARD IS TOLLED DUE TO AN OFFER OF SUBSTANTIALLY EQUIVALENT EMPLOYMENT TO NICHOLSON ..................................................................................... 18

        2.   BACKPAY COMPENSATION IN THE EVENT THE POSITION OF CAPTAIN OF THE CESSNA 402 WAS NOT SUBSTANTIALLY EQUIVALENT EMPLOYMENT ........................... 19

**TABLE OF CONTENTS**
**(continued)**

      B.      FRONT PAY ........................................................................................... 19

      C.      COMPENSATORY AND PUNITIVE DAMAGES ........................................... 19

      D.      ATTORNEYS FEES ............................................................................... 20

V.      ABANDONMENT OF ISSUES ....................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Barbour v. Browner*,
    181 F.3d 1342 (D.C. Cir. 1999) ................................................................................ 16

*Brady v. Fort Bend County,*
    145 F.3d 691 (5th Cir. 1998) .................................................................................... 20

*Caudle v. Bristow Optical Co., Inc.,*
    224 F.3d 1014 (9th Cir. 2000) .................................................................................. 19

*Dale v. Chicago Tribune Co.,*
    797 F.2d 458 (7th Cir. 1986) .................................................................................... 16

*Fair Housing of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002) .................................................................................... 20

*Fishback v. District of Columbia Dept. of Corrections,*
    86 F.3d 1180 (D.C. Cir. 1996) ................................................................................. 16

*Ford Motor Co. v. EEOC,*
    458 U.S. 219 (1982) ................................................................................................. 18

*Graham v. Long Island R.R.,*
    230 F.3d 34 (2d Cir. 2000) ...................................................................................... 14

*Kolstad v. American Dental Ass'n,*
    527 U.S. 526 (1999) ................................................................................................. 20

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ................................................................................................. 13

*Pollard v. Rea Magnet Wire Co.,*
    824 F.3d 557 (7th Cir. 1987) .................................................................................... 17

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ................................................................................................. 14

*Salinas v. O'Neill,*
    286 F.3d 827 (5th Cir. 2002) .................................................................................... 19

iii.

# TABLE OF AUTHORITIES
## (continued)

*Shott v. Rush-Presbyterian-St.Luke's Med. Ctr.,*
  338 F.3d 736 (7th Cir. 2003) ........................................................................... 20

*St. Mary's Honor Center v. Hicks,*
  509 U.S. 502 (1993)....................................................................................... 13

*St.Louis Fire Fighters Ass'n v. St. Louis,*
  96 F.3d 323 (8th Cir. 1996) ........................................................................... 20

*Teitelbaum v. Sorensen,*
  648 F.2d 1248 (9th Cir. 1981) ....................................................................... 20

*Texas Dept. of Community Affairs v. Burdine,*
  450 U.S. 248 (1981)....................................................................................... 13

*Vasques v. County of Los Angeles,*
  349 F.3d 634 (9th Cir. 2004) ............................................................. 14, 15, 16

*Villiarimo v. Aloha Island Air, Inc.,*
  281 F.3d 1054 (9th Cir. 2002) ....................................................................... 13

*Waterhouse v. Dist. of Columbia,*
  298 F.3d 989 (D.C. Cir. 2002).......................................................................... 16

## Rules

42 U.S.C. § 1981a(b)(1).................................................................................... 20

42 U.S.C. § 2000e-5(k) ................................................................................... 20

## I.  GENERAL FACTUAL BACKGROUND

During the jury trial[1] in this case, Defendant Hyannis Air Service, Inc. dba Cape Air will present evidence sufficient to show that Plaintiff Tiffany Anne Nicholson's gender discrimination claim is without any support in fact or law.  Instead, if ever there could be a case of self-inflicted harm this is the quintessential example.  It is difficult to fathom how a pilot who, among numerous other instances of unacceptable and unsafe conduct, sleeps when she is supposed to be training, shows up unequipped to fly training flights, is otherwise insubordinate to the flight captain, and yet is still afforded an opportunity to re-train and fly with no pay cut, can cry "discrimination" after abandoning the employment.  What's more, if there ever could be a case where any benefit of doubt should be given to the employer's legitimate reasons for discipline, likewise this case is the exemplar:  if a commercial airline pilot is deemed unsafe by industry professionals qualified to make that determination it would be unthinkable to put passengers in the same airplane with that pilot.  In one instance a career commercial transport pilot with an exemplary flight record characterized his training flight with Plaintiff as the most unsafe flight he ever experienced.  That same pilot recounted air disasters attributable to the same short-comings plainly apparent in Plaintiff.  Plaintiff was removed from flight status and offered multiple opportunities of retraining because she was an unsafe pilot, not because she is female.  Plaintiff rejected the opportunity to retrain and resume flying at the same pay and chose instead to walk away from her job.  This lawsuit is nothing more than Plaintiff's way of expressing sulking regret for her own actions, which is evident by the fact that she had not once complained of discrimination until it was apparent that she had run out of excuses for her deficient piloting skills.

---

[1] Cape Air's Motion for Summary Judgment is still pending before the Court and may eliminate the need for a trial.

4812-7012-5058.1

Cape Air selected Nicholson to be one of eight pilots to staff Cape Air's new Micronesia flight operations beginning in 2004. The Micronesia routes utilized an ATR42 aircraft, a larger aircraft than the Cessna 402, which Cape Air utilizes in its other routes and which Plaintiff piloted for Cape Air prior to moving to Guam. Significantly, while the Cessna is a single pilot aircraft, the ATR requires a flightdeck crew of two, a Captain and First Officer. As will be apparent at trial, absolute cooperation between the Captain and First Officer is essential to safe operation of the aircraft. In the industry, such cooperation is referred to as "CRM", or Crew Resource Management. CRM requires flight crews to set aside any personal differences they may have and likewise requires each crewperson to have a cooperative personality and team approach to the complicated task of flying the aircraft. During ground school and initial training on the ATR42, Nicholson proved to be a competent pilot with acceptable CRM skills.

When the actual operations began, however, Nicholson's personality proved to be a difficult one, even combative at times, and her CRM skills came up missing in action. She was hostile, combative and abrasive, insubordinate and arrogant.[2] Her unbecoming behavior as a pilot adversely affected the environment of the cockpit and her working relationships with co-pilots. Her misbehavior was deemed to render flight operations unsafe by everyone who evaluated her, including her captains, supervisors, and managers, including Cape Air's then Pacific Regional Administrator (and pilot), Russell Price. Price, who had been impressed by Nicholson's performance at ground school and initial training, provided her further opportunities to correct and improve her cockpit communication skills, that is, her CRM skills. Price developed a four-day training plan, each day allowing Plaintiff an opportunity to improve her

---

[2] The industry *and the FAA* label such cockpit behavior as "machismo." The FAA officially classifies "machismo" as an undesirable pilot trait.

4812-7012-5058.1

CRM (as well as piloting) skills. However, Nicholson squandered each of those opportunities.[3] After wasting her opportunities to prove she was able to cooperate and communicate within the cockpit, Nicholson was referred to a panel of managers at Cape Air's home base in Hyannis, Massachusetts. The managers reviewed the reports provided to them by Price and other pilots and discussed the matter with Nicholson. Rather than terminate her for her deficient skills and failure to rectify these skills through additional training, Cape Air offered Nicholson an opportunity to keep flying. In particular, Cape Air offered an opportunity to return to her previous position as a Cessna 402 pilot and receive further training in the ATR42 with a long-term view to re-qualifying to fly the ATR and return to Guam. Nicholson refused that opportunity and simply never reported back to work.

Nonetheless, Nicholson filed this lawsuit claiming that the above-summarized actions of Cape Air were discriminatory on the basis of her gender.[4] The evidence at trial will show nothing can be further from the truth. Nicholson was treated equally with her male counterparts. When she was unable to perform her job safely she was afforded numerous opportunities to improve. When she failed to improve, she was offered her previous single-pilot position with further opportunities to be retrained to return to the ATR42. On the other hand, Nicholson cannot prove Cape Air took any action against her because of her gender because she has no such evidence. Cape Air will ask the jury to render a judgment in its favor, and will also ask the court to award it its attorneys' fees.

---

[3] In one instance she was instructed to fly the jumpseat to observe to pilots with good CRM skills. However, when Price arrived at the aircraft to check on her she was asleep in the passenger cabin. In another instance where she was to be the third in the cockpit to observe other pilots use of CRM, she showed up without her headset and thus would have had no means to listen to the other pilots talk to each other.

[4] At this juncture the Court may be wondering, what "actions" by Cape Air ? Indeed, Nicholson's "discipline" consisted of an offer of continued employment flying airplanes with no loss of pay or reduction in wages and an opportunity to re-qualify in the ATR while she underwent further training to address her skill deficiencies.

4812-7012-5058.1

## II.   **FACTUAL CONTENTIONS**

At the trial in this case, Cape Air intends to prove the following facts.

### A.   CAPE AIR, AND NICHOLSON'S HISTORY WITH CAPE AIR.

Cape Air is a regional airline based in Hyannis, Massachusetts, with a large number of its workforce being women. It employs between 80 and 100 pilots, including several senior female pilots who have spent more than ten years with the company. It also has four women in upper management positions, and many more at the mid-management level, and has received an award for its record in hiring and promoting females at the workplace. Cape Air's General Counsel who is also in charge of new business development is female. Cape Air has a publicly recognized record of excellence in hiring, promoting, and retaining female employees.

Nicholson started her employment with Cape Air in 2000 and was based out of Cape Air's Hyannis, Massachusetts, and Florida operations flying a Cessna 402. The 402 is a single pilot aircraft and as such Nicholson piloted the aircraft as a captain. Nicholson experienced some problems prior to transferring to Guam to work as a pilot in Cape Air's ATR42[5] flight operations, but was overall a good pilot operating the Cessna 402 aircraft.

### B.   GROUND TRAINING AND SIMULATOR TRAINING.

In 2004, Cape Air initiated operations in Micronesia at the expense of $3 million, and selected eight pilots to be trained to operate the ATR42 aircraft - four captains and four first officers. All eight pilots required training in the ATR42 because Cape Air did not fly the ATR42 on any of its existing routes. All eight pilots were necessary for the operations, and a significant investment of $25,000 to $30,000 was required to train each of the eight pilots.

---

[5] The ATR42 is a substantially larger aircraft than the single pilot Cessna 402 and, as noted above, requires a crew of two.

4812-7012-5058.1

The ATR42 has a two-pilot cockpit: a captain and a first officer.[6] The captain has the overall responsibility for the flight and its safety. Placement of unfettered authority in the captain arises out of a whole host of safety concerns for the passengers, crew, and aircraft. If a captain deems that a co-pilot flying as first officer is unsafe or in any manner jeopardizes safe operation of the aircraft, he has full discretion to remove the first officer.

The authority of the Captain and the duties and responsibilities of the Captain and the First Officer are outlined in Cape Air's General Operating Manual ("GOM"), a manual mandated by the FAA. In the GOM, a First Officer is tasked with assisting the captain in an efficient manner, preparing all required forms, maintaining a high degree of crew coordination and cockpit discipline (i.e., CRM), and performing other duties required by the captain. Nicholson agrees that the captain is the final authority on "communication safety, timeliness, everything," and that the First Officer does, among other duties, what the captain delegates to her.

The Guam pilots were selected based on seniority and regardless of gender, as is done in its Cessna 402 lines and throughout the airline industry. Nicholson applied for and was selected as a first officer based on her seniority. As will soon be noted, shortly after Cape Air's Micronesia operations began, Nicholson was disciplined over her deficient and unsafe Crew Resource Management ("CRM") skills. CRM involves cockpit communication skills, as well as problem solving, working together as a team, using all the resources available to a pilot, including the co-pilot, flight attendant, air traffic control, the company via radio, and all other tools to maximize the safety and efficiency of a flight. As all Cape Air witnesses will testify, in order for CRM to work well, pilots must approach it with the right attitude and have mutual respect.

---

[6] The ATR42 is also manned by one flight attendant, who is a member of the crew.

4812-7012-5058.1

Highly developed CRM is absolutely essential to safe flying, and is so recognized across the industry and understandably by the FAA.[7]  As Cape Air Director of Training (and pilot) David O'Connor will testify, accidents still occur because of breakdowns in CRM.[8]  Nicholson has also acknowledged the role of good communication skills as being necessary to fly the ATR, which will be explored at trial.  All eight pilots were trained to proficiency and passed ground school and simulator training, which included CRM training.

C.    FLYING EXPERIENCE.

During the proving runs and the initial Guam operations, other pilots started noticing that Nicholson displayed an attitude in the cockpit that made the cockpit tense and the flights unsafe, and reported their experience and complaints to Russell Price.  Also at that time, Price, himself a career commercial airline pilot, assessed Nicholson as having "[b]etter-than-average textbook knowledge, slightly below average stick-and-rudder skills, and on the poorest edge of acceptability CRM."  Because of the complaints from other pilots and his personal assessment, he devised a plan to observe her CRM skills.  However, before Price could conduct his observations, on August 31, 2004, Cape Air Captain Chuck White told Nicholson he was removing her from flight because in his opinion she was unsafe to fly.[9]  According to White, Nicholson displayed a bad attitude and poor communications skills, was difficult to get along with, and refused to answer flight checklists.  In her deposition, she admitted to failing to cooperate with White by completing a checklist by herself:

> Q.    Did you do anything that was not proper procedure during that flight?

---

[7] CRM originated back in the 1970s when NASA identified poor crew coordination as the cause of flying accidents.
[8] To highlight the critical need for CRM in the cockpit, it should be noted that lack of CRM was sighted by the NTSB as a contributing cause of the crash of Korean Airlines Flight 801 as the aircraft was on final approach to Guam International Airport.  More than 200 persons died when Flight 801 essentially flew into the side of a mountain at Nimitz Hill, ironically not more than a few hundred meters from navigational aides located there.
[9] It is important to keep in mind that the Captain's discretion is understandably plenary and his decision final, even though later when the aircraft and passengers are no longer at risk the decision turns out to be have been incorrect.

4812-7012-5058.1

A.    Yes, I did.

Q.    What did you do?

A.    ...because Chuck was not completing the checklist and it needed to be done, I verbalized the challenges and the responses. It was not a coordinated effort between us. . . . [I]t's supposed to be two people, one challenging, one responding, reading each item on the checklist. And in this instance, it was just one person.

Under the authority of the GOM, and as captain of the flight, White had the authority to remove her.

White's removal of Nicholson from the flight was immediately and thoroughly discussed between Price in his capacity as Pacific Regional Administrator, Steve Phillips, Cape Air's Chief Pilot, and David O'Connor. White conveyed that it was impossible and unsafe to work with Nicholson because of her behavior. Price, Phillips and O'Connor, in their review and in their personal experiences with Nicholson, determined that Nicholson displayed poor CRM thereby creating an unsafe flying environment and posing a risk to the passengers, crew and the aircraft.[10]

D.    <u>NICHOLSON'S RETRAINING.</u>

Cape Air will prove at trial that it offered Nicholson a second round of training, of which she failed to take advantage. Price, Phillips and O'Connor rated Nicholson as the weakest in CRM of all eight pilots and yet decided it was worth it to retrain Nicholson to improve her CRM skills. The additional training was to be administered by Price, a certified pilot with fourteen

---

[10] Though not to be dismissive of the need to fairly adjudicate this lawsuit, the paramount issue with which all were concerned, and which the Court must not lose sight of, was to avoid a situation whereby as a result of Plaintiffs attitude and poor CRM the passengers, crew and aircraft were put at risk of a fatal crash. If there ever was a situation where Cape Air decision makers must err on the side of safety and caution, this was it. The ugly alternative would be to be resigned to second-guessing themselves after a crash or other incident causing injury, death, loss of aircraft, or all three.

4812-7012-5058.1

years of experience at US Airways as a commercial transport pilot with an exemplary record and excellent cockpit communication skills.

Initially, Nicholson was instructed to sit in on an observation of fellow pilots Kevin O'Connor and Phil Dery as they flew the ATR42, so that she could observe their CRM skills in action. Nicholson acknowledged that observation is one form of learning, and that "any training will improve upon an ability that you have." Training by way of observing other proficient pilots is appropriate and is regularly used by Cape Air, as well as in the industry. It was particularly appropriate in Nicholson's case in which, as O'Connor testified at his deposition, "she had gotten to the point where she was technically competent in the handling of the aircraft, but was not competent in her interpersonal relationships within the cockpit and communication within the cockpit. And for that, observing a proficient flight crew is very appropriate. And the FAA would consider it too."

Nicholson failed to take advantage of the opportunity to "learn by watching." Instead of sitting in the cockpit jumpseat she sat in the first row of the passenger cabin of the aircraft during the critical final preflight preparation. Then, upon arriving on the aircraft Mr. Price found her asleep ! To top it off she quit early that day, observing only one round trip though she could have observed four. Even so, Price did not give up on Nicholson. Instead he devised a three-day plan of further training, on which he consulted with Phillips and Cape Air's Vice President of Human Resources, Linda Markham. Price also advised Nicholson that she was being observed.[11]

For the first day, Nicholson was tasked to fly with fellow pilot and captain John Kappeyne. She arrived on that day without a required headset,[12] and was sent to retrieve a

---

[11] O'Connor will testify that he also observed Nicholson's CRM deficiencies, and pointed them out to her.
[12] A headset is required and mandatory part of Cape Air's uniform for pilots.

4812-7012-5058.1

replacement headset, which meant that she missed out on part of the flying day.[13] The remaining days of the additional training were marked by poor CRM. On the second day, Nicholson was told she was insubordinate after refusing to shut an engine down at a captain's command. She used negative sarcasm during the flight. On the third day, Price set up a flight between Nicholson and White, on the same route in which White had previously removed her. On that flight, Nicholson acted with an attitude that was "defensive, antiauthoritarian, ego-driven." Price, a career pilot, believed her attitude made the flight one of his "top ten scary and dangerous flights" with a total breakdown of CRM. The flight started off with an operational error on Nicholson's part, which caused Nicholson to argue with White, and ended with Price removing her from the flight.[14]

While Nicholson claims that she "learns by doing," even when she worked in a CRM environment on these three additional days of training, she has admitted that her skills did not improve.

E.    NICHOLSON'S DISCIPLINE.

Cape Air will prove at trial that Nicholson underwent a thorough and fair disciplinary process. Nicholson returned to Hyannis to meet with Phillips, Larry Gualtieri, Cape Air's Director of Operations, and Markham, to discuss what occurred on Guam. The panel members discussed the events concerning Nicholson with Russell Price, and also reviewed written reports from Price, O'Connor, White, pilot Jon Bleiman, and pilot Phil Dery. The panel also offered

---

[13] Though Plaintiff complains that the "aircraft can be flown without a headset" that disingenuous statement only serves to further highlight her defensive and unsafe attitude. True, while the aircraft may be flown without the pilots wearing headsets, headsets and microphones are worn by pilots because otherwise they can not talk to each other unless they shout louder than the ever-present cockpit noise. Additionally, the integral microphone is used to communicate with air traffic control as well as other aircraft. Saying the aircraft can be flown with out a headset is a childish excuse, like saying that a car can be driven without watching the road.

[14] The number of instances of Plaintiff's display of deficient CRM skills and failure to recognize these deficiencies is too numerous to list within the twenty-page limit of this Trial Brief, but they will be explored at trial.

4812-7012-5058.1

Nicholson an opportunity to discuss her CRM deficiencies, specifically, her unwillingness to work as a team member in the cockpit on several occasions.

        1.    <u>Specific Problems with Nicholson's CRM Skills</u>

The panel's review concluded that Nicholson displayed an unsafe attitude and deficient CRM, such as those reported in the following examples:

        a.    David O'Connor reported and will testify that Nicholson displayed a "machismo"[15] attitude and was dismissive. For example, on a flight piloted by O'Connor and Nicholson, Nicholson was flying too slow and nose-up on final approach to landing, and O'Connor asked her to add more power, but her response was dismissive. Her exact response was to say "I got it" and yet she failed to add power and as a result the touch-down was exceedingly hard. O'Connor was concerned about her dismissive and unprofessional attitude, which was also displayed to other crew members. In another instance, Nicholson was assigned to sit in the jump seat of a flight handled by O'Connor and another pilot. O'Connor asked Nicholson to assist in pretrial preparations and she responded that "ACM means I ain't doing nothing."[16] O'Connor also observed Nicholson show up to work late, even though she was in the middle of an important evaluation period. Overall, O'Connor was concerned that based on his personal experiences with Nicholson and what he learned from pilots' interactions with her, she put at risk her fellow crew members and her passengers by intending to prove that she was better than anyone else.

        b.    Jon Bleiman reported that she ignored his callout requests and often responded to a request that it was "not her job".

---

[15] O'Connor will testify that Machismo is one of the five hazardous attitudes that was defined by the FAA in an advisory circular, and which is incompatible with professional flying.
[16] "ACM" means auxiliary crew member or a jumpseater, a person in the observation seat of a cockpit.

4812-7012-5058.1

        c.      Phil Dery, a Captain, reported and will testify that he requested she accomplish a trend monitor, a standard callout on a flight, and she replied "that's not my job."

Members of the Cape Air review panel were aware of these reports, in addition to a report submitted by Russell Price. Each panel member had grave concern as even a slight mishap in CRM skills may result in disastrous consequences.

### 2. The Panel's Decision.

The panel came up with an action form which, in its final form, prescribed: (1) a mandatory referral to Cape Air's Employee Assistance Program (EAP) to receive counseling in communication and interpersonal skills, and suspension until EAP completed successfully; (2) CRM training conducted by FlightSafety, a third-party flight instruction company;[17] (3) removal from flight status as an ATR42 crewmember, which may be reviewed in six months; (4) potential reinstatement as a 402 Captain including in the Pacific region;[18] (5) probation for six months; (6) potential termination should she be unable to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember. The basis for the discipline was

> Unable to interact and communicate effectively in a flightcrew environment. Failed to assist the captain the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM. Uncooperative attitude and inconsistent CRM skills created unsafe operative conditions in the cockpit.

The *Revised* Action Form also stated that "[a]ny future inability to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember will be grounds for termination." In other words, the discipline was

---

[17] If Nicholson elected to continue her employment under the Revised Action Form, this would have been her third round of training in CRM.

[18] In other words, she would have been allowed to fly an aircraft she had flown with success previously, and would be allowed to stay on Guam, where she desired to live.

4812-7012-5058.1

appropriately progressive as it was designed to give Nicholson benefit of doubt and a fair opportunity to achieve the goal of returning to flight status in both the Cessna 402 and ATR42. As for the **additional** training prescribed for Nicholson in the Revised Action Form, Cape Air had every intention of ensuring that Nicholson received the training recommended for her.

Nicholson appealed the Revised Action Form. Dan Wolf, President and CEO of Cape Air, conducted the review, with the assistance of Linda Markham, and upheld the Revised Action Form. Nicholson did not accept the decision and refused to bid to fly as captain on the 402 line for which she was eligible. As a result, Cape Air had no choice other than to conclude that Nicholson elected to quit her job. Plainly, during the entire disciplinary process, no one at Cape Air considered Nicholson's gender in making their decision.

### 3. Plaintiff's Failure to Recognize a Problem is Part of the Problem.

Cape Air will present testimony showing that part of the problem was Nicholson's failure (or refusal) to recognize her errors and deficiencies, an attitude which continues to this day. Cape Air management believed that Nicholson's combative attitude and manner **made her incompetent to fly** and difficult to retrain. O'Connor will testify that part of professionalism of a pilot is being able to see and admit your own deficiencies and striving to improve upon them, but that that was absent here because Nicholson displayed no sense of personal responsibility for her own circumstances. O'Connor will testify that she had a "fault-finding mentality and an inability to both accept constructive criticism and to hear suggestions from crew members." That mentality is dangerous, as Nicholson's supervisors will testify. That mentality has led to air disasters such as the horrific crash between two airliners at Tenerife, and the equally fatal Korean Airlines crash at Nimitz Hill, Guam, not all that many years ago.[19]

---

[19] KAL Flight 801 was a "controlled flight into terrain", that is, the pilots flew the airplane into the side of the mountain, the airplane did not crash on its own. The NTSB and FAA investigations revealed that at the time of the

4812-7012-5058.1

If Nicholson testifies as she did her in her deposition, she will confirm she had a different view of appropriate cockpit behavior. For example, she (understandably) testified that being difficult to get along with constitutes acceptable CRM behavior. Nicholson also believed she did not have a problem with CRM skills, in spite of being told over and over again that she was being monitored for her CRM short-comings. She wrote letters to Cape Air admitting her CRM shortcomings, and only after bringing this lawsuit, retracted those statements.

## III.  LEGAL DISCUSSION

### A.  NICHOLSON CANNOT PROVE A PRIMA FACIE CASE FOR GENDER DISCRIMINATION.

Title VII jurisprudence involves a burden-shifting framework. First, a plaintiff must prove a prime facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Specifically, she must show (1) that she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably. *Id.* at 802.

If the plaintiff establishes a prima facie case, the burden of production - but not persuasion - then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). If the employer meets its burden of production, the burden shifts back to the Plaintiff to produce evidence that the stated reasons are pretextual "either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-256 (1981). Nicholson must show that her gender "actually motivated the employer's

---

crash the senior officer was dismissive of warnings of insufficient altitude to clear the mountain. In other words, no CRM.

4812-7012-5058.1

decision," and that they had "a determinative influence in the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 143.

### 1.    Nicholson Was Not Qualified for Her Position

The evidence at trial will show that Nicholson was not qualified to fly the ATR42 for Cape Air. Nicholson's superiors will testify that Nicholson exhibited the poorest level of CRM, as described in the factual portion of this Motion, and that she was not qualified to fly the ATR42 because of her deficient CRM skills. Adequate CRM skills are essential for a pilot, particularly for the pilot of a passenger aircraft where passenger's lives are at stake. She also did not fulfill the duties of a First Officer under the General Operating Manual, particularly the duties to assist the captain in an efficient manner, preparing all required forms, maintaining a high degree of crew coordination and cockpit discipline, and performing other duties required by the captain. Rather, Nicholson acted in an insubordinate manner, as she readily admitted.

### 2.    Plaintiff Was Not Subject to Adverse Employment Action.

Cape Air will demonstrate at trial that a First Officer on the ATR 42 was considered a position inferior to being a Captain on the Cessna 402. Her discipline, in essence, was a return to a higher position after she elected to fly as a First Officer on the Micronesia routes. Also, captains in both aircraft were offered higher pay than First Officers in the ATR42. Therefore, in no way was Plaintiff subjected to adverse employment action.

### 3.    There are No Other Pilots Similarly Situated to Nicholson

To be similarly situated, Nicholson must show that another individual had a similar job and displayed similar conduct of comparable seriousness. *Vasques v. County of Los* Angeles, 349 F.3d 634, 641 (9th Cir. 2004); *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)

4812-7012-5058.1

(the standard for a similarly situated employee requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases). While other pilots had initial unsatisfactory check rides in the simulator, and were given additional training, no other pilot was recognized for having CRM problems. Phillips will testify that the pilots who received additional training were on the scale of operating the aircraft and performance on the check ride, whereas Nicholson's was more towards having the proper attitude to communicate well and help in good crew resources management. Therefore, no other pilot was similarly situated with Nicholson.

4.     Nicholson was Not Treated Differently from Others Similarly Situated

Even assuming that there are pilots who are similarly situated to Nicholson, the evidence will show that she was not treated differently from her male counterparts by being taken off flying the ATR. Under Cape Air's procedures, if a pilot fails a test, they are given another opportunity to pass. If they fail a further test, then they undergo a review to determine if there will be a further opportunity for training. This is exactly the situation followed in Nicholson's case. Nicholson was initially trained in CRM at ground school and passed. During the initial operating experience, she displayed poor CRM skills, and was given further training at the direction of Russell Price. Price evaluated her as having failed at those additional training opportunities. The Revised Action Form prescribed by the disciplinary panel included further training, meaning a *third* round of training. No other person had failed at a second round of training. Thus, while Nicholson was not similarly situated to any other person, her treatment did not differ from the Cape Air's prescribed module of training.

B.     LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS.

Assuming Nicholson satisfies her prima facie case, the burden shifts to Cape Air to provide a legitimate, non-discriminatory reason for disciplining her. 349 F.3d at 641. In

4812-7012-5058.1

examining Cape Air's proffered explanation for disciplining Nicholson, the Court may not "second-guess [the] employer's personnel decision absent a demonstrably discriminatory motive." *Waterhouse v. Dist. of Columbia*, 298 F.3d 989 (D.C. Cir. 2002). "The issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" *Fishback v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Anti-discrimination statutes do not authorize courts to act as a "super-personnel department" to reexamine an employer's business decisions. *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)).

Cape Air will show that it had a legitimate, non-discriminatory business reason for Nicholson's discipline and termination: she was unable to safely fly, and put lives at risk. She did not display adequate CRM skills, she showed a lack of personal responsibility for her actions, and she did not get along with her co-workers. All of these factors were considered by the panel of managers tasked to determine Nicholson's discipline. That same panel of managers - Phillips, Gualtieri and Markham – along with Cape Air President Dan Wolf considered reports of her lack of CRM, her lack of personal responsibility, and her inability to get along with other pilots when it determined her discipline, without any consideration to her gender.

C.    <u>THERE IS NO SPECIFIC OR SUBSTANTIAL EVIDENCE OF PRETEXT.</u>

Nicholson must put forward ***direct evidence*** showing that discrimination more likely motivated the employer, or indirect evidence that the employer's explanation is unworthy of credence. 349 F.3d at 641. In this case, there is no evidence, direct or otherwise, of pretext. Therefore, to show pretext using circumstantial evidence, a plaintiff must put forward ***specific and substantial*** evidence challenging the credibility of the employer's motives. *Id.* at 642. With respect to pretext, even if the evidence underlying their decision was false, if the decision-makers

4812-7012-5058.1

honestly believed the pilots' letters and reports, their decision will be upheld. 281 F.3d at 1054 ("courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless"). "Even a reasoned decision based on incorrect facts is not evidence of pretext." *Pollard v. Rea Magnet Wire Co.*, 824 F.3d 557, 559 (7th Cir. 1987).

There is no evidence, direct or circumstantial, that Cape Air's decision to discipline Nicholson is not worthy of credence, or that a discriminatory reason more likely motivated Cape Air to discipline her. There is no direct or circumstantial evidence suggesting that any of the decision-makers (Phillips, Gualtieri, Markham or Wolf) are not credible or that their decision was motivated by discriminatory motives. Rather, all will testify that they did not take Nicholson's gender into consideration, that they offered her a fair deal to receive additional training, and that they thought she was a good pilot on the Cessna 402. In fact, it makes absolutely no sense that Cape Air's proffered reasons are pretextual. Cape Air invested over $25,000 in Nicholson, and millions more in the Cape Air Micronesia operations. Cape Air's Micronesia's endeavor was expensive, and every pilot was needed to carry out the operations. Ex. R at 89:16-23, 103:12-19.

As the caselaw holds, Cape Air prevails if it reached a reasoned decision, even if based on incorrect facts. Cape Air's decision makers - some of whom witnessed first-hand Nicholson acting with poor CRM - honestly believed that Nicholson lacked CRM skills, in spite of their need for her piloting abilities to successfully carry out Cape Air's newly implemented Micronesia operations. Nicholson cannot put forward any specific and substantial evidence challenging Cape Air's motives as being merely pretextual.

## IV.   **DAMAGES**

If, despite the evidence, the Jury somehow finds Cape Air is liable for Title VII violations and the Court upholds that finding, Nicholson's recoverable damages are severely reduced by a

4812-7012-5058.1

tolling of backpay and a failure to mitigate. There are usually four components to a Title VII damages award: backpay, front pay, compensatory and punitive damages, and attorneys fees.

A.  BACKPAY.

      1.  Any Backpay Award is Tolled Due to an Offer of Substantially Equivalent Employment to Nicholson.

At the trial in this case, Cape Air will demonstrate that any backpay awarded to Nicholson must be reduced because she was offered, and refused, substantially equivalent employment. In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232 (1982), the Supreme Court determined that an employer charged with unlawful discrimination can toll the accrual of backpay by unconditionally offering the claimant the job she sought or a substantially equivalent job. Such an offer provides the plaintiff with an opportunity to minimize damages. The purpose of a backpay award is to make the plaintiff whole. Therefore, backpay terminates when there is an unconditional offer of reinstatement to the same or an equivalent position, as this signifies that the plaintiff has failed to mitigate her damages.

In this case, Nicholson was taken off her position as a First Officer on the ATR42, and offered a position as a Captain on the Cessna 402. In her fifth year as a FO on the ATR42, she made $32.58 per flight hour. A fifth year captain on the C402 earned $33.60 per flight hour. She therefore rejected a position that paid $1.02 more than what she earned as an ATR42 captain. The positions, moreover, were virtually similar in that they involved utilizing Plaintiff's flying skills.

As she rejected a position that was substantially equivalent to being a FO on the ATR 42, backpay tolled as of the date she rejected taking that position, October 22, 2004. On that date, she advised Cape Air that she will not bid into the 402. She had stopped flying on September 9, 2004.

4812-7012-5058.1

Backpay, if it is to be awarded, should be calculated at the rate of $32.58 times 18 hours per week multiplied by seven weeks. This amounts to $4,105.08.

<blockquote>
2.     <u>Backpay Compensation in the Event the Position of Captain of the Cessna 402 Was Not Substantially Equivalent Employment.</u>
</blockquote>

If a Jury were to somehow find that employment as a Cessna 402 pilot was not substantially equivalent to a First Officer on the ATR, backpay will be calculated by lost wages and salary, benefits, and prejudgment interest. Cape Air will establish at trial that any backpay awarded must account for her earnings since her departure from Cape Air. Cape Air has estimated these deductions to be at least $24,000.00.

B.     <u>FRONT PAY.</u>

Just as in backpay, Nicholson's refusal to take the Cessna 402 Captain position signifies a failure to mitigate damages. She is not entitled to front pay after rejecting the 402 Captain position. *Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014 (9th Cir. 2000).

C.     <u>COMPENSATORY AND PUNITIVE DAMAGES.</u>

Title VII imposes a cap of $300,000 on compensatory and punitive damages for employers of greater than 300 employees. 42 U.S.C. § 1981a(b)(3)(D). To be entitled to such damages, Plaintiff must prove that she sustained non-economic injuries, such as emotional distress, pain and suffering, harm to reputation, and other consequential injury caused by the defendant's conduct. *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002).

In this instance Plaintiff never sought psychological help. She has stated that there is nothing wrong with her abilities to fly a plane, and she does not need any counseling. What's more, lack of harm to reputation is self-evident in that she has secured new employment as a pilot. There is no justification for an award of compensatory damages as Nicholson will only make conclusory statements of her experiencing "emotional distress". *See Brady v. Fort Bend*

4812-7012-5058.1

*County,* 145 F.3d 691, 715 (5th Cir. 1998) (vague, conclusory and uncorroborated testimony of emotional distress will not support award of compensatory damages).

As for punitive damages, the Court should not even allow mention of this to a Jury. Nicholson must but can not possibly show Cape Air acted with malice or reckless indifference to Nicholson's rights. 42 U.S.C. § 1981a(b)(1). Plainly, given the undisputed facts, Nicholson will not be able to demonstrate any entitlement to punitive damages. There is no evidence that Cape Air acted knowingly in violation of the law. The present case, in which Cape Air acted with the distinct belief that its conduct was lawful falls within the type of conduct deemed not eligible for punitive damages by the Supreme Court. *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 536-37 (1999).

D.    ATTORNEYS FEES

Whichever party prevails may seek attorneys fees. 42 U.S.C. § 2000e-5(k). Attorneys fees are not mandatory, but rather lie in the discretion of the Court, which may deny such fees if, among other reasons, the defendant acted in good faith, if the amount of attorneys fees exceeds the amount of damages, if the plaintiff made a grossly excessive fee request or has limited success on the merits, or if the plaintiff failed to engage in meaningful settlement discussions. *See Teitelbaum v. Sorensen,* 648 F.2d 1248, 1250-51 (9th Cir. 1981); *Shott v. Rush-Presbyterian-St.Luke's Med. Ctr.,* 338 F.3d 736, 744, 747 (7th Cir. 2003); *Fair Housing of Marin v. Combs,* 285 F.3d 899, 908 (9th Cir. 2002); *St.Louis Fire Fighters Ass'n v. St. Louis,* 96 F.3d 323, 331-32 (8th Cir. 1996). If Nicholson prevails, Cape Air anticipates that some if not all of the above restricting factors should be taken into account in any fee award request.

If Cape Air prevails at trial, it will submit a motion for attorneys fees to the Court.

V.    **ABANDONMENT OF ISSUES**

No issues have been abandoned.

4812-7012-5058.1

DATED: Hagåtña, Guam, February 22, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
DAVID LEDGER
Attorneys for Defendant
Hyannis Air Service, Inc. dba Cape Air

4812-7012-5058.1

## DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on the 22d day of February, 2008, I will cause to be served, via hand delivery, a true and correct copy of the TRIAL BRIEF; DECLARATION OF SERVICE upon Plaintiff's Counsel of record as follows:

> **Phillip Torres, Esq.**
> **TEKER TORRES AND TEKER, P.C.**
> **130 Aspinall Avenue, Suite 2A**
> **Hagåtña, Guam 96910**
>
> **Attorneys for Plaintiff Tiffany Anne Nicholson**

DATED: Hagåtña, Guam, February 22, 2008.

_____
ELYZE J. MCDONALD

4812-7012-5058.1