1 **TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
2 HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601
3

4 *Attorneys for Plaintiff*

5

6

7

8                    IN THE DISTRICT COURT OF GUAM

9                              ----------

10 TIFFANY ANNE NICHOLSON,              )    CIVIL CASE NO. CV 06-00027
                                        )
11             Plaintiff,               )
                                        )    **PLAINTIFF'S MOTION FOR LEAVE**
12        vs.                           )    **TO FILE SUR-REPLY IN SUPPORT**
                                        )    **OF HER OPPOSITION TO**
13 HYANNIS AIR SERVICE, INC.            )    **DEFENDANT'S MOTION FOR**
   d.b.a. CAPE AIR,                     )    **SUMMARY JUDGMENT**
                                        )
14                                      )
             Defendant,                 )    [No Oral Argument Requested]
15                                      )
                                  ----------
16

17        NOW COMES Plaintiff TIFFANY ANNE NICHOLSON, and respectfully moves this

18 Honorable Court for leave to file herewith a Sur-Reply in Support of her Opposition to Defendant's

19 Motion for Summary Judgment.

20        Local Rule 7.1 which governs motion practice is silent as to the applicability to file a Sur-

21 Reply. Plaintiff thinks the Sur-Reply will assist the Court in evaluating the statements and issues

22 raised by Defendant Hyannis Air Service, Inc. d.b.a. Cape Air in its Reply Brief and should be

23 afforded the opportunity to do so. Thus, the proposed Sur-Reply that Plaintiff seeks to file (submitted

**FILED**
DISTRICT COURT OF GUAM

FEB 2 2 2008

**JEANNE G. QUINATA**
**Clerk of Court**

**ORIGINAL**

herewith) will address these statements and issues and complete the record for the Court's review.

For these reasons, Plaintiff respectfully asks that this motion be granted.

Respectfully submitted this 22nd day of February, 2008.

TEKER, TORRES & TEKER, P.C.

By: _____

PHILLIP TORRES, ESQ.
Attorneys for Plaintiff

**TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
HAGÂTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601

*Attorneys for Plaintiff*

IN THE DISTRICT COURT OF GUAM

----------

TIFFANY ANNE NICHOLSON,               )      CIVIL CASE NO. CV 06-00027
                                      )
                Plaintiff,            )
                                      )
         vs.                          )      **PLAINTIFF'S SUR-REPLY TO**
                                      )      **DEFENDANT'S MOTION FOR**
HYANNIS AIR SERVICE, INC.             )      **SUMMARY JUDGMENT**
d.b.a. CAPE AIR,                      )
                                      )
                Defendant,            )
                                      )

----------

Plaintiff TIFFANY ANNE NICHOLSON, in the above-captioned case, through undersigned

counsel, hereby files her Sur-Reply to Defendant's Reply to Plaintiff's Opposition to the Motion for

Summary Judgment filed on February 8, 2008.

In its Reply, Cape Air disputes Nicholson's Opposition arguments and argues that Nicholson

has not set forth a *prima facia* case, that Cape Air has articulated legitimate, non-discriminatory

reasons for Nicholson's discipline and that Nicholson has failed to provide specific and substantive

evidence of pretext for the disciplinary action taken by Cape Air.

# I.

## PRIMA FACIA CASE

**A.      Nicholson Was Qualified for Her Job, Similarly Situated to the Other Seven Pilots Employed by Cape Air in Guam in 2004 and Was Treated Differently from the Other Pilots When it Came to Remaining in the ATR 42 Program.**

Cape Air asserts that Nicholson fails to establish a *prima facia* case. The United States Supreme Court has said that the Plaintiff's burden to establishing a *prima facia* case in an employment discrimination case is "minimal." *Saint Mary's Honor Center v. Hicks*,[1] 509 U.S. 502, 506 (1993). It does not even need to rise to the level of a preponderance of the evidence. (*See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659-60 (9th Cir. 2002) emphasizing the low threshold for a *prima facia* case and holding that even an employees self assessment is relevant evidence.) Nicholson testified that she did not feel her CRM skills were lacking. ***Nicholson's March 1, 2007 Deposition Transcript, 10:16 – 11:9 and 16, attached hereto as Exhibit 13***.[2]

The elements of a *prima facia* case are not in dispute. In its Reply, Cape Air argues that Nicholson was not qualified for her job, not performing adequate CRM and that her performance was not in conformance with the General Operating Manual of Standards for First Officers. It further argues that Nicholson admitted that she failed to comply with proper procedures by not coordinating her effort with the Captain and cites to a portion of her deposition transcript and emails.

Cape Air mischaracterizes the Plaintiff's testimony and ignores the conflicting evidence and material disputes regarding CRM as set forth in Plaintiff's Opposition. At pages two and three of

---

[1]Cases cited are identified by italic print.

[2]Sur Reply Exhibits attached identified by bold-italic print.

its Reply Cape Air points to an incident stating that Nicholson admitted that she failed to comply with proper procedures and characterized that as an admission of wrongdoing and that she was not meeting Cape Air's legitimate expectations. However, Cape Air took the admission out of context and did not provide the Court with Plaintiff's entire testimony of what happened at that time.

In her deposition, Nicholson was asked by Defendant's counsel whether she had done anything that was not proper procedure on the flight from Guam to Saipan on August 31, 2004. Nicholson responded that she did. In response to further questioning from Cape Air's counsel, Nicholson explained that what she did was vocalize the crew checklist and the responses, which was required to be done on the flight. She did that because Captain Charles White did not respond to her requests to do the checklist and did not complete the checklist. The checklist should be completed by the Captain and First Officer acting in tandem. Thus, in order to get the checklist done, Nicholson verbalized the challenges and the responses into the cockpit recorder and the checklist was completed. That admission of doing something outside the manual procedures (i.e. not in tandem) is not an example of bad CRM nor was it any kind of an act that made the plane ride unsafe. What it was is the completion of requirements for the flight. Nicholson was asked if there was anything else that was not done according to procedure on that August 31, 2004 flight and her response was "No." ***Nicholson's February 23, 2007 Deposition Transcript, 154:8 - 157:14, attached hereto as Exhibit "14"***. This example constitutes at a minimum a material dispute of fact on whether this is bad CRM and is not an example of Nicholson not be qualified for her job. In addition, this example used by Cape Air in the Reply was not listed as an example of bad CRM by White or Cape Air or its disciplinary panel as a reason for discipline.

Cape Air also cites in Exhibit "J" of its Motion for Summary Judgment, an email from Tiffany Nicholson to Linda Markham, Dan Wolf and Larry Gualtieri dated September 19, 2004 as

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

Nicholson's admission that her CRM skills were lacking and that further CRM training would address her problems. **Defendant's Reply at page 3.** That email must be read and understood in the context of what happened in the previous week. In her Opposition, Nicholson stated that she was given a proposed Action Form on or about September 14, 2004. At that point Cape Air had pretty much decided on her discipline without input from her, though it was not final. A disciplinary hearing was held on September 17, 2004 and at the conclusion of the hearing, Nicholson was served with an Action Form which was identical to the one she was given three days earlier. **Exhibit "I" to Defendant's Reply.**[3] It clearly set forth her discipline and Cape Air's position with regard to her future employment. At that point in time Nicholson was dropped from the ATR 42 program.

In Guam, Nicholson flew the ATR 42 aircraft successfully and safely in July and August 2004. Cape Air has a system to report safety problems and the form is called the ESR, Employee Safety Report. *Linda Markham's Deposition Transcript, 140:11-22, attached hereto as Exhibit "15".* Charles White and Nicholson only flew together in August 2004 on three occasions. *Charles White's Deposition Transcript at p. 18 - 21, attached hereto as Exhibit "16".* White himself had gone through the same certification process as Nicholson and had only been flying the ATR 42 for a month. White's CRM training included the same amount of training as Nicholson and the other pilots, about six hours of classroom and two to ten hours in the simulator according to David O'Connor, the Director of Training. *David O'Connor's June 25, 2007 Deposition Transcript, 34:12 - 35:22, attached hereto as Exhibit "17".* Flight Safety, the Company that conducted the simulator training in Houston, had rated Nicholson as having good CRM skills and O'Connor had no reason to question its evaluation of Nicholson. **Training Notes attached to Plaintiff's**

---

[3]Reference to Exhibits in the Motion for Summary Judgment, the Opposition and Reply are identified by bold print.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1    **Opposition as Exhibit "11".** Nicholson had just been through ATR 42 training and been reviewed

2    by the Federal Aviation Administration ("FAA"), O'Connor, Chief Pilot Stephen Phillips and Guam

3    Regional Administrator Price in the aircraft and by Flight Safety and was qualified for the safe

4    operation of the aircraft. In fact, when Dan Wolf, the CEO of Cape Air, came to Guam to be a part

5    of the inaugural flight, Nicholson was selected to be the First Officer on that flight. *Russell Price's*

6    *Deposition Transcript, 64:4-13, attached hereto as Exhibit "18".*

7            Prior to August 31, 2004, no reports or documentation from co-workers, Cape Air

8    supervisors or management, the FAA or Flight Safety existed evidencing any concerns about

9    Nicholson's flying abilities in the ATR 42. **White's Deposition Transcript, Exhibit "9" in**

10   **Plaintiff's Opposition, 66:3-6. Nicholson's Deposition Transcript, Exhibit "3" of Plaintiff's**

11   **Opposition, 164:8-11.** It was White's interpretation of her CRM abilities that lead Cape Air to

12   suspect that Nicholson had CRM problems. However, White back tracked in his deposition stating

13   that he did not know if she was unsafe or if her skills were lacking. White was not contacted by any

14   management personnel from Hyannis seeking details about his decision to remove Nicholson from

15   the aircraft nor was White contacted by members of the panel prior to Nicholson's disciplinary

16   hearing to discuss the specifics of what occurred on that August 31, 2004 flight to Saipan. **Exhibit**

17   **"9"in Plaintiff's Opposition, 66:9 - 67:23; 86:5 - 88:12.**

18           Nicholson thought she was a safe and capable pilot and her examinations and flights in June,

19   July and August, 2004 support that. A dispute of material fact exists especially when the pilot who

20   removed her questioned his actions and whether he actually believed that Nicholson's CRM skills

21   were lacking. Clearly if White thought Nicholson was unsafe, why did he allow her to pilot the

22   plane back from Saipan with a plane load of passengers? Since the captain has the ultimate authority

23   with respect to a flight, clearly White's decision to have Nicholson pilot the plane back from Saipan

1  argues that he thought she was safe to fly and, therefore, she was performing according to her

2  employer's legitimate expectations. Thus, Nicholson has met her burden of establishing that she was

3  qualified for her employment with Cape Air.

4  **B.    Nicholson Was Similarly Situated.**

5  Cape Air argues that Nicholson is not similarly situated because no other pilot was

6  experiencing CRM problems and, therefore, Nicholson was not similarly situated to the other pilots

7  in Guam "in all material respects".  Defendant cites to cases  and quotes conclusions without

8  analyzing the facts of those cases to the present issue. Defendant states that "here Nicholson was

9  tasked to furnish undisputed evidence that male pilots engaged in comparable conduct, specifically,

10  deficient and unsafe CRM skills, and then were subjected to a different form of discipline."

11  **Defendant's Reply at page 4.**  Defendant misstates the law and Plaintiff's minimal burden.  In

12  *McGuinness vs. Lincoln Hall*, 263 F.3d 49 (2nd Cir. 2001), the Court discussed what is similarly

13  situated in the context of plaintiff's minimal burden to establish a *prima facia* case. The Court stated

14  that although the Plaintiff must show that she is similarly situated on all material respects that does

15  not mean that she must be similarly situated in *all* respects. "A plaintiff is not obligated to show

16  disparate treatment of an *identically* situated employee." *Id* at p. 53. (Emphasis in original).  Other

17  comparable "...employees must have a situation sufficiently similar to plaintiffs to support at least

18  a minimal inference that the difference of treatment may be attributable to discrimination." *Id.*

19  Plaintiff was one of eight pilots flying the ATR 42 and the only female pilot.  In her

20  Opposition, Plaintiff established that she was similarly situated to other pilots (Dery and Kappeyne)

21  whose abilities were deficient. Dery and Kappeyne's deficiencies and failures would automatically

22  eliminate them from the ATR 42 program.  The claims against Nicholson didn't subject her to

23  automatic removal her from the ATR 42 program. Despite being similarly situated with disciplinary

1  issues, the male pilots were not subjected to discipline and were given every opportunity to succeed

2  and stay in the ATR 42 program, Nicholson was not. Instead she was subjected to discipline, not

3  allowed to retrain to satisfy Cape Air's concerns and was eliminated from the program.

4        The point is that on at least three other occasions pilots failed to establish their competency

5  to be in the ATR 42 program and, therefore, had deficient and unsafe skills but they were not subject

6  to discipline and instead were given retraining at every opportunity to succeed. The pilots were

7  similarly situated because their opportunity to continue to fly in the ATR 42 was at risk. Thus,

8  Nicholson evidenced at least the minimal support of her claims, as required, and that the disparate

9  treatment may have been based on gender discrimination.

10       **C.    Nicholson was treated differently from other pilots.**

11       Cape Air contends that Nicholson was not treated differently from other pilots but required

12  a third round of training. That assertion misstates the issue and facts. The issue is whether or not

13  she was discriminated against and treated differently than the other pilots who had deficiency issues.

14  The other pilots' training was formal retraining in ground school and by Flight Safety in simulator

15  training. Nicholson retraining was by observation and flying with other pilots to improve her CRM

16  skills. However, Nicholson wasn't told that the observation of other pilots and flying with other

17  pilots was retraining and she wasn't told of what she had to correct, wasn't given feedback or

18  evaluations after the flights. ***Russell Prices' Deposition Transcript attached hereto as Exhibit***

19  ***"18".*** Other deficient pilots were told what the problems were, were provided with formal retraining

20  and were reevaluated.

21       None of the other pilots were called before the panel for formal discipline or for a

22  determination as to whether or not they should be subject to probation as part of being granted

23  additional training. When the other pilots were deficient because they had failed ground school or

1    simulator training or the check ride, they were reviewed informally and granted the opportunity to

2    go through the formal retraining in ground school or simulator training to retest and remain in the

3    program. They did not have to go in front of a panel and have that panel review what their

4    deficiencies were, be investigated as to what their deficiencies were or respond as to why they were

5    deficient. The affected pilots were allowed to retrain formally and retest to remain in the program.

6    They also were not subject to probation or subjected to demotion from the program. The only

7    identified assessment done on the pilots who failed was whether or not that pilot were capable of

8    learning.

9        The Chief Pilot and Regional Administrator hardly have a basis for asserting that Kappeyne,

10    Dery and O'Connor were worthy of acting as training pilots. Cape Air had Nicholson fly with John

11    Kappeyne with Price observing. Again Nicholson was not being trained. Kappeyne was not acting

12    as an instructor and Price did not comment during the flight. The training flight with Price as a

13    Captain never happened. The flight with White ended after one round trip, again without Nicholson

14    being told what she was doing wrong. She was simply told CRM is not working today and she was

15    sent home without further comment or evaluation. *Russell Price's Deposition Transcript, 86:1 -*

16    *87:15; 93:4 - 94: 8, attached hereto as Exhibit "18"*. The pilots did not interact with Nicholson and

17    Price did not point to specific things, he wanted Nicholson to learn from the flight. Cape Air's

18    argument assumes that she actually had a second round of training over four days. It is undisputed

19    that all of the pilots were new to the ATR 42 environment and had undergone the same certification

20    training. Cape Air asserts that observing Captain Phil Dery and First Officer David O'Connor was

21    training. Dery and O'Connor had been observed as a team by Price on only one or two occasions.

22    *Russell Price's Deposition Transcript, 77:11-16, attached hereto as Exhibit "18"*. David O'Connor

23    had no recollection of flying with Dery in July/August 2004 and only testified to having observed

Kevin O'Connor on one occasion. Thus, Nicholson who was treated substantially different from the other pilots.

## II.

### CAPE AIR'S DISCIPLINE OF NICHOLSON WAS DISCRIMINATORY AND ILLEGAL

Cape Air asserts that it disciplined Nicholson because of deficiencies in communication creating safety issues and an uncooperative attitude. The Cape Air handbook sets forth the company's policies against discrimination and harassment. It also sets forth the company's review rights given to employees. Specifically employees are entitled to a full investigation of the relevant facts and an independent review of any disciplinary action if they request a review. ***Company Handbook at page H518 - H519, attached hereto as Exhibit "19"***. That did not happen. White testified that no one talked to him about the details of the August 31, 2004 flight from Guam to Saipan. **Exhibit "9" to Plaintiff's Opposition, 86:6 - 88:22.** Nicholson testified that no one told her about what she was accused of doing that caused her to be removed from the flight. **Nicholson Deposition Transcript as Exhibit 3 to Plaintiff's Opposition, 147:10 - 151:4.**

The deposition transcripts of **Stephen Phillips, Exhibit "P" to Defendant's Motion, 60:24 - 61:25,** *Larry Gualtieri's Deposition Transcript, 21: 21-25; 22; 23:6-15, attached hereto as Exhibit "20"*, *Linda Markham's Deposition Transcript, 63:3-12, attached hereto as Exhibit "15" and Russell Price's Deposition Transcript, 118:6 - 119:2, attached hereto as Exhibit "18"*, indicate that they never talked with any of the pilots to investigate the specific incidents or allegations of misconduct by Nicholson on that fateful flight which caused her to be removed from the August 31, 2004 flight or the allegations in the letters. Only Phillips recalls talking to White but White asserts that no one at Cape Air ever spoke to him about <u>what happened on the flight or the</u>

substance of his letter. **Exhibit "Q" to Defendant's Motion at 86:5 - 89:2.**

Significantly, in the six week period before August 20, 2004, O'Connor and Phillips had flown with Nicholson and the rest of the pilots to review, assess, qualify and approve of the pilots' capabilities to fly the ATR 42. None of the management responsible for Nicholson's performance, specifically, Russell Price, David O'Connor or Stephen Phillips, ever documented any problems with Nicholson's abilities to operate the ATR 42 safely prior to August 31, 2004. Pilots and first officers are required to debrief each other on their flights at the end of the flying day and Nicholson testified that nobody ever complained to her prior to August 31, 2004 of any deficiencies. Cape Air has an ESR Form, an Employee Safety Report Form, which can be anonymously filed be any employee who believes that there is a safety concern. Any one of the Guam pilots could have filed that report with the home office if they believed that anyone was flying in an unsafe manner or if they were having safety issues with another employee. None of the Guam pilots or any other Cape Air staff ever availed themselves to that opportunity.

Finally, at the September 17, 2004 hearing, Tiffany Nicholson asked what the allegations against her were but she was not provided with any specific charges. Nicholson was told that fellow pilots had written letters. She asked to see the letters that had been written about her so that she could respond to any specific charges against her. The panel did not provide Nicholson with specific allegations of wrongdoing and did not allow her to look at the letters and, therefore, she was not afforded basic due process to respond to allegations and defend herself against any charges regarding her competency.

Prior to going to Guam all pilots were flying Cape Air's Cessna 402 planes which only require one pilot. Once Nicholson was removed from the ATR 42 program only male pilots were flying on Guam. Even Nicholson's successful completion of the training set forth in the Action

Form did not mean she would return to the program, only that she "may be reviewed in six months." Cape Air decided **before** Nicholson went to Hyannis that she would not fly the ATR 42 in Guam. *Stephen Phillips' Deposition Transcript, 186:12 - 187:18, attached hereto as Exhibit "21"*. Cape Air could not articulate a valid reason tying her training or discipline to the six month time period. *Stephen Phillips' Deposition Transcript, 186:7-18, attached hereto as Exhibit "21"; David O'Connor's June 25, 2007 Deposition Transcript, 44:14 to 47:22, attached hereto as Exhibit "17"*. It ensured only one objective, keeping Nicholson from flying in Guam with the male pilots in the two cockpit ATR 42 planes! Thus, the lack of investigation, Cape Air's articulated reasons do not hold water, are arbitrary and capricious and unworthy of credence. Thus, Nicholson was unlawfully disciplined in violation of Title VII and this Summary Judgment Motion should be denied.

### III.

### NICHOLSON HAS SET FORTH EVIDENCE OF DISCRIMINATORY PRETEXT TO HER DISCIPLINE

Cape Air asserts that Nicholson failed to provide specific and substantial evidence of pretext. Cape Air asserts that Nicholson being a female establishes nothing. It also asserts that there was no evidence that White not wanting to work with her was motivated by her gender. Cape Air asserts that there is no evidence that the rumors of a sexual relationship between her and Russell Price were circulated because of Nicholson's gender. Cape Air asserts that there is no evidence of any solicitation or planning of the letters other than her suggestion. Finally, Cape Air asserts that there is no admissible evidence that Cape Air failed to investigate allegations against Nicholson, confront her with those allegations, give her an opportunity to defend herself, make a record of the hearing or conduct an independent review.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

First, common sense provides the nexus of gender motivation for White not wanting to work with Nicholson and for the rumors. She was White's ex-girlfriend! She was rumored to be doing Price. Price set the schedules. She was the only female pilot around. The rumors were so extensive that Cape Air management knew. Of course White's feelings and the rumors were motivated by her gender. **Markham Deposition Transcript Exhibit 12 of Plaintiff's Opposition at 51:5-54:14**. White's attitude towards Nicholson and the rumors were a concern for Cape Air but once Nicholson was removed from Guam those problems were gone.

Next, Cape Air would have the court believe that the pilot letters are unsolicited coincidences even though they are all written on the sixth of September, 2004. However, Kappeyne wrote a letter on September 9, 2004 that was clearly solicited as evidenced by the first sentence. ***John Kappeyne's letter attached hereto as Exhibit "22"***.

Under Title VII, it is an unlawful employment practice to discriminate against an "individual with respect to his compensation, terms, conditions or privileges of employment..." 42 U.S.C. 2000e-2(a)(1). Nicholson has shown by direct and circumstantial evidence that she was subjected to unlawful, intentional discrimination and disparate treatment compared to the male pilots who had safety and competency issues at Cape Air. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 123 S.Ct. 2148, 2155 (2003) quoting *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 508 N. 17 (1957).

Nicholson asserts that the pilots on Guam did not want to fly with her and she was the victim of disparate treatment. ***Nicholson's March 1, 2007 Deposition Transcript, 45:17 - 48:18, attached hereto as Exhibit "13"***. Nicholson's skills to operate the plane and her knowledge of procedures were not at issue. Despite extensive reviews of her abilities over the previous ninety (90) days, there

**TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1   were no issues of her being unsafe or having poor CRM skills that created an unsafe environment

2   before August 31, 2004. ***Russell Price's Deposition Transcript, 130:25 - 131:18, attached hereto***

3   ***as Exhibit "18"***. While Dery and Kappeyne's training and flying failures automatically eliminated

4   them from the ATR 42 program, they were not required to attend a disciplinary proceeding. Their

5   ability to handle the work was assessed and they received the formal retraining for retesting and

6   check rides to remain in the ATR 42 program.

7        Nicholson was summoned to Company headquarters where she was disciplined and refused

8   formal retraining to allow her to remain in the ATR 42 program. As stated earlier, she was entitled

9   under the Company handbook to a thorough investigation of the charges against her as a privilege

10  of her employment. However, the "full investigation of all relevant facts" never took place. Besides

11  a right to a full investigation, the handbook also gives employees the privilege of a review of the

12  action taken. That review is to "...be performed by a manager, or panel of managers who were not

13  involved in the investigation that led to the disciplinary action..." That did not occur because the

14  review was handled by Markham and Wolf. ***Daniel Wolf's Deposition Transcript, 20:12-24; 26:19-***

15  ***28; 35:23 - 38:2, attached hereto as Exhibit "23"***.

16       Nicholson was not only disciplined and removed from the program but she was held to a

17  higher standard than the men pilots. According to the Action Forms dated September 17, 2004 and

18  September 24, 2004, Nicholson was placed on probation and required to have "a positive

19  attitude...on teamwork..." Failure to maintain that attitude would be grounds for termination. This

20  undefined attitude and termination sanction were not requirements placed upon any of the other male

21  pilots' employment conditions. For example, those who failed ground school or simulator training

22  were not required to pay special attention to certain rules or other conditions under sanction of

23  termination.

1    Nicholson was not presented with any specific charges at the disciplinary hearing as to what

2    her inadequacies were other than generally stating that her CRM skills were deficient and the other

3    pilots did not want to fly with her. Without being given any specific allegations of misconduct she

4    could not respond or defend herself, instead, she maintained that she had adequate CRM skills and

5    was not an unsafe pilot.

6        By the end of the day on the 17th, Nicholson realized her fate and if she wanted Cape Air to

7    reconsider its September 17th Action Letter she would have to acknowledge their concerns and

8    acquiesce to their position and that is exactly what she did in Exhibit "J" attached to Defendant's

9    Motion for Summary Judgment. Nicholson wanted to remain in the ATR 42 program and Exhibit

10   "J" makes it clear that she wanted to remain in the program. Thus, she agreed that First Officer

11   training and CRM training would be viable solutions to her problems. Furthermore, Nicholson

12   reminded Cape Air that it "had enough confidence in my abilities in the ATR42 to allow me to assist

13   in the training of three fellow pilots. I would like it if the company continued to have the same

14   confidence in me and believe that I have the ability, given more immediate training, to continue to

15   be a valuable member of the ATR program at this time." Nicholson relates in her email that other

16   pilots received additional training to stay in the ATR 42 program. She points out in the last

17   paragraph of the first page of the email that she was trained as a Captain and not a First Officer and

18   that the two jobs are different and that she would benefit from First Officer IOE but at no time does

19   she admit that she is unwilling to learn or that she is unsafe and unable to conduct herself in

20   conformance with the General Operating Manual or perform satisfactorily. Nonetheless, Cape Air

21   continued with its disciplinary action. Thus, Nicholson has provided direct and circumstantial

22   evidence of pretext of unlawful discrimination.

23   ///

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

**IV.**

**CONCLUSION**

Nicholson has set forth a *prima facia* case. Cape Air's explanation for discipline lacks credibility. Discipline was imposed without due process with the goal to remove her from Guam and the ATR 42 program. Even if the Court finds that Defendant has met its burden, Plaintiff has provided direct and circumstantial evidence of pretext of unlawful discrimination.

*Respectfully submitted* this 22nd day of February, 2008.

**TEKER, TORRES & TEKER, P.C.**

By: _____

**PHILLIP TORRES, ESQ.**
Attorneys for Plaintiff

# EXHIBIT 13

IN THE DISTRICT COURT OF GUAM

TIFFANY ANNE NICHOLSON,      ) CIVIL CASE NO. CV06-00027
                                   )
              Plaintiff,     )
                                   )
         vs.             )
                                   )
HYANNIS AIR SERVICE, INC.    )
dba CAPE AIR,              )
                                 )
              Defendant.    )
                                  )

DEPOSITION TRANSCRIPT

OF

# TIFFANY ANNE NICHOLSON

March 1, 2007

COPY

PREPARED BY:    GEORGE B. CASTRO
                  **DEPO RESOURCES**
                  #49 Anacoco Lane
                  Nimitz Hill Estates
                  Piti, Guam 96915
                  Tel:(671)688-DEPO * Fax:(671)472-3094

1  initial meeting to research and develop
2  solutions for improving my CRM skills". Do
3  you recall when that initial meeting occurred?

4  A   It was either that day or the day
5  before.

6  Q   And do you know who was part of that
7  meeting?

8  A   Steve Phillips, Larry Gualtieri, Linda
9  Markham, and myself.

10  Q   Do you know where that meeting took
11  place?

12  A   Hyannis.

13  Q   Okay.   And generally, what was
14  discussed at that initial meeting?

15  A   Can you be more specific?

16  Q   What was the purpose of that meeting
17  that you had in Hyannis?

18  A   To discuss why I had been suspended
19  from work.

20  Q   Okay.   And did you discuss CRM skills
21  during that meeting?

22  A   Briefly.

23  Q   What did they say about your CRM
24  skills?

25  A   That they were lacking.

1  Q  Okay.  And did they say anything
2  further with respect to why they were lacking?
3  A  No.
4  Q  They just said that they were lack- --
5  your skills were --
6  A  I was never given specifics.
7  Q  Okay.  And so what was your response?
8  A  That I did not feel my CRM skills were
9  lacking.
10  Q  Okay.  Now you said you had some time
11  to research and develop solutions for improving
12  CRM skills and later in the email you said you
13  have some ideas.  The first one is, you wanted
14  the opportunity to do IOE as an FO, is that
15  correct, that third paragraph?
16  A  That is correct.
17  Q  Okay.  And you mentioned further down
18  in that paragraph, I am qualified to be a
19  captain and a first officer, is that still
20  correct?
21  A  That is correct.
22  Q  Okay.  Now, at the end of that
23  paragraph you said, "I believe that FO IOE
24  would considerably increase my CRM skills as an
25  FO".  What are you referring to as FO IOE?

1    this email, if you recall?

2      A    In Hyannis.

3      Q    Okay.   Do you recall when you got to

4    Hyannis?

5      A    The beginning of that week.

6      Q    Okay.    Okay.   We'll mark this as

7    Exhibit 3.

8      (Defendant's Exhibit 3 was marked for

9    identification)

10     Q    Was there a further meeting held after

11   you sent that email?

12     A    Yes, there was.

13     Q    Do you recall what date that was?

14     A    Beginning of the following week.

15     Q    Okay.   Did you receive a response to

16   that email we just discussed, 89?

17     A    I do not believe I received a written

18   response.

19     Q    Okay.    Did you receive a verbal

20   response?

21     A    The follow up meeting.

22     Q    At the follow up meeting?

23     A    Yes.

24     Q    A few days later?

25     A    Yes.

1    Q    Okay.  So you don't believe that they
2    were being sincere when they said you may be
3    reinstated?
4    A    The reinstatement comment --
5    Q    I mean not reinstated.
6    A    -- is in reference to the Cessna 402.
7    Q    Right.
8    A    The ATR42 simply states that my
9    situation would be reviewed.  There is nothing
10   in this consequence letter that states that I
11   would be allowed to return to the 402 as
12   company -- after they reviewed my situation.  I
13   do not believe that I was wanted on Guam and I
14   do not believe that the company would have
15   allowed me to return.
16   Q    Okay.
17   A    Even though the position is a seniority
18   based bid and I was senior enough to hold the
19   position.  I do not believe that the company
20   would have allowed me to return to the ATR42.
21   Q    And what is your belief based on?
22   A    Russell Price's statement that me being
23   on Guam as an ATR42 Crew Member created too
24   many  headaches  for  him.  Chuck  White's
25   statement that he didn't believe his personal -

1  pilots and their feeling towards me.

2     Q   Okay.

3     A   That he stated to me that his opinion

4  was because I was better, I made the guys feel

5  inadequate.

6     Q   Okay, but did he say it was because you

7  were a girl?

8     A   Yeah.

9     Q   He did say that?

10    A   He said something along the lines of

11 guys don't like to be shown up by girls.

12    Q   When did he tell you this?

13    A   None of those statements were made at

14 any one specific time.   This was general

15 statements made throughout his observations of

16 my flights with John Kappayne and Chuck White.

17 They would have been on or after the middle of

18 August.

19    Q   Was there any other time in which

20 Russell Price referenced a complaint made about

21 you because you were a woman?

22    A   Not that I recall.

23    Q   Okay.   You mentioned John Kappayne's

24 attitude had changed.   Why did you attribute

25 that to your being a woman?

1   REPORTER'S CERTIFICATE

2

3      I, **George B. Castro**, Court Reporter, do

4   hereby certify the foregoing 102 pages to be a

5   true   and   correct   transcript   of   the   audio

6   recording made by me in the within-entitled and

7   numbered   case   at   the   time   and   place   as   set

8   forth herein.

9      I    do    hereby    certify    that    prior    to

10  examination   the   deponent   was   duly   sworn   upon

11  oath;   that   thereafter   the   transcript   was

12  prepared by me or under my supervision.

13     I   further   certify   that   I   am   not   a   direct

14  relative,   employee,   attorney   or   counsel   of   any

15  of   the   parties,   nor   a   direct   relative   or

16  employee   of   such   attorney   or   counsel,   and   that

17  I am not directly or indirectly interested in

18  the matters in controversy.

19     In   testimony   whereof,   I   have   hereunto   set

20  my   hand   and   seal   of   Court   this   19th   day   of

21  April, 2007.

22                                    **COPY**

23                          _____

24                              George B. Castro

25

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# EXHIBIT
# 14

IN THE DISTRICT COURT OF GUAM

TIFFANY ANNE NICHOLSON,                  ) CIVIL CASE NO. CV06-00027
                                         )
                    Plaintiff,           )
                                         )
            vs.                          )
                                         )
HYANNIS AIR SERVICE, INC.                )
dba CAPE AIR,                            )
                                         )
                    Defendant.           )
_____)

DEPOSITION TRANSCRIPT

OF

## TIFFANY ANNE NICHOLSON

February 23, 2007

**COPY**

PREPARED BY:        GEORGE B. CASTRO
                    **DEPO RESOURCES**
                    #49 Anacoco Lane
                    Nimitz Hill Estates
                    Piti, Guam 96915
                    Tel:(671)688-**DEPO** * Fax:(671)472-3094

1 this ESR?

2 Q  Who did you ask?

3 A  I can't remember.

4 Q  Okay.  Did he do anything on this day

5 that he threw you off?  Did he do anything that

6 gave you concern?

7 A  No.

8 Q  Did you do anything that was not proper

9 procedure during that flight?

10 A  Yes, I did.

11 Q  What did you do?

12 A  On the Guam-Saipan leg, I was the pilot

13 monitoring and Chuck had to get out some

14 papers, transfer control of the airplane to me.

15 We leveled off into the crew situation, at

16 which point the flying pilot asked the pilot

17 monitoring for the crew's checklist.

18   Chuck could not complete the crew's

19 checklist and there are maybe two or three

20 items on the crew's checklist.  I asked him

21 multiple times to complete the crew's

22 checklist.  He did not so I vocalized, I

23 verbalized the crew's checklist from memory

24 into the cockpit voice recorder, so that people

25 would know that it had been completed.

1  call for the checklist, and the pilot flying

2  and pilot monitoring's responsibility to make

3  sure that the checklist is complete. It is

4  also the responsibility of the captain to

5  ensure that all checklists are complete. Chuck

6  was the captain.

7      Q    Did he say anything as to why he wasn't

8  completing it?

9      A    No.

10     Q    Was there anything else that was not

11  according to procedure on that day?

12     A    No.

13     Q    Okay. So, that's the day he threw you

14  off. Had you flown with him prior to that day?

15         MR. TORRES: Before you move on to

16  another topic --

17         MS. McDONALD: Do you want to take a

18  break?

19         MR. TORRES: Yes, can we?

20         MS. McDONALD: Yeah, I'm sorry. It's

21  2:53.

22         (Off the record from 2:51 p.m. to 3:22

23  p.m.)

24  BY MS. McDONALD:

25     Q    With respect to that day that Chuck

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 198 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 2nd day of April, 2007.

**COPY**

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# EXHIBIT

# 15

# CERTIFIED COPY

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,   )
        Plaintiff,        )
                          )
vs.                       )
                          )
HYANNIS AIR SERVICE, INC. )
d.b.a. CAPE AIR,          )
        Defendant.        )
                          )


DEPOSITION OF

LINDA MARKHAM

HYANNIS, MASSACHUSETTS

MAY 17, 2007


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Patricia Bracken, CSR No. 1455898




FILE NO.: A102878

1    talked to Russell about her being unsafe to fly?

2    A.  Correct.  One correction, would it be

3    unsafe to fly in a two-man crew environment?  It's

4    not unsafe to fly.  It's the environment that that

5    CRM causes.  It creates a hostile working

6    environment.

7    Q.  Okay.  So it's a hostile working

8    environment and not a safety issue?

9    A.  Well, that can cause a safety issue.

10   Absolutely.

11   Q.  All right.  Exhibit 33 is the ESR.  And

12   you talked briefly about this in response to my

13   questions.  This is a report that exists so that

14   employees can do what?

15   A.  This is a report that employees fill out

16   to report any kind of incident, accident,

17   deficiency, or observation to the director of

18   safety.  They can do it anonymously, or they can,

19   as Tiffany did, put in her conduct information.

20   Q.  Okay.  And once this report is done, does

21   it trigger any sort of action on behalf of

22   Cape Air?

23   A.  The director of safety gets them, and I

24   believe he logs them in and then does some sort of

25   investigation or follow up.  Many times, if the

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 6th day of ____June____, 2007.

_Patricia Bracken_
Patricia Bracken, CSR No. 1455898

# EXHIBIT

# 16

IN THE DISTRICT COURT OF GUAM

TIFFANY ANNE NICHOLSON,　　　　） CIVIL CASE NO. CV06-00027
　　　　　　）
　　　　　Plaintiff,　　　　）
　　　　　　）
　　　　　　）
　　　　vs.　　　　）
　　　　　　）
HYANNIS AIR SERVICE, INC.　　）
dba CAPE AIR,　　　　）
　　　　　　）
　　　　　Defendant.　　　　）
　　　　　　）

DEPOSITION TRANSCRIPT

OF

# CHARLES WHITE

March 2, 2007

**COPY**

PREPARED BY:　　GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** * Fax:(671)472-3094

1   Q   Okay.  And then the Sim training?

2   A   That was the Sim training.  The ground
3  school, we corrected the tests right then and
4  there.

5   Q   Okay.  So, the Sim training is more of
6  somebody basically evaluating you based on
7  their experience, putting you through different
8  situations?

9   A   Yeah.  Emergency procedures.

10   Q   And then once you completed that, you
11  said you were asked to fly to Montreal?

12   A   Yes.

13   Q   Okay.  Were there any other of these
14  eight pilots asked to fly anywhere that you
15  know about?

16   A   I do not know.

17   Q   When did this flight from Montreal to -
18  - was it California --

19   A   Yes.

20   Q   -- take place?

21   A   Yeah.

22   Q   When did it take place?

23   A   When they were talking to me in fire
24  training, then it would have been a week after
25  the Sim.

1    Q   Do you maintain your flight logbooks?

2    A   Do I? No, not really.

3    Q   No?

4    A   No.

5    Q   Why not? Is it required?

6    A   I don't believe it is. The company has
7 a record of my flying.

8    Q   Have you ever maintained flight
9 logbooks?

10    A   Yeah, in the beginning, in order to get
11 my ATP.

12    Q   Okay. And when did you stop doing
13 that?

14    A   As soon as I got on with Cape Air.

15    Q   So, you're not aware of any sort of FAA
16 requirement to maintain logbooks?

17    A   Well, there is a proof of currency, but
18 like I said, the company, (a) we take a check
19 ride every six months which encompasses all the
20 approaches we need to shoe. So, the company
21 has records to that effect.

22    Q   Okay. If you disagreed with the
23 company, you're not -- you don't have any
24 document, written documentation, or do you keep
25 any other sort of written documentation or is

1    there a logbook?

2        A    No.

3        Q    Do you remember the day you came to

4    Guam?  A date?

5        A    I don't.  No.

6        Q    Were you on a plane our here with the

7    other seven pilots?

8        A    No, I don't think I was.

9        Q    Okay.  So, you came out here with just

10   yourself or --

11       A    Yeah.

12       Q    How long did you sign on for?

13       A    A year and a half.

14       Q    And how come you're still here?

15       A    The money is good.

16       Q    And are you flying any planes other

17   than the ATR42?

18       A    At this time?

19       Q    Yes.

20       A    No.

21       Q    How many hours do you work?

22       A    I usually work one or two days a week.

23   It's about a 13-hour day and somewhere around

24   six and a half to 6.8 hours a day, flight time.

25       Q    Okay.   So, you're flying about a

1 hundred hours -- you're getting about a hundred

2 hours in a month?

3     A    No, not really. Our min is 72 hours.

4 I don't even think I come close to that.

5     Q    Okay. But you're saying your day is

6 like 13 hours times two?

7     A    Yeah, but that's not flying though.

8     Q    Oh, you only get paid for your time in

9 the air?

10     A    Flight time, yes. About anywhere

11 between 6.5 and 6.8 hours a day of fight time.

12     Q    Well then, explain an average flight

13 day for me. What time do you get up --

14     A    Average flight day? I get up at 8:00

15 in the morning. I'm at the airport on a B

16 Shift at 9:15. I'll do nine legs: Guam-Rota-

17 Saipan. Then the rest of them are back and

18 forth to Saipan. And that's a long day. So,

19 that's about, on the books, 6.9, but I usually

20 do it in either 6.5 or 6.8.

21     Q    The last flight, you arrive home at

22 what time?

23     A    About 10:00 at night, 10:15.

24     Q    Went back to your house or --

25     A    No, to the airport here. Yeah.

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 127 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 13th day of April, 2007.

**COPY**

_____

George B. Castro

# EXHIBIT
# 17

2

3    TIFFANY ANNE NICHOLSON,        )  CIVIL CASE NO. CV06-00027
                                    )
4         Plaintiff,               )
                                    )
5         vs.                      )
                                    )         DEPOSITION OF
6    HYANNIS AIR SERVICE, INC.,    )         DAVID O'CONNOR
     d.b.a. CAPE AIR,             )          JUNE 25, 2007
7                                   )
          Defendant.              )
8    _____)   **ORIGINAL**

9

10        The deposition of **David O'Connor**, called by
     Plaintiff, pursuant to Notice and pursuant to the Federal
11   Rules of Civil Procedure, taken at the law offices of
     Carlsmith Ball, LLP, Bank of Hawaii Building, Suite 401, 134
12   West Soledad Avenue, Hagåtña, Guam 96910, on Monday, the 25th
     day of June, 2007, at the hour of 3:10 o'clock p.m.
13
          That at said time and place, there transpired the
14   following:

15

16
                    A P P E A R A N C E S:
17

18   For the Plaintiff        TEKER TORRES & TEKER, P.C.
                              By: Phillip Torres, Esq.
19                            Of Counsel

20   For the Defendant        CARLSMITH BALL, LLP
                              By: Elyze McDonald, Esq.
21                            Of Counsel

22

23

24

25

1          Q.    On June 14, 2004, Flight Safety had rated Tiffany

2     as having good CRM skills and situation awareness.

3          A.    I believe we've already looked at that and I think

4     that's a specific day of SIM training and it was an

5     evaluation that was positive reinforcement over a previous

6     day's deficiencies.  I would interpret that as a pat on the

7     back, as a means of trying to give a pilot in training

8     positive reinforcement.  It was not, to my recollection, an

9     overall assessment at the end of training.

10         Q.    It is the last entry on her training log.

11         A.    Can I see which exhibit you're specifically

12    referring to?

13         Q.    Do you have any reason to question the competency

14    of Flight Safety in its evaluation of pilots?

15         A.    There have been times when I have requested

16    instructors not to instruct for us.

17         Q.    Okay, and who would those be?

18         A.    I don't believe that any of the instructors that

19    instructed at the time Tiffany went through are included in

20    that group.

21         Q.    Okay.  Well, the instructors that did train the

22    pilots who went to Guam initially, do you have any issues

23    with any of those instructors?

24         A.    No, nor do I have any issues with the check airmen.

25    I vividly recall that the check airman who conducted

DAVID O'CONNOR:  June 25, 2007

1   Tiffany's oral, oral examination on the systems of the

2   aircraft told me that she was weak but passed.

3        Q.   Who was that, please?

4        A.   Dallas Gibson, I believe was his name.

5        Q.   Is the training a graded thing or is it a

6   pass/fail?

7        A.   It's a pass/fail.

8        Q.   If you pass, are you qualified to fly; are you

9   certified?

10       A.   It is one of the hurdles that you get through;

11  yeah, it's pass/fail though.

12       Q.   How much CRM training is given by Flight Safety

13  during the time that you were in Houston?

14       A.   Specific ground training, I don't believe there was

15  a dedicated module to CRM training but, rather, it forms a

16  continuous -- it is part of the continuous evaluation and

17  training throughout their SIM training.  So at the conclusion

18  of every lesson, you would be discussing the CRM issues, go

19  over ways to improve and it's just part and parcel of every

20  lesson.

21       Q.   Okay, but you were there and you had the

22  opportunity to observe?

23       A.   Mm-hmm.

24       Q.   What would you characterize those total number of

25  hours dedicated to CRM?

DAVID O'CONNOR:   June 25, 2007

1     A.   Um --

2     Q.   Just a guess.

3     A.   More than two, less than ten.

4     Q.   You testified that prior to your deposition on May

5  22nd, that you had just completed some CRM training which

6  consisted of six hours; remember that?

7     A.   Yes.

8     Q.   Is six hours a pretty standard amount of CRM

9  training?

10     A.   I don't have our training manual in front of me.  I

11  believe six hours is the standard for the separate ground

12  school.  So that would be the standard number of ground hours

13  apart from pre-briefings, post-briefings and strategy

14  sessions that take place in and around the simulator.  So

15  that would be -- yeah, that's a standard classroom amount.

16     Q.   So you said though that Houston, they got something

17  like two to ten?

18     A.   Yeah, but this is over and above whatever the

19  requirements were that we met in Hyannis.

20     Q.   This is the first time all these pilots were

21  receiving this kind of ATR42 training; right?

22     A.   Mm-hmm, yes.

23     Q.   You've been doing this for a long time, since the

24  '90s; how long does it take you to get proficient at CRM do

25  you think, if you ever become proficient at it?

DAVID O'CONNOR:   June 25, 2007

1        A.    He meets the standards.

2        Q.    So then is it fair to say that Nehal's problem as

3   far as John Kappeyne and Nehal were communicating?

4        A.    I think you're trying to characterize, you know, a

5   unique training environment and extrapolate that to their

6   whole employ here and I'm just not willing to concede that.

7   Our training environment in the simulator where they're

8   trying to learn the airplane is, is a bit different than once

9   they're online flying as a crew and they already have the

10  airplane mastered.  The difficulties that they experience in

11  the simulator are not necessarily extractible or

12  extrapolatable — if that's word — to their performance as a

13  crew on the line.

14       Q.    Okay.  Tiffany was told that interaction or action

15  forms, that they wanted her to undergo additional training

16  and you were -- your input was requested in that regard.

17       A.    Mm-hmm, yes.

18       Q.    And the additional training was that she would go

19  through additional CRM classes.

20       A.    Yes.

21       Q.    And take the EAP and communication skills.

22       A.    I don't have the final action letter in front of

23  me, but that sounds familiar.

24       Q.    And the reason for that was to improve her

25  abilities for a ATR42 environment; is that correct?

1       A.    Any crew environment, but yes.

2       Q.    Okay.  But I mean, she was being prohibited from

3   going into the ATR42 until she had done so?

4       A.    That's correct.

5       Q.    Okay.  So if you know, was that the reason why she

6   was being told to take the CRM and the EAP courses?

7       A.    I don't understand your question.

8       Q.    What was the purpose of having her take

9   interpersonal communication classes through EAP and undergo

10  additional CRM?

11      A.    To improve her performance in the cockpit, to

12  improve her ability to participate in the crew team

13  environment that is, you know, a multi-pilot crew airplane.

14      Q.    Okay.  And she refused to do that?

15      A.    That is my understanding.

16      Q.    And despite doing that, she wasn't going to get

17  back into the ATR42, or at least reviewed to get back in the

18  ATR42 for six months; is that your understanding?

19      A.    I believe that's the case, that within -- again, I

20  don't have the action form in front of me, but I think that

21  was the final characterization, that she would be reevaluated

22  for an ability to go back in the ATR42 within six months.

23      Q.    Okay, so what's the point of taking the courses if

24  you're not going to use it; what's the point of going through

25  the CRM if you're not going to use it?

1      A.    She would be using it.

2      Q.    She's not going to be on the ATR42.

3      A.    She very well could have been within six months

4  back on an ATR42.  I don't understand your question.

5      Q.    Well, she was being asked to go through the

6  training.

7      A.    Mm-hmm.

8      Q.    She said I don't want to; she says I didn't do

9  anything wrong essentially.

10      A.    Okay.

11      Q.    What's the point of having her go through it if

12  you're not going to put her back on the plane?

13      A.    It was certainly our hope that she would go through

14  it and she would be back in the airplane.

15      Q.    But if she goes through it and then has to sit on

16  this info for five months, where's the logic in that?

17      A.    The interpersonal skills that we would --

18      Q.    No, I'm talking about CRM.

19      A.    Sure.

20      Q.    Not the EAP.

21      A.    You know, CRM is not exclusive to the flight deck.

22  Once upon a time back in the 70s when CRM training started,

23  it was cockpit resource management.  It has since been

24  expanded to encompass the whole crew.  It's now popularly

25  referred to as crew resource management.  It encompasses your

1  interactions with flight attendants, with the people on the

2  ground, with the dispatchers, with the ramp agents, with

3  flight followers.  We would have had an opportunity to see

4  Tiffany working on her CRM skills even in the single pilot

5  environment for those six months.

6      Q.   Okay, but she was allowed to bid immediately for

7  the 402.  There wasn't an issue about her 402 skills.  This

8  was purely about the ATR42, so why have her do it?

9      A.   It was an issue about her ability to behave as a

10 crew member and a teammate in a multi-pilot crew.

11     Q.   But that was an issue about her -- all those things

12 you just said, not about being a teammate.  I mean, I don't

13 understand the logic, saying you've got to do this but you

14 ain't going to use it.

15     A.   Maybe a jury will.

16     Q.   I'm asking whether you see the logic in it.

17     A.   I do.

18     Q.   Okay, and explain that to me.

19     A.   I have to the best of my ability.

20     Q.   Okay.  CRM skills are something that you get better

21 at the more you use them; correct?

22     A.   Yes.

23              MR. TORRES:  I have nothing further.

24              MS. MCDONALD:  Can I ask him a few questions?

25              Do you need to take a break?

1                        REPORTER'S CERTIFICATE

2

3        I, Cecilia F. Flores, Stenotype Reporter, do hereby

4    certify the foregoing 53 pages to be a true and correct

5    transcript of the stenographic shorthand notes and audio

6    recording taken by me in the within-entitled and numbered case

7    at the time and place as set forth herein.

8        Dated at Hagåtña, Guam, this 27th day of August, 2007.

9

10                                _____
                                      Cecilia F. Flores
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAVID O'CONNOR:  June 25, 2007