# EXHIBIT
# 18

IN THE DISTRICT COURT OF GUAM

TIFFANY ANNE NICHOLSON,       )
                              )
    Plaintiff,            )
                              )
vs.                           )  CIVIL CASE NO.
                              )  CV06-00027
                              )
HYANNIS AIR SERVICE, INC.     )
dba CAPE AIR,                 )
    Defendant.            )

ORAL DEPOSITION

RUSSELL C. PRICE

October 16, 2007

    ORAL DEPOSITION OF RUSSELL C. PRICE, produced

as a witness at the instance of the Defendant and duly

sworn, was taken in the above-styled and numbered cause

on October 16, 2007, from 2:02 p.m. to 5:10 p.m.,

before Michelle Hartman-Solari, Certified Shorthand

Reporter and Registered Professional Reporter, reported

by computerized stenotype machine at the offices of

Anglo-American Court Reporters, 150 Minories, London

EC3N 1LS, United Kingdom, pursuant to the Federal Rules

of Civil Procedure and the provisions stated on the

record or attached hereto.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088    Fax: (011 44) 20 7265 1703
Website: www.a-acr.com    E-mail: info@a-acr.com



Case 1:06-cv-00027    Document 53-2    Filed 02/22/2008    Page 2 of 40

1  placing her back in the cockpit with Chuck, with me
2  watching and supervising and to see what had been
3  learned and how she put these skills into place.
4      Q    When you guys -- going back to when you
5  started flying commercially, just before that you had
6  your initial flight and Dan Wolf flew out to Guam for
7  that, the inaugural flight.
8      A    Uh-huh.
9      Q    Who were the pilots on that inaugural
10 flight?
11     A    Would be Tiffany and myself.
12     Q    Why was she selected?  Who selected her?
13     A    I did.
14     Q    At that point, you didn't have any
15 concerns about having her on that flight with the
16 president of the company?
17     A    I discovered, in retrospect, that we're
18 all capable of making mistakes and one of mine was my
19 judgment of Tiffany.  Tiffany did an excellent job in
20 the simulator, there was no doubt about that, and she
21 did a very good job when she was flying with me; and
22 she completely fell apart in the real world.  Without a
23 training pilot, outside of the simulator, it quickly
24 became evident that she did not have the skills to
25 safely operate the flight.

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088        Fax: (011 44) 20 7265 1703
Website: www.a-acr.com            E-mail: info@a-acr.com

Case 1:06-cv-00027   Document 53-2   Filed 02/22/2008   Page 3 of 40

ANGLO–AMERICAN
COURT REPORTERS

1 being the guy in the jump seat when you are getting

2 this company running?

3       A    It's not a luxury if you have sat in it

4 for 12 hours in a day, but I have sat in it many days.

5 Typically, I would -- very typical average, generic for

6 all of the training pilots would be a day in the left

7 seat being a captain for a new first officer, a day in

8 the right seat being a first officer for a new captain,

9 a day in the jump seat watching a crew, maybe take a

10 day off.

11       Q    Okay.  How many times do you think you

12 sat in the jump seat and watched Kevin and Phil in the

13 month of August 2004?

14       A    Together?

15       Q    Yes.

16       A    Would have been once or twice.

17       Q    Do you remember when?

18       A    No.

19       Q    Would there be a record somewhere of

20 whether those would -- that once or twice occurred?

21       A    There might be, although I'm not even

22 sure that those records need to be kept by the FAA

23 after more than a year, so they may well have already

24 been purged.

25       Q    How about Cape Air?



ANGLO-AMERICAN
COURT REPORTERS

```
 1              Q    Did you debrief Phil and Kevin?

 2              A    Yes.

 3              Q    What did they tell you?

 4              A    Phil told me he was surprised at how

 5    little she said and how quickly she left.

 6              Q    She wasn't in the jump seat.  Was she

 7    expected to be a participant?

 8              A    There is moments for anecdotal,

 9    team-building general conversation that would be

10    expected of a jump-seater.

11              Q    Okay.  But you said that your first

12    point was to observe the crew.

13              A    Uh-huh.

14              Q    Those were the words you said.  Did you

15    expect her to be a participant?  Did you tell her that?

16              A    A jump-seater is not a participant in

17    the flight unless the captain requests it.

18              Q    Did the captain request anything of her?

19    Did she fail to respond?

20              A    I don't know.

21              Q    Okay.  Did you ask him?

22              A    I did not.

23              Q    All right.  Did you fly with her?  Your

24    third point, did you ever fly with her?

25              A    No, we missed my day of training with
```


ANGLO-AMERICAN
COURT REPORTERS

1  her, because she failed on her second day of training

2  to be properly equipped for work.

3        Q    She didn't come with a headset?

4        A    That's correct.

5        Q    Did she tell you that her headset was

6  broken?

7        A    I believe she did.

8        Q    Did you try to find her another headset

9  that day?

10        A    I did.

11        Q    And was there one around?

12        A    And there I was not successful in

13  finding her one.

14        Q    Does Cape Air keep additional headsets?

15        A    No.

16        Q    What happens if a pilot's headset breaks

17  up?

18        A    If they have thought about it in

19  advance, they would get a spare one that the

20  maintenance uses when they are running up the airplanes

21  in the ramps.  They would borrow a friend's.  They

22  would have a spare.  I have two in Ireland, because I

23  don't ever want to be without one and I'm not allowed

24  to be without one, so --

25        Q    Okay.  But you looked around -- you



```
 1    She would take corrections on her technical abilities
 2    as an assault upon her ego, and she would remember it
 3    and she would try to pay it back.
 4            Q    Did you correct her on that flight?
 5            A    I -- John actually did a fairly good job
 6    briefing her, and I told him at the end of the day that
 7    his debrief of her I thought was sufficient.
 8            Q    Okay.  But you're there observing --
 9            A    Yes.
10            Q    -- and retraining?
11            A    Uh-huh.
12            Q    Did you comment during the flight?
13            A    Yes.
14            Q    Okay.  And give me an example of what
15    you said.
16            A    I don't specifically recall.
17            Q    Did you find yourself commenting often
18    during that flight?
19            A    I would say not, because then I probably
20    would remember things; and also I remember my intent
21    was I want to -- I want to see -- I'm not going to -- I
22    didn't have time to babysit her with every pilot for
23    every day for the rest of her flying career there, and
24    I needed to see how she would do under stressful
25    situations.
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: 44 020 7404 7088   Fax: 020 7404 7080
Website: www.a-acr.com   E-mail: info@a-acr.com



```
 1          Q    Okay.  But you said this is retraining.
 2          A    Uh-huh.
 3          Q    Is it retraining or just observation?
 4          A    It was both.
 5          Q    Okay.  But you can't give me any
 6    examples of what you said?
 7          A    It was three years ago, and I've flown a
 8    lot of flights since then.
 9          Q    Okay.  When you -- when she left to go
10    back to Hyannis, did you know where the company was
11    going with her?
12          A    No.
13          Q    Were you surprised that they gave her an
14    action form removing her from flying in Guam?  Were you
15    consulted at all in that regard?
16          A    No, but -- consulted, no; surprised, no,
17    because any reasonable, safety-oriented individual or
18    organization would have made the same choice.
19          Q    Okay.  There was a letter that you
20    wrote, and who did you send that letter to?
21          A    I've written a lot of letters.
22          Q    Okay.  You know what letter I'm talking
23    about, the one regarding Tiffany Nicholson.
24          A    If I am going to answer questions, I
25    have got to know what letter you're talking about.
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: Case 44060 cv-26022788 Document 53-2    Filed 02/24/2020 7 Page 8 of 40
Website: www.a-acr.com    E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

```
 1          A     That would have been on the fall time
 2   frame of 2004.
 3          Q     Okay.  After she was no longer with the
 4   company?
 5          A     I'm not sure of the time frame.
 6          Q     Okay.  Turn to your confidential
 7   summary, the last page.
 8          A     Uh-huh.
 9          Q     If you look at it, you're recommending
10   that she get -- I take the last paragraph as a
11   recommendation.  Is that how you intended it?
12          A     Well, you have to take it in context.
13   Let me just get myself up to speed on it.
14                Well, the first paragraph says, I feel
15   she has squandered her opportunities at correcting and
16   addressing the deficiencies and she has not shown that
17   she can consistently act as part of a safe cockpit team
18   and I feel that she should not be allowed to return to
19   the ATR.  Okay?  And then there is some verbiage giving
20   the background training, and then it says, since it's
21   not -- to paraphrase, since it's not my decision, if
22   you who are making the decision feel that you are going
23   to send her back, then I would recommend these
24   conditions.
25          Q     Okay.  After you sent this, did anybody
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com          E-mail: info@a-acr.com

Case 1:06-cv-00027     Document 53-2     Filed 02/22/2008     Page 9 of 40


ANGLO-AMERICAN
COURT REPORTERS

1    call you about this letter, about your recommendations?

2          A    I don't think so.

3          Q    You are recommending a six-month

4    probation period.  How do you -- well, what does that

5    mean?

6          A    Again, if, several "ifs" down the road,

7    then she comes back, I wanted -- I didn't want to

8    relive the turmoil and safety concerns over and over

9    again.  So if she came back and four captains walked up

10   again and said, she's unsafe to fly with, I wanted -- I

11   wanted a quicker resolution than starting the whole

12   process all over again.

13         Q    Granted.  I'm just asking you what

14   number two means to you.

15         A    That's what that means.

16         Q    Okay.  So you wanted some way to -- if

17   she's on probation, some way to reinstitute whatever

18   they -- penalties they have had before, discipline they

19   have had before.  What's number three?  What were you

20   thinking there?

21              MR. LEDGER:  Was that a question?

22         Q    (BY MR. TORRES):  Well, am I wrong in --

23         A    Let's hear it one more time.

24         Q    By being on probation, she has got a

25   penalty, right?  That penalty is basically being waived

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088                    Fax: (011 44) 20 7265 1703
Website: www.a-acr.com                        E-mail: info@a-acr.com

Case 1:06-cv-00027    Document 53-2    Filed 02/22/2008    Page 10 of 40


ANGLO-AMERICAN
COURT REPORTERS

1          A     I was probably one aspect of his

2     reliance.

3          Q     Okay.  Then is your answer yes, he did

4     call you and ask you what was going on with the pilots?

5          A     The answer is probably.  I don't

6     specifically recall, but I expect he did.

7          Q     And so in response to that, you

8     basically left it upon the pilots to deal with Steve

9     Phillips.  You didn't hold any regular meetings to --

10          A     In this time frame, I don't recall

11     holding any specific meetings.  Once we were done with

12     training and out of the pure training environment, we

13     had some welcome-to-Guam meetings when they first got

14     there, we had some get-to-know-your-mechanics-and-your-

15     cabin-attendant meetings; but I would say we were too

16     busy to hold a meeting anywhere in this time frame.

17          Q     So if there was any harassment going on,

18     you weren't aware of it?

19          A     That's correct.

20          Q     All right.  Let me just summarize your

21     testimony so we can get out of here.  Prior to

22     October 31, 2004, which is the flight between --

23          •          MR. LEDGER:  August.

24               THE WITNESS:  August sounds right.

25          Q     (BY MR. TORRES):  -- August 31, 2004,

Case 1:06-cv-00027 Document 53-2 Filed 02/22/2008 Page 11 of 40


ANGLO-AMERICAN
COURT REPORTERS

1  which is the flight with Chuck and Tiffany, there is no

2  documentation of any issues with the other pilots,

3  between Tiffany and the other pilots.

4          A    Okay.  There is no documentation of

5  issues between Tiffany and other pilots.  Is that the

6  question?

7          Q    Yeah.

8          A    I wouldn't say that I would know for

9  certain.

10          Q    You're not aware of anything?

11          A    That's fair enough.

12          MR. LEDGER:  Can I ask you a

13  clarification?  By "documentation," are you referring

14  to something in writing?

15          MR. TORRES:  Yes.

16          MR. LEDGER:  Did you understand that to

17  be the question?

18          THE WITNESS:  Yeah.

19          Q    (BY MR. TORRES):  And in the third week

20  of August, do you think Steve Phillips and David

21  O'Connor left Guam and they didn't have any issue with

22  Tiffany that they took up with her specifically that --

23  •to the best of your recollection?

24          A    I know we had various concerns about

25  various people, and I know there was a concern about

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel (01) 44 020 726 2088    Fax (0) 020 726 1703
Website: www.a-acr.com    E-mail: info@a-acr.com

Case 1:06-cv-00002    Document 53-2    Filed 02/22/2008    Page 12 of 40


ANGLO-AMERICAN
COURT REPORTERS

```
 1              IN THE DISTRICT COURT OF GUAM

 2    TIFFANY ANNE NICHOLSON,        )
                                     )
 3           Plaintiff,              )
                                     )
 4    vs.                            )  CIVIL CASE NO.
                                     )  CV06-00027
 5                                   )
      HYANNIS AIR SERVICE, INC.      )
 6    dba CAPE AIR,                  )
             Defendant.              )

 7

 8                    REPORTER'S CERTIFICATE

 9                    ORAL DEPOSITION OF

10                    RUSSELL C. PRICE

11                    October 16, 2007

12

13              I, Michelle Hartman-Solari, Certified

14    Shorthand Reporter and Registered Professional

15    Reporter, hereby certify to the following:

16              That the witness, RUSSELL C. PRICE, was duly

17    sworn and that the transcript of the deposition is a

18    true record of the testimony given by the witness;

19              That the deposition transcript was duly

20    submitted to the witness' attorney for the witness'

21    examination and signature.

22              I further certify that I am neither counsel

23    for, related to, nor employed by any of the parties in

24    the action in which this proceeding was taken, and

25    further that I am not financially or otherwise
```

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**
Tel: (011 44) 20 7264 2088          Fax: (011 44) 20 7265 1703
Website: www.a-acr.com          E-mail: info@a-acr.com


ANGLO-AMERICAN
COURT REPORTERS

1    interested in the outcome of this action.

2              Certified to by me on this 31st day of

3    October, 2007.

4

5    _Michelle Hartman Solari_

6    Michelle Hartman-Solari, CSR, RPR
     Texas CSR 7093

7    Expiration:  12/31/08

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ANGLO-AMERICAN COURT REPORTERS LTD**
**LONDON, ENGLAND**

Tel: (011 44) 20 7264 2088          Fax: (011 44)  20 7265 1703
Website: www.a-acr.com              E-mail: info@a-acr.com

ANGLO-AMERICAN
COURT REPORTERS

Case 1:06-cv-00027   Document 53-2   Filed 02/22/2008   Page 14 of 40

# EXHIBIT
# 19

manager or supervisor if needed, must complete the "Employer's First Report of Injury or Fatality" and submit to Human Resources via the address noted above.

The Company's Worker's Compensation Insurance Company has the right to deny any and all claims which are not timely submitted. All forms are available through each employee's manager.

## DISCIPLINARY ACTION

All employees are expected to maintain high standards of conduct and job performance. Failure to do so may result in disciplinary action including, verbal or written reprimand, suspension with or without pay, or termination from employment. The Company may terminate the employment relationship with or without cause or notice, unless otherwise specified in an authorized written employment contract.

**Reasons for Discipline and Performance Rules:** Rules for the acceptable conduct of employees are necessary for the smooth operation of the Company and the benefit and protection of the rights of all employees and customers. Although disciplinary action can be difficult for all those involved, it is our responsibility to act upon reports or observations of such behaviors. In addition, disciplinary action is an opportunity for an employee to make adjustments in behaviors so that he or she may once again contribute to our collective company service commitment.

Whenever an employee cannot meet the Company's required standards of performance or commits an offense warranting disciplinary action, her/his manager may begin disciplinary action at any of the steps listed below, depending on the circumstances. Similarly, at the Company's discretion, employees may not receive any warnings or suspensions prior to termination.

a.  **Step 1 Verbal Warning:** For the first, minor offenses the employee will be given a verbal warning. If a verbal warning fails to correct the situation within a reasonable length of time the manager may go to the second step of this procedure. All verbal warnings will be noted in the employee's personnel file and signed by the employee and manager.

b.  **Step 2 Written Warning:** For subsequent or serious offenses the employee will be given a written warning stating that the continuation of such action (defined) may result in discharge. The written warning may include probation or indicate that continuance of this performance may be cause for disciplinary action in the form of probation. The duration of probation may vary between 30-180 days and may include suspension of pass benefits and/or suspension of other benefits for the duration of the probationary period. Written warnings will be documented by the employee's manager and the employee will be asked to sign an acknowledgment of receipt of her/his written warning. The written warning will be filed in the employee's personnel file.

c.  **Step 3 Suspension/Termination:** If a repeated or serious offense occurs the employee may be suspended from work with or without pay or terminated. The length of suspension may vary depending on the seriousness of the offense. Depending on the circumstances, the employee may be informed that she/he is being placed on immediate suspension and asked to leave the premises immediately.

Managers are not required to go through the entire three (3) steps involved in the disciplinary procedure. Discipline may begin at any step in the procedure depending on the seriousness of the offense committed in the sole discretion of the manager.

Examples of conduct for which an employee will be subject to discipline, up to and including termination include but are not limited to:

(a)  Unauthorized, excessive or patterned Absenteeism
(b)  Tardiness or leaving the job before quitting time without authorization

(c) Inability to perform the quality and quantity of work required for the job
(d) Inattention to duties, sleeping on duty, etc.
(e) Use of profane or foul language
(f) Unauthorized use of Company equipment
(g) Violation of, or refusal to comply with, any Company policy or procedure
(h) Other similar conduct.

## Causes for Immediate Termination:

While an employee or the Company may terminate the employment relationship for any reason or no reason, with or without notice or cause, examples of conduct for which an employee may be subject to immediate termination include, but are not limited to the following:

(a) Mistreatment of a Customer
(b) Inappropriate possession of liquor or narcotics on Company premises or designated work areas
(c) Theft of Company property or the property of a Customer or employee
(d) Willful destruction of property belonging to others
(e) Unauthorized possession of a weapon
(f) Falsification of employee time cards or license requirements or any other business record or assisting others in such falsification
(g) The willful refusal to comply with the request of a manager, (insubordination) when such a request is considered to be within the normal operation of the company and within the employee's capabilities
(h) Failure to appear for work without proper notification to manager
(i) Appearance at work while under the influence of drugs or alcohol
(j) Violence or conduct that becomes a threat to the physical safety of any other person or the employee himself or herself
(k) Other conduct of similar severity.

The enumeration of rules covering discipline and termination are presented for illustration and do not limit in any way the Company's right to discipline or terminate an employee.

The circumstances of each instance of misconduct will necessarily vary from case to case. Therefore, if the manager finds that immediate termination may be warranted, she/he may immediately terminate the employee or put the employee on immediate suspension to allow time and opportunity for a full investigation of all relevant facts, including talking with the affected employee, before the decision to terminate is made.

Should any of the above action be imposed, the employee may request a review of the action within fourteen (14) days. This request must be in writing, state the reason for reconsideration, and be addressed to Linda Markham, Director Human Resources, or Cindy Beaton, VP Customer Service & Corporate Culture, Cape Air/Nantucket Airlines, 660 Barnstable Road, Hyannis, MA 02601. The review will be performed by a manager, or panel of managers, who were not involved in the investigation that led to the disciplinary action, as selected by Linda or Cindy. This process may include a review of the documentation involved in the investigation, a meeting, or both, in the sole discretion of the manager responsible for the review. You will receive a final determination in writing as soon as practicable.

# EXHIBIT 20

IN THE DISTRICT COURT OF GUAM

# CERTIFIED COPY

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,             )
                Plaintiff,          )
                                    )
vs.                                 )
                                    )
HYANNIS AIR SERVICE, INC.,          )
d.b.a. CAPE AIR,                    )
                Defendant.          )


DEPOSITION OF

LAWRENCE J. GAULTIERI

HYANNIS, MASSACHUSETTS

MAY 23, 2007


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Patricia Bracken, CSR No. 1455898

FILE NO.: A103990

```
 1   CRM retraining events and what transpired from

 2   those events.

 3        Q.   Did he tell you what transpired?

 4        A.   I'm sure he did, but I don't specifically

 5   recall those conversations.

 6        Q.   So you're there to basically present the

 7   allegations against Tiffany and why Cape Air feels

 8   that they need to do something, that there's a

 9   problem here?

10        A.   Yes.

11        Q.   What information did you review in order

12   to understand the problems?

13        A.   We reviewed some -- I believe there were

14   some letters that came from the regional

15   administrator and some other flight crew members in

16   Micronesia, as well as discussions with Tiffany in

17   that meeting.

18        Q.   So letters.  Did you talk to Russell

19   Price?

20        A.   Yes.

21        Q.   Did you talk to Chuck White?

22        A.   I don't specifically recall if I did or

23   not.  I may have, but I don't recall because that

24   would normally be more of a chief pilot function.

25        Q.   Jon Bleiman, did you review a letter from
```

21

```
 1    Jon Bleiman?

 2         A.   Yes.

 3         Q.   Did you talk to him about his letter?

 4         A.   I don't specifically recall talking to

 5    Jon Bleiman about it, no.

 6         Q.   How about -- actually, why don't we just

 7    go over these so we know what we're talking about.

 8    If you look at Exhibit 24, do you remember seeing

 9    this letter?

10         A.   It looks familiar.

11         Q.   And do you recall who wrote that?

12         A.   I believe it was Russell Price.

13         Q.   Okay.  And do you know how you got a hold

14    of this letter?  It's not addressed to anybody.

15         A.   I don't.  I don't recall.

16         Q.   Okay.  So you read this letter before the

17    hearing, and you talked to Russell Price.  Was your

18    conversation regarding this letter, which you

19    apparently received after September 9th, or was

20    it in that time -- or were your discussions with

21    Russell Price within that August 31st to

22    September 9th time frame?

23         A.   I don't specifically recall.  I'm sure if

24    this is -- if this came after September 9th, then

25    I'm sure I spoke with him prior to September 9th.
```

1          Q.   Assuming that conversation after
2     September 9th, did you have this letter in front of
3     you and go through it line by line with him or
4     paragraph by paragraph?
5          A.   I don't recall.
6          Q.   Did you get a chance to review this
7     letter before you came today?
8          A.   Yes.
9          Q.   Take a look at Exhibit 29.
10         A.   Exhibit 29?
11         Q.   Yes.  Do you remember seeing this before?
12         A.   Yes.
13         Q.   It's a two-page letter from David
14    O'Connor.  Again, it's not addressed to anybody.
15    Did you review this before the September 17th
16    hearing?
17         A.   Yes.
18         Q.   And did you get a chance to talk to David
19    about the information in this letter?
20         A.   I don't specifically remember having that
21    conversation, but I'm fairly certain I did.
22         Q.   Okay.  If you'll look at the next
23    exhibit, Exhibit No. 30, this one is sent to Steve
24    Phillips and is signed by Phillip Dery.  Was this
25    letter shared with you?

23

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this _13th_ day of _June_, 2007.

_Patricia Bracken_
Patricia Bracken, CSR No. 1455898

# EXHIBIT
# 2 1

IN THE DISTRICT COURT OF GUAM

CERTIFIED COPY

C.A. No.: CV 06-0027

TIFFANY ANNE NICHOLSON,        )
        Plaintiff,        )
                        )
vs.                     )
                        )
HYANNIS AIR SERVICE, INC.    )
d.b.a. CAPE AIR,           )
        Defendant.        )
                        )

DEPOSITION OF

STEPHEN G. PHILLIPS

HYANNIS, MASSACHUSETTS

MAY 18, 2007

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: Patricia Bracken, CSR No. 1455898

FILE NO.: A102879

1    A.  She was no longer demonstrating those.

2    Q.  Do you think she simply lacked them or

3 wasn't demonstrating them?

4    A.  I think she wasn't demonstrating them.  I

5 think she had the knowledge of what CRM was all

6 about and had the ability to demonstrate that, but

7 was not doing so.

8    Q.  By the time she had come to Cape Air in

9 September, Cape Air had no interest in keeping her

10 in the ART 42 anymore?

11    A.  September of what year?

12    Q.  September 2004.  By the time she's called

13 back to Hyannis, Cape Air has no interest in

14 keeping her in the ATR 42 plane?

15    A.  The plan at that point was to have her

16 fly the 402, yeah.

17    Q.  So are you agreeing with my statement or

18 no?

19    A.  Can you restate the exact wording?

20    MR. TORRES:  Could you repeat the question,

21 please?

22         (Question read back)

23    A.  I agree with that, except that it was for

24 a period of time.

25    Q.  And they weren't going to give her any --

186

1　　address it.　They were only concerned about ATR --
2　　about CRM, but not giving her any additional CRM
3　　training?
4　　　　　A.　No.　We were going to continue -- while
5　　she was in the 402, continue to address the skills
6　　necessary to participate in good CRM skills, yes.
7　　　　　Q.　What confuses me is you're saying I want
8　　you to do CRM.　I'm not going to put you in the
9　　ATR 42.　And in fact, you're going to do the CRM,
10　　and you're not even going to use it for the next 6
11　　months, correct?　Or initially for the next 18
12　　months?
13　　　　　A.　The plan was to have her fly the 402.
14　　She would remain employed and be in an environment
15　　where it was not necessary to the degree that it is
16　　necessary in the ATR until she could improve her
17　　interpersonal skills and demonstrate a willingness
18　　to improve in that area.
19　　　　　Q.　So did you believe that she had no
20　　willingness to improve in that area?
21　　　　　A.　At the time in Guam, yes.
22　　　　　Q.　And that's based upon your review or your
23　　conversation with Russell and review of letters?
24　　　　　A.　Conversations and review of letters, yes.
25　　　　　Q.　You talked about the headset, and that

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this ____7____ day of ____June____, 2007.

*Patricia Bracken*

Patricia Bracken, CSR No. 1455898

# EXHIBIT 22

September 9, 2004

      I have been asked too reflect and put in writing on my flying experience with Ms Nickelson.

The first day on the line was with D. O'Connor on the jump seat and Tiffany as my F.O. After I checked in, I believe it was right after the typhoon, an absolutely horrible day weather wise, I proceeded to my aircraft for the initial preflight.

I found T. in the aircraft and asked weather she had already done the outside walk around, to which she replied " yes, I did". The overnight-kit was still attached to the plane including all the covers from the static sources, gearpins etc. I brought this up and the response: "That's not my job, that is for maintenance to do". I proceeded to do it myself, and she came out and told me that she had already called maintenance for them to come over and take care of it. My response was, "I don't mind doing it, I will take care of it.

Had she discussed this with me first, the call (she made this without getting me involved) would not have been necessary.

      We proceeded with the originating checklist, during which I did not correctly executed one of the items required. She pointed this out by saying in a very unpleasant tone of voice "that is not valid, you have to do that again". I have no problem accepting criticism, it was the way this event was delivered, that actually set the tone of our working relationship for the rest of the day.

      Once inside, it was clear that we would not be able to depart on time because of the prevailing weather en route and at our destination. The crew arrived for the next airplane and the captain asked me whether they could use the GPU cart, which was still attached to our plane. As it was clear that we would not leave any time soon I replied " sure go ahead" . Tiffany was there and started arguing with the captain about him using the cart. I once again told the captain to just take it.

She went outside followed by the captain. What transpired out there, I cannot comment on, I was not there.

About 20 minutes later, the captain came back and told me that she was not giving up the cart. The captain and I, we both went to D'Oconnor and informed him about the current events.

      Flying with T. that day, although we only did one round trip was challenging. The weather was horrific, so time for anything else but full concentration on the task at hand, and is what we had. The communication in the cockpit is very demanding. Unfortunately, there is no spirit of team play, just an attitude of "you against me, and me against U atmosphere. She knows her flows and procedures inside out, God forbid if a response is not exactly as it is written. By itself, I have no problem with that, the response you get if the answer is not what she expects, that I do. The way she handles this, makes a very unpleasant working environment. It creates a lot of tension in the cockpit.

      On different occasions when asking for a checklist, it is ignored and the question has to be reposed. If asked to remove an overnight kit or writing the times in the logbook the response you get" it is not my job", or "I'll do it but you know I don't agree with it".

PLAINTIFF'S EXHIBIT 54

Regards ,

J Kappeyne van de Coppello

# EXHIBIT 23

1      IN THE DISTRICT COURT OF GUAM

# CERTIFIED COPY

2

3                                    C.A. No.: CV 06-0027

4                                        )
5   TIFFANY ANNE NICHOLSON,              )
             Plaintiff,                  )
6   vs.                                  )
                                         )
7   HYANNIS AIR SERVICE, INC.,           )
    d.b.a. CAPE AIR,                     )
8            Defendant.                  )
                                         )
9

10

11

12                  DEPOSITION OF

13                 DANIEL A. WOLF

14             HYANNIS, MASSACHUSETTS

15                 MAY 23, 2007

16

17

18  ATKINSON-BAKER, INC.
    COURT REPORTERS
19  (800) 288-3376
    www.depo.com
20

21  REPORTED BY:  Patricia Bracken, CSR No. 1455898

22

23

24

25  FILE NO.: A103990

1

1      on that panel spoke to those pilots prior to making

2      that decision is I don't know.

3            Q.  Okay.  Do you think if they're going to

4      use their letters in their evaluation and decision

5      making, they should have?  You know, that's a bit

6      speculative.

7            A.  Let me answer it.

8            Q.  If you want.

9            A.  Russell is a very experienced pilot, and

10     he is our regional administrator.  And if, from

11     their perspective, Russell's dialogue with these

12     pilots was sufficient as far as that pilot input in

13     addition to the letters, I would say it is not

14     necessarily the case that part of the process would

15     be for that panel to talk directly to those pilots.

16           Q.  Do you know whether the letters were

17     solicited by Russell or anybody else?

18           A.  I have no idea.

19           Q.  Russell also wrote a letter which was

20     submitted to the panel.  It is Exhibit 26 -- I'm

21     sorry.  It's Exhibit 24.

22           This morning, we did Larry Gaultieri's

23     deposition, and I asked him whether or not he had

24     talked to Russell about the content of the letter.

25     And his response was he thought so, but he couldn't

                                                      26

of policy?

    A.  I guess I could answer the question best by saying that there would be reasons to have that type of policy, and there are also reasons to not have that kind of policy.  In the past, as we've evaluated the pros and cons of that type of policy, we have believed that the ability for employees to experience and enjoy life in the company and outside the company is best to not have that type of policy.  Now, I am well aware that there are reasons why companies might choose to have that type of policy.  We have never made that choice however.

    Q.  When you say you're well aware that companies might have that kind of policy, if somebody is involved with management, and other people think they're getting preferential treatment or something of that nature, could that create morale problems?

    A.  Certainly there is a potential if relationships are allowed in the company that there can be allegations of that.

    Q.  After the action form -- and there was a revised action form on the 24th of September of 2004.  After that action form was issued, Tiffany

1  asked for a formal review as outlined in the

2  handbook. And in the prior testimony, we were told

3  that you were the person that conducted that

4  appellate review. Is that accurate?

5      A.  There was a review process that I was a

6  part of, yeah.

7      Q.  What was the process?

8      A.  The process was to -- for me to get

9  briefed by Linda Markham as to what had transpired

10 up until that point and to get as much information

11 from Linda as possible and to participate in

12 Tiffany's best interest, but also consistent with

13 the observations and decisions made of our flight

14 management and flight training department, a

15 resolution which would allow Tiffany to stay with

16 the company and potentially train and get back into

17 the ATR, but also not sort of inflict my opinion or

18 overrule the decisions made by the flight

19 management department.

20     In fact, I was trying to find a compromise

21 that would both satisfy the decisions that had been

22 made by the flight management department, but also

23 try to keep Tiffany employed and engaged.

24     Q.  Well, under the action form -- and here's

25 the revised action form for your review. Under the

1    revised action form, she was not going to be able
2    to fly the ATR 42 for at least six months, and I
3    believe her testimony was that she saw that as a
4    demotion she didn't want to have.  Do you see that
5    as a demotion?
6         A.   No, I did not see it as a demotion.
7         Q.   Did she express to you her thoughts in
8    that regard?
9         A.   I don't remember.
10        Q.   And if somebody has aspirations -- and
11   again, I'll refer to the testimony previously from
12   Phil Dery -- and if you want to move on to other
13   aircraft, bigger aircraft, you have to have so many
14   minimum hours in turbine flying or other kinds of
15   flying just to be an applicant.  Is that your
16   experience?
17        A.   Yes.
18        Q.   This morning we did the deposition of
19   Larry Gaultieri, and I asked him why not just allow
20   her to go through this training and then get back
21   into the ATR 42.  Why impose a six-month ban?  Do
22   you know why the six-month ban was imposed?
23        A.   I don't.
24        Q.   In the initial action form, she was
25   precluded from going to fly at all in Guam.  Do you

1   know why they wanted to keep her out of Guam?

2       A.   I don't know that, no.

3       Q.   Russell Price is no longer with the

4   company.  Do you know what he's doing these days?

5       A.   I believe Russell took a job flying in

6   Ireland.

7       Q.   Do you know the airline?

8       A.   I don't.

9       Q.   And as I understand it, he's on a leave

10  of absence for a year which would expire in

11  November.  If he wants to come back, he has a

12  complete right to come back, right?

13      A.   He has the right to come back as a flight

14  crew member, not in a management position.  So if

15  you're on our seniority list, which Russell is, the

16  leave of absence applied to our seniority list as a

17  crew member, not into the management position.  So

18  he does not have the right to come back as a

19  manager.

20      Q.   You talked about that you wanted to

21  see -- as part of this independent review, you

22  wanted to see if you could find a way to address

23  Cape Air's concerns, Tiffany's concerns, and keep

24  it together?

25      A.   Yes.

# REPORTER'S CERTIFICATE

I, PATRICIA BRACKEN, CSR No. 1455898, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Massachusetts that the foregoing is true and correct.

Dated this _13th_ day of _June_, 2007.

_Patricia Bracken_

Patricia Bracken, CSR No. 1455898

# CERTIFICATE OF SERVICE

The undersigned certifies that on this date I caused to be served, via hand delivery, a file-stamped copy of Plaintiff's Motion for Leave to file Sur-Reply in Support of Her Opposition to Defendant's Motion for Summary Judgment, on:

> Elyze J.T. McDonald, Esq.
> Carlsmith Ball
> Suite 401
> Bank of Hawaii Building
> Hagåtña, Guam 96910

DATED at Hagåtña, Guam, on February 22, 2008.

**PHILLIP TØRRES**

H:\COMMON\USERS\#PLEADINGS\NICHOLSON, TIFFANY\066 SUR REPLY.wpd