DISTRICT COURT OF GUAM

TERRITORY OF GUAM

TIFFANY ANNE NICHOLSON,

    Plaintiffs,

vs.

HYANNIS AIR SERVICE, INC.
d.b.a. CAPE AIR,

    Defendant.

Civil Case No. 06-00027

**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On March 25, 2008, this matter came before the court for a hearing on the Defendant, Hyannis Air Service, Inc.'s Motion for Summary Judgment. The Defendant argued that the Plaintiff Tiffany Anne Nicholson had failed to offer a prima facie case based on sex discrimination under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-5(f)(1). Having considered the parties' arguments and submissions, as well as relevant caselaw and authority, the court hereby **GRANTS** the Defendant's motion and issues the following decision.

### BACKGROUND

On September 28, 2006, this action was instituted by the Plaintiff pursuant to Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. § 2003, *et. seq.* The complaint alleges that while she was employed with Hyannis Air Service, Inc., d.b.a. Cape Air ("Cape Air") she was subjected to sex discrimination. Cape Air is a small regional airline based in Hyannis, Massachusetts. *See* Docket No. 39, Motion, Ex. M at 177:4-9. In 2000, the Plaintiff began her employment with Cape Air. At that time she was based out of Cape Air's Hyannis and Florida operations flying a Cessna 402.

In 2004, Cape Air began its operations in Micronesia at an expense of more than $3 million. *See* Docket No. 39, Motion, Ex. S at 69:7-12. The Plaintiff was selected to be one of eight pilots (four captains and four first officers) to staff Cape Air's Micronesia flight operations. *Id.,* Ex. A at 74:1-3. The pilots were selected based on seniority, regardless of gender. *Id.,* Ex. A at 72:24 - 73:2; Ex. P at 17:3-9, 108:24-109:4. Each of the eight pilots were trained at a cost of $25,000 to $30,000. *Id.,* Ex. O at 177:16-23, 178:8-13. After the pilots' training concluded, in June 2004 the Plaintiff was transferred to Guam and began working as a Captain and First Officer. Compl. at ¶ 10.

The Micronesia routes utilized an ATR42 aircraft, which is a larger aircraft than the Cessna 402, which Cape Air utilizes in its other routes. As noted prior to being transferred to Guam, the Plaintiff flew the Cessna aircraft. The Cessna is a single pilot aircraft whereas the ATR42 requires a flightdeck of two, a Captain and First Officer. Because there are two pilots on deck, cooperation is essential. In the industry, such cooperation is referred to as Crew Resource Management ("CRM"). CRM requires flight crews to set aside any personal differences they may have and likewise requires each crew person to have a cooperative personality and team approach to the complicated task of flying the aircraft. *See* Docket No. 39, Motion , Ex. P at 112:6-18; Ex. R at 43:5-44:20, 45:4-10. CRM is critical to safe flying and is recognized across the aviation industry. *Id.,* Ex R at 48:1-5. According to fellow pilot David O'Connor "[t]here's still accidents occurring because captains refuse to take input from first officers and also accidents where first officers sort of mentally take over the cockpit and direct the flight."[1] *Id.,* Ex. O at 145:6-10. During ground school and initial training on the ATR42, the Plaintiff proved to be a competent pilot with acceptable CRM skills. *Id.,* Ex. O at 12:7; Ex. P at 10:10-15.

However, once the actual flights began, the Plaintiff experienced problems with her co-pilots. *See* Docket No. 39, Motion , Ex. R at 76:20-25. Her CRM skills were deemed insufficient and additional training was found necessary. Cape Air's then Pacific Regional Administrator, Russell Price, flew to Guam and tried to provide the Plaintiff further opportunities to correct and improve her cockpit communication skills. Mr. Price had been impressed with the Plaintiff's performance at ground school and had wanted to see her succeed. Mr. Price assessed the Plaintiff

---

[1] Mr. O'Connor was the Director of Training. He provided the ground training for the eight pilots in Hyannis, Massachusetts, the simulator training Houston, Texas and the training for the actual flying of the aircrafts in Guam. *See* Docket No. 39, Motion, Ex. O at 11:24-12:1.

as having "[b]etter-than-average textbook knowledge, slightly below average stick-and-rudder skills, and on the poorest edge of acceptability CRM." *Id*., at 73:24-74:5. Mr. Price developed a four-day training plan, each day allowing a Plaintiff an opportunity to improve her CRM skills. However, those training opportunities did not go well.

For example, Mr. Price thought it would be beneficial for the Plaintiff to observe the CRM skills exhibited by fellow pilots Kevin O'Connor and Phil Derry as they flew the ATR42 on a flight. *See* Docket No. 39, Motion , Ex. K at 112:24-113:5, 169:5-7; Ex. O at 38:12-13. On this training day, the Plaintiff failed to take advantage of the opportunity to "learn by watching." Rather than observing in the cockpit, she sat in the first row of the aircraft during the critical final preflight preparation. *Id.,* Ex. R at 96:1-22. Upon arriving on the aircraft, Mr. Price found her asleep in the passenger cabin and asked her why she was not in the cockpit. *Id.* She responded that she did not want to get in the way. *Id.* She then left early for the day, observing only one round trip for the entire day though she could have observed four trips.

On another training day, the Plaintiff was tasked to fly with fellow pilot and Captain John Kappeyne. *Id.*, Ex. K at 173:20-22. She arrived to work without a required headset[2] and was sent to retrieve a replacement headset, which resulted in her missing part of the flying day. *Id.,* at Ex. K at 173:23-175:0. The remaining days of the additional training were also marked by poor CRM. On the next day, after the flight with Captain Kappeyne, the Plaintiff was told she was insubordinate after refusing to shut an engine down at the captain's command. *Id.,* at 125:20-126:17. She used negative sarcasm during the flight. Ex. R at 111:5-21. On the third day, Mr. Price set up a flight between the Plaintiff and Captain Chuck White, on the same route that Captain White had previously removed her. During that flight, Mr. Price perceived the Plaintiff's attitude to be "defensive, antiauthoritarian, ego-driven." *Id.,* at 119:22-25. Mr. Price believed her attitude made the flight one of his "top ten scary and dangerous flights" with a total breakdown of CRM. *Id.,* at 114:13-15. Apparently the flight started off with an operational error on the Plaintiff's part, which caused the Plaintiff and Captain White to argue, and ended with Mr. Price removing her from flying for the rest of the day and taking over her flight duties. *Id.*, at 118:4-121:22.

---

[2] A headset is required and a mandatory part of the Cape Air's uniform for pilots. *See* Docket No. 39, Motion , Ex. R at 107:3-7.

Thereafter, Mr. Price contacted his headquarters. Management at Cape Air's home base in Hyannis, Massachusetts reviewed reports by Mr. Price, other pilots and spoke to the Plaintiff about the problems. There seemed to be a consensus that the Plaintiff's attitude and manner made her incompetent to fly. Accordingly, disciplinary actions were deemed necessary;[3] however, rather than terminate her, Cape Air offered an action plan that would allow the Plaintiff to keep her job. Management required the following: (1) a mandatory referral to Cape Air's Employee Assistance Program ("EAP") to receive counseling in communication and interpersonal skills, and suspension until EAP was completed successfully; (2) attending CRM training conducted by FlightSafety, a third-party flight instruction company: (3) removal from flight status as an ATR42 crewmember, which may be revised within six months; (4) potential reinstatement as a C-402 Captain including the Pacific Region; (5) probation for six months; and (6) potential termination should she be unable to maintain a positive attitude in the work environment based on teamwork, or inability to fulfill the duties and responsibilities of a flight crewmember. *See* Docket No. 39, Motion, Ex. G.

The Plaintiff appealed the proposed action plan. Daniel A. Wolf, President and CEO of Cape Air, conducted the review of the proposed action plan, and with the assistance of Linda Markham, Vice-President of Human Resources, upheld the action plan. *See* Docket No. 39, Motion, Ex. S at 6:6-11. The Plaintiff did not accept that decision and thereafter failed to report back to work. *Id.,* at Ex. N at 62:5-8. Accordingly, Cape Air concluded that the Plaintiff had abandoned her work at Cape Air. *See* Docket No. 55, Declaration of Linda Markham, at p. 6.

## DISCUSSION

The Defendant now moves this court to grant it summary judgment. Summary judgment is appropriate when the evidence, read in the light most favorable to the nonmoving party,

---

[3]The basis for the Plaintiff's discipline was:

> Unable to interact and communicate effectively in a flightcrew environment. Failed to assist the captain in the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM [General Operating Manual]. Uncooperative attitude and inconsistent CRM skills created unsafe operative conditions in the cockpit.

*See* Docket No. 39, Docket No. 39, Motion, Ex. G.

Page 4

Case 1:06-cv-00027    Document 61    Filed 03/27/2008    Page 4 of 11

demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party opposing summary judgment cannot rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial. *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988). Moreover, to defeat a summary judgment motion, the nonmoving party must come forward with evidence sufficient to establish the existence of any disputed element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The court must draw inferences from the evidence in a light most favorable to the nonmovant, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment should not be granted if the evidence indicates that a reasonable fact-finder could find in favor of the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

Under a Title VII claim, the appellant must carry the burden under the statute of establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff alleging discrimination under Title VII may proceed under two theories of liability: disparate treatment or disparate impact. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1987).

To establish a prima facie case of disparate treatment the Plaintiff needs to provide evidence that suggests that the employment decision was based on an impermissible criterion such as race, color, religion, sex or national origin. *Diaz v. Am. Tel & Tel.*, 752 F.2d 1356, 1361 (9th Cir. 1985).

To make out a prima facie case of disparate impact, the Plaintiff must identify a neutral practice or policy that has a significantly adverse impact on persons of a protected class. *Conn. v. Teal*, 457 U.S. 440, 446 (1981). Under the disparate treatment theory, proof of discriminatory intent is required, whereas intent is irrelevant to a disparate impact theory. *Watson,* 487 U.S. at 988.

### A. PRIMA FACIE CASE

In this instance, the Plaintiff is proceeding on a disparate treatment theory. She will thus need to show that: 1) she belongs to a protected class; 2) that she was qualified for the position; 3) that she was subject to an adverse action; and 4) that other similarly situated individuals outside the protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 41 U.S. 792, 802 (1973); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.,* 225 F.3d 1115, 1123 (9th Cir. 2000).

The Plaintiff satisfies the first prong of the *McDonnell* test, as she is a member of a protected class because she is a woman. 41 U.S. at 802. As to the second prong, there is some question as to whether she was qualified for the position. While the Plaintiff claims that she was more than competent, the evidence presented indicates that she was not qualified to fly the ATR42 for Cape Air.

Each of her superiors testified that she was not qualified to fly the ATR42 because of her deficient CRM skills. *See* Docket No. 39, Motion, Ex. P at 175:22-23; Ex. O at 122:19-25. Adequate CRM skills are essential for a pilot, particularly for the pilot of a passenger aircraft where passengers' lives are at stake. The Plaintiff did not fulfill the duties of a First Officer under the General Operating Manual, particularly the duties to assist the captain in an efficient manner, preparing all required forms, maintaining a high degree of crew coordination and cockpit discipline, and performing other duties required by the captain. Instead, the Plaintiff acted in an insubordinate manner. She was removed from flying for insubordination, on August 31, 2004 by Captain Chuck White. *See* Docket No. 39, Motion, Ex. C.

Captain White's removal of the Plaintiff from the flight was discussed among Mr. Price, in his capacity as Pacific Regional Administrative, Steve Phillips, Cape Air's Chief Pilot and David O'Connor, Cape Air's Director of Training. *See* Docket No. 39, Motion, Ex. O at 29:7-10. Captain White found it impossible to work with the Plaintiff because of her behavior. *Id.* at 29:11-

20. Mr. Price and Messrs. Phillips and O'Connor, in their review and own personal experiences with the Plaintiff determined that the Plaintiff displayed poor CRM thereby creating an unsafe flying environment and posing a risk to the passengers, crew and aircraft. *Id.,* Ex. P at 41:7-17.

Captain O'Connor remarked that the Plaintiff had a "fault-finding mentality and an inability to both accept constructive criticism and to hear suggestions from crew members." *See* Docket No. 39, Motion, Ex. O at 130:3-130:5.

> A. And I found that when Tiffany was acting as the captain, she could be domineering to the point of stifling input from the first officer. And when she was a first officer, she could be fault finding to the point where she was advising the cockpit.
>
> Q. You said that both situations are dangerous. Could you describe how.
>
> A. Sure. In the 1970's there was a famous accident in Tenerife where a captain who wouldn't listen to his flight engineer and his co-pilot for KLM initiated a takeoff in fog despite the fact that Pan Am was still on the runway, and they crashed into one another. The co-pilot and the flight engineer on the KLM flight both knew that something wasn't right, but were unable to get through to the captain.
>
> There have been other accidents in the regional airline industries especially where a weak captain is dominated by a first officer who is attempting to usurp the authority of the captain. And where the captain is not in charge, then the state of the cockpit degenerates to the point where both controlled flight into terrain where they both lost situational awareness, and they ended up flying into the side of a hill.
>
> In both those scenarios, there was either an overly domineering captain or a domineering co-pilot, and it can be quite dangerous.
>
> Q. Okay. And your experience
>
> A. That is correct.

Id., Ex. O at 145:11-146:17.

The Plaintiff herself, admits in a letter to Cape Air, that her CRM skills were lacking and that further CRM skills training would address her "problem." *See* Docket No. 39, Motion, Ex. J. It seems clear from the evidence submitted that the Plaintiff was not qualified because of her deficient CRM skills.

The third prong concerns whether the Plaintiff was subject to an adverse employment action. The Ninth Circuit has held that "not every employment decision amounts to an adverse

employment action," explaining that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations" are actionable. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir.2000). Termination, negative employment references, undeserved negative performance reviews, and denial of promotions qualify as adverse employment actions. *Id.*, *see Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir.2002) (average or mediocre performance ratings failed to make out a prima facie case for retaliation). In contrast, "mere inconveniences or an alteration of job responsibilities do not qualify." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998); *Kortan v. State of Cal.*, 5 F.Supp.2d 843, 853 (C.D.Cal. 1998) (neither verbal disparagement, low performance rating, denial of request for change of supervisor, nor denial of transfer amount to an adverse action.) Likewise, paid administrative leave does not constitute an adverse employment action. *See Green v. Safeway Stores*, 1998 WL 898366 (N.D.Cal. 1998); *Sharp v. Am. Tel. & Tel. Co.*, 2000 WL 970665 (N.D.Cal. 2000) (held no adverse action when Plaintiff placed on leave with full pay because no evidence of any loss in wages or benefits.).

Construing the facts in the Plaintiff's favor, as the court must do at this stage of the proceedings, Cape Air's reassignment of the Plaintiff's flying duties likely constitutes an adverse employment action because the change would have been a "material adverse change in the terms and conditions of her employment." *See Torres v. Pisano*, 116 F.3d 625, 640 (2nd Cir.1997) (an adverse employment action involves a "materially adverse change in the terms and conditions of employment") (citation omitted); *St. John v. Employment Dev. Dep't.*, 642 F.2d 273, 274 (9th Cir. 1981) (a transfer to another job of the same pay and status may constitute an adverse employment action.).

However, the court does not find that the Plaintiff satisfies the fourth prong of the *McDonnell* test. To be similarly situated, the Plaintiff must show that another individual had a similar job and displayed similar conduct of comparable seriousness. *Vaques v. County of Los Angeles*, 359 F.3d 634, 641 (9th Cir. 2004). She has failed to present any such evidence. Although there are other employees who held the same level position as the Plaintiff, no other employee "engaged in problematic conduct of comparable seriousness to that of [the plaintiff]." *Id.* at 641.

While other pilots had initial unsatisfactory check rides in a simulator, and were given additional training, no other pilot was recognized for having CRM problems. *See* Docket No. 39, Motion, Ex. O at 17:2-5, 21:3-13; Ex. P at 26:7-13. The pilots who received additional training "were on a scale of operating the aircraft and performance on the check ride. Tiffany's was more towards having the proper attitude to communicate well and help in good crew resources management. And so that was little different than the technical skills that were knowledge of flying the airplane." *Id.*, Ex P at 141:24-142:9.

The Plaintiff claims that there were similarly situated pilots because there were pilots who had challenges with their technical piloting skills that required additional retraining. Therefore, she argues that her CRM deficiencies and the piloting deficiencies are a distinction without a difference. However, there does indeed seem to be a difference. One can be retrained and refine their piloting skills; however, if personality is an issue, the CRM skills, if not improved upon, may continue to pose a real risk of safety.

The Plaintiff is tasked with showing there were male pilots engaged in comparable conduct, specifically, deficient and unsafe CRM skills, and then were subjected to a different form of discipline. Here, no evidence was presented to indicate such a situation. None of the remaining seven male pilots she worked with failed at CRM. No other pilot needed a third round of training like the Plaintiff. Quite simply, there is no other employee to compare to the Plaintiff.

Moreover, even if the court was to find that the Plaintiff was similarly situated to her co-employees, she was certainly not treated differently. Under Cape Air's procedures, if a pilot fails a test, he or she is given another opportunity to pass. *See* Docket No. 39, Motion, Ex. O at 14:12-15. If they fail a further test, then they undergo a review to determine if there will be a further opportunity for training. No other person had failed at a second round of training. *Id.*, at 183:25-185:2. The offer of subsequent training to the Plaintiff was no different treatment than that offered her counterparts. She did not take advantage of the second round of training and was offered a third round which she declined. The court finds that the Plaintiff has not established a prima facie case.

### B. PRETEXT

Assuming that the Plaintiff establishes a prima facie case, the burden shifts to the employer

to articulate a legitimate non-discriminatory reason for the adverse action. *Chuang,* 225 F.3d at 1123. The burden then shifts back to the Plaintiff to demonstrate that the asserted reason was a pretext for retaliation. *Id.* "The issue is not 'the correctness of desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reason it offers." *Fishback v. D.C. Dep't. of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996). The Defendant claims that the discipline meted out to the Plaintiff was necessary because she was considered unsafe to fly and the safety of crew and passengers were placed at risk. Accordingly there were legitimate, non-discriminatory business reasons for the Defendant's actions.

The depositions of the chief pilot, Steve Phillips, director of training, David O'Connor, and Regional Administrator for Cape Air, Russell Price, each mentioned personal experiences flying with the Plaintiff and observation of her inadequate and unsafe CRM skills. *See* Docket No. 39, Motion, Exs. P, O, R.

Because the Defendant has articulated a non-discriminatory, legitimate business reason for the Plaintiff's discipline, the Plaintiff must put forward direct evidence showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence. *Vasquez*, 349 F.3d at 641. The Defendant claims that there is no such evidence. "Even a reasoned decision based on incorrect facts is not evidence of pretext." *Pollard v. Rea Magnet Wire Co.,* 824 F.3d 557, 559 (7th Cir. 1987). Cape Air decision's was based upon what it believed at the time, and what it's key personnel had observed as to the Plaintiff's attitude and behaviors. There was no intent to terminate her, she was offered an opportunity to receive additional training and maintain her employment. Mr. Wolf stated that he "would have done everything [he] could have done relative to the process to see that Tiffany got back into the ATR." *See* Docket No. 39, Motion, Ex. S at 66:7-9. She chose not to avail herself of that opportunity.

The Plaintiff claims that she was the only female out of the eight pilots. However, she does not show any connection between being a female and any discrimination. The Plaintiff also mentions that Chuck White did not want to work with her because they had had a past personal relationship. However, a past relationship is not the same as showing Chuck White did not want to work with her because she was a female. She also states that there were rumors of her having

an affair with Russell Price. However, for the Plaintiff to show that the disciplinary action was a pretext on this basis, the Plaintiff would have to show she was singled out for such comments because of her gender. *See Pasqua v. Metro Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) (employee failed to show that alleged sexual harassment arising out of rumors of his illicit relationship with one of his subordinates was based on his gender). There is no indication that the rumors were created because of her gender. The Plaintiff also suggests that several of her co-pilots were "solicited" to write letters concerning her lack of CRM skills. However, even if they were asked to write letters for the company as to their experiences with the Plaintiff, there is nothing to suggest that doing so was a pretext for discrimination.

The Plaintiff also claims that the Defendant failed to investigate the allegations against her, confront her with the allegations and give her an opportunity to defend herself. However, there is no showing that there were any "irregular" procedural steps in the grievance process.

In sum, there is no genuine issue of any material fact in this case. The Plaintiff cannot make out a prima facie case of discrimination; she seemingly was neither qualified for her job nor was she treated differently from the male pilots. In fact, there appears to have been considerable efforts expended by Cape Air in trying to retrain her, but they proved unsuccessful. Additionally, the Defendant has presented a legitimate, non-discriminatory basis for its discipline of the Plaintiff, namely her substandard CRM skills which presented a danger to crew and passengers. Accordingly, summary judgment is warranted under the set of facts as presented.

## CONCLUSION

For the foregoing reasons, the court finds that the Plaintiff has neither established a prima facie case of sex discrimination nor shown that any of the actions taken by Cape Air were pretexts for discrimination. Accordingly, the Defendant's Motion for Summary Judgment is hereby **GRANTED**.

**SO ORDERED**.



/s/ Frances M. Tydingco-Gatewood
    Chief Judge
Dated: Mar 27, 2008